UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

LAZARE KAPLAN INTERNATIONAL INC.,                   :        Civil Action No. 11 Civ. 9490-ALC
                                                                            :
                              Plaintiff,                                  :
                                                                            :
            - against -                                                  :
                                                                            :
KBC BANK N.V. and ANTWERP DIAMOND BANK   :
N.V.,                                                                      :
                                                                            :
                              Defendants.                             :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

STATE OF NEW YORK          )
                                           ) ss.:
COUNTY OF NEW YORK     )

          WILLIAM H. MORYTO, being duly sworn, deposes and says:

### Introduction

1.          I am the Chief Financial Officer ("CFO") and a Vice President of Plaintiff
Lazare Kaplan International Inc. ("Lazare"), and have been employed in that position since May
15, 2000.  In my capacity as CFO of Lazare, I am responsible for negotiating and administering
the various revolving credit facilities and bank accounts that Lazare maintains or has maintained
with its different lenders, including with Defendants KBC Bank N.V. ("KBC") and Antwerp
Diamond Bank N.V. ("ADB"), as well as with Bank Leumi USA ("Leumi") and ABN-AMRO
N.V. ("ABN-AMRO").  Lazare used its revolving credit facilities to provide liquidity for its day-
to-day operations.  I have personal knowledge of the facts set forth herein.

2.          I submit this sworn Declaration in opposition to the pre-answer motions to
dismiss the Complaint filed by Defendants.

3.          Defendants' motions are based entirely on a factually erroneous and
misleading description of the banking and credit relationships that existed between Defendants

1

and Lazare, and the documents governing those relationships. As I explain below and as the KBC and ADB documents annexed as exhibits hereto demonstrate, ADB's New York representative office ("ADB-NY") provided loans to Lazare, during the entire period referenced in the complaint, under an unsecured revolving credit facility (the "Lazare Credit Facility"), but did not provide any other banking services to Lazare. Indeed, Lazare did not even have a bank account at Defendant ADB during this time period. Instead, ADB-NY required Lazare to set up a banking relationship with and open a bank account at KBC's New York Branch ("KBC-NY") at 125 West 55th Street and later 1177 Avenue of the Americas, New York, New York. In doing so, ADB required that this bank account (the "KBC-NY Bank Account") be the **exclusive** account through which Lazare and Defendants funded, operated, administered and accepted repayments of the Lazare Credit Facility. The KBC-NY Bank Account remains open to this day.

4.      The Lazare Credit Facility was linked to the KBC-NY Bank Account through an agreement with Lazare that expressly required all payments and disbursements under the Lazare Credit Facility to be effected through the KBC-NY Bank Account, **and all disputes to be litigated under New York law and in New York courts**. Thus, as shown below, substantially **all** of the funding that Lazare used to finance Informal Sector diamond operations, including specifically all of the purchases of the Informal Sector diamonds described in the Complaint that were stolen from Lazare by Defendants, emanated from the KBC-NY Bank Account. The KBC-NY Bank Account was an operating bank account. KBC-NY did not merely clear funds as Defendants would have the Court believe. KBC-NY acted as a full-service, primary banker to Lazare. Contrary to the statements in Defendants' motion papers, and as the documents annexed hereto as exhibits demonstrate, the Lazare Credit Facility and the KBC-NY Bank Account were set up, funded, administered and operated in New York pursuant

2

to agreements made and signed in New York. That is why the KBC-NY Bank Account documents contain an express choice of New York law and New York forum selection provision, and why Lazare clearly understood and intended that any litigation between the parties would be resolved under New York law in the New York courts.

5.    Incredibly, Defendants do not even mention Lazare's KBC-NY Bank Account or any of the operative documents pertaining to that bank account in their motion papers. Quite the opposite, Defendants appear to be trying to affirmatively conceal the existence of that bank account and the documents underlying it from the Court. For example, in their motion papers, Defendants repeatedly (and improperly) conflate a secured credit facility in Belgium between Lazare's Belgian subsidiary, Lazare Kaplan Belgium N.V. ("LKB"), and ADB with Lazare's unsecured Lazare Credit Facility in New York, in an apparent attempt to make it appear to the Court that the Lazare Credit Facility is connected to Belgium and linked to a bank account at ADB. Defendants even go so far as to annex as exhibits to their papers copies of a bank account opening document (Exhibit "B" to the Declaration of ADB's counsel, Cynthia Okrent dated April 6, 2012 ("Okrent Decl.")) pertaining to LKB's bank account at ADB in Belgium as if to suggest that this account somehow belongs to Lazare, which it does not.

6.    Defendants further construct arguments and appear to reference case law involving banks that function solely as clearing banks for dollar denominated transactions when Defendants know full well (despite their failure to inform the Court) that KBC-NY did not simply act as a clearing bank. KBC-NY was a primary banker to Lazare and in that capacity executed and had intimate knowledge of the banking transactions at issue in the Complaint.

