# EXHIBIT K

**Excerpt from K. Van Raemdonck, "De invloed van de wet van 8 december 1992 ter bescherming van de persoonlijke levenssfeer t.o.v. de verwerking van persoonsgegevens op de banksector Deel 1," RW 1996-97, 899.**

The Belgian banker is nevertheless clearly bound by an obligation of discretion. Records of a confidential nature which are communicated to him, as well as information which he generates due to own processing, must remain confidential, unless the law provides for exceptions or the client himself consents to the dissemination thereof.

## ERRATUM

Vennootschap - Misbruik van voorwetenschap

Correctionele Rechtbank Antwerpen dd. 27 september 1995, R.W., 1996-1997, 469, dient gelezen te worden als Correctionele Rechtbank Gent.

## MEDEDELINGEN

Studieavond: De Raad voor de Mededinging

Op maandag 10 maart 1997 organiseert het Centrum voor Beroepsvervolmaking in de Rechten (CBR) een studieavond waarop prof. J. Stuyck (K.U.L.) een uiteenzetting zal geven over de Raad voor de Mededinging.

Inlichtingen en inschrijvingen: CBR, tel. 03/820.29.08 en fax. 03/820.29.38.

Verantwoordelijkheid en aansprakelijkheid van de Milieuambtenaar

De V.Z.W. Vlaamse Milieudeskundigen en de V.Z.W. Water - Energie - Leefmilieu organiseren op 19 maart 1997 in de raadzaal van het Provinciehuis van Antwerpen een studienamiddag rond het thema «Verantwoordelijkheid en aansprakelijkheid van de milieuambtenaar».

Op deze studienamiddag komt zowel de overheid (de heer F. Desmyter, secretaris-generaal dep. Leefmilieu en Infrastructuur - ministerie Vlaamse Gemeenschap en mevrouw Schmidt, juriste V.S.G.B.) als de ervaringen van het bedrijfsleven met de openbare milieudiensten aan het woord (de heer J. Houtmeyers, milieuverantwoordelijke en de h. R. Meirinck, directeur dienst leefmilieu en natuurontwikkeling van de stad Gent), aangevuld door een juridische uiteenzetting over aansprakelijkheid (prof. A. Van Oevelen, gewoon hoogleraar U.I.A.).

Deze activiteit van de V.Z.W., V.M.D. en de V.Z.W. WEL richt zich dan ook tot al haar leden, evenals de ambtenaren van de Vlaamse overheidsinstellingen en juristen.

Meer inlichtingen kunnen bekomen worden op het secretariaat van de V.Z.W., V.M.D. (tel. 015/20.68.66 en fax 015/21.65:98) en van de V.Z.W. WEL (tel. 03/353.72.53 en fax 03/535.89.91).

Cursus: Europees Gemeenschapsrecht

Op 10, 11 april (Maastricht) en op 13, 27 mei (Utrecht) a.s. zal door METRO, het Maastrichts Europees Instituut voor Transnationaal Rechtswetenschappelijk Onderzoek van de Universiteit Maastricht, onder auspiciën van de Stichting Europees Privaatrecht een cursus worden georganiseerd «Europees Gemeenschapsrecht voor Privaatrechtjuristen».

In de cursus zullen de beginselen van het Europees recht voor zover deze van belang zijn voor een privaatrechtjurist centraal staan. Op donderdag 10 en vrijdag 11 april komen de algemene beginselen en implementatievereisten aan de orde, evenals de thematiek van de rechtsbescherming, de overheidsaansprakelijkheid en de veranderingen in het nationaal aansprakelijkheidsrecht onder invloed van het Europees recht. Ook zal aandacht worden besteed aan recente evoluties in het Europees recht, onder meer ten gevolge van de intergouvernementele conferentie. Tijdens de laatste twee dagen zullen veeleer bijzondere thema's uit het Europees recht die van bijzonder belang zijn voor privaatrechtjuristen worden behandeld, waaronder het internationaal privaatrecht, het Europees economisch recht en het Europees consumentenrecht. Ten slotte zal ook

de betekenis van de juridische dienst van de Europese Commissie voor het privaatrecht worden toegelicht.

