# EXHIBIT P

A.R. A/10/02453

---

### SUPPLEMENTARY PLEADINGS
of 19 March 2012

---

For:  **LAZARE KAPLAN INTERNATIONAL INC.**, company pursuant to the law of Delaware (United States of America) with principal place of business at New York 10036 (United States of America), 19 West 44th Street, 16th Floor.

Summonsed in the main claim
Plaintiff in the counterclaim in subordinate order

with as Counsel Maître Francine WACHSSTOCK, with offices at 2018 Antwerp at Van Bréestraat 20

LAZARE KAPLAN BELGIUM N.V., with principal office at Hoveniersstraat 30 at 2018 Antwerp,

Voluntarily intervening party

with as Counsel Maître Francine WACHSSTOCK, with offices at 2018 Antwerp at Van Bréestraat 20

Versus:  **ANTWERP DIAMOND BANK N.V.**, with principal office at 2018 Antwerp, Pelikaanstraat 54, with enterprise number BE-404.465.551

Plaintiff in the main claim
Summonsed on the counter claim in subordinate order

with as Counsel, Maître Bob DELBAERE, with offices at 2600 Berchem, at Generaal van Merlenstraat 3

---

### COURT OF COMMERCE AT ANTWERP
### 7TH CHAMBER

---

Subject to all reserve and without making any disadvantageous acknowledgements.

Having regard for the summons introducing the proceedings dated 16 March 2010

Having regard for the pleadings of pleading party dated 15 October 2010

Having regard for the supplementary pleadings of plaintiff dated 31 December 2010

Having regard for the supplementary pleadings of pleading party dated 28 February 2011

Having regard for the summarizing pleadings of plaintiff dated 31 May 2011

Having regard for the voluntary intervention of Lazare Kaplan Belgium NV (referred to hereinafter as LKB) on 20 July 2011

Having regard for the pleadings of Lazare Kaplan International dated 19 September 2011

Having regard for the injunction of the Court of Commerce at Antwerp dated 14 October 2011 setting a timetable for pleadings with the agreement of all parties.

Having regard for the pleadings of plaintiff dated 19 December 2011.


I.    PRELIMINARY REMARKS

Having regard for the summons of plaintiff with introduction date 23 June 2010.

Having regard for the injunction of the Court of Commerce of 4 August 2010 in which a timetable for pleadings was determined for the proceedings in which the claim of plaintiff is disputed in its entirety, namely a credit agreement in New York that was handed over by the New York office of plaintiff to pleading party.

Having regard for the timetable for pleadings, pleading party now takes its fourth pleadings on 19 March 2012, period determined by injunction of the Court of Commerce at Antwerp dated 14 October 2011 in accordance with the timetable agreed by parties.

Below pleading party will also dispute the competence of the Court of Commerce to hear this dispute.
As pleading party has already pointed out the proceedings concern a credit agreement reached in New York by the US office of plaintiff to pleading party, a company established in New York in the United States of America.

The credit in US dollars was negotiated in New York, signed in New York and further processed in New York.

According to plaintiff's own exhibits the loan is subject to the law of New York, which means that all matters concerning the applicability of the loan contract must be handled further to the law of New York and all legal proceedings concerning the loan contract must be filed in New York or before a court that according to the law of New York has jurisdiction for the dispute.

Plaintiff and pleading party have since 2009 been in dispute in New York in connection with accusations of the lamentable conduct of plaintiff in connection with a New York credit facility, which is the subject of these proceedings. The aforementioned dispute in New York dates from before these proceedings and should be resolved in New York in accordance with US law.

That in the meantime Lazare Kaplan International has started legal proceedings against Antwerp Diamond Bank and against KBC Bank on 23 December 2011 before the United States District Court Southern District of New York, where the proceedings are known as Civil Action no. 11-cv-9490 (**see Folder XXII, Exhibit 1**)

That both parties have taken the necessary steps before the Court at New York for the further pursuit of the proceedings in New York, The proceedings concern a claim of Lazare Kaplan International under the Racketeering Influenced and Corrupt Organizations Act ("RICO") (**see Folder XXII, Exhibit 1**)

In these proceedings LKI seeks a sum of least USD 500 million from ADB and KBC.

That the Courts of New York have jurisdiction over the dispute between parties as described in these pleadings and the courts at Antwerp lack jurisdiction.

That pleading party files these pleadings subject to the reserve of all its rights.

## II.     IN FACT

## A.     THE NEGOTIATION AND SIGNING OF THE LOAN CONTRACTS IN NEW YORK PURSUANT TO AMERICAN LAW

That pleading party Lazare Kaplan International Inc. (referred to hereinafter as "**LKI**") is a public incorporation established in the United States of America and has had a financial relationship with plaintiff Antwerp Diamond Bank N.V. (referred to hereinafter as "**ADB**") for more than 10 years.

That ADB itself presents itself in page 2 of its pleadings of 31 December 2010 as "*a Belgian Bank which is active solely in the diamond industry*".
This assertion that ADB is active *solely* in the diamond industry is not correct.

That when confronted with this inaccuracy ADB added the following to its third pleadings of 19 December 2011, "*Pleading party has for many years played a leading role in the financing of diamond firms and their associated enterprises*".

In reality ADB has financed numerous other activities, among others those of Mr Erez Daleyot, in other fields for tens of millions of US dollars so that a real merry-go-round of international transactions arose without effective economic justification as described in LKI's RICO claim dated 23 December 2011 (**see Folder XXII, Exhibit 1**).

ADB finances other activities of diamond traders, such as real property activities in Eastern Europe and aircraft, for tens of millions of US dollars, for which apparently ADB lacks the necessary expertise (see for example DDM Holding CVA and the statements about same below).

That Antwerp Diamond Bank NV misrepresents the facts when it says that the loan contract was signed in Antwerp, which was not the case.

That the loan contracts were signed in the offices of pleading party in New York.

That the American branch of ADB in New York negotiated this (business) with pleading party and the documents were signed in pleading party's offices in New York.

That the general conditions in English which in the United States of America were applicable to ADB New York's clients are applicable to the relationship between parties (see **Folder 1, Exhibits 1, 2 and 3**).

That when the website of ADB in Antwerp is consulted only general conditions in Dutch [are displayed] and which are entitled General Conditions for Banking Operations (in Dutch) and that the English text [that is displayed] states that it is only a translation of the Dutch text (see **Folder 1, Exhibit 8**). These are completely different general conditions to those contained in the exhibits produced by pleading party (see **Folder 1, Exhibits 1, 2 and 3**; exhibits 4 and 5 in

plaintiff's bundle). This in particular proves that the general conditions produced by plaintiff and pleading party LKI in the English language, mentioning the jurisdiction of the Courts of New York, cannot even be consulted in Antwerp. The contract was thus signed in New York, subject to the general conditions in English that where available in that place.

That it has always been evident to parties that only the courts at New York have jurisdiction pursuant to the law of New York (see **Folder I, Exhibit 4** and **Folder IV, Exhibit 1**, namely letters from the lawyer Chris Sullivant, the US counsel for pleading party).

That pleading party shows that:

- LKI is established in New York and that it proceeded to the signing of the loan contract in its offices in New York;

- That the documents signed by pleading party were sent together with the written authorization of the Executive Committee of the Board of Directors of pleading party on 8 May 2008 via Fedex by Mr Moryto from the offices of LKI 19 West 44 Street, New York, NY 10036, to the offices of Antwerp Diamond Bank in New York at 1177 Sixth Avenue, New York, NY 10036, to the attention of Oakley Champine. That Fedex delivered the documents in that place on 9 May 2008 to the offices of Antwerp Diamond Bank's branch in New York at 09:45 local time (see **folder I, Exhibit 5**);

- Payments by LKI were made in US dollars to an American account held by ADB with KBC New York

That pleading party, however, must defend itself in connection with a vigorously strongly disputed claim.

That the dispute is very extensive and is governed entirely by US law.
That the Courts of New York have legal jurisdiction to hear the dispute such as described in these pleadings, and the courts at Antwerp have no jurisdiction.

That LKI has started RICO proceedings in New York in the USA on 23 December 2011 and LKI thus refers to the facts set out in same.


B.  THE START AND THE SMOOTH COURSE OF THE RELATIONSHIP BETWEEN THE BANK AND LAZARE KAPLAN INTERNATIONAL

That as mentioned above pleading party LKI has in the meantime started legal proceedings against Antwerp Diamond Bank and KBC Bank on 23 December 2011 before the United States District Court Southern District of New York (which has jurisdiction), where the facts of the case are set out very extensively in a document of 160 pages (**Folder XXII, Exhibit 1**). The Courts at New York have legal jurisdiction in respect of the dispute between parties such as described in these pleadings and the Courts at Antwerp have no jurisdiction.

That pleading party LKI nonetheless states the facts of the case once again below.

That plaintiff, ADB, is a bank that says it is solely active in the financing of the diamond and jewellery industries (see the 2008 and 2009 annual accounts of ADB, **Folder VII, Exhibits 1 and 2**).

That Antwerp Diamond Bank NV is one of the two major suppliers of finance to the diamond market and according to its annual accounts describes itself as the market leader.

That pleading party, LKI, had a credit line of USD 45,000,000 as confirmed by the credit confirmation letter dated 20 February 2008, and that pleading party was thus a very important customer of pleading party ADB.
That pleading party, LKI, always paid off the principal and the interest on the credit line correctly and that in no instance was there any defaulting payment.

## C.   THE PURPOSE OF THE CREDIT LINE AND ITS REPAYMENT

That as mentioned above pleading party LKI has in the meantime started legal proceedings against Antwerp Diamond Bank and KBC Bank on 23 December 2011 before the United States District Court Southern District of New York (which has jurisdiction), where the facts of the case are set out very extensively in a document of 160 pages (**Folder XXII, Exhibit 1**). The Courts at New York have legal jurisdiction in respect of the dispute between parties such as described in these pleadings and the Courts at Antwerp have no jurisdiction.

That pleading party LKI nonetheless states the facts of the case once again below.

That loans were provided to pleading parties in the context of the financing of its general operating requirements, which included the financing of the purchase of rough diamonds, including rough diamonds from Angola and DTC goods (rough diamond delivered ten times a year by Diamond Trading Company to its privileged customers – known as "DTC sightholders").

That plaintiff had to monitor, and was able to monitor, the diamond operations extremely closely, as for a relatively small bank such as ADB the financing of these has a large financial impact on its activities.

That ADB monitored the flow of goods and money, as the financing operations entailed very large sums of money (certainly in comparison with the limited equity of ADB, see in connection with the limited equity of ADB, **Folder VII, Exhibits 1 and 2**).

That this was determined by contract in the credit confirmation letter of 20 February 2008 (**Folder I, Exhibit 1**).

That aforementioned credit confirmation letter of 20 February 2008 was drawn up and signed in the US and that all this was done in the English language.

That the schedule to the credit confirmation letter sets out various amendments to the general conditions concerning bank transactions and various amendments to the general conditions regarding the provision of credit (see **Folder I Exhibit 1**).

That pleading party refers among other things to Article 5, in which it is provided that ADB was to be given information about the financing of purchases of rough diamond from the mines in Angola (**Folder I, Exhibit 1**)

Article 5:

*"Monthly a detailed list of outstanding receivables, not including Lazare Kaplan Japan and Bellataire + information on the prepayments to Angola (diamond from mines) due by the 25th of the following month"*

That it now appears that enormous quantities of goods belonging to pleading party (or associated companies) were diverted by ADB, behind the back of pleading party, and that the flow of finance associated with these goods passed via ADB, and that gigantic sums were involved.

That ADB knew of and even took part in these financial transactions, including those relating to the diamonds from Angola as well as the DTC goods.

D.    THE CONFLICT BETWEEN LAZARE BELGIUM AND DD MANUFACTURING AND THE ROLE OF ADB BANK AS THE BANKER OF BOTH

That as mentioned above pleading party LKI has in the meantime started legal proceedings against Antwerp Diamond Bank and KBC Bank on 23 December 2011 before the United States District Court Southern District of New York (which has jurisdiction), where the facts of the case are set out very extensively in a document of 160 pages (**Folder XXII, Exhibit 1**). The Courts at New York have legal jurisdiction in respect of the dispute between parties such as described in these pleadings and the Courts at Antwerp have no jurisdiction.

That pleading party LKI nonetheless states the facts of the case once again below.

That pleading party was doing business with companies of the group around the businessman Erez Daleyot, including the Belgian companies D.D. Manufacturing NV (referred to hereinafter as **DD**) and K.T. Collection BVBA (referred to hereinafter as **KT**), likewise customers of ADB.

That the Daleyot group of companies, one of ADB's most important customers, could draw on and apparently still draws on enormous lines of credit with ADB, which are said to be in excess of  USD 120,000,000.

That ADB financed both the diamond operations of pleading party's group and those of the Daleyot group both for very large amounts.

That ADB had a unique view of the affairs of both groups as well as of the monies that the Daleyot group, including DDT/KT and other companies of the Daleyot group owed to the LKI group.

That pleading party came into conflict with Daleyot and his companies, including DD and KT.

That plaintiff was informed by word of mouth and in writing of this, as well as of the course of development of the conflict, and ADB participated in this.

See among others the following letters (**Folder II, Exhibits 1 to 8 inc., and Folder III, Exhibit 1**).

- Letter to ADB from Lazare Kaplan Belgium dated 8 January 2009
- Letter to ADB from Lazare Kaplan Belgium dated 10 February 2009
- Letter to Lazare Kaplan Belgium from ADB dated 16 February 2009
- Letter to ADB from Lazare Kaplan Belgium dated 31 March 2009
- Letter to ADB from Lazare Kaplan Belgium dated 15 May 2009
- email to ADB from Lazare Kaplan Belgium dated 4 June 2009
- email to ADB from Lazare Kaplan Belgium dated 5 June 2009
- email to ADB from Lazare Kaplan Belgium dated 14 June 2009
- Letter to ADB from Lazare Kaplan Belgium dated 22 June 2009

That in this way ADB was regularly informed both in writing and by word of mouth of the fact that there were serious difficulties between DD, KT and other companies controlled by Daleyot and pleading party's group, and of the role of ADB in this dispute.

That ADB would have had to closely monitor the transactions, the progress of the goods and the money in order to keep an eye on the risks falling under its lines of credit.

That compared to the nominal capital of the plaintiff, enormous sums of money were involved as Daleyot's companies could draw on lines of credit in excess of USD 120,000,000, pleading party – LKI – could draw on USD 45,000,000, and the Belgian company, Lazare Kaplan Belgium could draw on USD 25,000,000 of credit.

That thus the companies which are locked in a fierce dispute are all customers of plaintiff, who together have outstanding loans for a total of about USD 200,000,000.
See for the purposes of comparison the limited equity capital of the bank (**Folder VII, Exhibits 1 and 2**, i.e. the annual accounts of ADB Bank).

That ADB received the money taken by DD, KT and other companies controlled by Daleyot and which arose from the sale of diamonds, the revenues of which belonged to the LKI group.

Internally ADB used this money to limit the reckless loans that ADB (partly in view of its limited equity) had granted to the companies controlled by Daleyot, via dummy companies that had accounts with ADB.

By authorizing unsecured loans for real property, aircraft and works of art to the Daleyot group, ADB's interests conflicted with those of LKI and LKB.

That precisely in the same period ADB made use of the opportunity to obtain additional securities in respect of the companies controlled by Daleyot, including DD (see **Folder VIII, Exhibits 4 to 6**) and did so at the expense of other creditors such as pleading party's group.

That these securities can in any case not be validly asserted in respect of pleading party, as has already been indicated in writing by Lazare Kaplan (see **Folder II, Exhibits 2 and 4**).

That this happened with the manifest knowledge and cooperation of the Bank.

That ADB was at all times the banker both of LKI and DD and was perfectly aware that DD was in default in connection with its financial obligations in connection with the revenues from the diamonds belonging to the LKI group, which should have been paid to the LKI group.

That ADB was fully aware, because of among other things the reports from both clients, of the large sums mentioned in the table shown in **Folder IX, Exhibit I** and which were deposited with ADB, of the supporting documents, and of the fact that the monies paid to ADB accounts related to the sale of rough diamonds, which revenues had to be repaid to the LKI group, including the revenues from the diamonds originating from Angola, and which among others were the object of the finance granted by ADB to pleading party.

That LKI provided ADB with a table of the payments that DD received to its accounts with ADB Bank and which were derived from the sale of the Angolan diamonds that belonged to LKI (or associated companies) for at least USD 77,736,872.31 (**Folder IX, Exhibit 1**)

That these goods and the associated money flows are so large that, for the small niche bank that is ADB, they represent almost half its nominal capital.

That this thus could not possibly have escaped the attention of a professional banker specialized in the diamond trade.

That ADB incorrectly states on page 12 of its summarizing pleadings that it has nothing to do with the disputes and proceedings of LKB, that it is said to be a matter of diamonds from Angola, which transactions are financed among others by ABN Amro  Bank.

First of all ADB is fully aware that diamonds bought in Angola by LKI/LKB were financed by ADB as expressly mentioned in the credit confirmation letter of 20 February 2008 (**Folder I, Exhibit 1**).
Of this 24 million dollars were embezzled by Daleyot with the help of ADB and the invoices of LKB to DD for this amount were pledged to ADB (see **Folder XIV, Exhibits 1 to 6 inc.).**
ADB thus had a view of the progress of the diamonds from Angola, and financed this itself.

Secondly ADB was aware of the USD 14 million of diamonds that Daleyot had been able to embezzle with the help of ADB. These were goods that were bought in the context of the sights at DTC, and here too the invoices of LKB to DD were financed by and pledged to ADB.

The USD 38 million (of diamonds) described above were sold by LKB to DD and KT subject to the reserve of ownership, which ADB was aware of. DD and KT then sold these diamonds on to their clientele, and the revenues from the sales ended up in the accounts of DD and KT at ADB, without the revenues from the sale ever being transferred to LKB by ADB.

The conflicting and double entries made by ADB played a crucial role in this, and the acceptance of the money from the sale of the diamonds subject to the reserve of ownership, where the bank was aware that the money had not been passed on to the supplier LKB (for the double entries in the accounts see **Folder XIII, Exhibit 1, annex 2**).

Third, in the case of Gulfdiam (company owned jointly by Lazare Kaplan and Daleyot), diamonds were embezzled by Daleyot by causing these diamonds to be sent from Gulfdiam to three other companies, including Gemport (see the organization chart in **Folder XX, Exhibit 2**).

Gemport, a Dubai company fully controlled by Daleyot, sent the diamonds to Diamco in Switzerland, and there the diamonds were sent to a company in Israel, formerly known as FTD, and now called ED Gems.
ED Gems sent these diamonds to Belgium, to DD and KT, who sold the embezzled diamonds. The revenue from these stones – more than 77 million dollars – was used to pay off their dramatic debit positions with ADB (**Folder XX, Exhibit 2**).