7.    But unlike its Belgian subsidiary LKB, Lazare does not have a bank account at ADB; rather, it has a bank account at KBC-NY that is subject to a New York choice

3

of law and New York forum selection clause. That KBC-NY Bank Account was essential to the Illegal Scheme described in the Complaint to steal and divert the diamonds and sales proceeds belonging to Lazare and its affiliates; many of those diamonds were purchased or financed with funds from the KBC-NY Bank Account, and the sales proceeds pertaining to those diamonds were wrongfully diverted by Defendants away from Lazare's KBC-NY Bank Account where they should have been applied to pay down Lazare's debts under the Lazare Credit Facility.

8.     For the Court's convenience, I have annexed as exhibits to this Declaration the relevant documents pertaining to the Lazare Credit Facility and the corresponding KBC-NY Bank Account that clearly reflect the parties' agreement and intention that disputes between them are to be resolved under New York law in the New York courts.[1]  I have also annexed examples of the various bank forms and statements that were used to operate the Lazare Credit Facility and the KBC-NY Bank Account. These examples show that in 2008 alone, KBC-NY wire transferred **$63,375,419.13** out of the KBC-NY Bank Account in connection with Lazare's purchase or financing of Angolan rough diamond buying operations, including all of the stolen Informal Sector diamonds described in the Complaint. They further provide evidence of the extent to which both KBC and ADB were directly involved in and aware of Lazare's purchase or financing of the diamonds that were stolen, and were directly involved in the diversion and theft of the sales proceeds of those diamonds.

---

[1] Annexed as Exhibits "A," "B" and "C," respectively, are true and correct copies of ADB's confirmation letter dated February 20, 2008 (the "ADB Loan Agreement"), and the General Credit Granting Conditions ("ADB Credit Conditions") and General Conditions for Banking Operations ("ADB Banking Conditions") referenced in the ADB Loan Agreement. Annexed hereto as Exhibits "D," "E" and "F" are true and correct copies of the various documents pursuant to which the KBC-NY Bank Account was opened. Annexed hereto as Exhibits "G," "H," "I," "J" and "K" are true and correct copies of the bank documents that Defendants issued in the course of operating the Lazare Credit Facility and the KBC-NY Bank Account.

## The Manner in Which the Lazare Credit Facility Was Operated

9.      On behalf of Lazare, I was responsible for setting up the Lazare Credit Facility with ADB-NY in its current form, increasing the amount of the Facility to $45 million, obtaining renewals and modifications of the Lazare Credit Facility, negotiating applicable interest rates, borrowing money under the Lazare Credit Facility, providing monthly financial information to ADB and KBC about Lazare's business operations, and arranging for periodic repayment of the Lazare Credit Facility in New York.

10.     I was similarly responsible for setting up Lazare's KBC-NY Bank Account for the Lazare Credit Facility, entering into agreements with KBC-NY and ADB-NY regarding that bank account, providing KBC-NY with regular draw down requests and funds for repayments under the Lazare Credit Facility and other bank documents related to the operations of the KBC-NY Bank Account, and ensuring the proper review of the bank statements and other information that Lazare received from KBC-NY in regard to the KBC-NY Bank Account and the Lazare Credit Facility.[2]

11.     On multiple occasions between 2000 and 2009, I personally met and corresponded in New York City with ADB bank officers Philippe Loral, Marc Weiss, Peter Driesen, Andrew Rogow and Oakley Champine and KBC bank officers Maaike Maeckelbergh, William Cavanaugh, Patrick Daems, Gregory T. Boston and Oliver Smekens, among others, to discuss the Lazare Credit Facility and the related KBC banking operations for the Lazare Credit Facility.

---

[2] After reviewing KBC's submission in which KBC claimed that it had no connection to the Lazare Credit Facility and that Belgian courts should have exclusive jurisdiction over Lazare's claims against KBC, I was certain that KBC's interpretation was wrong as it was completely incompatible with my understanding of Lazare's relationship with KBC. As a result, I searched for and found files relating to Lazare's relationship with KBC in New York and located the KBC Banking Conditions. The KBC Banking Conditions confirmed what I had understood to be true -- that I had set up the Lazare Credit Facility (including the operating account relating thereto, i.e., the KBC-NY Bank Account) to be governed under New York law and to require that disputes be resolved in the New York courts.

12.    I also oversaw the revolving lines of credit and banking relationships that Lazare had with ABN-AMRO and Leumi during this same time period.[3]  Just as with ADB, the revolving lines of credit that Lazare maintained with its other lenders were all unsecured.

13.    On May 31, 2001, at Defendants' direction, Lazare opened Lazare's KBC-NY Bank Account at KBC-NY.

14.    Simultaneously, on May 31, 2001, Defendants required that Lazare agree and confirm in writing that all payments and disbursements under the Lazare Credit Facility would be effected through Lazare's KBC-NY Bank Account, and that ADB and KBC would be permitted to exchange with each other all credit, financial and other information concerning Lazare (the "ADB/KBC Agreement").  A true and correct copy of the ADB/KBC Agreement, dated May 31, 2001, which was prepared by ADB for my signature and which I executed and returned to ADB-NY, is attached hereto as Exhibit "D."