Voor verdere informatie kan contact worden opgenomen met het secretariaat van METRO, Universiteit Maastricht, tel: 043-3883060, fax: 043-3259091.

Colloquium: Arbitrage en Europees Recht

Op 25 april 1997 organiseert Het Belgisch Centrum voor Studie en Praktijk van Nationale en Internationale Arbitrage (CEPINA) een internationaal colloquium over «Arbitrage en Europees Recht».

Voor bijkomende inlichtingen en inschrijving: secretariaat van het CEPINA, Stuiversstraat 8, 1000 Brussel, tel. 02/515.08.35 en fax 02/515.08.75.

K.U.Leuven - Vacatures

1. De Faculteit Rechtsgeleerdheid wenst over te gaan tot de aanwerving van een *voltijds lid* van het *zelfstandig academisch personeel* dat ingeschakeld zal worden in het onderwijs en het onderzoek in de *sociologie van de criminaliteit en van het recht*. De leeropdracht bestaat uit de volgende colleges:
- grondslagen van de criminologische sociologie;
- kwalitatieve onderzoeksmethodes in de criminologie met werkcollege - sociologische methodes;
- actuele ontwikkelingen in het criminaliteitsbeleid;
- organisatiegerichte methodieken van criminologische interventie, met werkcollege: deel veranderingsstrategieën.

Van de kandidaat wordt verwacht dat hij/zij onderzoekservaring (doctoraat en publikaties) heeft op het gebied van de sociologie van de criminaliteit en de sociologie van het recht. De kandidaat is bij voorkeur licentiaat/doctor in de rechtsgeleerdheid en licentiaat/doctor in de sociologie. Het zal de opdracht zijn van de kandidaat om in het curriculum criminologische wetenschappen het sociologisch-criminologisch onderzoek verder uit te bouwen, met daarin specifieke aandacht voor vormen van criminaliteit van overheidsinstellingen. Tevens wordt van de kandidaat verwacht dat hij/zij specifieke kennis heeft van de beleidsontwikkelingen binnen het vakgebied van het strafrecht en de criminologie, met daarin bijzondere aandacht voor de ontwikkeling van criminaliteitsbeleid vanuit internationale en supranationale instellingen. Van de kandidaat wordt bovendien een actieve inzet verwacht in de bestuurlijke raden en structuren van de Faculteit.

2. De Faculteit Rechtsgeleerdheid wenst over te gaan tot de aanwerving van een *voltijds lid* van het *zelfstandig academisch personeel* dat ingeschakeld zal worden in het onderwijs en het onderzoek naar de *bronnen en beginselen van het recht*. De leeropdracht bestaat uit de volgende colleges:
- bronnen en beginselen van het recht;
- werkcollege bronnen en beginselen van het recht.

Van de kandidaat wordt verwacht dat hij/zij onderzoekservaring (doctoraat en publicaties) heeft op het gebied van de rechtswetenschap. De kandidaat is doctor in de rechten. De kandidaat zal bereid zijn zich actief in te schakelen in de structuren van de KULAK zoals de bibliotheekcommissie en de commissie informaticabeleid. Van de kandidaat wordt verwacht dat hij vrijwel permanent aanwezig is op de KULAK. Zijn vertrouwdheid met de regio uit zich in het uitbouwen van netwerken met de lokale balies, magistraten en het verenigingsleven. De kandidaat zal samenwerken met het PUC (het Postuniversitair Centrum) om activiteiten en studiedagen in verband met de positieve rechtswetenschap te organiseren. Gelet op het plichtvak in de eerste kandidatuur wordt van de kandidaat op onderwijskundig vlak een sterk aansprekend en boeiend profiel verwacht. De kandidaat moet leiding geven aan een jonge ploeg assistenten en hun wetenschappelijk- en doctoraatsonderzoek begeleiden.

Wie wil solliciteren voor een van deze functies, dient hiervoor C3-formulieren te gebruiken. Die kunnen aangevraagd worden op de Dienst Academisch Personeel, Krakenstraat 3, 3000 Leuven, (016)32.40.88 of op het administratief secretariaat van de faculteit.