Gemport sent monies to Mauridiam (a Mauritius company likewise controlled by Daleyot) whereby at least USD 15 million was transmitted to the ADB account of DD (**see Folder XX, Exhibit 1**).
Moreover Mauridiam sent USD 30 million to the offshore company Hatilem, and Hatilem sent these monies back to the DDMH company on its account with DD.
See **Folder XVIII, Exhibits 1 to 6 inc.** for the financial set-up arranged by Mauridiam, Erez Daleyot and DD.
ADB was nonetheless aware of this and it actively financed a whole range of offshore companies from November 2007 on (see **Folder XVIII, Exhibit 7**).
On 28 July 2008 it appeared that ADB was fully aware of the circulation of funds between Mauridiam and Erez Daleyot (see **Folder XVIII, Exhibit 8**).
Only after the complaints of pleading party did ADB start to ask questions of DD. On 24 November 2009, DD sent a description of Mauridiam and its real property investments to the bank (see **Folder XVIII, Exhibit 9**).
According to the email of 25 February 2009 from ADB to DD it seemed that the bank could make nothing at all of it and it sent a series of questions about the structure and the shareholders (**Folder XVIII, Exhibit 10**).

What it really comes down to is that when LKB first wrote to ADB on 8 January 2009 asking about missing diamonds and sums of money, the bank suddenly started to ask questions – in February 2009 – about the tens of millions of USD that had vanished via ADB accounts, and

Cypriot companies with Swiss bank accounts in order to purchase real property in Central and Eastern Europe, aircraft and works of art.

That this gigantic merry-go-round of money flows in and out of ADB accounts are described in great detail in the RICO complaint of 23 December 2011 (see **Folder XXII, Exhibit 1**).

That the Courts at New York have legal jurisdiction for this dispute between parties such as described in these pleadings and the courts at Antwerp do not have jurisdiction.


E.   THE ATTITUDE OF ADB

E.1   The attitude of ADB in respect of LKI

That as mentioned above pleading party LKI has in the meantime started legal proceedings against Antwerp Diamond Bank and KBC Bank on 23 December 2011 before the United States District Court Southern District of New York (which has jurisdiction), where the facts of the case are set out very extensively in a document of 160 pages (**Folder XXII, Exhibit 1**). The Courts at New York have legal jurisdiction in respect of the dispute between parties such as described in these pleadings and the Courts at Antwerp have no jurisdiction.

That pleading parties LKI and LKB, referred to hereinafter as pleading party, nonetheless state the facts of the case once again below.


a) Period January 2009 to September 2009

That in the period January 2009 to June 2009, pleading party informed its banker, ADB, on various occasions of the dispute between Lazare Kaplan and DD (see the letters addressed to ADB in this period in **Folder II, Exhibits 1 to 8 inc. and Folder III, Exhibit 1**).

That on 29 January 2009 ADB wrote to DD that it was "out of cover", or in other words had exceeded the conditions of its credit, and that ADB was extremely concerned by the gigantic private withdrawals from DD (see **Folder XIII, Exhibit 1, annex 9**).

That, however, ADB adopted a hypocritical attitude.
For example on 16 February 2009 it wrote to LKB that it would not intervene in the dispute between LKB and DD and that all transactions with DD had proceeded in accordance with the principles of the law (Folder II, Exhibit 3).

That, however, on 13 March 2009 ADB went behind the backs of LKB and LKI and wrote to DD with specific questions about its position in respect of LKI and LKB, and asking DD to inform KBC of this too (**Folder XIII, Exhibit 1, Annex 6**, letter from ADB to DD dated 13 March 2009).

That afterwards ADB asked for a report from DD about its commercial relations with LKI. DD then handed this report to ADB's legal adviser on 8 April 2009 (**Folder XIII, Exhibit 1, Annex 7**, email of 8 April 2009 from the Financial Manager of DD to KBC).

Contrary to what ADB argues in its summarizing pleadings, namely that it was only recently informed of the dispute, it appears from the exhibits that it had asked DD and KT for information. Moreover LKB handed over the complete bundle of the interlocutory proceedings on 25 June 2009, and ADB signed for its receipt on 26 June 2009 (**Folder II, Exhibit 9**).

ADB made no mention at all to LKB of the fact that it had asked for a report from DD and nor did it mention the conflicting accounting entries in the bank.

That ADB refused to communicate with LKB and LKI about LKI's vanished money.

That even in the letter of 22 July 2009 from a Lazare Kaplan company to ADB about the flows of money and the knowledge of ADB concerning same, no substantive response was forthcoming.

   b) <u>Period September 2009 to 28 December 2009</u>

That according to pleading party the way pleading party's dossier was handled was unusual (see **Folder V, Exhibit 17**, letter 7 March 2010 from LKI to ADB, and **Folder VII, Exhibit 1**, letter of 23 March 2010 from the American counsel for LKI to the American counsel for ADB).

That according to pleading party certain persons did not conduct themselves as one would expect of a normal professional banker acting in the same circumstances.

ADB was under pressure to keep DD afloat in view of ADB's great financial exposure to the Daleyot companies, which exposure had been recklessly allowed to grow unchecked; this led to ADB acting improperly.

ADB was aware at the time that a company of the Lazare Kaplan group was awaiting the payment of about USD 38 million, which had to be paid by DD and KT further to invoices, which had been pledged to ADB.

ADB then incorrectly decided to continue supporting DD and KT, because it was under pressure because of its great exposure.

Monies arising from the sale of diamonds belonging to Lazare Kaplan ended up in ADB Bank, but were not credited to the Lazare Kaplan accounts and the Bank was entirely aware of this and ADB manipulated its accounts.

Thereafter the Bank slily attempted to put pressure on the Lazare Kaplan companies.

The conduct of ADB was clearly not that of a normal banker acting under the same circumstances, as such a banker would have carefully monitored the situation.

All the rules were trampled on (see later), something which culminated in the deliberate termination of pleading party's credit lines on 28 December 2009, in an attempt to force LKI into submission.

That in doing so, ADB Bank did in September 2009 deliberately sow confusion by making written allegations against the subsidiary company of pleading party, which was supposed to have breached its exclusivity covenant by agreeing a credit facility for USD 5.2 million with another credit institution.

A normal banker acting in the same circumstances would not have behaved in this way and would first of all have checked the facts.
This in itself shows in what an underhand way Lazare Kaplan was treated by ADB.

Plaintiff ADB Bank wrote on 28 September 2009 to Mr Moryto of Lazare Kaplan (**Folder III, Exhibit 2**):

> "*this is creating an event of default under the credit agreement and allows the bank to immediately terminate or suspend the loan as a whole*".

When confronted with evidence that the allegations of the Bank were baseless (**Folder III, Exhibit 3**), plaintiff was on 1 October 2009 obliged to change tack, to excuse itself in writing to pleading party and ADB then said that in contrast to its earlier communications there had indeed been no *event of default* on the part of Lazare Kaplan (**Folder III, Exhibit 4**).

That upon the examination of this incorrect written presentation of the facts, it appeared that KBC, the parent company of ADB, had made these incorrect facts public (see in connection with the explicit reference to KBC – **Folder III, Exhibits 4, 4bis, 4ter**).

That this conduct of plaintiff cannot be reconciled with the behaviour of a professional banker active in the diamond industry, who must act prudently and with caution.

As a professional banker ADB was fully aware that at the time LKI was a publicly traded company in the United States of America, but that it nonetheless proceeded to make incorrect written statements about a Lazare Kaplan company, and subsequently had to recant these statements.

It is clear that Lazare Kaplan reserves all its rights and makes all due reserve for all losses in the widest sense of the word, and that these will be claimed from ADB by reason of its underhand conduct in the most appropriate forum.

That this all too transparent attempt of the Bank was undoubtedly part of a deliberate attempt to destabilize the Lazare Kaplan group.

c) period from 28 December 2009 and thereafter

That hardly 3 months later on 28 December 2009, the credit lines of pleading party were prematurely terminated (see **Folder IV, Exhibit 1**).
That the termination of the loans took place between Christmas and New Year when LKI's senior management was on holiday.

That on 6 January 2010 LKI sent a letter by Fedex from its offices in New York, 19 West 44th Street, New York, about the peculiar behaviour of ADB Bank to Antwerp Diamond Bank NV, 1177 Avenue of the Americas, 7th Floor, NY, New York 10036.
Attached to this letter was a copy of the letter of 29 July 2009 to Antwerp Diamond Bank, which had remained unanswered by the latter, even though its content was alarming (**Folder V, Exhibit 1**).

That subsequently there was a very extensive exchange of letters between pleading party and ADB in January 2010 until March 2010 (see **Folder V, Exhibits 1 to 20 inc.).**

That there was also a correspondence between the American counsel for LKI and American counsel for ADB on 23 March 2010 (**see Folder VI, Exhibit 1**).

E.2.  ADB TERMINATED THE LKI CREDIT BECAUSE OF ITS EXPOSURE TO THE DALEYOT COMPANIES

At the time ADB's exposure to the companies of Erez Daleyot, including DD, KT and DDM HOLDING CVA amounted to USD 120,000,000.

ADB, alarmed by the letter of 8 January 2009 from LKB to ADB (**Folder II, Exhibit 1**) realized that DD's debts were of gigantic proportions and started to write to DD. On 29 January 2009, ADB wrote to DD that it was "out of cover" by more than 83 days and that this for a sum that had grown to over USD 76 million (**Folder XIII, Exhibit 1, annex 9**).
In the same letter ADB also referred to the fact that Mr Erez Daleyot had allowed his current account in respect of his company to grow from 16 million euros to over 25 million euros.

Specifically this means that Mr Erez Daleyot was draining his company of funds via the ADB accounts for a sum of more than 25 million euros (or more than a billion Belgian francs).
ADB thus paid these sums directly to third parties for the account of Daleyot and thus took an active hand in draining the companies of funds.

That in fact this did not escape the attention of the chartered accountant-statutory auditor, Van Herck, who complained about it in the report of the statutory auditor attached to DD's annual accounts for financial 2008 (see the Van Herck report attached to the balance sheet and annual accounts, **Folder XVI, Exhibits 1 and 2**).

ADB was in an exposed position for the unsecured loans that it had granted to the DD group for (the purchase of) real property, works of art and aircraft.

The draining of funds from the DD and KT companies (both debtors of LKB) was implemented via ADB accounts in the following way:

The monies that ADB had lent to DD and KT passed through ADB accounts to another company incorporated by Erez Daleyot in which Erez Daleyot is the director-manager, namely the Belgian company DDM HOLDING CVA, with enterprise number 0886.952.261 (hereinafter **DDMH**).

It should be pointed out that DDMH has an offshore subsidiary, namely EKT Air Services Ltd, a Cypriot company (see **Folder XI, Exhibits 1 to 4 inc**., being the deed of incorporation of DDMH by Erez Daleyot, and three annual accounts for DDMH, for the financial years 2007, 2008 and 2009, and accompanied by a statement by Erez Daleyot that the net assets of the company have fallen to below one quarter of the nominal capital; the annual accounts show immense losses).

DDM HOLDING lent enormous sums (several million euros) from its ADB account to the Cypriot company EKT Air Services Ltd., and subsidiary of DDM HOLDING, and EKT Air Services Ltd. has its bank accounts in offshore centres.

Later on it turned out that the monies lent by ADB outside Belgium had disappeared, and ADB was left without any guarantees, in a period of economic crisis, and ADB saw no way of recovering these enormous sums.

The annual accounts of DDM HOLDING filed with the National Bank of Belgium reveal a complete financial disaster for the years 2007-2008-2009.

ADB took possession of over USD 77,000,000 (see **Folder V, Exhibit 5**) of the monies derived from the sale of diamonds, and which were intended for Lazare Kaplan, in order to cover ADB's position in respect of Daleyot's companies:

- ADB had a very good motive for acting in this way: its exposure of USD 120,000,000 to the Daleyot companies;

- ADB then supported DD in order to avoid a crash of the Daleyot companies, because ADB had lent enormous amounts to DD and KT via ADB accounts.

- These monies were passed on via ADB accounts to DDMH, which has no diamond activities (see the corporate purpose of DDMH, **Folder XI, Exhibit 1**, in which diamonds are not mentioned at all).

- DDMH granted a loan via ADB bank accounts to EKT Air Services, a Cypriot company, with an office address in Switzerland (as mentioned in the annual accounts of DDMH) and a Swiss bank account, so that the monies lent by ADB went to Switzerland for the purchase of private aircraft.

- DDMH passed money on via its ADB account, via KERTALOR's ADB account to companies with activities in Eastern Europe, such as Hatilem Enterprises Ltd. All these monies were passed on via ADB and the money was clearly not destined for financing diamond trading activities.

- Large sums in US dollars were received on DD bank accounts with ADB which came from a foreign company in Mauritius called Mauridiam and the bank apparently failed to make any kind of examination of the structure of Mauridiam and the origin of these monies.

- The same applies to the large sums received from and transferred to the Cypriot company called Hatilem in connection with real property in Eastern Europe. ADB had been aware of the structure of the Daleyot companies since November 2007 and ADB knew of Mauridiam's holding in Gulfdiam (in connection with Mauridiam see **Folder XVIII, Exhibit 1**, for the structure of the Daleyot companies see **Folder XVIII, Exhibit 7**, i.e. an email dated 28 November 2007 from DD to ADB).

Even though LKI continued to insist on an examination of the state of the bank accounts of DD and KT by ADB bank and of the large flows of money in order to locate the monies that belonged to the Lazare Kaplan companies and that derived from the sales by DD and KT of diamonds belonging to the Lazare Kaplan companies, and where the revenues from same were not allocated by ADB to Lazare Kaplan, ADB refused to make an appropriate response.

That ADB could on the one hand not remain watching Lazare Kaplan's account, with respect to which it held pledged invoices of sales by Lazare Kaplan companies to Daleyot companies and on the other hand allow the flow of tens of millions of dollars with transfers of funds to and from the ADB bank accounts of Daleyot companies with sums coming in from HSBC Geneva and Mauritius and sums going out to the Swiss accounts of Cypriot companies.

To summarize, ADB was in no position at all to recover the USD 120,000,000 that it had loaned to the Daleyot companies and which had then in turn transferred these monies to companies and bank accounts in countries such as Switzerland, Dubai and Cyprus for financing non-diamond related business such as aircraft and real property in Eastern Europe, which took place with the knowledge of ADB, as this money passed through ADB accounts.

The pressure on ADB to recover the money was enormous.
On 13 March 2009, ADB asked DD to provide information about the investments in Central and Eastern Europe, as well as information about its net positions in respect of LKI and LKB (see **Folder XIII, Exhibit 1, annex 6**).
From the letter it also appears that two experts from KBC Bank NV were scheduled to visit the DD company on 20 March 2009.
What is truly startling is that ADB did not know what real property projects were being financed in Central and Eastern Europe and started to ask questions about the investment structures, the companies involved and their possible links with the DDM group.
In reality the monies that ADB had loaned to DD and KT on their ADB accounts flowed via the ADB accounts of DDMH and Kertalor, without ADB obtaining any kind of mortgage or other

security on these real property projects, the aircraft ordered for private use, the luxury yachts, etc.
All in all more than 10 million euros were diverted from DDMH to EKT Air Services, a Cypriot company with a Swiss bank account, and where EKT's shares were not even given in pledge to ADB, which either deliberately or otherwise omitted to ever ask for such security.

With this pressure on it ADB found a way of appropriating more than USD 77,000,000 (see the letter of 4 February 2010 from the US counsel of LKI to the US counsel of LKB sent from New York to New York, **Folder V, Exhibit 5**, with a table listing roughly USD 77,000,000, the content of which was never disputed by ADB).

As professional bankers of Lazare Kaplan ADB had been long aware that Lazare Kaplan sold its diamonds to DD subject to the reserve of ownership.
Specifically this means that the diamonds DD sold to its customers for more than 77 million euros were not DD's diamonds for as long as DD did not pay its supplier.

However ADB was not at all bothered by the fact that DD sold the diamonds to its customers and then credited the 77 million dollars from the sales to DD's debit account with ADB.

On 8 April 2009, DD's financial manager promised KBC to reduce the outstanding debit of USD 95 million to USD 51.9 million while at the same time explicitly referring to the "LKI Report" (**Folder XIII, Exhibit 1, annex 7**).

ADB's concern was limited exclusively to seeing the huge credit line authorized to DD-KT of roughly USD 120,000,000 to be reduced and this was purely in its own interest.
At that time ADB was in a very difficult situation because the amounts owed by DD-KT and the Daleyot companies were apparently more than the amount that a bank is allowed to lend to a single debtor.

The bank, finding itself with its back to the wall, simply closed its eyes and in June 2009 allowed itself to receive USD 20 million in six transfers from HSBC Geneva, Switzerland to ADB, and supported by an agreement between HSBC and ADB (see **Folder XX, Exhibit 3**).

See for example:

- USD 4,000,000 from DKT Diamonds Ltd. (an offshore company), which came from HSBC Geneva from an offshore company of Erez Daleyot to DD on or about 28 May 2009;

- USD 3,000,000 from DKT Diamonds Ltd. (an offshore company), which came from HSBC Geneva from an offshore company of Erez Daleyot to DD on or about 10 June 2009;

It thus appears that:

- On **15 May 2009** Mr Maurice Tempelsman, Chairman of LKI complained in writing to Mr Guy Snoeks of ADB about the obstructive strategy of DD regarding an independent audit carried out by a third party, such as had been agreed between parties (see **Folder V, Exhibit 5**)

- It is remarkable that 14 days later, on about **28 May 2009** ADB Bank received a sum of USD 4,000,0000 on the account of DD with ADB in Antwerp, which came from an offshore company called DKT Diamonds Ltd. which belonged to Mr Erez Daleyot, and which money came from the Swiss Bank, HSBC Geneva.

- A couple of days later, **on 4 June 2009**, Mr Maurice Tempelsman of LKI wrote again to Mr Guy Snoeks of ADB, again complaining that LKI had not received an answer to its letter of 15 May 2009 once again complaining (translation into English of a passage in Dutch that was originally in English) "*the independent audit by a third party which had been agreed is apparently being obstructed. There is no rational explanation  that I can give to the Board of LKI – or for that matter to anybody else – of why this independent audit by a third party should be obstructed*" (see **Folder II, Exhibit 6**).

- One day later on **3 June 2009** Mr Guy Snoeks of ADB offered to set up a meeting in the same week (see Folder II, Exhibit 7)

- About 5 days later on **Wednesday 10 June 2009** a payment of USD 3,000,000 was made by DKT Diamonds Ltd., an offshore company belonging to Mr Erez Daleyot, from a Swiss bank account with HSBC Geneva, to a Belgian bank account held with ADB in Antwerp in the name of DD Manufacturing NV. ADB ignored the origins of the money, even though DD account was being monitored on a daily basis.