15.    The ADB/KBC Agreement directly links and ties the Lazare Credit Facility to Lazare's KBC-NY Bank Account, as follows:

> We hereby agree that **all** disbursements and payments **under our credit facility** with Antwerpse Diamantbank N.V. **shall be effected through our account with KBC Bank N.V. - New York Branch** and shall result in a same day debit or credit to our loan balance with Antwerpse Diamantbank N.V.  It is understood and agreed that KBC Bank N.V. and Antwerpse Diamantbank N.V. may fully exchange all credit, financial and any other information concerning our company and our accounts. (Emphasis added).

---

[3] I am also a director of Lazare's Belgian subsidiary, LKB, and from 2000 to 2010 oversaw the secured credit facility that LKB had with ADB in Belgium during that time.  Unlike the Lazare Credit Facility, which was entirely a working capital line, LKB only borrowed against specific individual invoices.  Unlike the bank documents pertaining to the Lazare Credit Facility, which are exclusively provided and executed in English, all legally binding bank documents pertaining to LKB's Belgian loan from ADB are provided and executed in Flemish with only a nonbinding "Free Translation" provided in English.

16.    In connection with the opening of Lazare's KBC-NY Bank Account for the Lazare Credit Facility, Defendants required Lazare to sign another document entitled "Account Agreement and General Terms and Conditions" (hereinafter the "KBC Banking Conditions") and to provide certain account-related documentation.    The KBC Banking Conditions provide that Lazare's KBC-NY Bank Account and all agreements between Lazare and KBC relating to that bank account or disputes arising thereunder **are expressly subject to exclusive jurisdiction in the courts of the County of New York or the federal courts situated in the Southern District of New York.** Annexed hereto as Exhibit "E" is a true and correct copy of the KBC Banking Conditions, together with a cover letter from KBC-NY bank officer Maaike Maeckelbergh to me enclosing copies of the KBC Banking Conditions.

17.    Paragraph 35 of the KBC Banking Conditions (Exhibit "E") provides, in relevant part, as follows:

> This Agreement, and all other agreements you have with KBC Bank relating to your accounts, shall be governed by, and construed in accordance with the laws and regulations of New York State and the United States of America.  **Any claim or action you bring must be brought before the courts of the County of New York, State of New York, or the Federal Courts situated in the Southern District of New York, which you agree shall have exclusive jurisdiction over these Terms and Conditions or any other agreements you have with KBC Bank relating to any accounts or disputes arising thereunder.**
> (Emphasis added)

18.    Annexed hereto as Exhibit "F" are true and correct copies of the signature cards and other account documentation that Lazare provided to KBC-NY between December 1, 2000 and May 31, 2001 in connection with the opening of Lazare's KBC-NY Bank Account.

19.    The KBC-NY Bank Account was one of Lazare's primary operating bank accounts used to receive deposits and make distributions to third parties.  As such, KBC: (a)

provided full-fledged banking services to Lazare in New York; (b) saw and executed all cash movements through this account (not merely monies going to and coming from the Lazare Credit Facility); and (c) was subject to applicable anti-money laundering and know your customer obligations.

20.    In 2008 alone, deposits into the KBC-NY Bank Account from third parties were approximately $178.5 million, and disbursements to third parties were approximately $178.2 million. The KBC-NY Bank Account was a zero balance account, meaning that the account contains only enough funds to cover disbursements or payments from the account, and is restored to a zero balance at the end of each day. True and correct copies of the 2008 bank statements sent by KBC-NY to Lazare relating to Lazare's KBC-NY Bank Account are annexed as Exhibit "G."

21.    The representation in ADB's papers that ADB did not make loans in New York is false. I personally negotiated and executed the Lazare Credit Facility in New York and arranged for loan repayments to be made here in New York, through Lazare's KBC-NY Bank Account, as demonstrated by Exhibits "G" and "H" hereto. Lazare does not now have and did not at any relevant time have a bank account at ADB relating to the Lazare Credit Facility.[4]

22.    Thus, as demonstrated in Lazare's KBC-NY Bank Account statements (Exhibit "G"), when Lazare wanted to draw down under the Lazare Credit Facility to purchase diamonds or make payments for diamond related business, it would submit a "KBC Transfer Form" to KBC in New York (true and correct copies from 2008 are annexed as Exhibit "H")

---

[4] Indeed, Lazare did not want a bank account in Belgium for several additional reasons, including, but not limited to: (a) the fact that there is a six hour time difference between New York and Belgium which would make same day banking impossible; (b) language considerations, geographic distance and time differences would make it very difficult to effectively communicate; (c) Lazare is not licensed to operate and does not operate in Belgium; and (d) Lazare's Belgian subsidiary, LKB, does business in Belgium and has a banking relationship with ADB there. And as ADB acknowledges, ADB has no authority to provide a bank account to Lazare in New York.

requesting a wire transfer from the KBC-NY Bank Account in connection with the payment in question. KBC-NY would wire the funds in question to the intended recipient (i.e., the payee) and debit Lazare's KBC-NY Bank Account. KBC-NY would then credit the KBC-NY Bank Account in the amount of the requested wired payment, leaving a zero balance in the KBC-NY Bank Account. Thereafter, KBC would report to ADB the net activity in the KBC-NY Bank Account for the day, and the outstanding loan balance under the Lazare Credit Facility would be increased or decreased to reflect the net activity in the KBC-NY Bank Account.[5]

23.     For the Court's convenience, I have included along with the KBC Transfer Forms in Exhibit "H" a true and correct copy of a summary schedule that I created consisting of 2008 transactions detailing $63,375,419.13 in transfers from Lazare's KBC-NY Bank Account relating exclusively to Lazare's Angolan rough diamond buying operations. These payments include all of the funds used to purchase the stolen Informal Sector diamonds (the proceeds of which Defendants stole from Lazare and misused for their own benefit and for the benefit of other members of the Enterprise).