# DE INVLOED VAN DE WET VAN 8 DECEMBER 1992 TER BESCHERMING VAN DE PERSOONLIJKE LEVENSSFEER T.O.V. DE VERWERKING VAN PERSOONSGEGEVENS OP DE BANKSECTOR

(deel 1)

1. Deze bijdrage is erop gericht na te gaan welke invloed de wet van 8 december 1992 ter bescherming van de persoonlijke levenssfeer op de banksector heeft. Het uitgangspunt hierbij is het nauwe verband tussen de vertrouwelijkheid in bankzaken en de persoonlijke levenssfeer.

2. In een eerste hoofdstuk wordt het uitgangspunt toegelicht en wordt het begrip «persoonlijke levenssfeer» afgebakend t.o.v. aanverwante begrippen. Het tweede hoofdstuk geeft een overzicht van het normatief kader inzake de bescherming van de persoonlijke levenssfeer. De Wet Bescherming Persoonsgegevens wordt systematisch behandeld in hoofdstuk drie. Daarbij wordt aandacht besteed aan het toepassingsgebied, de verplichtingen van de houder, de rechten van de betrokkene en de mededeling van persoonsgegevens aan derden. Hoofdstuk vier belicht dan kort de verhouding tussen de Wet Verwerking Persoonsgegevens en de sectorale privacywetgeving. Verder wordt het grensoverschrijdend verkeer van persoonsgegevens behandeld in hoofdstuk vijf. Het volgende hoofdstuk wordt gewijd aan de bepalingen van de Wet Verwerking Persoonsgegevens m.b.t. de controle en het toezicht. Een laatste, rechtsvergelijkend hoofdstuk geeft een overzicht van de regels aangaande de bescherming van de persoonlijke levenssfeer in Duitsland, Frankrijk, het Verenigd Koninkrijk en Nederland. Ten slotte worden, bij wijze van algemeen besluit, enkele conclusies en bedenkingen geformuleerd.

## I. PROBLEEMSTELLING EN AFBAKENING T.A.V. AANVERWANTE BEGRIPPEN

### A. DE BETROKKENHEID VAN DE BANKSECTOR BIJ DE BESCHERMING VAN DE PERSOONLIJKE LEVENSSFEER

3. De banksector heeft, vooral door toedoen van de Belgische Vereniging van Banken,[1] de ontwikkelingen, zowel op het Belgisch als op het Europees vlak, inzake de bescherming van de persoonlijke levenssfeer bij de verwerking van persoonsgegevens, nauwgezet opgevolgd. Bij de redactie van de uitvoeringsbesluiten, die overigens twee jaar en langer op

zich hebben laten wachten, heeft de banksector zelf inspraak gekregen.[2]

De sterke betrokkenheid van de banksector heeft zelf zijn redenen:[3]

1) Er is een nauw verband tussen privacybescherming en informatisering. De informatica is niet weg te denken uit de bankwereld.

2) De werking van de bank impliceert de aanwezigheid, de registratie en de verwerking van een enorme hoeveelheid gegevens. Bovendien lijkt deze hoeveelheid nog voortdurend toe te nemen.[4] Dit is o.m. te wijten aan de uitgebreide cliëntele, de stijging van het aantal verrichtingen als gevolg van de automatisering en de groeiende hoeveelheid bankproducten door de branchevervaging.

3) Diverse (sociologische) studies tonen aan dat financiële gegevens gerekend worden tot de uiterst persoonlijke gegevens met een zeer hoge gevoeligheidsgraad, vooral wanneer deze gegevens negatief blijken te zijn.

4. Uit het bovenstaande blijkt dat vooral praktische en organisatorische redenen (hoe kan een bank een dergelijke hoeveelheid gegevens verwerken zonder automatisering?) naast commerciële redenen de belangrijkste oorzaak zijn van de massale verwerking van persoonsgegevens in de banksector. Soms is de wet zelf die de banken verplicht om bepaalde (persoonlijke) gegevens te verwerken en te bewaren.[5] Hierbij kan o.m. gedacht worden aan art. 15 Wet

---

[1] Talrijke congressen en studiedagen werden door de Vereniging van Banken georganiseerd, o.m. op 23 maart 1993 en op 23 juni 1995. Telkens werd een referatenboek uitgegeven. Daarnaast stuurt de Vereniging van Banken aan haar leden-banken vaak «ter informatie» circulaires; deze bevatten nu eens informatie, dan weer een eisenbundel die de Vereniging van Banken als pressiegroep van de banken wil naar voren schuiven.