- A day later on **Thursday 11 June 2009** in the afternoon there was a follow-up meeting between Mr Bill Moryto of Lazare Kaplan and ADB Bank at which it was stressed that ADB carefully monitored the positions of the accounts between LKB and DD-KT (see email 15 June 2009 from Mr Bill Moryto of Lazare Kaplan to Mrs Snyers of ADB, Folder II, Exhibit 8)

- On **Monday 15 June 2009** Mrs Veerle Snyers confirmed by email the receipt of Mr Bill Moryto's email of 15 June 2009 (see the email of 15 June 2009 from Mr Bill Moryto from Lazare Kaplan to Mrs Snyers of ADB, **Folder II, Exhibit 8**).

It now appears that ADB received USD 20 million in 6 transfers to the accounts that DD keeps with the bank, all made from HSBC Bank in Geneva for the account of the dummy corporation DKT Diamonds Ltd (see **Folder XX, Exhibit 3**).

A simple examination by ADB of the company documents would have revealed that DKT Diamonds had only one shareholder, the Israeli company Ildia Holdings, which in turn has only one shareholder, namely Equalia Trust Services of Liechtenstein (see **Folder XX, Exhibits 1 and 2**). Such an examination would also have revealed that DKT Diamonds no real diamond activities.
What this comes down is that ADB allowed itself to receive USD 20 million in June 2009 while being very well aware that LKI was complaining about the embezzlement of diamonds and monies for a value of USD 135 million.

In these circumstances ADB did not act as a prudent professional banker – lender placed in the same circumstances. After all it is extremely telling that on 16 May 2011, pending this dispute ADB promoted Mr Guy Snoeks, who was a member of ADB's management committee and was responsible for this dossier, to a faraway spot in Slovenia (see Folder XVII, Exhibit 1).

The Lazare Kaplan Group (LKG) has been the victim of a fraud, in which ADB willingly and knowingly took a part.

In October 2010 ABN Amro Bank confirmed the claims of LKG by agreeing a settlement with it.

On 1 July 2011 the merits of LKG's claims were again confirmed by the Lloyd's underwriters and LKG agreed a settlement with respect to which it believes that it is the largest settlement ever for claims in diamonds and gems. Specifically LKG has received USD 60 million from its insurers as a result of the settlement (see **Folder XIII, Exhibit 1, annex 10**, i.e. the press release about the settlement with the insurers).

Although the insurers have nonetheless taken account of the embezzlement of monies and diamonds at the expense of Lazare Kaplan, ADB, despite being extensively warned, received USD 20 million on the DD account, which was deep in the red, from HSBC Geneva.

That as mentioned above pleading party LKI has in the meantime started legal proceedings against Antwerp Diamond Bank and KBC Bank on 23 December 2011 before the United States District Court Southern District of New York (which has jurisdiction), where the facts of the case are set out very extensively in a document of 160 pages (**Folder XXII, Exhibit 1**). The Courts at New York have legal jurisdiction in respect of the dispute between parties such as described in these pleadings and the Courts at Antwerp have no jurisdiction.

That pleading party LKI nonetheless states the facts of the case once again below.

The problem of HSBC and diamond traders is well known (see the newspaper articles **in Folder XII, Exhibits 1 and 2**) and it shall be subjected to legal scrutiny in the United States of America.

The conduct of ADB was not that of a normal professional banker acting in the same circumstances.

That in the meantime criminal proceedings have been started against HSBC. That the US counsel of LKI has given notice to HSBC to produce certain documents, specifically the banking documents from which the relationships of HSBC with ADB are apparent (see

**Folder XXIV**, **Exhibit 1**, letter dated 23 February 2012 from the lawyer Chris Sullivan to the HSBC group about the back-to-back transactions between HSBC and ADB and the specific bank accounts of dummy companies around Daleyot with bank accounts with HSBC.

The criminal investigation of HSBC has now entered an active phase according to HSBC's own statements:

- Press clipping dated 27 February 2012 "HSBC states that it may face criminal charges for transactions" (see **Folder XXIV, Exhibit 2**).

- Press clipping dated 27 February 2012 "HSBC says U.S. money-laundering enforcement measures 'likely'" (see **Folder XXIV, Exhibit 3**).

In view of the current criminal investigation of HSBC, the chances that the back-to-back transactions between HSBC and ADB are high and it is even probable that HSBC will itself take the initiative in the context of the negotiation in the United States of America of a "deferred prosecution agreement".

These back-to-back transactions will show that the conduct of ADV was not the conduct of a normal professional banker acting in the same circumstances.

In order to solve its own problems ADB appropriated monies destined for Lazare Kaplan, and failed to allocate these to Lazare Kaplan.

ADB has been reimbursed as it was ADB who received these monies.

The compensation for damages that LKI claims in the United States of America are huge and in this connection LKI refers to the RICO complaint dated 23 December 2011 (**Folder XXII, Exhibit 1**).

That moreover there is a criminal investigation pending against ADB which is being pursued by examining magistrate C. VANWAMBEKE and which was started by another customer of the bank. That this plaintiff has attached the RICO complaint of pleading party, which is a public document, to the file of the criminal investigation (see more below).

That in the meantime criminal investigations have been started of the partners of Daleyot, including Mr ARABOV (see more below, see also the **exhibits in Folder XXII and Folder XXIII**).

F. <u>THE UNTIMELY TERMINATION OF THE CREDIT BY ADB AFTER LKI MADE A PURCHASE AND PAID ABOUT USD 10 MILLION</u>

That as mentioned above pleading party LKI has in the meantime started legal proceedings against Antwerp Diamond Bank and KBC Bank on 23 December 2011 before the United States District Court Southern District of New York (which has jurisdiction), where the facts of the case are set out very extensively in a document of 160 pages (**Folder XXII, Exhibit 1**). The Courts at New York have legal jurisdiction in respect of the dispute between parties such as described in these pleadings and the Courts at Antwerp have no jurisdiction.

That pleading party LKI and LKB, referred to hereinafter as pleading party, nonetheless states the facts of the case once again below.

That at the end of 2009, the receiver of the bankrupt diamond firm Overseas Diamonds offered the stocks of this company for sale, and that Antwerp Diamond Bank NV held liens on these diamonds.

That only the largest traders in the diamond market had the financial muscle power to make offers for the very large diamond stocks of this bankrupt company.

That pleading party LKI put in the highest, and thus the winning, bid of a good USD 10 million, and was therefore able to buy the diamonds, and was able to do so despite there being a financial crisis.

That on 8 December 2009 the receiver instructed ADB to release the diamonds to the transport firm Brinks on behalf of the receiver (**Folder IX, Exhibit 2**).

That the payment was made by cheque drawn on a US bank, namely Bank of America, by pleading party.

That on 28 December 2009 Maître Annemie Moens, acting on behalf of the receiver of Overseas Diamonds informed both pleading party and plaintiff, ADB, that aforementioned cheque had been cashed, and that pleading party had therefore paid the price (**Folder IX, Exhibit 3**).

That therefore ADB was able to see in December 2009 that pleading party was able to purchase very large consignments of diamonds and pay for them as well.

That nonetheless ADB, acting in bad faith, decided on 28 December 2009 to terminate the credit facility of pleading party LKI. That this was unjustifiable and untimely (see below).

On 28 December 2009 a meeting between the US lawyers for ADB and Lazare Kaplan was scheduled for the first week of January 2010 (see **Folder IV, Exhibit 3**, email 28 December from Paul Michels, lawyer for ADB, to Chris Sullivan, lawyer for Lazare Kaplan).

That this was not the conduct of a normal professional banker acting in similar circumstances.


G.   THE TERMINATION OF THE FACILITIES AT A TIME WHEN THE PRINCIPAL
     AND THE INTEREST ON THE OUTSTANDING LOANS WAS BEING PAID
     WITHOUT DIFFICULTY BY LAZARE KAPLAN

That as mentioned above pleading party LKI has in the meantime started legal proceedings against Antwerp Diamond Bank and KBC Bank on 23 December 2011 before the United States District Court Southern District of New York (which has jurisdiction), where the facts of the case are set out very extensively in a document of 160 pages (**Folder XXII, Exhibit 1**). The Courts at New York have legal jurisdiction in respect of the dispute between parties such as described in these pleadings and the Courts at Antwerp have no jurisdiction.

That pleading party LKI and LKB, referred to hereinafter as pleading party, nonetheless states the facts of the case once again below.

That on precisely the same 28 December 2009, in the holiday period between Christmas and New Year – and on the same day that the receiver of Overseas Diamonds confirmed the payment by pleading party of roughly USD 10 million – ADB suddenly decided to terminate the facilities of LKI with notice of just two months (see **Folder IV, Exhibit 1**).

That this happened suddenly, even as parties were in discussions about the major problem with DD and the role that ADB had played in it.

That LKI's credit facilities were terminated without any valid reason being given, even though LKI had always made its payments in good time.

That this conduct of the Bank cannot be reconciled with the behaviour of a professional banker active in the diamond industry, who should act prudently and with caution.

That therefore there was no failure of payment on the part of pleading party which could have given reason for a professional banker acting in the same circumstances to terminate the credit facilities on 28 December 2009 in the way done so recklessly by ADB.

The termination of the credit facilities is incomprehensible, as ADB as a professional banker active, among other things, in the diamond industry, was fully aware of the fact that the Lazare Kaplan group was a member of the exclusive group of DTC sightholders.

The DTC sights are financed in Antwerp primarily by two banks: ADB and ABN Amro Bank. These banks know that the DTC sights have to be financed 10 times a year, and that it is in general relatively difficult to find financing in a period of just two months.

ADB was perfectly well aware that every DTC sightholder is the beneficiary of a rough diamond supply contract under the so-called Supplier of Choice (SOC) programme until 2012.

This thus means that ADB suspended the financing of a DTC sightholder during the current term of the contract with DTC, which is totally unreasonable and incomprehensible: after all the bank earns money by providing this finance.

ADB should at the very least have continued the financing until the end of the SOC contract between pleading party and DTC.

ADB is fully aware as professional banker of the fact that just a single default on payment on a DTC sight entails the risk of losing the right to be a sightholder; and exactly for this reason the decision of ADB to terminate the credit facilities with only two months' notice was extremely harsh. ADB put pressure on a publicly traded company during the term of a current contract, and this was a contract that it been financing for many years.

As far as LKI has been able to determine the termination of the credit facilities of a DTC sightholder during the term of the contract with DTC has never taken place before in Antwerp.

It should be clear that the aforementioned conduct of ADB (apart from the other unlawful conduct of ADB), is bound to give rise to claims for the compensation in full of all losses under the applicable law of this forum insofar it should have any detrimental effect on LKI.


## H.   THE LOSS TO LAZARE KAPLAN

That as mentioned above pleading party LKI has in the meantime started legal proceedings against Antwerp Diamond Bank and KBC Bank on 23 December 2011 before the United States District Court Southern District of New York (which has jurisdiction), where the facts of the case are set out very extensively in a document of 160 pages (**Folder XXII, Exhibit 1**). The Courts at New York have legal jurisdiction in respect of the dispute between parties such as described in these pleadings and the Courts at Antwerp have no jurisdiction.

That pleading party LKI and LKB, referred to hereinafter as pleading party, nonetheless states the facts of the case once again below.

That LKI has set out its claim for compensation for damages in the RICO suit of 23 December 2011.
That the loss increases every day, and that ADB is entirely aware of such but still does nothing to limit the loss to LKI and LKB.

## III.  IN LAW

### A.1  IN LIMINE LITIS: LACK OF LEGAL AUTHORITY AND JURISDICTION OF THE COURT OF COMMERCE AT ANTWERP WHEREAS PURSUANT TO THE CONTRACT THE COURTS AT NEW YORK HAVE JURISDICTION

That the credit facility between plaintiff and pleading party is governed by *a "Credit confirmation letter"* dated 19/20 February 2008 (see **Folder 1, Exhibit 1**).

That this document refers to the "*General Conditions for Banking Operations*" (**GCBO**) of November 2001 (see Folder I, Exhibit 3) and to the "General Credit Granting Conditions" (**GCGC**) of November 2001 (see **Folder I, Exhibit 2**).

That of these two documents, the General Conditions for Banking Operation (**GCBO**) are generally applicable to the keeping of accounts with the Bank (which is not directly the problem at hand), whereas the General Credit Granting Conditions (**GCGC**) are specifically applicable to the provision of credit and are thus in this case applicable to the situation, and should at least take precedence over the GCBO, as this is a matter of the provision of credit and the termination of such.

That Article 24 of the General Credit Granting Conditions provides (**Folder 1, Exhibit 2** – own underlining):

> "These General Credit Granting Conditions and any loan extended pursuant to the terms hereof shall be governed by and construed in accordance with <u>the law of the State of New York of the United States of America</u>. The foregoing choice of New York law to govern these General Credit Granting Conditions and any loan extended pursuant to the terms hereof shall prevail over any conflicting choice of law in any other document.
>
> The Bank may bring any legal action or proceeding with respect to these General Credit Granting Conditions or any loan extended pursuant to the terms hereof <u>in the courts of the State of New York in the Borough of Manhattan, City of New York, United States of America or in the Courts of the United States of America for the Southern District of New York</u>, and each of the borrower and the guarantor, surety or pledgor in respect of the obligations of the borrower hereby accepts for itself, and in respect of its property, generally and unconditionally, the jurisdiction of the aforesaid courts. In addition the Bank shall have the right to raise proceedings against any party before any other court having jurisdiction under applicable law.
>
> ...
>
> Each of the borrowers and any guarantor, surety or pledgor in respect of the borrower's obligations hereby appoints the person named in Schedule A attached hereto or in a

related documents as its agent for the service of legal process in New York in connection with these General Credit Granting Conditions or any loan extended pursuant to the terms thereof."

(followed by the translation of same in Dutch)

That thus it is absolutely clear that on the one hand it is the law of the State of New York in the United States of America that is applicable to the contractual relationship between pleading party LKI and ADB (also see below under B).

That on the other hand it is very clearly stipulated that only the courts of New York mentioned in Article 24 GCGC referred to above are authorized to hear a dispute about a loan granted under the General Credit Granting Conditions.

That therefore the Belgian courts do not have any legal authority to hear the dispute and should therefore declare themselves lacking legal authority and jurisdiction in favour of the Courts of New York in the United States of America.

That even in the interpretation of the contract most favourable to plaintiff, namely Article 24 GCGC, it is stated that "*The Bank shall have the right to raise proceedings against any party before any other court having jurisdiction under applicable law*", pleading party stresses that Article 24 GCGC clearly stipulates that the bank may only introduce proceedings before an

other court that has jurisdiction pursuant to the applicable law, i.e. US law (see below). Well, pursuant to US law a dispute concerning a loan granted by the New York establishment of a non-US bank to a Delaware corporation with its principal office in New York and subject to New York law and which comprises an acceptance of the jurisdiction of the Courts at New York, must be settled in the courts at New York.

That pleading party refers in this respect to the opinion in American law of Maître Sullivan of the office of Herrick Feinstein LLP dated 23 June 2010, which confirms the lack of jurisdiction of the Belgian courts and the jurisdiction of the courts of New York (see **Folder I, Exhibit 4**).

LKI also refers to the opinion of Chris Sullivan dated 26 August 2011 (**Folder I, Exhibit 6**) given in response to the opinion of the American lawyer acting for ADB dated 29 March 2011. It appears from the opinion of 26 August 2011, which is based on the extensive case law that the courts of New York have jurisdiction and that US law is applicable.

That the Court of Commerce at Antwerp should declare itself to be lacking legal authority and jurisdiction in favour of the courts at New York in the United States of America.

That LKI further remarks:

Should a Belgian court fail to abide by the express stipulations choosing for the law of New York and the courts of New York contained in the loan documents this would be severely and inequitably prejudicial to LKI.

LKI is a publicly quoted company that discloses all its banking contracts in its public filings with the Securities and Exchange Commission.
Shareholders who buy or sell LKI shares rely on these public filing when they take a decision to buy or sell LKI shares.

All the banking contracts of LKI (with ADB, ABN Amro and Bank Leumi USA) contain the same clauses concern the choice of New York law and the courts of New York.
This is so because the company negotiates and obtains such stipulations when it agrees loan contracts with its credit providers.

The choice of New York law, and the procedural and substantive means of law and recourse available in the courts of New York are substantial and are of extreme importance to the current business operations of the company and its ability to protect its rights and exert the means of law available to it.

This is the reason why the refusal of ADB to respect the choice of the stipulations about New York law and the courts of New York contained in the credit agreement with LKI represent a significant and inequitable disadvantage to LKI.

Both LKI and ADB are represented by New York lawyers in connection with the dispute about the credit facility that has arisen between them.

Notwithstanding the fact that LKI has repeatedly requested ADB to abide by the clauses choosing for New York law and the courts of New York, ADB has refused to do so.

By acting in this way ADB threatens to put LKI in a position whereby LKI would compromise its public communications to existing and potential shareholders, and it withholds from LKI that which it in primary order agreed in the credit agreement with ADB.

Both ABN Amro Bank and Bank Leumi USA have respected the clauses for choosing for New York law and the courts of New York in their credit agreements.

The failure to abide by same by ADB and the refusal to comply with it, puts LKI in the untenable and impossible situation of having to defend itself before the Belgian courts contrary to its right to proceed according to New York law and before the courts in New York.

LKI therefore claims and states in its pleadings before this court that it is has been involved in these proceedings subject to its protest and that it in no way waives or exempts itself from its right to enforce the clauses electing for New York law and the courts of New York that are mentioned in the credit agreement.

Only the Courts of New York can apply the law of New York to these proceedings between parties and lead to a ruling on this dispute that would not prejudice or affect the rights of parties and their means of law under the law of New York.

That the Court of Commerce at Antwerp should declare itself lacking in legal authority and jurisdiction in favour of the Courts at New York in the United States of America.


A.2. <u>GENERAL CREDIT GRANTING CONDITIONS TAKE PRIORITY AND PRECEDENCE OVER THE GENERAL CONDITIONS OF BANKING OPERATIONS</u>

The credit agreement of 28 February 2008 refers to two documents containing general conditions:

- The General Credit Granting Conditions (**Folder 1, Exhibit 2**)

- The General Conditions for Banking Operations (**Folder 1, Exhibit 3**).

As these are two different sets of general conditions there is of course a clause providing for when one should be applicable and when the other is applicable.

The dispute between the present parties concerns the obligation to repay or otherwise of a loan to ADB Bank NV and the way in which the credit was terminated.

It is then evident that the General Credit Granting Conditions (**Folder I, Exhibit 2**) are applicable.

The argument put forward by ADB Bank that these conditions are not relevant because there is now no further credit relationship between parties is legally a total nonsense.