24.     By way of example, one of the documents annexed as Exhibit "H" consists of a KBC Transfer Form requesting a payment on June 3, 2008 of $467,056.31 to HSBC Bank USA for the benefit of Sodiam in Angola. The form reads in pertinent part as follows:

KBC BANK N.V.                              TRANSFER FORM
New York Branch
125 West 55th Street
New York, NY 10019
(212) 541-0600

_____

NAME OF ACCOUNT: LAZARE KAPLAN INTERNATIONAL INC.

---

[5] Lazare will seek discovery of the extent to which KBC and ADB reconciled between themselves these payments and the degree to which KBC functioned as a co-lender under the Lazare Credit Facility.

ACCOUNT NUMBER: 24079801

TODAY'S DATE: 6/3/2008          VALUE DATE: 6/3/2008

PLEASE PAY:          AMOUNT:          USD $467,056.31

CHARGES (deducted from amount):          USD 25.00

PAY TO: (US Bank): HSBC NY

BENEFICIARY BANK:          BANCO DE FOMENTO ANGOLA

BENEFICIARY CUST:          SODIAM - SOCIEDADE DE
                          COMMERCIALIZACAO DE DIAMANTES
                          DE ANGOLA

This payment by Lazare is for costs of Informal Sector diamonds at issue in the Complaint.

　　　　25.　　The corresponding bank statement in Exhibit "G" shows a debit in the same amount to Lazare's KBC-NY Bank Account:

| | | Debit Amount |
|---|---|---|
| 6/3/2008 | 001A80603PR03708 | 467,056.31 |

/ACC/IBAN AO 060006000032940483182 ORG LAZARE KAPLAN
INTERNATIONAL, INC. NEW YORK, NY 10036 IBK HSBC BANK USA
BUFFALO,NY BBK BANCO DE FOMENTO SARL ANGOLA LUANDA,
ANGOLA BNF SODIAM SOCIEDADE DE DE ANGOLA FED IMA
20080603B1Q8841C000213

　　　　26.　　When Lazare deposited funds into the KBC-NY Bank Account to repay loans under the Lazare Credit Facility, the KBC-NY Bank Account would first be credited and then, as the Lazare Credit Facility was repaid and replenished, debited by the amount of the repayment, again leaving a zero balance.

27.     I do not understand how KBC can truthfully claim in its motion papers that it was not a party to any of the transactions described in the Complaint involving Lazare.[6] As noted above, in order to draw down under the Lazare Credit Facility, Lazare had to submit a KBC Transfer Form to KBC-NY signed by two officers of Lazare detailing the amount of the request, the payee and the beneficiary.   KBC could not process that Transfer without first complying with all relevant anti-money laundering and know your customer obligations, and verifying that Lazare had enough credit available in the Lazare Credit Facility to support the transfer, and was not otherwise in violation of the commitments in the ADB Loan Agreement. Among those commitments was a requirement that Lazare deliver to ADB on a monthly basis a detailed list of outstanding receivables and information on prepayments to Angola for diamonds from mines -- the very diamonds that Lazare was purchasing with funds from the Lazare Credit Facility via the KBC-NY Bank Account.

28.     In sum, under the foregoing arrangement KBC-NY was responsible for making disbursements and payments from the KBC-NY Bank Account, transferring sufficient funds into the KBC-NY Bank Account to cover those payments, accepting and accounting for deposits by or on behalf of Lazare into the KBC-NY Bank Account, preparing and issuing bank statements and other account documentation reflecting the foregoing transactions, and notifying ADB when and to what extent to debit or credit the Lazare Credit Facility, and verifying the

---

[6] Defendants' knowledge of, and involvement with, Lazare's Angolan Formal Sector rough diamond operations dates back to at least January 23, 2006, when Defendants financed Lazare's initial Formal Sector purchase in the amount of U.S. $10,464,086.49 (See Exhibit "I" which is a true and correct copy of the related KBC Transfer Form). Further, Defendants regularly financed Lazare's operating costs incurred in connection with its Formal and Informal Sector Angolan rough diamond buying operations (as an example, I have attached as Exhibit "J" a true and correct copy of a KBC Transfer Form for the payment of insurance premium for a policy covering Lazare's Formal and Informal Sector Angolan diamonds to its London broker, Willis Limited). In addition, Defendants received millions of dollars in payments disbursed by Gulfdiam DMCC from its bank account at ABN-AMRO in Dubai (see Exhibit "K" which reflects a deposit of U.S. $5,499,970.00 credited to Lazare's KBC-NY Bank Account on August 13, 2008). KBC similarly made payments relating to Lazare's purchase of DTC Sight Diamonds that are the subject of Lazare's Complaint (also included in Exhibit "J" is a true and correct copy of a KBC Transfer Form in the amount of U.S. $454,966.95 to DEBEERS UK LIMITED relating thereto).

propriety of the funds and the parties to the transactions. Lazare is prepared to prove at trial that the requested transfers in Exhibit "H" were used to purchase or finance many of the diamonds that were stolen and sold through the RICO Enterprise and that the sales proceeds of which ended up with Defendants, and were misused by Defendants for their own benefit and for the benefit of other members of the Enterprise.