[2] ROBBEN, F., «De verwerking van gevoelige en gerechtelijke gegevens in het licht van de Belgische Wet Verwerking Persoonsgegevens», T. Comp., 1995/3, 90-99; ROBBEN, F., «De uitvoeringsbesluiten nrs. 9 en 12 van de Belgische Wet Verwerking Persoonsgegevens», T. Comp., 1995/4, 146-156; K.B. nrs. 7, 8, 9 van 7 februari 1995 ter uitvoering van de Belgische Wet Verwerking Persoonsgegevens, B.S., 28 februari 1995 en K.B. nr. 12 van 7 maart 1995 ter uitvoering van de Belgische Wet Verwerking Persoonsgegevens, B.S., 14 maart 1995.

[3] MEYSMANS, E., «Bancaire bestanden en Privacy-bescherming in België», T. Comp., 1992, 9-10; MEYSMANS, E., «De Wet tot bescherming van de persoonlijke levenssfeer ten opzichte van de verwerking van persoonsgegevens, gevolgen voor de banksector», in De bescherming van de persoonlijke levenssfeer: toepassing van de Wet van 8 december 1992 in de banksector, Brussel, Belgische Vereniging van Banken, 1993, 1-2.

[4] LÉONARD, Th., «Banques en vie privée; deux problèmes d'application de la loi du 8 décembre 1992», in Droit de l'informatique: enjeux - nouvelles responsabilités, Brussel, Ed. du Jeune Barreau, 1993, 445.

[5] MEYSMANS, E., «De Wet tot bescherming van de persoonlijke levenssfeer ten opzichte van de verwerking van persoonsgegevens. Gevolgen voor de banksector», in De bescherming van de persoon-

Consumentenkrediet [6] dat bepaalt dat de kredietgever slechts een krediet mag verstrekken wanneer hij, gelet op de gegevens waar hij over beschikt of zou moeten beschikken, redelijkerwijze kan verwachten dat de consument in staat zal zijn contractuele verplichtingen na te komen. Verder verplichten art. 6 van de wet van 17 juli 1975 m.b.t. de boekhouding en de jaarrekening van ondernemingen [7] en art. 7 van de wet van 11 januari 1993 tot voorkoming van het gebruik van het financieel stelsel voor het witwassen van geld [8] de bankier om tot vijf jaar na het beëindigen van de cliëntenrelatie een kopie te bewaren van alle bewijsstukken die voor de identificatie van de cliënt hebben gediend.

5. Voorlopig kan geconcludeerd worden dat de banken zich in een weinig benijdenswaardige positie bevinden, nu zij enerzijds de privacy en het verwachtingspatroon van discretie van de cliënt centraal willen stellen, maar anderzijds tevens genoodzaakt zijn om in bepaalde gevallen te informeren naar of informatie te verlenen over het vermogen van dezelfde cliënt. Terecht wordt gesproken van een spanningsveld tussen het recht op informatie over andermans vermogen van de ene en het recht op bescherming van de persoonlijke levenssfeer van de andere. [9] Hoe dan ook, de bescherming van de persoonlijke levenssfeer is zeker geen onbekende voor de banksector, integendeel, ze drukt haar stempel op de werking van de bankwereld.

### B. DE DIVERSE BANCAIRE BESTANDEN

6. De gegevens waarover de banken beschikken, worden opgeslagen in diverse bestanden die zich op de verschillende niveaus bevinden: [10] lokaal (de agentschappen), regionaal (de zetels), nationaal (de hoofdzetel), interbancair (dochter- en zustermaatschappijen) [11] en internationaal (in groepsverband).