The credit relationship between parties provided for a number of general conditions including the applicable law and the forum with jurisdiction should the credit relationship give rise to dispute.

These general conditions constitute party of the credit contract and continue to be the contractual conditions between parties even after the contract has come to an end.

The argument of ADB Bank is absurd. It would mean that after the termination of any contract whatsoever the conditions regarding applicable law and the court with jurisdiction is no longer applicable merely and solely because the contract has said to have been terminated.

That after all in other disputes between plaintiffs and its other clients-borrowers in New York in connection with the credit relationship, the plaintiff did in fact pursue the dispute in New York under US law, and subject to the same General Credit Granting Conditions.

See **Folder X**:

- **Exhibit 1**: Record of proceedings dated 9 August 2001 before the Supreme Court of New York between Antwerp Diamond Bank NV as plaintiff and SST Diamonds INC as defendant.

- **Exhibit 2**: Record of proceedings dated 19 January 2005 before the Supreme Court of New York between Antwerp Diamond Bank NV as plaintiff and Alison Gem Corporation as defendant.

That the position of plaintiff is thus entirely incorrect.

A.3  PLAINTIFF IN THE MAIN CLAIM INVOKED THE GENERAL CREDIT GRANTING CONDITIONS ITSELF

Whereas the position of plaintiff in the main claim developed in its pleadings of 31 December 2011 to the effect that the General Credit Granting Conditions are assertedly not applicable such conflicts with the position adopted in its correspondence;

That upon the (improper) termination of the loan plaintiff invoked these General Credit Granting Conditions (GCGC).

See:

- Letter of 28 December 2009 from ADB to LKI terminating the credit (**Folder IV, Exhibit 1**):

    *"Pursuant to Article 10 of the General Credit Granting Conditions which forms part of the Line Letter ..."*

- Letter of 3 March 2010 from ADB to LKI after the termination of the credit (**Folder V, Exhibit 14**):

    *"The current outstanding principal balance plus accrued interest due and owing under the Credit Facility as of the Termination Date is USD 43,295,452.90.*
    *In connection therewith and pursuant to Article 11 of the General Credit Granting Conditions (which forms part of the Line Letter)..."*


A.4  THE COUNTERCLAIM OF LKI WAS ENTERED IN SUBORDINATE MANNER AND THE ACTION FOR THE VOLUNTARY INTERVENTION OF LKB WERE WAS LIKEWISE ENTERED IN SUBORDINATE MANNER IN THE IMPOSSIBLE EVENT THAT THE COURT SHOULD DECLARE ITSELF TO HAVE JURISDICTION

 That in its pleadings of 19 December 2011 ADB attempts to sow confusion.

It states incorrectly that LKI had determined that the Courts at Antwerp were a competent forum to hear its counterclaim.

LKI stresses that this position of ADB is entirely incorrect. LKI and LKB once again emphasize that the Courts at New York have jurisdiction and that the law of New York is applicable.

The counterclaim of LKI was only entered in subordinate order against the impossible event that the Court should declare itself to have jurisdiction.

ADB attempts to sow the same confusion regarding the voluntary intervention of LKB. Here too this voluntary intervention was entered only in subordinate order against the impossible event that the Court should declare itself to have jurisdiction.

Pleading party LKB refers to the petition for voluntary intervention dated 20 July 2011, in which the operative part clearly states (own underlining)

> "Insofar the Court should declare itself to have jurisdiction
> To declare the voluntary intervention of petitioner to be acceptable and meritorious;"

The articles of the law invoked by ADB namely Jud. Code 565, 5° and Jud. Code 634 are incorrectly invoked and irrelevant because the counterclaim of LKI and the voluntary intervention of LKB were expressly entered in subordinated order in the impossible event that the Court should declaring itself to have jurisdiction.

It is clear that the dispute must be settled before the competent Court in New York.

A.5  PARTIES MADE EACH OTHER SUBJECT TO AMERICAN LAW AND FURTHERMORE THE GENERAL CONDITIONS IN THE ENGLISH LANGUAGE STIPULATE THE JURISDICTION OF THE COURTS AT NEW YORK

Plaintiff incorrectly states that all disputes between parties assertedly have their basis in Antwerp. Plaintiff has a "Representative Office" in New York in order to serve their American customers. For this reason therefore it signed an English language credit agreement with specifically English language general conditions (see **Folder I, exhibits 2 and 3**). These general conditions cannot be found on ADB's website in Antwerp, where only the Dutch language conditions are mentioned, accompanied merely by a translation into English (**Folder I, Exhibit 8**).
All transactions are in USD and were routed via the United States.
The Wikipedia article produced by plaintiff (its exhibit 12) indeed proves that the electronic clearing system for US dollar transactions take place in the United States.

B.  AMERICAN LAW IS APPLICABLE

That pursuant to Article 24 GCGC referred to above, American law is applicable and is so notwithstanding "every conflicting choice of law in any document whatsoever" (Folder 1, Exhibit 2, Article 24).

> "These General Credit Granting Conditions and any loan extended pursuant to the terms hereof shall be governed by and construed in accordance with the law of the State of New York of the United States of America. The foregoing choice of New York law to govern these General Credit Granting Conditions any loan extended pursuant to the terms hereof

*shall prevail over any conflicting choice of law in any other document."*

(followed by translation into Dutch)

...

That in Article 24 of the General Credit Granting Conditions (GCGC) the law of the United States of America is designated, and that in consequence the law of the United States of America is applicable.

That in this respect pleading party refers to the opinion in US law of Maître Sullivan of the legal office Herrick Feinstein LLP dated 23 June 2010, in which it is confirmed that US law is applicable to the credit relationship (see **Folder I, Exhibit 4**).

That pleading party moreover points out that:

- the credit facilities were entered into by a US company
- the credit agreement was entered into by the American branch of ADB
- the credit agreement was negotiated in New York
- the credit agreement was signed in New York
- the credit agreement was intended for the financing of trading activities in New York
- the credit letter was written in English
- payments had to be made to the account kept by ADB with KBC New York

That from this it also follows that New York law is applicable.

That according to the law of New York only the Courts at New York have jurisdiction.

C.  PURSUANT TO US LAW THE COURTS OF NEW YORK SHALL DETERMINE THAT THE CREDIT FACILITIES HAVE BEEN REPAID

That as mentioned above pleading party LKI has in the meantime started legal proceedings against Antwerp Diamond Bank and KBC Bank on 23 December 2011 before the United States District Court Southern District of New York (which has jurisdiction), where the facts of the case are set out very extensively in a document of 160 pages (**Folder XXII, Exhibit 1**).
The Courts at New York have legal jurisdiction in respect of the dispute between parties such as described in these pleadings and the Courts at Antwerp have no jurisdiction.

That plaintiff is all too aware that according to US law the credit facilities have been repaid in full.

That it is remarkable, and this speaks volumes, that when the US counsel of pleading party, wrote in detail in his letter of 23 March 2010, only 8 days after the issue of the summons, to the US counsel of plaintiff that the courts of New York have jurisdiction under US law, plaintiff acting via its US counsel never disputed this (see **Folder VI, Exhibit 1**).

That pleading party regards the attitude of the US counsel of plaintiff as a tacit acceptance of the legal position of pleading party, namely the jurisdiction of the courts at New York and the applicability of US law, and that pursuant to US law the credit facilities have been repaid.

That thus the claim is disputed in its entirety.

D.  <u>IN THE IMPOSSIBLE EVENT THAT THE COURT SHOULD DECLARE ITSELF
    TO HAVE JURISDICTION: SUSPENSION OF THE PROCEEDINGS BY REASON
    OF PENDING CRIMINAL INVESTIGATIONS</u>

Whereas there were international money movements worth hundreds of millions of US dollars between various banks which were nothing more than paper transactions unsupported by any economy activity, and that ADB was one of the pivotal organizations among the banks involved in this merry-go-round (see the statement of facts in the RICO complaint filed by pleading party LKI dated 23 December 2011, **Folder XXII, Exhibit 1**).

That the Courts of New York have jurisdiction over the dispute between parties as described in these pleadings and the courts at Antwerp lack jurisdiction.

That the proceedings have found their way into the international press, including the highly respectable *Financial Times,* which published an article entitled "*Diamond dealer sues two Belgian banks*" (**Folder  XXII, Exhibit 2**).

That the non-specialist Belgian press has also picked up the story and analysed same:

See the clipping from the weekly magazine *Knack* dated 18 January 2012, (**Folder  XXII, Exhibit 4**):

> "*Officially there has not been a fraud, even so the complaint of the American diamond trader Maurice Tempelsman against KBC and its subsidiary, Antwerp Diamond Bank, leaves little to the imagination. Even if only 10% of the 156 page complaint of 23 December 2011 that Knack was able to examination were found to be true, Antwerpse Diamond Bank (ADB) is up the proverbial creek.*"

That international criminal investigations have indeed been started in the wake of the publication of these articles and that there growing international attention has been given to gigantic transactions between banks disguised as diamond transactions.

That in consequence it is hardly surprising that criminal investigations have been started all over the world with the aim of tracking down these fictive transactions the huge sums involved and their enormous extent:

- <u>International criminal investigation in Israel into financial transactions between diamond banks</u>:

- See: article that appeared on 19 January 2012 in the quality Israeli financial journal *Globes* (**Folder XXI, Exhibit 5**) with as title: "*Four diamond merchants [who were] customers of a clandestine bank free on bail*". According to the article the persons concerned were Meir and Abraham Anavi, as well as Doron and Alon ARABOV. DALEYOT and ARABOV are business partners (**Folder XXIII, Exhibits 1, 2 and 3**).

- See: article published in *The Marker* on 29 January 2012 accompanied by a free translation into English (**Folder XXI, Exhibit 7**) from which the seriousness of the facts and the international nature is apparent as indicated by the raid on the Israeli diamond bourse.

- For the entanglement of the financial dealings between ARABOV and Mr Erez DALEYOT see the following exhibits (**Folder XXIII, Exhibits 1, 2 and 3**):

  **Folder XXIII, Exhibit 1**: Document from the Responsible Jewellery Council about the DDM Arabov Group

  **Folder XXIII, Exhibit 2**: Document about the Life Diamonds Foundation

  **Folder XXIII, Exhibit 3**: Document showing the corporate structure of the Israeli company DDM Arabov Group Ltd, in which both Erez Daleyot and Alon Arabov are directors.

In January 2012 a special brigade of the Israeli authorities specialized in serious money-laundering practices raided the Israeli diamond bourse in order to shut down a clandestine bank that carried out transactions via a normal bank in Israel with other normal banks in another country that had nothing to do with diamond transactions but were disguised as diamond transactions.
This means that banks specialized in diamond transactions apparently cooperated in these transactions and ADB makes a point of saying that it plays a leading role in the financing of diamonds all over the world.
A criminal investigation is pending in Israel and according to the press the trail leads to many other countries.
A clandestine bank/money exchange established in the diamond bourse in Israel, apparently implemented illegal money transactions worth tens of millions of dollars.

A number of persons were arrested in consequence. Only a few of the names of those arrested have been obtained by the press, but these include the ARABOV brothers, the same ARABOVs who are the partners of Erez Daleyot in his company in South Africa, where they jointly operate a factory (**Folder XXIII, Exhibits 1 and 2**).

DD and KT state that they are both shareholders of the South African company LIFE DIAMOND CUTTING WORKS PROPIETARY LTD ("**LIFE**"), and ARABOV is another business partner/shareholder in the same company, which they manage jointly (see the annual accounts of DD, **Folder XXVI, Exhibit 1, p. 14**, **Folder XXVI, Exhibit 2, p. 13, Folder XXVI, Exhibit 3, p. 13**, and for KT alone see **Folder XXVI, Exhibit 4, p. 8**).

The criminal investigation by reason of tax evasion and money laundering is still in progress (see the *Globes* article of 19 January 2012, **Folder XXII, Exhibit 5**). Alon ARABOV is a business partner of Daleyot, and was explicitly mentioned as being in an involved in an international investigation into money laundering with ramifications over the entire world as was recently detailed in an article published in *The Marker* on 27 January 2012 (**FOLDER XXII, Exhibit 7**).

Furthermore the links between ARABOV and DALEYOT exist elsewhere in other trading relationships and companies, including the Israeli company DDM ARABOV GROUP LTD (registration number in Israel 513928499) in which both Mr Erez DALEYOT and Mr Alon ARABOV are directors and which has an odd shareholding structure, namely a trust and a registered office established in the offices of an Israeli lawyer (**FOLDER XXIII, Exhibit 3**).

- That a complaint with civil party suit was filed with the Examining Magistrate at Antwerp on 2 June 2011 by Mr Nishit Prakash KOTHARI. That a first supplement to aforementioned complaint was filed on 3 August 2011 by Mr KOTHARI, which supplementary complaint was also against Antwerp Diamond Bank. That another supplement to this complaint was filed by Mr KOTHARI on 27 November 2011.

  That the matter is the subject of an investigation led by examining magistrate C. Van Wambeke, dossier no. 108/11, and with record number in the Public Prosecutor's Office AN.10.99.430/2011. That the investigation in respect of ADB among others is still in progress.

  That the RICO claim of LKI is a document of public record and counsel for Mr KOTHARI did on 20 February 2012 caused Examining Magistrate C. Van Wambeke to add a copy of LKI's RICO complaint against ADB to the criminal dossier in Belgium. That as a result the examining magistrate has learnt of the fact and is apprised by the facts described in the RICO complaint of 23 December 2012.

That there clearly is a current criminal investigation of the facts that are the subject of this present claim of ADB before the Court of Commerce at Antwerp.

That pursuant to the legal maxim *Le criminel tient le civil en état*, which freely translated means that criminal proceedings suspend civil proceedings, the current proceedings must be suspended.

E. IN SUBORDINATE ORDER: insofar the Court should declare itself to have jurisdiction and insofar the Court deems Belgian law applicable

  E.1. breach of the language legislation – public policy

Whereas the Belgian company Lazare Kaplan Belgium NV entered into a loan agreement with ADB on 19 February 2008.

That this credit confirmation letter was drafted in Dutch and subjected to general conditions that were also written in Dutch (see **Folder I, Exhibit 7**)

That the credit confirmation letter dated 20 February 2008 between the American company Lazare Kaplan International and ADB was drafted in English and not in Dutch and was made subject to the law of New York, with the courts of New York having jurisdiction.

That insofar your court should be of the opinion that it has jurisdiction and that Belgian law is applicable, ADB is in breach of the language legislation.

That the language legislation is a matter of public policy.

That pursuant to Article 52 of the law of 18 July 1966 required records and instruments are subject to the Dutch language regime.

> *"§1. For records and documents required by law and regulation and which are intended for their personnel of private industrial, commercial or financial companies must use the language of the region where their commercial office or various commercial offices are established"*

That plaintiff incorrectly asserts that Article 52 quoted above refers only to records and documents intended for the personnel. This is patently incorrect: the article is applicable to both the records and documents required by law and regulation and to records and documents destined for the personnel.

Legal theory also confirms this interpretation of pleading party, which is the only grammatical and legally correct one, of Article 52 (See I. DE WEERDT, *Taalgebruik in het bedrijfsleven*, Maklu, Antwerp, 2010, p. 32, no. 78):

> *"It is clear that this does not refer only to documents intended for the personnel and which are also required by law and regulation, such as the many documents relating to the social security. The initial scope of the draft [law] was indeed limited to this, but the final text [of the law] makes an undeniable distinction: the documents, required by law and regulation, and those intended for the personnel."*

That this most certainly applies to documents that must be submitted to the Commission for Banking, Finance and Assurance.

That the general conditions of a bank must be registered and submitted to aforementioned commission (See I. DE WEERDT, *Taalgebruik in het bedrijfsleven*, Maklu, Antwerp, 2010, p. 20, no 32), and must of course be in Dutch. That this did not take place for the General

Credit Granting Conditions of November 2001 (**Folder I, Exhibit 2**) and the General Conditions for Banking Operations of November 2001 (**Folder I, Exhibit 3**).

That as long as the contract is subject to US law this is not problematical, but as soon as the bank incorrectly asserts that the contract is subject to Belgian law, these general conditions in English constitute a breach of the language legislation.

That this is a matter of public policy. That the credit confirmation letter dated 20 February 2008 which ADB invokes must therefore also be declared invalid.

That the penalty for the breach of the language legislation is the invalidity of the transaction.

That the language legislation is a matter of public policy.

That in its decision of as long ago as 31 January 1978 the Court of Cassation ruled that *"the Court may not have regard for documents drafted in the wrong language and that it may not take account of the content thereof, in particular with the expression of will."*

That in the impossible event that the Court should declare Belgian law to be applicable, then Belgian legislation must be applicable in its entirety including the language legislation which is a matter of public policy.

That pursuant to Article 58 of the law of 18 July 1966 the documents in English of plaintiff on which it bases its claim, namely exhibit 1 and exhibits 4 and 5 of plaintiff are invalid and therefore the Court may not base itself on them.

<u>E.2. no contractual interest and no conversion into euros at the highest rate on the date of payment</u>

Whereas in its summarizing pleadings dated 31 May 2011 plaintiff claims the following in the operative part of its summons:

   *"in consequence to direct defendant to pay to petitioner the equivalent in euros of USD 43,295,452.90 subject to the deduction of a sum of USD 123,625.00 paid by defendant on 5 March 2010 and subject to the deduction of a sum of USD 156,402.38 paid by defendant on 19 April 2010.*
   *(sum to be converted into euros at the highest rate on the date of payment) and to be increased by the contractual interest;"*

That plaintiff nowhere indicates why contractual interest should be payable, pleading party disputes this most strenuously, nor does plaintiff indicate the amount of the contractual interest that it claims and nor does it indicate from what date this interest should is allegedly payable.

The claim for contractual interest is lacking in merit.

Finally plaintiff claims a sum in USD (the currency of the USA) but asks the court to direct plaintiff to the payment of the equivalent in euros.

Plaintiff also incorrectly demands that this conversion into euros should be made at the highest rates on the date of payment.

The credit agreement between pleading party and plaintiff was agreed in US dollars and there was never any mention between parties of a conversion into euros in connection with the credit facility of USD 45 million that plaintiff refers to.

The Belgian courts may give a judgement in foreign currency and there is no reason to pronounce a judgement in euros as there was absolutely no such agreement between parties.

The claim for conversion into euros of the amount allegedly payable therefore lacks merit.

F.   IN SUBORDINATE ORDER: Insofar the Court should do the impossible and declare itself to have jurisdiction and insofar it should do the impossible and declare Belgian law to be applicable: COUNTERCLAIMS

F.1  Tortious termination of the credit line: contractual liability of the Bank

E.1.1 The credit facilities should not have been terminated by a professional banker in the diamond industry in respect of a DTC sightholder

ADB acting when all the diamond industry was on holiday did on 28 December 2009 terminate the credit facilities of:

- Lazare Kaplan International Inc., which had a credit facility with ADB of USD 45 million (See **Folder I, Exhibit 1 and Folder IV, Exhibit 1**)

- Lazare Kaplan Belgium NV, which had a credit facility with ADB of USD 25 million, at the time of the termination there was no outstanding balance (**Folder IV, Exhibit 2**).