### The Choice of Law and Forum Selection Clauses with Documents

29.    The actual banking relationship that existed between Lazare and Defendants is completely consistent with the documents (all of which were drafted by ADB or KBC) pertaining to the Lazare Credit Facility and Lazare's KBC-NY Bank Account. My understanding of the documents squarely contradicts and refutes the forum selection and forum non conveniens arguments in Defendants' motion papers. The ADB Loan Agreement pertaining to the Lazare Credit Facility (including the ADB Credit Conditions and the ADB Banking Conditions generally referenced therein), the ADB/KBC Agreement, and the KBC Banking Conditions reflect my understanding of the parties' intention that New York law would govern disputes between us like the one currently before the Court, that the banks would be required to sue Lazare in New York City in regard to any disputes that arose with Lazare involving the Lazare Credit Facility and Lazare's KBC-NY Bank Account, and that Lazare would be free to sue Defendants in New York City where Lazare maintains its headquarters and principal offices.

### *The KBC Banking Conditions*

30.    As I have always read and understood the choice of law and forum selection clauses in the KBC Banking Conditions (Exhibit E, at ¶ 35), they clearly provide for the application of New York law and exclusive jurisdiction of New York courts over disputes

concerning "this Agreement, and all other agreements you have with KBC Bank relating to your accounts ...."

31.    The ADB/KBC Agreement clearly requires that all activity under the Lazare Credit Facility must be effected through Lazare's KBC-NY Bank Account. It directly links and ties the KBC-NY Bank Account to the Lazare Credit Facility by providing that disbursements and payments under the Lazare Credit Facility shall result in a same day debit or credit to Lazare's loan balance with ADB. It expressly provides that KBC and ADB may fully exchange all credit, financial and other information concerning Lazare and its accounts.[7]

32.    It could not be more clear from the language in the ADB/KBC Agreement and my experience working with these two banks that KBC and ADB worked together, hand-in-glove, in regard to the Lazare Credit Facility. KBC was in charge of the money that came into and went out of Lazare's KBC-NY Bank Account (including amounts unrelated to the Lazare Credit Facility), and thus it was my understanding that the ABD Credit Conditions and KBC Banking Conditions governed Lazare's relationship with KBC and ABD. Throughout the Complaint, Lazare provides concrete examples of how KBC and ADB were privy to the most intimate financial details of Lazare's business operations, and had ready access to information showing the movement of the stolen LKI Diamonds and the sales proceeds of those diamonds.

### *The ADB Credit and Banking Conditions*

33.    The Lazare Credit Facility was confirmed by the ADB Loan Agreement dated February 20, 2008 (Exhibit "A"). On behalf of Lazare, I counter-signed and mailed the

---

[7] We hereby agree that **all** disbursements and payments under our credit facility with Antwerpse Diamantbank N.V. **shall be effected through our account with KBC Bank N.V. - New York Branch** and shall result in a same day debit or credit to our **loan balance** with Antwerpse Diamantbank N.V. It is understood and agreed that KBC Bank N.V. and Antwerpse Diamantbank N.V. may fully exchange all credit, financial and any other information concerning our company and our accounts." Exhibit "D" (emphasis added).

original via Federal Express to Oakley Champine of ADB-NY at the New York Representative

Office of ADB. (A true and correct copy of the Federal Express receipt is included in Exhibit

"A.") The Letter provides that "[t]he granting of this credit is governed by our *General*

*Conditions for Banking Operations* and by our *General Credit Granting Conditions...*"

(Emphasis supplied). My understanding is that the ADB Credit Conditions are addressed to the

granting of credit and the making of loans to borrowers, while the ADB Banking Conditions are

addressed to the operation of bank accounts at ADB, such as the use of wire transfers, checks,

safe deposit boxes, and related matters. Lazare is not an account holder at ADB, does not have a

bank account or safe deposit box or mail box at ADB, and does not have keys or checks from

ADB as contemplated by the ADB Banking Conditions.

34.    Article 2 of the ADB Credit Conditions provides that:

> **Unless otherwise provided in writing**, the loan facilities granted
> by the Bank, including all transactions entailing an obligation vis-
> à-vis the Bank, are governed by the General Conditions for
> Banking Operations and the provisions laid down hereinafter.
> (Emphasis added).