7. Sedert geruime tijd is in de banksector geopteerd voor een systeemgerichte benadering met geïntegreerde bestanden. Geïntegreerde systemen veronderstellen: [12]

1) de bepaling van welke informatie op lokaal vlak en welke informatie op centraal vlak bijgehouden wordt;

2) de organisatie van de gegevensstromen tussen het centrale systeem en de lokale bestanden.

---

*lijke levenssfeer: toepassing van de Wet van 8 december 1992 in de banksector*, Brussel, Belgische Vereniging van Banken, 1993, 2.

[6] Wet van 12 juni 1991 op het consumentenkrediet, *B.S.*, 9 juli 1991.

[7] Wet van 17 juli 1975 m.b.t. de boekhouding en de jaarrekening van ondernemingen, *B.S.*, 4 september 1975.

[8] Wet van 11 januari 1993 tot voorkoming van het gebruik van het financieel stelsel voor het witwassen van geld, *B.S.*, 9 februari 1993.

[9] Deze problematiek werd uitstekend geanalyseerd door VERBEKE, A., «Informatie over andermans vermogen; belangenafweging tussen het recht op privacy van de schuldenaar en het recht op informatie van de schuldeiser», *R.W.*, 1993-1994, 1141 e.v.

[10] MEYSMANS, E., «Bancaire bestanden en privacy-bescherming in België», *T. Comp.*, 1992, 10.

[11] Bijvoorbeeld een bestand cliënten KB en HSA.

[12] COX, J.-C., «La loi sur la protection des données à caractère personnel et les réalités opérationnelles des banques», in *Bescherming van de persoonlijke levenssfeer; gevolgen voor de banken*, Brussel, Vereniging van Banken, 1993, 6-9.

Dergelijke geïntegreerde systemen maken het mogelijk om een volledig beeld over elke cliënt te krijgen. [13] Hierop is ook het zogenaamde «relatiebankieren» geënt. Deze geïntegreerde aanpak betekent echter ook een reëel gevaar voor de bescherming van het privé-leven van de cliënt, zeker wanneer het geheel van deze gegevens vlot toegankelijk is voor alle werknemers van de bank. In dit opzicht is een toepassingsgericht systeem met disparate bestanden een grotere waarborg voor de bescherming van het privé-leven van de cliënt. De verspreiding van de informatie genereert een toegangsbelemmering. Op grond van het principe van de proportionaliteit dient immers niet gezocht te worden naar de meest efficiënte informatieverspreiding, maar wel naar de minst schadelijke voor de bescherming van de privacy van de cliënt. [14] De bestaande geïntegreerde gegevenssystemen van de bank dienen dan ook te worden aangepast teneinde zich minstens te conformeren met het proportionaliteitsvereiste. [15] Minimaal betekende dit dat men bankintern aan elk personeelslid, naar gelang van zijn functie, een «sleutel» verstrekt heeft, waardoor hij op het netwerk slechts toegang kreeg tot die bestanden die werkelijk nodig zijn voor de uitoefening van zijn functie.

8. Inhoudelijk wordt traditioneel een onderscheid gemaakt tussen vijf types bestanden: [16]

1) Het *cliëntenbestand* met identificatiegegevens over natuurlijke personen en rechtspersonen. Dit bestand heeft een centrale positie tussen de andere bestanden.

2) De *productiebestanden* waarin productiegebonden informatie is opgeslagen (kredietinformatie, safesbestand, overschrijvingenbestand).

3) Een *prospectiebestand* met gegevens over personen die nog geen cliënt zijn.

4) De zogenaamde *negatieve bestanden*: ze worden soms ook «zwarte lijsten» genoemd. Ze worden samengesteld op basis van eigen ervaringen met een cliënt, uitwisseling van informatie tussen de banken en openbare gegevens (vgl. geprotesteerde wissels).

5) De *niet-cliëntgerichte* bestanden zoals het personeelsbestand en de bestanden van de studiedienst.