That ADB, a professional banker and market leader in the financing of diamond transactions, cut off the credit lines of the Lazare Kaplan group worth a total of USD 70 million (USD 45 million for LKI and USD 25 million for LKB).

That on 28 December 2009 the termination of the credit facilities was given with notice of two months for LKI (**Folder IV, Exhibit 1**) and hardly a month for LKB (Folder IV, Exhibit 2).

That ADB knows, as a professional banker in the diamond industry, very well that diamond companies usually have very significant assets in the form of a stock of diamonds and far fewer assets, if not non-existent, assets in cash.

That ADB thus assumed that a diamond firm could sell its entire stock in a period of two months in order to make the repayment of an allegedly outstanding sum of USD 45 million.

That it is entirely unprofessional and unreasonable to demand such a repayment (which indeed was not outstanding).

That ADB was very well aware that the monies incoming by LKB could only be drawn from a stock of diamonds and moreover knew very well that a sum of USD 135 millions in goods and monies had been embezzled, and that this was an embezzlement in which ADB had had a hand.

That Lazare Kaplan had on several occasions during 2009 complained about this embezzlement to ADB and that the latter did wish to investigate it.

That the Lloyd's underwriters have reached a settlement with the Lazare Kaplan group for a sum of USD 60 million (see **Folder XIII, Exhibit 1, annex 10**), which means that Lloyd's is convinced that the diamonds were embezzled.

That the termination of the credit facilities for a value of USD 70 million is even more remarkable considering that the Lazare Kaplan group is well known to ADB.

Lazare Kaplan has been a DTC sightholder since 1946. This means that Lazare Kaplan has been trading rough diamonds as a privileged buyer for more than 65 years, Lazare Kaplan has moreover been publicly quoted in the United States since 1972.

Furthermore Lazare Kaplan has trading relationships with the world's largest rough diamond suppliers.

Until this dispute Lazare Kaplan has never had an disagreement with ADB about the repayment of principal or interest.

F.1.2 The true reason for the termination

Between 2007 and 2009 LKI and its shareholders were the victim of a plot that led to USD 135 million being embezzled.

Following its own investigations LKI was able to discover that its former business partner Erez Daleyot, working in association with ADB, diverted diamonds and the revenues from their sale from Lazare Kaplan to companies controlled by Erez Daleyot and the banks that financed these companies, including ADB.

To make this possible a great number of dummy companies were incorporated. Some of these were customers of ADB and the revenues from the embezzled goods could be paid into them.

ADB, which had granted credit facilities worth USD 120 million to the companies of Erez Daleyot, i.e. DD and KT, knew at the very latest in November 2007 that it was financing a whole series of offshore companies belonging to Daleyot in accordance with a whole structure.

When ADB realized that it would not recover the vast sums that it had loaned to the companies of Erez Daleyot, ADB shut it eyes to the incoming sums credited to the accounts of DD and KT and ADB took part in the withdrawal of the monies.

In reality this was the revenue from the diamonds of Lazare Kaplan that it had sold with reserve of ownership to DD and KT.

The Bank incorrectly states in its pleadings that it is "only active in the diamond industry". That when ADB was confronted with this inaccuracy it added the following sentence to its third pleadings of 19 December 2011, "Pleading party has for many years played a leading role in the financing of diamond companies and their associated enterprises".

In reality ADB financed DD and KT, two diamond firms belonging to Erez Daleyot, for a sum of USD 120 million, and these firms had accounts with ADB. The money loaned by ADB was transferred from these ADB accounts to DDMH NV and Kertalor, two firms that were not active in the diamond industry. The money was then transferred from this ADB account to Switzerland to Cyprus companies such as EKT Air Services, Hatilem and others.

Totally incorrectly ADB states that the termination of the credit facilities of Lazare Kaplan had nothing to do with the exposure of ADB to Daleyot's companies (see summarizing pleadings for ADB, page 16 penultimate paragraph). In reality ADB urgently needed to receive monies on the accounts of the Daleyot companies, which were in the red, and it allowed monies to flow in from HSBC Geneva for a total of USD 20 million in June 2009, without even making a record of the economic beneficiary of the company that transmitted this money in its books.

In reality this was a pure back-to-back operation that ADB had agreed with HSBC Bank on the basis of the bank guarantee supplied by HSBC, where this money could be drawn by DD from ADB in Belgium, although the economic beneficiary of the accounts in Belgium and Switzerland appear to be one and the same person.

Here the Bank transgressed all the standards of normal banking and as a result ended up by being burdened with DD debit positions for enormous sums of money.

As a result of this pressure it appropriated the revenues from the sale of the diamonds for itself.

That ADB incorrectly stated that LKI is supposed to have failed to supply financial information, and ADB states that LKI failed to supply ABN Amro Bank and Bank Leumi the required and requested documents relating to the financial position of the company. Nothing could be further from the truth.
Pleading party submitted a great deal of financial information to ADB and to its other bankers. Pleading party LKI was confronted with the contradictory and double accounts of ADB and this put it in a situation where it was impossible to publish its balance sheet.
It is ADB that created the situation that made it impossible for LKI to publish its annual accounts (see Chapter F.2 for more information about the unorthodox accounting system of ADB.

F.13  The contractual liability of the Bank for the untimely termination of the credit facilities and the loss to pleading party

ADB Bank is liable for the untimely termination of the credit facilities of Lazare Kaplan. In consequence of the termination of the credit facilities pleading party was unable to obtain finance from another bank.

ADB failed to perform the contract in good faith.
The untimely termination of the credit facilities worth USD 70 million without reason, and the imposition of two month repayment period was mistaken.

As a professional banker ADB knew that Lazare Kaplan is a Diamond Trading Company (DTC) sightholder and is required to purchase diamonds ten times a year, and that the sights are financed solely by a professional banker active in the diamond industry.

There are as far as pleading party is aware no other instances of the termination of the credit facilities of a DTC sightholder when the contract between the sightholder and DTC is still active.

ADB could have, as would have been appropriate for a prudent banker:
- Waited until the Supplier of Choice (SOC) contract between DTC and Lazare Kaplan had expired;
- Progressively reduced the credit facility until the end of the current SOC contract.

Pleading party has suffered immense harm that is still making itself felt, as it cannot publish its accounts because of the pending proceedings against ADB.

Because of the current proceedings Lazare Kaplan no longer has a stock exchange quotation and currently estimates its losses at USD 500 million.

In consequence of the tortious conduct of ADB, Lazare Kaplan no longer had significant funds available to it that it needed for financing its existing trading activities in the United States and throughout the entire world. This calls for significant compensation of the order of millions of dollars for the compensation of loss of important contracts, markets and finance. The situation also led to the disruption of certain commercial activities in key countries where it operates, the delisting of LKI on the AMEX exchange (resulting in a fall in price, the trading volume and liquidity of LKI shares), commercial disruption, the termination and cutting back of certain trading operations and personnel, the drastic increase of insurance costs, and very considerable harm to LKI's good name and reputation.
All these items of loss indicated by LKI could have reasonably been anticipated by ADB.

F.2.  Improper accounting within ADB so that conflicting double entries were made with grave consequences for Lazare Kaplan: liability of the banker

Lazare Kaplan Belgium sold diamonds subject to reserve of ownership (See **Folder XIV, Exhibit 9**)

This concerns the following invoices from LKB to DD (see **Folder XIV, Exhibits 1 to 9 inc.**):

| Invoice number | Invoice date | Date of Payment | Amount of principal in USD | Payment status |
|---|---|---|---|---|
| R05 - 8020 | 31.08.2008 | 31.10.2008 | USD 6,951,419.90 | unpaid |
| R05 - 8023 | 30.10.2008 | 31.12.2008 | USD 6,935,698.58 | unpaid |
| R02 - 800015 | 18.09.2008 | 31.10.2008 | USD 5,424,114.00 | unpaid |
| R02 - 800016 | 30.09.2008 | 30.11.2008 | USD 3,205,343.10 | unpaid |
| R02 - 800017 | 29.10.2008 | 29.12.2008 | USD 2,475,406.62 | unpaid |
| R02 - 800018 | 31.10.2008 | 31.12.2008 | USD 1,665,389.44 | unpaid |
| **TOTAL** | | | **USD 26,657,371.64** | **unpaid** |

And this concerns the following invoices from LKB to KT:

| Invoice number | Invoice date | Date of Payment | Amount of principal in USD | Payment status |
|---|---|---|---|---|
| R02 - 800013 | 30.06.2008 | 31.08.2008 | USD 6,034,806.00 | unpaid |
| R02 - 800014 | 24.07.2008 | 30.09.2008 | USD 5,583,488.00 | unpaid |
| **TOTAL** | | | **USD 11,618,294.00** | **unpaid** |

LKB sent DD and KT a reminder on 8 January 2009 by registered letter to pay the aforementioned invoices and sent a copy to ADB as well, likewise by registered letter (See **Folder XIII, Exhibit 1, annex 1**, namely the registered letter of 8 January 2009 from LKB to ADB with an attached copy of the letter from LKB to DD and KT of the same date).

DD made inquiries of ADB, who was the banker of both LKB and DD and KT, in order to obtain a copy of the booking entries for certain money movements.
The following day on 9 January 2009 ADB handed DD a copy of the way the money movements between DD and LKB were entered at ADB Bank in DD's dossier with ADB (See **Folder XIII, Exhibit 1, annex 2**, i.e. the email of 9 January 2009 from ADB to DD about the financial transactions between DD and LKB).

For ADB the way these entries were made was very important because DD enjoyed a credit line worth USD 120 million for which there was insufficient cover at the time that DD had to make transfers to LKB, so these money transfers were made in the DD dossier in a very particular way and that they were at the very least made behind the back of LKB, the current petitioner in voluntary intervention.

LKB for its party likewise systematically received written requests from the risk monitoring service of ADB about how the money that it received from DD had to be booked and LKB indicated the reason, namely payments for outstanding invoices.
These money movements were thus entered in this way in LKB's dossier with ADB bank.

Specifically this means that one and the same transfer between DD and LKB was entered in the DD dossier with ADB as the payment of a new invoice whereas the same payment was

entered in the LKB dossier with ADB as the payment of an invoice that had already fallen due.

ADB maintained this contradictory accounting method for months and even years even though ADB was definitely aware that LKB and DD were fighting out their differences before the Court of Commerce at Antwerp, as well as the fact that LKB was seeking the appointment of an expert before the Court, and that LKB was trying in vain to collect its invoices for a total of USD 38 million from DD and KT.

ADB was aware of the difficulties because of a letter of 8 January 2009 from LKB to ADB (**Folder XIII, Exhibit 1, annex 1**, namely a letter dated 8 January 2009). On 9 January 2009 ADB corresponded with DD about this without informing LKB (see **Folder XIII, Exhibit 1, annex 2**, email 9 January 2009).

On 16 February 2009 ADB wrote hypocritically to Lazare Kaplan that it could not correspond about its relationship with other customers but it gave assurances that all its transactions with DD Manufacturing NV complied in full with the legal principles and that it did not wish to intervene in the discussions between LKB and DD (see **Folder II, Exhibit 3**).

In reality the Bank did in fact communicate with DD about this and wrote to DD on 13 March 2009, in this letter ADB asked both DD and KT to state their respective net positions in respect of LKI and LKB to ADB and to send a copy to KBC (see **Folder XIII, Exhibit 1, annex 6**, namely the letter from ADB to DD and KT dated 13 March 2009).

The double entries appear to have to made ADB very nervous indeed and it asked DD and KT for a report on their relationship with LKI, where none of this was disclosed to LKI, a publicly quoted company in the United States.

On 8 April 2009 the financial manager of DD confirmed to KBC that the cash flow of DD stood currently at minus USD 95 million, but projected that it could be reduced to a debit position of USD 51.9 million in a just a few months, writing the following:
 *"I have also passed on the LKI report to Veerle"*
 *(see **Folder XIII, Exhibit 1, annex 7**, namely an email dated 8 April 2009 from Raffi Fass, financial manager of DD to Michel Vaneeckhoudt of KBC).*

The person he is referring to is Veerle Snyers, the legal adviser of ADB. Nobody at KBC and ADB found it necessary in April 2009 to confront LKI with this report and to hear its point of view.

Despite the fact that in May and June 2009 LKI complained to LKI about money and diamonds embezzled by DD and KT (see letter of 15 May 2009 from LKI to ADB, the email dated 4 June 2009 from LKI to ADB, and the subsequent letters of 5 June 2009 and 14 June 2009 from LKI to ADB (**Folder II, Exhibits 5 to 8 inc.)** ADB did not cooperate at all in connection with the embezzled monies and diamonds, even though ADB had been in the possession of a report from DD since April 2009 and that ADB was definitely aware that it had made contradictory bookings.

The Bank thus made a mistake by making double and contradictory bookings, furthermore the Bank made a mistake in not disclosing these contradictory bookings within the financial institution to LKI and LKB, and finally the Bank made a mistake when it disclosed these

contradictory bookings to DD and KT without informing LKB and by requesting a report from DD and KT about LKI behind the back of the latter.

The Bank also erred by leading LKB to believe that the Bank agreed with the claims of USD 38 million on DD and KT by writing on 21 September 2009 to LKB's auditors, Blanckaert, Missorten, Spaenhoven & Co CVBA that the credit facilities of LKB were secured within the Bank by claims on third parties for USD 38 million effective as of 31 May 2009:

> *"Customer: Lazare Kaplan Belgium NV*
> *Serial number: 0549*
>
> *Statement as per 31.05.2009:*
>
> *3. Credits and securities*
>
> *See: Credit confirmation letter dated 19.02.2008, copy attached.*
>
> *Credit facility and are according to our books secured by:*
>
> *- A sum of USD 1,066,817.48 of export claims and a sum of USD 38,487,524.70 of local claims that have been domiciled to our bank".*

> *(See Folder XV, Exhibit 1 annex 3, letter ADB dated 21 September 2009 to Blanckaert, Missorten, Spaenhoven & Co. CVBA)*

The content of aforementioned letter contradicts the email of 9 January 2009 from ADB to DD, from which the alleged payment of the invoices is supposed to be apparent (**Folder XIII, Exhibit 1, Annex 2**).

The defence of ADB contained in its pleadings of 19 December 2011, pages 25-26 is as follows:

> *"As both parties use the invoices of the other as a condition for being able to take up credit, pleading party does record the attribution of the payments that both parties make. Pleading party did observe that parties sometimes allocated payments differently, assigning them to different invoices or claims, but it cannot do more than record same."*

As this is a judicial confession by ADB, namely a confession made in proceedings before a court, in which ADB admits, as a professional banker  and market leader in financing diamond transactions, to having been aware of the different attribution of money flows by LKB and by DD.

That pursuant to Article 1356 of the Civil Code a judicial confession is a statement made in law by party or its specially authorized representative. *"It supplies complete proof in respect of the person who has made the confession".*

That pleading party invokes this judicial confession to prove the ERROR of ADB as a professional banker.

That pleading party refers to the numerous letters that it wrote to ADB (including its letter of 31 March 2009 in Folder II, exhibit 4, in which pleading party stated its claim of 38 million dollars on the Daleyot companies), without the latter ever informing pleading party that these money flows were booked differently within ADB.

That now with this judicial confession by ADB the double entries within ADB Bank have been proven.

That the FAULT is proven.

That however ADB, which has judicially acknowledged that in 2009 it cooperated with the contradictory entries, did as professional financier make LKB believe that it still had claims on DD, and did confirm in writing to the statutory auditor – chartered accountant of pleading party that these claims of LKB on DD and KT still existed.

See the following exhibits in **Folder XXVII**:

1. Email from ADB to LKB dated 23 July 2009 stating the position of LKB on 23 November 2008 including according to ADB claims of LKB on DD for USD 26 million serving as basis for the loan, of which more than USD 12 million "overdue – final warning"

2. Email from ADB to LKB dated 23 July 2009 stating the position of LKB on 31 December 2008 including according to ADB claims of LKB on DD for USD 14 million serving as basis for the loan, of which more than USD 12 million "overdue – final warning"

3. Email from ADB to LKB dated 2 March 2009 to also seek monthly reporting by LKB to ADB in accordance with the attached example, i.e. the monthly report of 31 December 2008 of outstanding accounts receivable, in which it is stated that there are claims of LKB on DD for more than USD 26 million with the indication "YES" in a given column in order to show that these invoices are the subject of a loan/collateral by/for the bank.

4. Email from LKB to ADB dated 22 July 2009 with an attached monthly report of accounts receivable for May 2009.

5. Email from LKB to ADB dated 22 July 2009 with an attached monthly report of accounts receivable for June 2009.

6. Email from LKB to ADB dated 27 August 2009 with an attached monthly report of accounts receivable for July 2009.

7. Email from LKB to ADB dated 2 September 2009 with an attached monthly report of accounts receivable for August 2009.

8. Email from LKB to ADB dated 2 October 2009 with an attached monthly report of accounts receivable for September 2009.

9. Email from LKB to ADB dated 6 January 2010 with an attached monthly report of accounts receivable for December 2009.

10. Email from LKB to ADB dated 9 February 2010 with an attached monthly report of accounts receivable for January 2010.

That from the analysis of the documents it appears that ADB acting a professional banker confirmed to its important customer Lazare Kaplan (important customer who enjoyed a credit facility of USD 45 million via LKI and a credit facility of USD 25 million via LKB, or jointly USD 70 million) confirmed that:

- LKB enjoyed a loan on an invoice from LKB to DD, which invoice was dated 31 August 2008 and had a due date of 31 October 2008 and was 29 days in arrears for a sum of USD 6,951,420 on 30 November 2008 (see **Folder XXVIII, Exhibit 1, page 4, last line**)

- on 9 January 2009 ADB as professional banker wrote to its other important customer DD (a customer who enjoyed a credit facility of USD 120 million) about this same invoice dated 31 August 2008, with due date 31 October 2008 for a sum of USD 6,951,420 as follows:

   *"Subject: DETAILS OF INVOICE USD 6951419*
   *Ronit,*
   *These are the details of the first invoice, the others will follow directly.*
   *I have to send each of these by separate mail, as otherwise our system could crash.*
   *Marc*

   *....*

   *Description Value*                                   *Value Description*

| *date of payment* | *11 – SEP – 2008* | |
|---|---|---|
| *Local counter party* | *05649* | *LAZARE KAPLAN BELGI* |
| *Invoice date* | *31 – AUG - 2008* | |
| *Type of goods* | *RD* | *NATURAL UNPROCESSED DIAMOND* |
| *Unit* | *C* | *Carats* |

*"*

That the documents emanating from ADB are contradictory and prove the contradictory bookings. For example it appears from the document in **Folder XXVII, Exhibit 1, page 4, last line** that ADB writes to LKB that the invoice for USD 6,951,420 is unpaid and in 29 days in arrears on 30 November 2008 whereas from the documents in Folder XIII, Exhibit 1.2, page 2 it appears that ADB wrote to its other customer DD that the same invoice for USD 6,951,420 was paid on 11 September 2008.