35.    It is and has been my clear understanding that the ADB/KBC Agreement

and the KBC Banking Conditions constituted a written agreement as contemplated by Article 2

of the ADB Credit Conditions, and that the intended result of agreeing to the ADB/KBC

Agreement was to make clear to all that the KBC Banking Conditions, and not the ADB Banking

Conditions, applied to the Lazare Credit Facility. [8]    As previously explained, the ADB/KBC

---

[8]  In similar fashion, Article 37 of the ADB Banking Conditions expressly contemplates the existence of other
agreements relating to loans to Lazare, as follows:

Article 37 - Applicable Law and Jurisdiction - Choice of Law and Forum

Except as provided with respect to Collateral and subject, in the case of loans or the granting of
credit, to any other choice of law made in the General credit Granting Conditions **or other
agreements relating to such loans or granting of credit**, the obligations of the account holder,
any correspondent, surety, guarantor, third-party pledger and other third party involved and the
Bank are subject to and shall be governed by Belgian law....

Agreement was prepared for my signature by ADB. It was given to me to be executed simultaneously with the opening documents for the KBC-NY Bank Account, which included the KBC Banking Conditions. By its terms, the ADB/KBC Agreement was relied on by Lazare, KBC and ADB (for almost a decade) to govern the day-to-day operation and administration of all payments and disbursements of the KBC-NY Bank Account and the Lazare Credit Facility. Because Lazare opened a bank account with KBC-NY to exclusively handle all payments and disbursements under the Lazare Credit Facility with ADB, Lazare did not need and to this day does not have a banking relationship with ADB. Lazare has only an unsecured credit relationship with ADB. It therefore stood to reason that the ADB Banking Conditions would be of no consequence to Lazare or its relationship with ADB.

36.    Consistent therewith, it was my understanding that the KBC Banking Conditions, and not the ADB Banking Conditions, were relevant to Lazare. I believe this to be the plain and clear meaning of these documents and I believe that it is also the only reasonable meaning that can be arrived at in light of the facts and circumstances existing at the time when those documents were prepared and executed.[9]

37.    Lazare does not have a bank account, joint account, demand account, fixed-term account or deposit book account at ADB and thus is not an account holder at ADB; it is an account holder at KBC-NY. Thus, the provisions in the ADB Banking Conditions addressed to "account holders" at ADB have no applicability to the Lazare Credit Facility.

38.    The statement in ADB's motion papers (Declaration of Veerle Snyers dated April 4, 2012 at ¶¶ 5-6 and Okrent Decl. ¶ 4) that the Lazare Credit Facility was not paid in

---

[9] As ADB concedes in its motion papers, it was not capable of providing Lazare with the full-service banking relationship that Lazare required to conduct its international business operations. That is why ADB directed Lazare to open the KBC-NY Bank Account and substituted the KBC Banking Conditions in place of the ADB Banking Conditions.

New York is simply false. The KBC-NY bank statements annexed as Exhibit "G" show that in 2008 alone Lazare drew down approximately $147.7 million on the Lazare Credit Facility in New York and repaid approximately $147.4 million of drawings, or loans, in New York through the KBC-NY Bank Account at KBC-NY.

39.    Lazare does not have an office or otherwise do business in Belgium; rather LKB (a Belgian corporate subsidiary of Lazare) does business in Belgium where it maintains its own banking relationship and bank account with ADB under a different set of documents (all of which, as required under Belgian law, were executed in Flemish and not English).

40.    I have always understood the Lazare Credit Agreement to be governed by New York law and that any action brought in connection therewith was required to be filed in the courts of New York. It was clear to me that the ADB/KBC Agreement explicitly linked **all** payments and disbursements under the Lazare Credit Facility to Lazare's KBC-NY Bank Account and that in doing so Lazare and ADB were agreeing to the KBC Banking Conditions mandating New York law and New York courts. The choice of New York law and New York courts in the KBC Banking Conditions dovetailed perfectly with the choice of New York law and New York courts specified in the ADB Credit Conditions. This too made perfect sense. This is evident also from the fact that, as discussed in the Complaint (at ¶ 515) the Lazare Credit Facility was terminated under Article 10 of the ADB Credit Conditions (and not the ADB Banking Conditions) by written notice dated December 28, 2009. For Defendants now to try and confuse matters asserting that the ADB Banking Conditions are somehow intended to trump the ADB Credit Conditions and KBC Banking Conditions is ridiculous. It is even more ridiculous when one considers that Lazare does not have a banking relationship with ADB, it has only a credit relationship.

**Lazare's Banking Relationship With KBC And Lazare's Credit Relationship With ADB Are Solidly Anchored In New York**

41.     The Lazare Credit Facility was negotiated and set up in New York, funded in New York, administered in New York, renewed and modified in New York, paid in New York, and terminated in New York. All documents relating to the Lazare Credit Facility are in English, not Flemish, and the loans under the Lazare Credit Facility are in dollars not euros or other foreign currency.

42.     The Lazare Credit Facility was administered exclusively through the KBC-NY Bank Account that Lazare had at KBC in New York.

43.     Between 2000 and 2009, I met on any number of occasions in Lazare's office in New York City and ADB's offices at 1177 Avenue of the Americas in New York City with ADB bank officers Philippe Loral, Marc Weiss, Peter Driesen and Oakley Champine, and in the New York City offices of Lazare with KBC bank officers Maaike Maeckelbergh, William Cavanaugh, Patrick Daems, Gregory T. Boston and Oliver Smekens, among others.