### C. DE BEGRIPPEN PRIVACY, DISCRETIEPLICHT, BEROEPSGEHEIM EN BANKGEHEIM IN HUN ONDERLING VERBAND

9. De bankier is niet gehouden door een beroepsgeheim, i.c. het bankgeheim. Beroeps- of bankgeheim zouden, conform art. 458 Sw. een strafrechtelijk gesanctioneerde zwijgplicht met zich brengen. Het Hof van Cassatie heeft immers duidelijk gezegd dat noch de aard van de door de bankier uitgeoefende taken, noch enige wettelijke bepaling aan de bankier de hoedanigheid verlenen van een persoon die ertoe gehouden is het beroepsgeheim, als bepaald in art. 458

---

[13] LÉONARD, Th., «Banques et vie privée: deux problèmes d'application de la loi du 8 décembre 1992», in *Droit de l'informatique*, Brussel, Ed. du Jeune Barreau, 1993, 449 e.v.

[14] VERBEKE, A., *l.c.*, 1155.

[15] Cfr. infra sub nrs. 46 en 47.

[16] MEYSMANS, E., «Bancaire bestanden en privacy-bescherming in België», *T. Comp.*, 1992, 10.

Sw., te eerbiedigen. [17] In Luxemburg wordt het bankgeheim wel erkend. [18]

10. Toch is de Belgische bankier duidelijk gehouden door een discretieplicht. Gegevens van vertrouwelijke aard die hem meegedeeld worden, alsook informatie die hijzelf door eigen verwerking genereert, moeten vertrouwelijk blijven, tenzij de wet uitzonderingen bepaalt of de cliënt zelf toestemming tot openbaarmaking verleent. Het bankgeheim is aldus gereduceerd tot een op straffe van schadevergoeding gesanctioneerde discretieplicht. [19] Als grondslagen van die discretieplicht tijdens de contractuele relatie worden aangevoerd: [20]

1) de discretieplicht als een vaststaand gebruik in de banksector;

2) de discretieplicht als een contractuele verbintenis, eventueel volgend uit een bankreglement;

3) de discretieplicht als een deontologische regel; dit komt neer op een verbintenis door eenzijdige wilsuiting van de kant van de bank;

4) de discretieplicht gebaseerd op de wettelijke verplichting tot uitvoering te goeder trouw van verbintenissen.

De discretieplicht bestaat m.i. ook in de precontractuele of de postcontractuele fase. Ze is dan echter gegrond op art. 1382 B.W. Dit is wel degelijk relevant als men rekening houdt met de verplichting van de bank om bepaalde gegevens tot vijf jaar te bewaren.

11. Velen in de banksector dachten aanvankelijk dat de privacywetgeving nauwelijks aanpassingen voor de bank met zich zou brengen, gelet op de reeds lang gerespecteerde discretieplicht. Het domein van de informationele privacy is echter veel ruimer dan dat van de discretieplicht. [21] Dit wordt duidelijk als men het informatieverwerkend proces onderdeelt in drie hoofdfases: invoer, verwerking en uitvoer intern en extern. De discretieplicht ziet enkel op het aspect UITVOER-EXTERN; de bank mag de vertrouwelijke gegevens niet naar de buitenwereld toe kenbaar te maken. Dit aspect wordt dan weer minder benadrukt in de privacywetgeving. Deze laatste behandelt immers eerder de fases «invoer» en «verwerking» van het informatieverwerkend proces. [22] Zo behandelt de privacywet wel [23] en de discretieplicht niet de wijze waarop gegevens verzameld worden (invoer), de doeleinden van de verwerking (verwerking), het gebruik dat van de gegevens wordt gemaakt (verwerking), de bewaringstermijn van de gegevens (verwerking), het onderhoud van de gegevens (verwerking), de interne raadplegingen van de gegevens (uitvoer-intern), de verplichtingen van de houder van het bestand (invoer - verwerking - uitvoer) en de rechten van de betrokkene (invoer - verwerking - uitvoer).

---

[17] Cass. 25 oktober 1978, *Pas.*, 1979, I, 237.

[18] Arr. Rb. Luxemburg, 26 juni 1981, *Bank Fin.*, 1983-188.

[19] SMITS R., *Privacy en bankgeheim*, Gent, Mys en Breesch, ter perse, 5-7.

[20] SMITS, R., *o.c.*, 6-7, en de vele verwijzingen aldaar.

[21] MEYSMANS, E., *Implementatie van de privacy-wetgeving*, Brussel, BVK Studiedag, 19 november 1992, 4-5.