When on <u>11 September 2008</u> ADB made an entry into DD's account of the supposed payment of the invoice of 31 August 2008, it was perfectly aware on that day that the same invoice of 31 August 2008 was marked in the LKB account as having not been paid, and that it formed the basis of the loan to LKB by ADB.

What would a professional banker placed in the same circumstance have done?

In the opinion of pleading party a professional banker placed in the same circumstances on 11 September 2008 not have marked the invoice as paid in the accounts of one customer (DD) while marking the invoice as a claim on which a loan could be granted in the accounts of another customer (LKB).

This ERROR, namely the conflicting entries, which have been judicially recognized by ADB, have a causal relationship to an immediate loss to LKB of more than 12 million US dollars. After all after 11 September 2008, LKB continued to sell diamonds to DD, namely 4 different invoices, i.e. the invoice dated 18 September 2008 for a sum of USD 5.4 million (**Folder XIV, Exhibit 3**), the invoice dated 30 September 2008 for a sum of USD 3.2 million (**Folder XIV, Exhibit 4**), the invoice dated 29 October 2008 for USD 2.4 million (**Folder XIV, Exhibit 5**) and the invoice of 31 October 2008 for a sum of USD 1.6 million (**Folder XIV, Exhibit 6**).

That ADB was thus ruefully obliged to see that the sales between the parties continued and it that was even actively cooperated with the artificial maintenance of the loan to DD by entering the so-called payments to the invoices in the DD account, and on the other hand writing the statutory auditor of LKB that there were still local claims of more than USD 38 million outstanding (**Folder XV, Exhibit 1, annex 3**).

That ADB in view of the transgression of the risk ratios for a single customer with respect to DD-KT, to which it had loaned USD 120 million (a large part of which had in the meantime found its way to Switzerland and Dubai, as well as to luxury aircraft, yachts, villas, Bentleys, etc. and this via ADB accounts of DD-KT and vehicles specially created for this purpose, which also banked with ADB), ADB could apparently not do otherwise than keep DD-KT in life, and did so by cooperating with such fraudulent accounting entries.

That ADB is obviously in breach of the financial legislation, among others Article 43 of the law of 22 March 1993 on the status of and the supervision of the credit institutions (recently updated by the Law of 28 July 2011, Belgian Official Gazette of 31 August 2011). That the first words of Paragraph 1 of aforementioned Article 43 was amended by Article 102 of the Royal Decree of 3 March 2011, B.O.G. of 9 March 2011. That pursuant to aforementioned article "*the standards of solvency, liquidity, and risk concentration and other limiting standards which must be complied with by all credit institutions or by category [of same]*". That ADB with an equity of 137 million euro failed to comply with the relevant standards by allowing an outstanding risk of USD 120 million in respect of the Daleyot companies.

That this was concealed from the public, including pleading party, for many years.

At no time did ADB write to the Lazare Kaplan group to inform it about these contradictory entries.

These are not just contradictory entries, but also banking positions that bank based itself to make loans to its respective customers LKB and DD, and because the positions were contradictory, ADB wrote only to DD on 13 March 2009 (see **Folder XIII, Exhibit 1.6**) to

ask about the positions of DD in respect of LKI and LKB, but never wrote to the publicly quoted Lazare Kaplan group about this.
To the contrary, ADB deliberately allowed Lazare Kaplan to think that ADB recognized LKB's claims on DD, while ADB wrote to DD saying that these same invoices had been paid.

Not exactly the most minor mistake a banker could be held liable for!

The bank has a duty to inform third parties when it granted finance to the Daleyot companies and is thus liable for the information it discloses or fails to disclose to third parties, including LKI and LKB.

For example a credit provider is liable if it creates an appearance of solvency in respect of third parties by granting loans without justification. The "*bonus pater familias*" (the good head of household) criterion applies here, *"During the loan agreement (maintenance) has a duty of supervision and should be able to discern any signals (and to act accordingly by bringing the loan to an end) that indicate that the borrower has got into financial difficulties or which are indicative of the imprudent administration of the credit facilities by the borrower; [...] the bank should as a normal prudent bank thus assess whether the loan is still justified in order to assess its liability in respect of third parties (who indeed may suffer loss as a result of the appearance of solvency created by the maintenance of the loan"* (R. FRANSIS, "Bankiersaanspraakelijkheid en exoneratiebedingen in algemene bankvoorwaarden", *Jura Falconis* 2004-5, 320-323)
In addition the bank is of course liable when it deliberately supplies incorrect information about the solvency of the borrower, certainly when the third party suffers very significant loss as a result, such as in this case.

See

- R. FRANSIS, "Bankiersaanspraakelijkheid en exoneratiebedingen in algemene bankvoorwaarden", *Jura Falconis* 2004-5, 324

- Mons, 12 June 2006, *JLMB* 2007, 146: in this case the Court of Appeal at Mons ruled that the lender was liable because it supplied incorrect information about the solvency of the borrower to a third party, who suffered a loss as a result.

- Brussels, 20 February 2001, *R.W.* 2002-03, issue 10, 383: in this case the Court of Appeal at Brussels ruled that the limits of the discretion of the bank in respect of a customer reaches its limits with the protection of the rights of a third party who provided security and would as a result suffer serious loss.

- Courts Antwerp, 18 February 2010, *R.W.* 2010-1, issue 34, 1447: the Court of First Instance at Antwerp ruled that the lender must provide sufficient information to the guarantor about the financial condition of the borrower, namely because if it does not the guarantor could sustain severe financial loss.

A professional bank placed in the same circumstances would not have acted in the way ADB acted, most certainly not in respect of an American publicly quoted company, such as LKI.

ADB is contractually liable in respect of LKB, LKB had be able to be sure that when it replied to the Risk Monitoring Service of ADB about the destination of the received monies, and received no reply, that this was accepted in this way by the bank (**see Folder XIII, Exhibit 1, annexes 3 and 4**).

ADB is contractually liable in respect of LKI.

The loss to Lazare is directly and causally linked to the banking conduct of ADB. A professional banker placed in the same circumstances would not have acted in this way.

F.3. The Bank took an active role in questioning the worth of the security that LKB had given to the Bank, namely the invoices of LKB to DD and KT: liability of the Bank.

When LKB complained to ADB, ADB replied to LKB on 16 February 2009 that the bank would not intervene in a dispute between its customers, whereas on 9 January 2009 it had provided evidence to DD of the booking of these invoices without informing LKB, which is proof that ADB had itself manipulated.

To make the case even more extreme on 21 September 2009 ADB sent LKB's chartered accountant a credit confirmation letter showing the situation on 31 May 2009, from which it appears that LKB still disposed of local claims of more than USD 38 million domiciled to the bank.

ADB thus confirmed to Blanckaert, Missorten, Spaenhoven & Co. CVBA Chartered Accountants, who were the chartered accountants – statutory auditor of LKB, that LKB had USD 38 million (which are the claims on DD and KT), where ADB recorded in its own books, but in the DD dossier, that these invoices had been paid by bank transfers from DD to LKB.

As a professional banker ADB was moreover aware that these unpaid invoices for USD 38 million – invoices which had been pledged by way of security to ADB – would serve, after payment by DD and KT, to clear LKB's credit facility with ADB.

ADB incorrectly stated in its most recent pleadings that the invoices of LKB made out to DD were not pledged in security to the bank. This is incorrect. The invoices formed the basis of the loan, why otherwise would the bank be concerned about whether the invoices had been paid or otherwise and insist on receiving reports on same (see all the exhibits in **Folder XXVII**).
See in particular **Folder XXVII, Exhibit 3**):

-  Email from ADB to LKB dated 2 March 2009 to also seek monthly reporting by LKB to ADB in accordance with the attached example, i.e. the monthly report of 31 December 2008 of outstanding accounts receivable, in which it is stated that there are claims of LKB on DD for more than USD 26 million with the indication "YES" in a given column in order to show that these invoices are the subject of a loan/collateral by/for the bank.

As a banker ADB may not reduce, obstruct, or question the securities that its borrower LKB has on its debtors.

A borrower that provides his bank with securities, such as the invoices of the borrower LKB on DD and KT, should be able to expect that the Bank, namely ADB, will not perform any act that could be detrimental to these securities.

To ensure that the invoices for USD 38 million should remain a solid guarantee for the credit line of LKB with ADB, ADB was not allowed to make any contradictory entries in its books indicating the asserted payment by DD and KT.

By undermining the securities ADB must as banker bear the consequences of it erroneous conduct itself and it is at the very least liable for compensation to LKB in the amount of the destruction of the security.

In respect of LKI the bank is extra-contractually liable on the basis of Article 1382 of the Civil Code.

F.4.  Third party connivance in breach of contract: the Bank received monies for diamonds that were sold subject to reserve of ownership

All sales of diamonds by LKB to DD were made subject to the reserve of ownership (see **Folder XIV, Exhibits 1 to 9 inc.** for the invoices and general conditions).

Specifically this means that DD and KT only acquired ownership of the diamonds at the time that aforementioned diamonds were paid to LKB.

The diamonds were not paid to LKB by DD and KT so that DD KT sold goods that were not their property and that thus they committed a breach of contract.

ADB, a third party, was an accomplice to this breach of contract.

The Bank was aware of the reserve of ownership because the invoices of LKB to DD and Kt served as security for the credit agreement between LKB and ADB.

The question of third party connivance in breach of contract clearly extends to the sale of goods (see E. Dirix, Obligatoire verhoudingen tussen contracten en derden, Maarten Kluwer page 214 no. 278).

The Bank as a third party accomplice in breach of contract is liable and did knowingly and willingly accept the revenues from the diamonds on the accounts of DD and KT as payments on the debit positions of the latter fully aware that the diamonds were sold by DD and KT subject to reserve of ownership and that payment had not been made to LKB.

There is no dispute about the fact that there was a reserve of ownership of the diamonds sold by LKB to DD and KT.
As the professional banker of both companies, ADB was aware of this.

KT acknowledges a debt of USD 1.7 million to LKB, so that for this at least one third party accomplice has already been found in respect of ADB.


The bank is liable as third party accomplice in breach of contract and did knowingly and willingly accept the revenue from the diamonds on the accounts of DD and KT for the settlement of the debit position where it knew very well that the diamonds were sold by DD and KT subject to reserve of ownership and had not been paid to LKB.

F.5. The Bank jointly brought about the embezzlement of the assets/debtors of Lazare Kaplan: liability of the Bank

ADB allowed its account holders and borrowers DD and KT take up USD 120 million of credit, whereby these two companies were to a large extent drained of assets by personal withdrawals by Mr Erez Daleyot, acting in breach of company law, of more than EUR 25 million (see **Folder XIII, Exhibit 1, annex 6**, namely the email of 13 March 2009 from ADB to DD).

That money from DD and KT was transferred from their ADB accounts to the ADB accounts of two other companies belonging to Mr Daleyot, namely DDM HOLDING CVA  and KERTALOR HOLDING NV (both recently incorporated, namely in 2007 and with negative assets, see **Folder XI, Exhibits 1 to 4 inc.**) so that these could pass on these monies to offshore centres with bank accounts in tax havens.

The money in DD and KT should have been transferred to the account LKB holds with ADB. ADB participated in the destruction of the securities of Lazare Kaplan.

That the Bank is liable in respect of third parties when a customer/borrower (i.e. DD) uses the borrowed money for purposes other than the contractually intended purpose (diamond trading), such as real property in Central and Eastern Europe (E. WYMEERSCH, Overzicht van Rechtspraak, T.P.R., 2008, no. 9, p 1052).

That on 13 March 2009 ADB suddenly asked DD about the status of the real estate in Central and Eastern Europe, the questions put by the Bank are astounding: questions about investment structure, the companies involved, the shareholding structure and links to the DDM group (see **Folder XIII, Exhibit 1, annex 6**). That therefore the Bank allowed an outflow of tens of millions of US dollars via the ADB accounts of DDMH and Kertalor without even bothering to find who the shareholders were, what the investment structure was, and that even the location of the real property and its value were not known to the Bank.

That this stands in startling contrast to the first sentence of the summarizing pleadings of ADB in which it states that it only finances diamond (trading) activities, while tens of millions of US dollars were made available via ADB accounts to the Erez Daleyot companies without ADB having any mortgage guarantee or other security on the real property in Eastern and Central Europe.

That all the annual reports of ADB systematically repeat that the Bank is active only in the financing of diamond (trading) (see **Folder VII, Exhibits 1, 2 and 3**).
That this is incorrect and misleading information, which is addressed to third parties and customers, including Lazare Kaplan, as [monies were transferred] from ADB accounts using

money borrowed from ADB by means of the following set-up: the money borrowed from ADB by DD was transferred in the form of a loan to the ADB account of DDMH, where it was then transferred from this account to Swiss bank accounts held by Cypriot companies, where it was used to finance private aircraft and real property in Eastern and Central Europe. On each occasion these transfers within ADB required only one day to complete.

The Bank knew of Daleyot's offshore companies as of November 2007 (see **Folder XVIII, Exhibit 7**) and specifically was aware of the Cypriot company EKT Air Services with a Swiss bank account which was used in connection with private aircraft.
ADB facilitated the payments to the Swiss accounts of the offshore companies.

That as a result the Bank facilitated the embezzlement of assets by DD and KT, after all it was from the ADB accounts of DD and KT that the monies were passed on to DDMH and Kertalor likewise via ADB accounts.

On 29 January 2009 the Bank had already complained that the Bank had not received any securities for more than 83 days and for a sum of close to USD 77 million (see **Folder XIII, Exhibit 1, annex 9**, letter from ADB to DD of 29 January 2009). From the aforementioned letter it also appears that the Erez Daleyot's current account with his companies came to 25 million euros, i.e. one thousand million Belgian francs, and that the Bank was pressing for an urgent repayment and clarifications. DD and KT's chartered accountant remarked on the draining away of the companies' assets by Mr Erez Daleyot with a complete disregard for the rules of company law (see **Folder XVI, Exhibits 1 and 2**).

DD and KT's own chartered accountant was forced to point out that the annual accounts of the two companies had to be amended because the claims on DD and KT were not even mentioned in the annual accounts for 2008 (see the letters of 28 June 2011 from the chartered accountant
Mr Van Herck, about the fact that he urgently requested revised annual accounts and urgently amended annual accounts for 2008, **Folder XVI, Exhibits 3 and 4**).

In contrast to its conduct in respect of LKB and LKI, ADB has not cut off the credit lines of DD and KT. When LKI failed to submit its financial statement, but had nonetheless made all its payments pursuant to the credit agreement, ADB did notwithstanding drastically cut off the credit lines of the Lazare Kaplan companies on 28 December 2009.
On the other hand ADB continues to finance DD and KT to this very day, both companies that have failed to make the compulsory filings of their annual accounts for the last two years in due time.

The only highly laconic response that ADB has made is that it has a duty of discretion, and has, so it says, no authority to make any comment.
Nothing could be further from the truth!
There was little to be seen of this duty of discretion when ADB wrote only to DD on 13 March 2009 (see **Folder XIII, Exhibit 1.6**) in order to learn of the positions of DD in respect of LKI and LKB, but failed ever to write to the publicly quoted Lazare Kaplan group about this matter.

ADB plotted together with DD, ADB could not do otherwise, after all it had concentrated USD 120 million on a single customer (contrary to every applicable regulation imaginable) and remains as silent as the grave on the subject.

The Bank acted incorrectly by providing credit to DD and KT in the context of the offshore set- ups of the latter and permitted DD and KT, debtors of LKB, to build enormous debit positions
(see in this connection E. Wymeersch TPR 2000 no. 28: Aansprakelijkheid kredietverlening – schadebepaling).

The Bank is liable on the grounds of Article 1382 Civ. Code.

F.6. The Bank accepted back-to-back loans from the debtor of Lazare Kaplan notwithstanding the embezzlement of diamonds and monies from Lazare Kaplan

Plaintiff had already been informed in early 2009 of the fact that DD and KT had not made any payments for the diamonds sold by LKB.

The Bank appears to have asked DD and KT for a report about their position with Lazare Kaplan, but never checked this report with Lazare Kaplan itself (see **Folder XIII, Exhibit 1, annex 7**)

In June 2009 ADB went so far as to accept an inflow of money in six transactions for a total of USD 20 million from the dummy company DKT Diamonds Ltd. with a bank account with HSBC Geneva, which was paid to the bank account of DD with plaintiff in Antwerp.

In this connection plaintiff was apparently perfectly content merely to record that the money came from DKT without any further investigation (see **Folder XX, Exhibit 3**).

A simple check of the company documents would have revealed that DKT Diamonds has in reality only one shareholder, namely Ildia Holdings Ltd., and that the latter also has only one shareholder, Equalia Trust Services of Liechtenstein (see **Folder XX, Exhibits 1 and 2**) and that in reality DKT Diamonds deploys no diamond activities.

Even though Lazare Kaplan had during months and in particular in June 2009 been complaining to ADB that monies had been embezzled, ADB nonetheless accepted USD 20 million without checking on its origins.

In reality ADB drew down a back-to-back guarantee from HSBC Geneva (see **Folder XX, Exhibit 3**).

This attitude of ADB is mistaken and is certainly not the attitude that one would expect from a prudent bank acting in the same circumstances.

This mistaken attitude of ADB, which ignores the legal provisions regarding banking transactions in connection with the verification of the origins of the money, has a direct causal connection with the gigantic loss sustained by Lazare Kaplan.

Should in June 2009 ADB have complied with the law and asked questions about this inflow of USD 20 million from Geneva, the whole fraud perpetrated by DD and KT would have emerged earlier.

Lazare Kaplan has only been able to recover USD 60 million from its insurers and reached a full and final settlement with insurers in July 2011. This does not cover all the losses suffered by the Lazare Kaplan group, and thus does not cover the entirety of the loss caused by ADB's conduct.

The attitude of ADB has had as consequence that Lazare Kaplan has not been able to complete its filings and has in consequence been delisted by the New York Stock Exchange.

ADB is liable in respect of LKI on the basis of Article 1382 Civ. Code.

F.7. ADB actively financed the debtor of Lazare Kaplan in a way that made the embezzlement of money possible

ADB actively financed DD and KT, the debtors of Lazare Kaplan, in a way that made it possible for them to embezzle Lazare Kaplan's money.