44.     When I needed to arrange, modify or amend the Lazare Credit Facility, I would negotiate the proposed terms, changes, conditions and wording with Mr. Loral, ADB-NY's Executive Vice President and Head of North American Relations. These negotiations were normally done in person at my office in New York. At no time did I negotiate loan terms, conditions, modifications or amendments in Belgium. A true and correct copy of an example of one such modification that I negotiated with Mr. Loral (and which is signed by Mr. Loral) is attached hereto as Exhibit "L"

45.     I very clearly remember a series of conversations with Mr. Loral, in which he protested the fact that Lazare maintained both a revolving line of credit and a bank account with Leumi while only maintaining a revolving line of credit with ADB. Loral invited me to the

17

new offices of ADB at 1177 Avenue of the Americas in Manhattan, and proudly showed me the KBC computer systems and facilities used to run and administer ADB's New York operations. He told me that ADB leases a section of KBC's office and, with KBC's support could provide Lazare with additional banking services well beyond those offered by Leumi. I similarly remember the KBC officers identified above coming to Lazare's offices in New York City to make a presentation about the expanded banking services offered by KBC-NY, including interest rate swaps and collars and other derivative products, and to urge Lazare to use KBC-NY for a broad array of banking services.

46.     Furthermore, on numerous occasions, Mr. Loral requested that I increase Lazare's borrowings under the Lazare Credit Facility albeit at the expense of reducing borrowings under LKB's Belgian loan facility. In particular, Mr. Loral strongly urged me to do so toward the end of each calendar year, explaining that the Lazare Credit Facility was a New York loan, carried on the books of ADB-NY, while the LKB loan was a Belgian loan carried on the books of ADB's home office in Belgium. Mr. Loral explained that increasing the amount Lazare borrowed in New York would help ADB-NY meet its financial performance goals on which ADB-NY and Mr. Loral were measured and upon which Mr. Loral's compensation was based. As Mr. Loral was ADB-NY's senior executive handling the Lazare relationship, I believed, at all times, that he was acting with the full authority of ADB.

47.     I mention these conversations because they (among many others) are indicative of the extent to which Lazare's relationship with ADB and KBC was solidly anchored in New York in the same manner as its relationship with Leumi and ABN-AMRO are/were anchored in New York. Lazare is a New York based company, and all of its banking relationships with its lenders are similarly based in New York.

48.     At no time did anyone at ADB or KBC communicate to me any belief or understanding that Lazare would be bound to litigate in Belgium disputes involving the Lazare Credit Facility or the KBC-NY Bank Account.  To the contrary, the representatives of ADB-NY and KBC-NY with whom I dealt went out of their way to convince me that ADB and KBC were actively doing business in New York and could compete with the New York subsidiaries of Lazare's other lenders.

49.     In that regard, I have annexed hereto as Exhibit "M" a true and correct copy of the following letter dated April 20, 2005 from ADB to Lazare:

> Dear valued client,
>
> We take this opportunity to inform you that Mr. Andrew Rogow has tendered his resignation to pursue other career opportunities. The Executive Committee wishes to thank him for his valued contributions.
>
> We are pleased to announce that Mr. Marc Weiss has been promoted to Senior Vice President and General Manager of the New York Representative Office.
>
> Mr. Weiss has been involved in financing companies in the diamond and jewelry industries for more than 25 years and has been Senior Representative Officer for Antwerp Diamond Bank's New York Representative Office since its inception.
>
> Mr. Weiss will be contacting you in due course to ensure that your financing requirements continue to be considered on a timely basis. Please feel free to call on Mr. Weiss at any time.

**Defendants Were Intimately Involved In The Theft Of The LKI Diamond Sales Proceeds**

50.     Finally, the KBC Banking Conditions and the documents related thereto demonstrate beyond question that ADB and KBC functioned jointly with respect to the Lazare Credit Facility and the diversion and misappropriation of the stolen diamonds and sales proceeds that are described in the Complaint.  It should be clear from the documents relating to the

19

formation of the Lazare Credit Facility that KBC was inextricably involved at every step with the Lazare Credit Facility. The Lazare Credit Facility conditioned the availability of credit on a number of financial covenants, and required Lazare to provide to ADB each month a detailed list of outstanding receivables and a borrowing base certificate[10] attesting to the amount and value of Lazare's assets (primarily inventory and receivables). A true and correct example of such a borrowing base certificate provided to ADB is annexed hereto as Exhibit "N." The template for the borrowing base certificate was created by ADB and provided to Lazare to be filled out by Lazare. Notably, ADB refers in the template to the $45 million Lazare Credit Facility as "Credit line **ADB NY**" and refers to LKB's $25 million credit facility as "Credit line ADB HO." I understood "ADB NY" to mean ADB's New York representative office and "ADB HO" to mean ADB's "Home Office" in Belgium.

51.    From 2000 to 2010, I was in regular contact with ADB-NY regarding Lazare's finances. I can state of my own personal knowledge that key people at the bank were well aware of the details of Lazare's purchases and sales of diamonds during the critical period of time at issue in this lawsuit and, based thereon, I do not believe it is possible for them to have been unaware of the diversion of the funds from those specific purchases and sales.