[22] DUMORTIER, J. *Europese en Belgische reglementering over de behandeling van persoonsgegevens*, Leuven, ICRI, 1993, 3-4.

[23] MEYSMANS, E., *o.c.*, 4-5.

12. Daaruit volgt duidelijk dat de privacy veel ruimere verplichtingen voor de banksector meebrengt dan de traditioneel reeds gerespecteerde discretieplicht. Welke bijkomende verplichtingen de banken moeten nakomen en welke gevolgen dit met zich brengt, zal door de systematische bespreking heen van de wet van 1992 ter bescherming van de persoonlijke levenssfeer gepoogd worden na te gaan.

### II. HET NORMATIEF KADER

13. Het privé-leven werd voor het eerst beschermd in art. 8 EVRM. [24] Dit werd gevolgd door art. 17 van het UNO-pact betreffende de burgerlijke en politieke rechten. [25] Deze twee verdragsbepalingen hebben beide rechtstreekse werking. [26] Ze zijn ongetwijfeld de grondslagen van de huidige Belgische wet ter bescherming van de persoonlijke levenssfeer. Toch moet hun bruikbaarheid t.a.v. de banksector minstens gerelativeerd worden; grondrechten zijn er in de eerste plaats wat betreft de relatie burger-staat (privacy = the right to be let alone). De horizontale werking van de grondrechten (bv. de relatie cliënt - bank) is en blijft een betwist domein.

14. Op 28 januari 1981 werd in het raam van de Raad van Europa de Conventie nr. 108 gesloten. [27] Deze Conventie werd nog gevolgd door een aanbeveling van de Raad van Europa i.v.m. de bescherming van persoonsgegevens gebruikt voor betalingen en aanverwante verrichtingen [28] en een aanbeveling van het Ministercomité van de Raad van Europa betreffende de bescherming van persoonsgegevens voor direct-marketing-doeleinden. [29]

15. Op 8 december 1992 is dan de wet van 8 december 1992 betreffende de bescherming van de persoonlijke levenssfeer ten opzichte van de verwerking van persoonsgegevens tot stand gekomen (hierna: W.V.P.). [30] De inwerkingtreding van de wet werd uitgesteld tot 1 maart 1995. [31] Op de valreep [32] en net over de valreep [33] kwamen nog enkele belangrijke uitvoerende K.B.'s tot stand. Een deel hiervan

---

[24] Goedgekeurd bij wet van 13 mei 1955, *B.S.*, 19 augustus 1955.

[25] Goedgekeurd bij wet van 15 mei 1981, *B.S.*, 6 juli 1983.

[26] VELU, J., *Les effets directes des instruments internationaux en matière de droit de l'homme*, Brussel, Swinnen, 1982, 120 pp.; DUMORTIER, J., *Europese en Belgische reglementering over de behandeling van persoonsgegevens*, Leuven, ICRI, 1993, 5-6.

[27] Conventie Raad van Europa tot bescherming van personen t.o.v. de geautomatiseerde verwerking van persoonsgegevens, goedgekeurd bij wet van 17 juni 1991, *B.S.*, 30 december 1993.

[28] R (90) 19 van 13 september 1990.

[29] R (85) 20 van 25 oktober 1985.

[30] Wet tot bescherming van de persoonlijke levenssfeer ten opzichte van de verwerking van persoonsgegevens, *B.S.*, 18 maart 1993, als gewijzigd door de wet van 22 juli 1993, *B.S.*, 26 juli 1993 en wet van 30 juni 1994, *B.S.*, 18 augustus 1994.

[31] Wet 30 juni 1994 houdende wijziging van art. 52 W.V.P. 1992, *B.S.*, 18 augustus 1994.

[32] K.B. nrs. 7, 8, 9 van 7 februari 1995 ter uitvoering van de Belgische Wet Verwerking Persoonsgegevens, *B.S.*, 28 februari 1995.

[33] K.B. nr. 12 van 7 maart 1995 ter uitvoering van de Belgische Wet Verwerking Persoonsgegevens, *B.S.*, 14 maart 1995.