To wit ADB signed a credit agreement with DD and KT for USD 120 million, while its nominal capital according to publication was only EUR 158 million in 2009 (see **Folder VII, Exhibits 1 and 2**).

From ADB's 2010 Annual Report filed on 11 May 2011 (**Folder VII, Exhibit 3**) it appears:

> *"Equity*
>
> *In consequence of the most significant write downs on distressed loans, the Bank recorded a negative result in 2010 of  EUR – 38,518,451.*
>
> *In application of the IRB Foundation method the available Equity of the Bank (including subordinated accounts) falls back to EUR 137,518,234, compared to EUR 158,695,279 last year".*

From this it appears that in 2009 the available equity of ADB was EUR 158 million and that in 2010 it was EUR 137 million.

In 2009 the outstanding credits granted to the Daleyot companies for USD 120 million and which were on 29 January 2009 not secured to the tune of USD 76 million were totally in breach of the provisions of law.

Among the equity requirements to which finance houses are subject by reason of their legal status is the prohibition on building up an excessive concentration of risk with a single contracting party: in principle the total risk built up with one and the same contracting party or group may not exceed more than a certain percentage – currently 25 % - of the equity of the finance house (see in this connection Wymeersch E. inter alia overzicht van rechtspraak privaat bankrecht (1999-2007) T.P.R. 2008, page 1049, sub. 7).  See now Art. III.4 §1, 1° Besluit van de Commissie voor het Bank-, Financie- en Assurantewezen of 17 October 2006 on the equity of finance houses and investment enterprises as approved by Ministerial Decree of 27 December 2006, Belgian Official Gazette 3 January 2007, which provides for the limitation of the total risk exposure to another party to 25% of the equity of the finance house.

The Court of Appeal at Brussels ruled on 23 January 2003 that exceeding these percentages is a matter that touches on public policy.

The Court of Appeal also ruled that ignoring these percentages does not give rise to the invalidation of the credit agreement (which would mean this credit agreement between ADB and DD remains valid) but that the equity decision of the Commissie voor Bank en Financiewezen (Commission for the Banking and Finance Industry) is restricted to the internal administration of the finance houses. The Court was not required to rule on whether exceeding these percentages is an error that can cause harm to third parties.

As the Court was of the opinion that the equity percentage touches on public policy every breach of same that causes loss to third parties, including Lazare Kaplan, is an error. ADB was as a result of granting enormous loans put into a position in respect of DD and KT that it was forced to act improperly in respect of Lazare Kaplan.

The concentration of ADB's risk in the Daleyot companies was USD 120 million, when its net equity stood at EUR 158 million in 2009.

This explains ADB's conduct in respect of Lazare Kaplan in 2009.

LKI institutes a claim against ADB on the basis of Article 1382 Civ. Code whereby LKD observes that by acting in breach of the law ADB acted erroneously, that this error of ADB has a direct causal link to the loss sustained by LKI.

In 2009 LKI was looking for money embezzled by the Daleyot companies and ADB received USD 20 million from HSBC Geneva via a back-to-back loan and USD 15 million from Mauridiam, a Mauritius company controlled by Mr Erez Daleyot, where embezzled money had also been parked. ADB received USD 30 million from Mauridiam via Hatilem in the same way.

ADB is liable in respect of LKI on the basis of Article 1382 Civ. Code.

<u>F.8. ADB received monies from Lazare Kaplan's debtor without complying with the provisions of law and regulation regarding the origin of monies: liability of the Bank</u>

That since January 2009 Lazare Kaplan had been informing ADB for months on end that it had been the victim of an embezzlement of money and diamonds for a sum of USD 135 million.
That ADB as professional banker must comply with all the requirements of law and regulation, including the Royal Decree of 3 June 2007 implementing Article 14 quinquies of the Law of 11 January 1993 on the prevention of the use of the financial system for laundering money and financing terrorism.
That this Royal Decree was in effect in June 2009. That Article 2 sub 12° of aforementioned Royal Decree considers the use of back-to-back loans to be an "indicator" [*the term is defined in the Royal Decree – translator*]
That in June 2009 Lazare Kaplan was looking for the vanished funds and Lazare Kaplan is of the opinion that ADB failed to comply with all the requirements of the law, including the aforementioned Royal Decree of 3 June 2007.

ADB did not investigate who the true owner was of DKT Diamonds Ltd., namely its shareholder Ildia Holdings Ltd. of Israel, whereof the sole shareholder is Equalia Services Trust of Liechtenstein (see **Folder XX, Exhibits 1, 2 and 3**).

That ADB should have determined who the economic beneficiary was of the DKT Diamonds account with HSBC, from which USD 20 million was transmitted to Antwerp.
That Lazare Kaplan has searched all over the world in an effort to trace the stolen money and goods.

That ADB acted erroneously by not complying with the relevant provisions of law and ADB caused harm to Lazare Kaplan that has a direct causal link to the incorrect conduct of the Bank.

ADB is liable in respect of LKI on the basis of Article 1382 Civ. Code.

F.9. ADB artificially provided further credit to the debtor of Lazare Kaplan in order to obtain securities for itself as banker to the detriment of the other creditors of DD and KT including Lazare Kaplan.

That as early as 8 January 2009 LKB wrote to ADB in order to inform it of the debts of DD and KT owing to Lazare Kaplan (see **Folder II, Exhibit 1**).

That the entire diamond market was aware of the financial difficulties of Mr Erez Daleyot and his companies. He was even forced to sell his factory in Botswana.
See the article in Polished Prices dated 23 January 2012, **Folder XXII, Exhibit 6**:

> *"With the crash in 2009 and 2010 it is known that Daleyot certainly suffered very strained financial circumstances, as certainly did others, but his was certainly critical at the time.*
>
> *The factory he had opened to much publicity employing deaf people in Botswana was summarily closed, allegedly with many unpaid bills.*
>
> *I am not aware of any other sightholder that had such a calamitous shutdown in Botswana as Daleyot or indeed anywhere else".*

In early January 2009 ADB was forced to note that DD and KT were deeply in debt and on 29 January 2009 was also forced to note that it as Bank had granted more credit to DD although the latter was already 83 days "out of cover", i.e. that it no longer complied with the conditions of the credit (see **Folder XIII, Exhibit 1, annex 9**, letter ADB of 29 January 2009 to DD).

That it now appears that ADB artificially maintained its credit to DD and KT in order to provide itself with securities, including a pledge on the goodwill, for which a private contract was signed on <u>12 January 2009</u> and which was registered on 14 January 2009 at the Mortgage Registration office for a sum of USD 38.5 million (see **Folder VIII, Exhibit 4**). That from the
conditions of the deed of pledge it appears that the Bank had obtained a lien on 50% of the revenues from the sale of the inventory.

First of all the goods were sold by LKB to DD and KT subject to a reserve of ownership until their payment in full and that this was well known to ADB.

ADB did not want to know that this inventory were diamonds belonging to LKB, apart from this it is so that ADB appropriated the entire revenue from the sale of the diamonds for itself.

That on 10 February 2009 LKB complained about the fact that ADB had started appropriating securities for a value of over USD 17 million (see **Folder II, Exhibit 2**).

On 7 October 2009 ADB acquired a contractual mortgage registration on Mr Erez Daleyot's home for a sum of EUR 5.5 million by way of security for the debts of DD and KT.

LKB protested against this course of affairs to the Bank in its letter of 31 March 2009 (**Folder II, Exhibit 4**) and subsequent (**Folder II, Exhibits 5 to 8 inc**.).

ADB artificially maintained its credit to DD and KT in order to avoid a discussion about its securities and in order to reduce the debit of DD from USD – 90 million to USD – 52 million as was projected by the financial manager of DD to ADB and KBC (**Folder XIII, Exhibit 1, annex 7**).

DD's annual report for financial 2008 was first filed by DD on 30 July 2009, the DD's auditor discovered that it did not fully comply with the text for which he had written a report.

DD was then obliged to file its annual report on financial 2008 for a second time, and the revised report was filed with the National Bank of Belgium on 25 June 2010.

Because this second publication was equally inaccurate, company auditor Van Herck sought a third publication of the 2008 figures (see the letters from Van Herck of 8 June 2011, **Folder XVI, Exhibits 3 and 4**). The third filing has still to be made.

The third publication of the figures for 2008 for DD was made on 9 December 2011 (**Folder XXVI, Exhibit 1**).

The annual reports for 2009 and 2010 of both DD and KT were published long after the date required by law (**Folder XXVI, Exhibits 2, 3 and 4**).

<u>The artificial finance granted by ADB to the Daleyot companies remains in place despite the merry-go-round of tens of millions of dollars that Mr Erez Daleyot announced would be an increase in capital pending the criminal investigations</u>

Pleading party points out that pending these criminal investigations, D.D. Manufacturing NV published annual accounts for the 2009 financial year in December 2011 to which was attached a report by the Board of Directors dated 26 September 2011 to the General Meeting in which the following is stated under item no. 5 "Prospects", "Before the end of the 2011 financial year an increase in capital will be implemented by means of an investment by new shareholders of USD 65,000,000" (**Folder XXVI, Exhibit 3**).

Pleading party points out that pending these criminal investigations, K.T. Collection BVBA published annual accounts for the 2009 financial year in December 2011 to which was attached a report by the Board of Directors dated 22 August 2011 to the General Meeting in which the following is stated under item no. 5 "Prospects", "Before the end of the 2011 financial year an increase in capital will be implemented by means of an investment by new shareholders of USD 18,000,000" (**Folder XXVI, Exhibit 4**).

That therefore Erez Daleyot proposes that he will be able to find USD 83,000,000 of fresh capital, i.e. USD 65 million plus USD 18 million.

The question then arises of who is prepared to inject USD 83 million into two Belgian companies, D.D. Manufacturing NV and K.T. Collection BVBA, that are subject to current criminal investigation for tax fraud and money laundering, the current dispute and the negative articles in the media about Mr Erez Daleyot, and where moreover the chartered accountant of the companies in question has refused to comment.

By contrast the annual reports for DDM Holding (DDMH) for the years 2007, 2008 and 2009 show that the net assets of the company have fallen to less than one quarter of the nominal capital (see **Folder XI, Exhibits 2, 3 and 4**). Despite this ADB continues to artificially finance the DD company, to the detriment of the other creditors, including the Lazare Kaplan Group.

Although DDMH has been making losses ever since its incorporation in 2007, the DDMH account with ADB has been used as a trapdoor account to funnel funds from Switzerland to the Cypriot companies. ADB continued to finance DD and KT even though DDMH was making a loss.

ADB Bank failed to comply with the Royal Decree of 13 June 2007 implementing Article 14 quinquies of the Law of 11 January 1993 on the prevention of the use of the financial system for laundering money and financing terrorism, namely Article 2, 8° where the use of intermediary accounts as trapdoor accounts is clearly designated as an "indicator".

The ADB account of DDMH with number 640-081380114 was used to funnel money to the Cypriot company Hatilem Enterprises, and this was always done within 24 hours of DDMH receiving the money from DD.
The same system was used when DDMH transferred monies to the Cypriot company EKT Air Services Limited: here the money was received by DDHM from DD and then transferred to the Swiss account of EKT Air Services Limited.

This incorrect conduct of ADB caused harm to LKI and LKB for which compensation is sought.

ADB is liable in respect of LKI on the basis of Article 1382 Civ. Code.

G.   <u>IN MOST SUBORDINATE ORDER: insofar the Court should declare itself to have jurisdiction and insofar the Court declares Belgian law to be applicable: appointment of a court-appointed expert</u>

In most subordinate pleading party supports the prayer of the voluntarily intervening party LKB for the appointment of a court-appointed auditor with instructions as set out in the operative part of these pleadings.

H.   <u>NO PROVISIONAL ENFORCEABILITY</u>

That having regard for the jurisdiction of the courts of New York no provisional enforceability can be granted.

That having regard for the foreign law that is applicable no provisional enforceability can be granted.
That plaintiff ADB seeks the provisional enforceability in its prayer.

That in this case there is at the very least no reason to permit such as pleading party disputes both the legal authority, jurisdiction and merits of the prayer of plaintiff, and pleading party LKI should also be allowed to assert its rights in appeal.

That pleading party is a publicly traded company and that provisional enforceability may have significant legal implications in connection with the obligations of US publicly traded companies.

That the provisional enforceability is an exception, and in this case should not be allowed. Plaintiff should not have its prayer granted.

## FOR THESE REASONS

and all others that may be presented during the course of the proceedings, and which here are expressly reserved

## MAY IT PLEASE THE COURT

In primary order

To declare itself lacking legal authority and jurisdiction and to state that the Courts of New York in the United States of America have jurisdiction and to refer the case to the Courts of New York in the United States of America.

To declare the claims of plaintiffs to be unacceptable and lacking in merit.

In subordinate order

Should in the impossible event of the Court declaring itself to have jurisdiction, to rule that the applicable law is the law of New York and that the counterclaims of Lazare Kaplan Inc. have merit as described below.

In subordinate order

Should in the impossible event of the Court declaring itself to have jurisdiction and insofar the Court should declare Belgian law to be applicable, to declare the counterclaims of Lazare Kaplan International Inc. to be acceptable and meritorious, and in consequence to direct Antwerp Diamond Bank to damages of USD 500 million.

To declare the claims of the voluntarily intervening party to be acceptable and meritorious and insofar necessary before giving judgement to appoint a court-appointed chartered accountant with instructions such as described in the petition for voluntary intervention filed by Lazare Kaplan Belgium NV on 20 July 2011.

To declare the claim of Lazare Kaplan Belgium NV against ADB for USD 350 million to be acceptable and meritorious where it is understood that this sum is to be set against the sum payable by ADB to Lazare Kaplan International Inc.

<u>In most subordinate order</u>

Before giving judgement to appoint a court-appointed chartered accountant with the following instructions:

- to convene all parties and to hold a first introductory meeting within 14 days of the judgement to be given appointing the court expert;
- to request all necessary and/or useful documents from parties, including the Lazare Kaplan report that DD handed over to ADB Bank in March/April 2009, as well as the internal bookkeeping entries of ADB, as well as all communications made in the second half of 2008 between ADB (including the Risk Monitoring Service of ADB) and DD Manufacturing NV and KT Collection BVBA about the payments of the latter to LKB
- To request all correspondence between LKB and ADB (including the Risk Monitoring Service of ADB) about the transfers of DD and KT to LKB
- To request all LKB's monthly reports from ADB
- To verify all bookkeeping entries within ADB of the monies received on the account of LKB
- To verify the bookkeeping entries within ADB of the monies leaving the accounts of DD and KT to LKB
- To verify the bookkeeping entries within ADB of the monies received on the account of LKB from DD and KT.
- To give his opinion on the internal consistency of this bookkeeping entries and to make a list of the contradictory entries
- To estimate the loss sustained by LKB
- To give an opinion on whether a normal prudent banker acting in the same circumstances and subject to the accounting legislation applicable in Belgium to finance houses, would have made such bookkeeping entries and maintained a risk profile of this kind
- To reply to all useful questions put by parties
- To request all useful documents from ADB which were used by ADB to reply to LKB's chartered accountant Blanckaert Missorten Spaenhoven & Co CVBA Chartered Accountants informing them that LKB had domiciled USD 38 million of local claims with ADB Bank
- To give a technical opinion on whether the email from ADB to DD of 9 January 2009 containing bookkeeping entries that largely invalidate these claims in the accounts of the Bank in the bank's dossier of DD contradicts the aforementioned letter to LKB's statutory auditor
- To summarize the whole in an expert report, in accordance with the rules of the Judicial Code, and to file it with the Clerk to the Court within a month of his appointment.

To direct ADB to all the costs of the proceedings including the compensation for proceeding in law in the amount of 16,500 euros.

Antwerp, 19 March 2011

For pleading party
Its counsel

Francine WACHSSTOCK
Advocate

<div style="border:1px solid black">

**INVENTORY**

**LAZARE KAPLAN INTERNATIONAL INC vs ANTWERP DIAMOND BANK NV**

**COURT OF COMMERCE ANTWERP**

</div>

I.     CREDIT AGREEMENT AND CONTRACTUAL RELATIONSHIP BETWEEN  LAZARE KAPLAN  INTERNATIONAL  INC.  AND ANTWERP  DIAMOND  BANK NV

1. Credit confirmation letter of 20 February 2008 between  LKI and ADB and schedule of the same date.

2. General credit granting conditions of November 2001

3. General conditions for banking operations of November 2001

4. Legal opinion of lawyer Ch.  Sullivan concerning the applicable law (New York), the requirements of New York law regarding accounting and "discovery", as well as the exclusive jurisdiction of the courts of New York

5. Fedex of 8 May 2008 from LKI offices in New York to the offices of Antwerp Diamond Bank in New York for the attention of Oakley Champine

6. Letter from the American lawyer Chris Sullivan dated 26 August 2011

7. Credit confirmation letter dated 19 February 2008 between LKB and ADB in Dutch and English

8. Printed version of the ADB website as it was on 11 March 2012 and accessed from Antwerp

II.     CORRESPONDENCE FROM LAZARE  KAPLAN TO ADB ABOUT THE CONFLICT WITH DD-DALEYOT GROUP

1. Letter of 8 January 2009 from Lazare Kaplan to Antwerpse Diamantbank enclosing the letters dated 8 January 2009 from Lazare  Kaplan  to DATED Manufacturing and K.T. Collection.

2. Letter dated 10 February 2009 from Lazare Kaplan to Antwerpse Diamantbank.

3. Letter dated 16 February 2009 from Antwerpse Diamantbank to Lazare Kaplan.

4. Letter dated 31 March 2009 from Lazare Kaplan to Antwerpse Diamantbank attaching the letter dated 31 March 2009 from Lazare Kaplan to DATED Manufacturing, K.T. Collection and Mr Erez Daleyot.

5. Letter dated 15 May 2009 from Mr Maurice Tempelsman to Antwcrpse Diamantbank

6.  email dated 4 June 2009 from Maurice Tempelsman of Lazare Kaplan to Mr Snoeks of Antwerpse Diamantbank

7.  email dated 5 June 2009 from Maurice Tempelsman of Lazare Kaplan to Mr Snoeks of Antwerpse Diamantbank (and the reply of 5 June 2009 from the latter to this communication from Mr Tempelsman).

8.  email dated 14 June 2009 from Mr Moryto of Lazare Kaplan to ADB Bank, and reply from ADB to same

9.  Letter dated 25 June 2009 from Lazare Kaplan to Antwerpse Diamanthank, signed for receipt on 26 June 2009

III.  <u>DETERIORATION OF THE RELATIONSHIP BETWEEN LKI  AND ITS BANKER ADB IN 2009 AS A RESULT OF THE DISSEMINATION OF INCORRECT INFORMATION BY ADB</u>

I.  Letter dated 22 July 2009 from Lazare Kaplan Belgium to ADB

2.  email dated 28 September 2009 from Mr Dullaert of ADB to Mr Moryto of LKI

3.  email dated 28 September 2009 from Mr Moryto of LKI to Mr Dullaert of ADB

4.  email dated 1 October 2009 from Mr Dullaert of ADB to Mr Moryto of LKI

4.bis email dated 13 October 2009 from Mr Marc Ghysels of the Nationale Bank of Belgie to Mrs Sandra Adam of ADB.