52.    There are very few banks in the world that finance the purchase and sale of diamonds, and they do so by carefully monitoring and tracking the movement of the diamonds purchased by their customers. Rough diamonds are shipped via bonded courier services, together with detailed descriptions in accompanying documentation in the form of Kimberley Process Certificates, bills of lading and invoices. At any point in time, ADB had possession of

---

[10]  A borrowing base certificate is a periodic report submitted by a borrower to a lender regarding such things as asset values. As is often the case in a revolving credit facility, ADB required Lazare to submit monthly borrowing base certificates to help calculate the maximum amount that could be borrowed under the Lazare Credit Facility.

or ready access to documents showing the origin, carats and description of the stones that were purchased by Lazare and stolen by Defendants and Daleyot.

53.     In its Complaint, Lazare alleges that Defendants KBC and ADB provided banking services to, and had first-hand knowledge of, the companies (identified in the Complaint as part of the Enterprise) that were directly involved in the misappropriation of the LKI Diamonds. Indeed, this information shows that ADB is listed as a loss payee on a trade credit insurance policy issued to Daleyot's companies by AIG UK Limited and on which companies in the Enterprise are named insureds. (Complaint ¶¶ 172-176).

54.     The Complaint further alleges that many of those companies were shell entities or trust structures that have no legitimate business purpose other than to move money across international borders. (Complaint ¶¶ 47-53; 69-73; 176-186). Any bank that took the trouble to know its customers or to exercise minimal due diligence in accordance with applicable law would quickly realize that such companies could not and would not be lawfully buying and selling rough diamonds.

55.     This, in part, is why Lazare was so shocked to learn, following an exhaustive, more than two year worldwide investigation into the disappearance of the stolen diamonds described in the Complaint, that $122 million of the sales proceeds of the diamonds had been traced directly to Defendants KBC and ADB. According to the evidence described in the Complaint (and by Defendants' own admission in the Declaration of Mr. Walter Haeck), every dollar of those monies involving Defendants or their clients' accounts at ADB was transferred to and through KBC-NY, the same offices where Lazare maintained the KBC-NY Bank Account and through which Lazare borrowed the money to purchase or finance the diamonds in the first place. These are the same monies that were then diverted out to Defendants

and to third parties. A substantial amount of these monies was used for real estate projects in which KBC had an interest, to pay down debts owed to Defendants by ADB's largest customer, Erez Daleyot, and for other improper purposes alleged in the Complaint. (See e.g. Compl. ¶¶ 38, 46, 120, 275, 351, 581-82, 799).

56.     Lazare has offered evidence to Defendants demonstrating that ADB received at least $77 million of proceeds from the sales of the stolen LKI Diamonds, and that these monies belong to Lazare and should have been applied in full satisfaction of the Lazare Credit Facility. (In the Declarations submitted by Defendants, they concede that all of these monies were cleared through KBC-NY in New York City.) In connection therewith, I have reviewed documents that demonstrate that additional monies belonging to Lazare and transferred to accounts at ADB through improper "back to back" transactions totaling $20 million involving HSBC and ADB as well as the $15 million from Mauridiam (both of which are described in the Complaint (see Compl. ¶¶ 260-72 and 442-449)) were transferred through KBC-NY to ADB. Lazare has further offered to provide ADB with evidence showing that ADB, with full knowledge, incorrectly applied those monies in reduction of loans owed by Daleyot under circumstances that involve improper and possibly criminal conduct.

57.     Does it really make any sense under these circumstances that Defendants cannot provide Lazare or the Court with an accounting of the deposits in question or respond to discovery regarding specific deposits and money transfers executed by KBC in New York relating to monies and property owned by Lazare?

### Conclusion

58.     This is the background against which Defendants argue to this Court that Lazare does not have any viable claims against them, and, even if it does, it should be forced to

22

litigate those claims in Belgium. It would be difficult for me even to imagine a more frivolous and less well-founded argument.

59.    As I explained above, all of Lazare's lenders are foreign banks doing business in New York City, either through subsidiaries, branches or representative offices. All of Lazare's credit facilities with its different lenders were negotiated, executed and set up in New York, funded in New York, administered in New York, extended and modified in New York, paid in New York and, in the case of the Lazare Credit Facility with Defendants, terminated in New York. Apart from ADB's and KBC's recent arguments, every one of Lazare's lenders recognizes in its loan documents that disputes between Lazare and its lenders relating to Lazare's credit facilities in New York should be litigated under New York law in the New York courts.

60.    Defendants' motions to dismiss notwithstanding, the same logic applies to Defendants' relationship with Lazare. As a public company (Lazare was listed on the American Stock Exchange until August 2010), Lazare did not agree that disputes involving hundreds of millions of dollars could be litigated only outside of the United States under the law and court system of a foreign country. That is not what I negotiated, it is not what Defendants negotiated, it is not what the documents we signed clearly and unambiguously provide, and it is certainly not what Lazare intended or understood from those documents from Lazare's discussions with Defendants and the parties' course of dealings over many years.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: May 16, 2012

William H. Moryto

Notary Public
FRANK ROSELLI
Notary Public, State of New York
No. 01RO6104084
Qualified in New York County
Term Expires January 12, 20_16_

23