4.ter  email dated 14 October 2009 from Mr Marc Ost with an overview of the registration with the Central Credit Registry in the name of LKB dated 13 October 2009 in attachment

5.  Letter dated 28 december 2009 sent by email from Mr Maurice Tempelsman (LKI) to Mr Pierre De Bosscher (CEO of ADB)

IV.  <u>UNTIMELY TERMINATION OF THE CREDIT FACILITIES FOR LKI AND LKB  BY PROFESSIONAL BANKER ADB </u>

1.  Termination of the credit facilities by letter of 28 December 2009 from ADB to LKI

2.  Termination of LKB's credit line by ADB on 28 December 2009

3.  email dated 28 December 2009 from Paul Michels counsel for ADB to Chris Sullivan counsel for Lazare Kaplan

V.     CORRESPONDENCE FOLLOWING THE UNTIMELY TERMINATION OF THE
       CREDIT FACILITY (JANUARY – MARCH 2010) UNTIL SUMMONS ON 16 MARCH
       2010

1.     Letter dated 6 January 2010 van pleading party LKI aan ADB

2.     Letter dated 13 January  2010 from the US counsel of pleading party LKI to US counsel for
ADB

3.     Letter dated 19 January  2010 from the US counsel of ADB to US counsel for pleading party
LKI

4.     Letter dated 22 January 2010 from the US counsel of ADB to US counsel for pleading party
LKI

5.     Letter 4 February  2010 from the US counsel of pleading party LKI to US counsel for ADB

6.     email correspondence dated  7  February  2010 between US counsel for pleading party LKI and
       US counsel for ADB

7.     email correspondence dated 8 February  2010 between US counsel for pleading party LKI and
       US counsel for ADB

8.     Letter dated 16 February 2010 from the US counsel of pleading party LKI to US counsel for
ADB

9.     Letter dated 23 February 2010 from Lazare Kaplan to Mr De Bosscher, Chairman of the
       Management Committee of ADB containing a draft standstill agreement

10.    Letter dated 23 February 2010 from Lazare Kaplan to Mr Gijsens containing a draft standstill
       agreement

11.    email dated 23 February  2010 from pleading party LKI to Mr Gijsens containing a draft
       Confidentiality Agreement, a free translation of a confidentiality agreement, as well as an email
       dated 24 February 2010 confirming the receipt of the email dated 23 February 2010

12.    email dated 26 February 2010 from Mr De Bosscher, Chairman of the Management Committee
of
       ADB, to LKI

13.    email dated 1 March 2010 from Mr Maurice  Tempelsman, Chairman of the Board of LKI, to
       Mr Luc Gijsens, Chairman of the Board of ADB

14.    Letter dated 3 March 2010 from ADB to pleading party LKI

15.    Letter dated 3 March 2010 sent by email for Mr Maurice  Tempelsman of LKI to Mr  De
       Bosscher, CEO of ADB

16.    Letter dated 3 March 2010 from US counsel of LKI to US counsel of ADB

17.   Letter dated 7 March 2010 from pleading party LKI to ADB

18.   Letter dated 11 March 2010 from ADB to pleading party LKI

19.   Letter dated 11 March 2010 from dhr. Luc Gijsens, Chairman of the Board of ADB, to Maurice Tempe1sman Chairman of LKI.

20.   Letter dated 14 March 2010 sent by fax from Mr Maurice Tempelsman, Chairman of the Board of pleading party LKI, to Mr Luc Gijsens, Chairman of the Board of ADB, and copied to Mr Vandendriessche of ADB's audit committee

## VI.   CORRESPONDENCE BETWEEN THE US LAWYERS OF PARTIES AFTER THE SUMMONS

1.   Letter dated 23 March 2010 from US counsel for pleading party LKI to US counsel for ADB

## VII.   ANNUAL ACCOUNTS OF ANTWERP DIAMOND BANK NV

I.   Annual Accounts for 2008 of ADB as filed with the National Bank of Belgium

2.   Annual Accounts for 2009 of ADB as filed with the National Bank of Belgium

3.   Annual Accounts for 2010 of ADB as filed with the National Bank of Belgium

## VIII.   SECURITIES TAKEN BY ANTWERP DIAMOND BANK IN RESPECT OF DD MANUFACTURING BEFORE AND DURING THE ESCALATION OF THE CONFLICT BETWEEN PLEADING PARTY AND DALEYOT-DD

1.   Lien on goodwill dated 14 March 2000 by Antwerpse Diamantbank at the charge of D. D. Manufacturing NV for USD 2,200,000.

2.   Lien on goodwill dated 23 February 2006 by Antwerpse Diamantbank at the charge of D. D. Manufacturing NV for USD 27,500,000.

3.   Lien on goodwill dated 23 February 2006 by Antwerpse Diamantbank at the charge of K.T. Collection BVBA for USD 1,650,000

4.   Lien on goodwill dated 14 January 2009 by Antwerpse Diamantbank at the charge of D. D. Manufacturing NV for USD 38,500,000

5.   Trust Receipt PAND09354814 dated 3 February 2009 from which it appears that ADB Band accepted goods in pledge for a value of USD 17,576,707.23.

6. Contractually agreed registratration dated 7 October 2009 of a mortgage of 5,500,000 euros on the
   home of Daleyot  and his wife in favour of Antwerpse  Diamantbank for the loans of respondents

## IX.  OTHER EXHIBITS

1. Table of invoices and payments to the ADB account of DD, this was an attachment to the letter
   dated 4 February 2010 (Folder V, Exhibit 5) and attachment to the letter of 7 March 2010 (Folder
   V, Exhibit 17)

2. email of 8 December 2009 from Maître A. Moens, acting Receiver of the failed Overseas
   Diamonds, enclosing an invoice for Overseas Diamonds's stock of diamonds for
   USD 9,501,000

3. email of 28  December  2009 in which Maître A. Moens, acting Receiver of the failed Overseas
   Diamonds, confirms that the cheque of pleading party for USD 9,501,000 USD has been
   collected by the receivership.

## X.  US CASE LAW CONCERNING ANTWERP  DIAMOND BANK

1. Records of proceedings dated 9 August 2001 before the Supreme Court of New York between
   Antwerpse  Diamant Bank NV as plaintiff and SST Diamonds INC as defendant

2. Records of proceedings dated 19 January  2005 before the Supreme Court of New York
   between Antwerpse Diamant Bank NV as plaintiff and Alison Gem Corporation as defendant

## XI.  DDM HOLDING CVA

1. Publication in the Belgian Official Gazette of an abstract from the record of incorporation of
   DDM HOLDING CVA

2. Annual Accounts of DDM Holding CVA for financial 2007

3. Annual Accounts of DDM Holding CVA for financial 2008

4. Annual Accounts of DDM Holding CVA for financial 2009

## XII.  HSBC PRESS CLIPPINGS

1. Article dated 4 Fcbruary 2011 from the De Standaard

2. Article dated 4 Fcbruary 2011 from the De Morgen

3. Article dated 6 April 2011 from Knack

4.  Article from the De Tijd, 3 September  2011 about HSBC and diamond traders


XIII.   NOTIFICATION OF DEFAULT OF ADB BY LAZARE  KAPLAN

1.  Letter dated 18 July 2011 from Lazare Kaplan to Antwerpse  Diamant Bank with enclosures:

   1.  Registered letter of 8 January  2009 from LKB to ADB with enclosed copy of the letter from LKB to DD and KT of the same date

   2.  email of 9 January  2009 from ADB to DD about financial transactions between DD and Lazare Kaplan Belgium NV

   3.  email from LKB dated 30 October 2008 to ADB Risk Monitoring Service

   4.  email from LKB dated 31 October 2008 to ADB Risk Monitoring Service

   5.  Letter of 21 September  2009 from ADB to statutory auditor of LKB

   6.  Letter of 13 March2009 from ADB to DD

   7.  email of 8 april 2009 from DD to KBC

   8.  Letter of 22 July 2009 from LKB to ADB with enclosures

   9.  Letter of 29 January 2009 from ADB to DD

   10. Press clipping LKI July 2011

2.  Letter dated 9 August 2011 from Lazare Kaplan to Antwerpse  Diamant Bank


XIV.   INVOICES FROM LAZARE  KAPLAN  BELGIUM  TO DD MANUFACTURING NV AND K.T. COLLECTION BVBA WITH RESERVE OF OWNERSHIP, INVOICES GIVEN IN PLEDGE TO ADB, WHICH WERE USED TO MAKE DOUBLE ENTRIES IN THE ACCOUNTS.

I.  Invoice dated 31 August 2008 from Lazare Kaplan Belgium to DD Manufacturing for USD 6,951,419.90, still outstanding

2.  Invoice dated 30 October 2008 from Lazare Kaplan Belgium to DD Manufacturing  for USD 6,935,698.58, still outstanding

3.  Invoice  dated  18 September  2008  from  Lazare Kaplan  Belgium  to DD  Manufacturing for USD 5,424,114.00, still outstanding

4.  Invoice dated  30 September  2008  from  Lazare Kaplan  Belgium to DD  Manufactming for USD 3,205,343.I 0, still outstanding

5.  Invoice dated 29 October 2008 from Lazare Kaplan Belgium to DD Manufacturing for USD 2,475,406.62, still outstanding

6.  Invoice dated 31 October 2008 from Lazare Kaplan Belgium to DD Manufacturing for USD 1,665,389.44, still outstanding

7.  Invoice dated 30 June 2008 from Lazare Kaplan Belgium to K.T. Collection for USD 6,034,806.00, still outstanding

8.  Invoice dated 24 July 2008 from Lazare Kaplan Belgium to K.T. Collection for USD 5,583,488.00, still outstanding

9.  The back of the Lazare Kaplan Belgium invoice (and thus the back of invoices 1 to 8 above) setting out the conditions of sale of Lazare Kaplan Belgium


## XV.    CREDIT CONFIRMATION LETTER FROM ADB TO THE STATUTORY AUDITOR OF LAZARE KAPLAN

1.  Credit confirmation letter of 21  September  2009 from Antwerpse Diamantbank to the statutory auditor of Lazare Kaplan Belgium NV, namely Blanckaert, Missorten, Spaenhoven & Co Bedrijfsrevisoren CVBA


## XVI.    BALANCE SHEETS FOR  DD MANUFACTURING  NV AND CORRESPONDENCE WITH THEO  VAN HERCK BEDIJFSREVISOR  BVBA, THE STATUTORY AUDITOR OF DD MANUFACTURING NV AND K.T. COLLECTION BVBA

I.    Annual accounts of DD Manufacturing NV for financial 2008 filed on 30 July
      2009 with the Report of the Statutory Auditor, Theo Van Herck BVBA concerning 27 million euros
      that had been withdrawn from the company in contravention of company regulations.

2.  Corrected annual accounts of DD Manufacturing  NV for financial 2008, filed on 25 June 2010, with the Report of the Statutory Auditor, Theo Van Herck Bedrijfsrevisor BVBA concerning 27 million euros that had been withdrawn from the company in contravention of company regulations.

3.  Letter dated 8 June 2011 from the statutory auditor of DD Manufacturing NV, Theo Van Herck Bedrijfsrevisor BVBA, to DD Manufacturing NV concerning the 2008 figures that must be adjusted.

4.  Letter dated 8 June 2011 from the statutory auditor of K.T. Collection BVBA, Theo Van Herck Bedrijfsrevisor BVBA, to K.T. Collection BVBA concerning the 2008 figures that must be adjusted.

XVII.  PRESS RELEASE ADB

I.    Press release from ADB dated 16 May 2011. Mr Guy Snoeks leaves ADB for Slovenia

XVIll. MAURIDlAM

I.   Company document of Mauridiam Investment & Consulting

2.   Overview of the banking movements of Mauridiam with Barclays Bank from 15 November 2006 to 11 September 2009

3.   (Account) opening documents Mauridiam Investment & Consulting with Barclays Bank

4.   Document of 30 May 2008 about bank transfer of USD 5 million from Mauridiam (Barclays Bank Mauritius) to DD  Manufacturing  NV (Antwerp Diamond Bank)

5.   Bank document for another transfer of USD 5 million from dated 3 June 2008 from Mauridiam (Barclays Bank Mauritius) to DD Manufacturing NV (Antwerp Diamond Bank) via KBC New York

6.   Documents of 26 June  2008 about a third bank transfer of USD 5 million from Mauridiam (Barclays Bank Mauritius) to DD Manufacturing NV (Antwerp Diamond Bank)

7.   email from Raffi Fass (DD) to Kurt Beckers (ADB) of 28 November 2007 enclosing a tree diagram of the companies

8.   email from Raffi Fass (DD) to Kurt  Beckers (ADB) of 28  July 2008 about USD 15 million of bank transfers from Mauridiam

9.   email from Raffi Fass (DD) to Kurt  Beckers (ADB) of 24 February 2009 about questions about Mauridiam and investments in real estate

10. email from Raffi Fass (DD) to Kurt  Beckers (ADB) of 25 February 2009 about questions about Mauridiam and the other companies dependent on it

XIX.    PRESS CLIPPING LA PROVENCE ON EQUALIA

XX.    BACK-TO-BACK  LOANS  VIA  DKT  DIAMONDS  –  HSBC  ACCOUNT GENEVA TO DD MANUFACTURING NV ACCOUNT WITH ADB

1.    DKT Diamonds Limited company document

2.   Ildia Holdings company document with Equalia as shareholder

3.   Letter from Lawyer Chris Sullivan dated 26 August 2011 with enclosures about DKT and its account with HSBC

XXI.   ORGANIZATION CHARTS

1.  Organization Chart 1 Gulfdiam – Gemport -  Mauridiam – DD with ADB account

2.  Organization Chart 2 Gulfdiam – Gemport -  Diamco – ED/FTD – DD with ADB account

3.  Organization Chart 3 ADB – DD – DDMH – Hatilem etc.


XXII.   RICO PROCEEDINGS AND PRESS CLIPPINGS ABOUT CURRENT CRIMINAL
       INVESTIGATIONS OF DALEYOT AND/OR HIS PARTNERS

1.  RICO complaint dated 23 December 2011

2.  Clipping from the *Financial Times* of 23 December 2011

3.  Clipping from *Diamond Intelligence* dated 2 January 2012

4.  Clipping from *Knack* magazine dated 18 January 2012

5.  Clipping from *Globes* dated 19 January 2012 in Hebrew and translated into Dutch about Daleyot's
   business partner

6.  Clipping from *Polished Prices* dated 23 January 2012

7.  Clipping from *The Marker* dated 27 January 2012

XXIII.   EXHIBITS ABOUT THE LINKS BETWEEN EREZ DALEYOT AND ARABOV
        AGAINST WHOM A CRIMINAL INVESTIGATION IS PENDING

1.  Document from the Resposible Jewellery Council about the DDM Arabov Group

2.  Document about the Life Diamonds Foundation

3.  Printed computer document showing the corporate structure of the Israeli company DDM Arabov
   Group Ltd. in which both Erez Daleyot and Alon Arabov are directors.

XXIV.   CRIMINAL INVESTIGATION OF HSBC: BACK-TO-BACK LOANS BETWEEN ADB
        AND HSBC

1.  Letter dated 23 February 2012 from advocate Chris Sullivan to HSBC Group about the back-to-
   back tranactions between HSBC and ADB and specific bank accounts of dummy companies close
   to Daleyot and which have HSBC bank accounts

2.  Press clipping dated 27 February 2012 "HSBC says it may face criminal prosecution for
   transactions"

3. Press clipping dated 27 February 2012, "HSBC says US money-laundering enforcement measures "likely".

## XXV.  LETTERS TO THE SUPERINTENDENT OF BANKS IN NEW YORK

1. Letter dated 27 May 2011

2. Letter dated 21 February 2012

## XXVI.  ANNUAL ACCOUNTS OF D.D. MANUFACTURING NV AND K.T. COLLECTION BVBA

1. Annual accounts for financial year 2008, filed for the third time by D.D. Manufacturing on 9 December 2011, accompanied by a "Decline to Comment" statement by the statutory auditor.

2. Annual accounts for financial year 2009, filed for the third time by D.D. Manufacturing on 14 December 2011, accompanied by a "Decline to Comment" statement by the statutory auditor.

3. Annual accounts for financial year 2010, filed for the third time by D.D. Manufacturing on 14 December 2011, accompanied by a "Decline to Comment" statement by the statutory auditor.

4. Annual accounts for financial year 2010, filed for the third time by D.D. Manufacturing on 14 December 2011, accompanied by a "Decline to Comment" statement by the statutory auditor.

## XXVII. EMAIL CORRESPONDENCE BETWEEN LKB AND ADB IN BOTH DIRECTIONS FROM WHICH IT APPEARS THAT ADB PROVIDED FINANCE TO LKB ON THE BASIS OF THE CLAIMS THAT LKB HAD ON DD

1. email from ADB to LKB dated 23 July 2009 stating the position of LKB on 30 November 2008, including claims, according to ADB, of LKB on DD for USD 26 million serving as the basis of the finance, of which more than USD 12 million was marked "overdue – final warning"

2. email from ADB to LKB dated 23 July 2009 stating the position of LKB on 31 December 2008, including claims, according to ADB, of LKB on DD for USD 14 million serving as the basis of the finance, of which more than USD 3 million was marked "overdue – final warning"

3. email from ADB to LKB dated 2 March 2009 to ask also for monthly reports from LKB to ADB in accordance with the attached example, i.e. the monthly report of 31 December 2008 of the outstanding accounts receivable, in which it is stated that there are claims of LKB on DD for more than USD 26 million and marked YES in a particular column to indicate that these invoices are the object of a loan provided by the bank.

4.  email from LKB to ADB dated 22 July 2009 with attached monthly report of outstanding accounts receivable for May 2009

5.  email from LKB to ADB dated 22 July 2009 with attached monthly report of outstanding accounts receivable for June 2009

6.  email from LKB to ADB dated 27 August 2009 with attached monthly report of outstanding accounts receivable for July 2009

7.  email from LKB to ADB dated 2 September 2009 with attached monthly report of outstanding accounts receivable for August 2009

8.  email from LKB to ADB dated 2 October 2009 with attached monthly report of outstanding accounts receivable for September 2009

9.  email from LKB to ADB dated 6 January 2010 with attached monthly report of outstanding accounts receivable for December 2009

10. email from LKB to ADB dated  9 February 2010 with attached monthly report of outstanding accounts receivable for January 2010