# EXHIBIT A

1

```
     DISMATCH
1    UNITED STATES DISTRICT COURT
1    SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x
2
3    LAZARE KAPLAN INTERNATIONAL
3    INC.,
4
4                    Plaintiff,        New York, N.Y.
5
5          v.                          11 CV 9490 (ALC)(JCF)
6
6    KBC BANK N.V. and ANTWERP
7    DIAMOND BANK N.V.,
7
8                    Defendants.
8
9    ------------------------------x
9
10                                     January 30, 2014
10                                     3:10 p.m.
11
11   Before:
12
12                    HON. ANDREW L. CARTER,
13
13                                     District Judge
14
14                        APPEARANCES
15
15   HERRICK, FEINSTEIN
16        Attorneys  for Plaintiff
16   BY:  CHRISTOPHER J. SULLIVAN
17          JASON D'ANGELO
17          BRYAN MELTZER
18          CHANTELLE ARIS
19
19   ORRICK, HERRINGTON & SUTCLIFFE
20        Attorneys  for Defendant KBC BANK
20   BY: RICHARD A. MARTIN
21          PETER A. BICKS
21
22   LANKLER, SIFFERT & WOHL
22        Attorneys  for Defendant ADP BANK
23   BY: HELEN GREDD
23          PATRICK P. GARLINGER
24
25
```

DISMATCH
```
 1                    (Case called)
 2             MR. SULLIVAN:  Christopher Sullivan, for the
 3     plaintiff.  Good afternoon, your Honor.
 4             MS. GREDD:  Good afternoon, your Honor, Helen Gredd,
 5     for Antwerp Diamond Bank.
 6             MR. MARTIN:  Richard Martin, together with Peter Bicks
 7     for KBC Bank.
 8             THE COURT:  Good afternoon.  We're here today for a
 9     premotion conference.  Plaintiff has indicated they would like
10     to file a motion, or perhaps several motions.
11             Regarding how we are proceeding today, I know the
12     parties called chambers to figure out how much time we have
13     allotted.  It's not my intention on deciding any of the issues
14     today.  I'm not exactly clear about what it is the plaintiffs
15     are actually seeking, and certainly there isn't any case law or
16     any other authority cited in this letter.  I can't really make
17     any of these decisions.  I don't intend on making decisions
18     today.  Even if plaintiff's counsel has that currently,
19     obviously the defendants haven't had an opportunity to look at
20     it.  I haven't had an opportunity to look at the case law on
21     this.  I would like to get some clarity from plaintiffs as to
22     what exactly it is that we're concerned about.  I have a sense
23     of what you are concerned about.  I'm trying to figure out what
24     it is you actually want me to do.
25             MR. SULLIVAN:  Thank you, your Honor.
```

3

DISMATCH

1          I think it's fair to say that the plaintiff is a
2     little confused as well by recent developments in the case.  We
3     thought long and hard about whether to write to your Honor in
4     the first instance, given that we have been proceeding since
5     your Honor's ruling with some dispatch in exchange of
6     documentary evidence and in preparing for what we expect to be
7     an abbreviated set of depositions attending to coming before
8     your Honor, perhaps for an evidentiary hearing.
9          But when we looked at the public announcements made by
10    the defendant KBC with respect to the sale of defendant ADP
11    with the closing of New York office and disposition of certain
12    loan portfolios, we grew very concerned that those actions
13    implicate the very issues regarding which we are taking
14    discovery, pursuant to your Honor's direction in the Second
15    Circuit's direction; namely, the banking arrangements between
16    the parties.  Our concerns were exacerbated by a couple of
17    issues that have arisen with respect to the document production
18    and a request by defendant KBC that certain documents be
19    returned in accordance with the parties' stipulated protective
20    order.  It's a request that's not described in our letter, but
21    it's related to the issues before the Court, and to some
22    extent, it is explanatory of why we are here.  I apologize if
23    that's a little bit opaque.  If I can, there are five specific
24    requests that the plaintiff is making to the Court.
25          The first is that we expand the scope of the discovery

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

DISMATCH

1    that you have outlined and directed the parties to take to
2    include both the proposed sale by KBC of its 99.9 percent stock
3    interest in ADP to what appears to be a Chinese real estate
4    development company based in China, and the disposition of loan
5    portfolios, which may include the credit facility and attendant
6    loans that are the subject of Lazare's RICO action before your
7    Honor.
8            We would like to take documentary and deposition
9    discovery regarding the transactions -- not to interfere in the
10   transactions as counsel suggested in letters to the Court --
11   but to find out, very simply, what happened to our loan, what
12   is the real banking relationship between the parties, because
13   the limited discovery that we have taken so far directly
14   corroborates our belief that KBC approved and underwrote this
15   loan from the very beginning and now appears to be taking back
16   the loan from a buyer that doesn't have the money to buy the
17   bank in the first place.
18           We're sitting here looking at what, on its face, is a
19   fraudulent conveyance under the New York Debtor and Creditor
20   law, a sale without fair consideration that leaves one party
21   absolvent.  We're saying we don't understand it.  In the middle
22   of a lawsuit one of the defendants is being converted into a
23   shell.  The proposed sale is being financed by the seller.
24   It's to a real estate company that's not a bank.  It's never
25   been a bank.  It has no banking operations.  It has no stated

                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

DISMATCH

1   capital of any kind.  It has no public financial statements.
2   As far as we can tell, it has a limited diamond business in the
3   Far East and owns $65,000 of residential property in Houston,
4   Texas.  This entity is now going to control ADP Bank, the party
5   with respect to which we want to take depositions, the party
6   whose documents we are in the process of ascertaining.
7           I will say that counsel has been gracious, counsel for
8   ADP has been gracious enough to offer to talk to us and try to
9   work out the issues, but I don't think she has any more answers
10  than we do.  We don't know who is going to be representing ADP
11  going forward.  We don't know whether a third party Chinese
12  real estate company has any interest in cooperating with our
13  discovery.  We don't know that documents are going to be
14  preserved and protected, the parties are going to be available
15  for deposition.  We really don't know too much.  We're asking
16  the Court to permit us to take focused discovery regarding the
17  transaction and regarding the disposition of the loan.  That's
18  request one.
19          The second request is to fast track the depositions.
20  Three depositions is what the plaintiff would like to take, one
21  principal of KBC and two of ADP.  Schedule those for the first
22  week in March by which time we expect documentary discovery to
23  be complete.  Let's have a date certain that puts a control on
24  the case.  We don't know the time table for this proposed
25  transaction.  Our counsel in Belgium tell us it must be

6

DISMATCH

1   approved or rejected within 90 days, which would be sometime in
2   March.  I can't speak to that empirically myself.  I am not
3   Belgian counsel, but it's going to move forward with some
4   alacrity one way or the other.
5           When we look at the KBC press announcements, we see a
6   number of them say before the transaction closes the following
7   will happen.  I don't know what that means.  Is the credit
8   facility and attendant loans that are the subject of this case
9   going to be transferred?  Are they already at KBC since we now
10  know that KBC underwrote the risk in the first place?  Have
11  they been written off?  The documents suggest they have.  What
12  treatment is being given to that loan?  It directly bears on
13  the issue of which form selection clause governs the
14  transactions in this case.
15          We have a lot of questions and not much in the way of
16  answers.  We think limited, focused discovery on the nature of
17  the transaction that does not intrude into any confidential
18  aspect, that focuses on Lazare Kaplan's concerns, Lazare
19  Kaplan's loans, whether it's a real transaction or a fraud of
20  some kind.  It's very relevant to our case, your Honor, if the
21  defendant, in the middle of the case, is being turned into a
22  shell.  We would like a schedule of depositions, three of them,
23  in the first week in March.  We would like some arrangement,
24  and we can certainly discuss it with Ms. Gredd, but I think the
25  Court perhaps needs to be involved.  How do we protect and

7
DISMATCH
1  preserve documents when there is a third party coming into the
2  case that has no interest in cooperating and virtually no
3  contact with the United States?  How do we protect our ability
4  to take deposition discovery from ADP, as well as documentary
5  discovery?  Where are the documents going to be maintained?
6  Here in New York?  In Belgium?  Who has control of them?  Do we
7  have the ability to force the new owner to participate?  I
8  don't have the answers to these questions.  That's three.
9        Four, in our letter we ask the Court to allow us to
10 modify the stipulated protective order between the parties in
11 order to allow Belgian counsel to describe certain documents to
12 the Belgian courts.  The protective order has a precision that
13 anticipates modification.  It's not uncommon.  There is quite a
14 bit of case law in this circuit in situations involving
15 parallel litigation that you modify the protective order in one
16 case to allow it to be use in the other case.  We can cite
17 those cases for your Honor.
18       The point is simply the documents that have been
19 produced very recently directly contradict statements made to
20 this Court by the defendants.  Directly contradict.  They also
21 contradict statements being made to the Belgian courts.
22 Belgian counsel would like the ability to say to the Belgian
23 courts, Here are the type of documents we know to exist.  If
24 the court would like to order them produced, we would be happy
25 to produce them.  That's all we are asking.  We simply want to
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

8

DISMATCH

```
 1    give Belgian counsel the ability to describe to the Belgian
 2    courts, in different proceedings there, documents they think
 3    the court might want to order.  We don't feel comfortable under
 4    the protective order going that step.  We are asking the Court
 5    to allow us to modify the protective order.  We think those
 6    documents, your Honor, when they are brought to your attention,
 7    are going to dramatically change the nature of this case.
 8    That's an issue for this Court.  That's number four.
 9            Number five, we received a request from KBC's counsel
10    to pull back 650 documents that were produced.  This, your
11    Honor, is not described in our letter, but it's related to the
12    issues.  These are the documents.  They are heavily redacted.
13    Many of them are blank.  The request came that, on privilege
14    and other grounds unspecified, all of the documents are being
15    pulled back under our stipulated protective order to be further
16    redacted.  The procedure in the stipulated protective order is
17    for the aggrieved party, that would be Lazare here, to come to
18    the Court and say, We object to the return of the documents.
19    We think that there is no valid basis on privilege or other
20    grounds for compelling their return, and we would like the
21    Court to resolve the issue.  I don't know that it's fair to
22    your Honor to proffer 650 pages, so what we thought we might do
23    is suggest to counsel they indicate what further redactions
24    they want to make to the documents by delivering a further
25    redacted copy, and then we let the Court decide.  Why is it
```

9

DISMATCH
1  significant?  Because among these documents, your Honor, are
2  documents that prove that KBC underwrote the loan.  That is a
3  direct contradiction of what you were told, what the Belgian
4  courts were told and what we were told.  It's not an
5  insignificant issue.
6            Those are the five reasons for the conference.  There
7  are other related issues, but that, in essence, is why we asked
8  to be heard today, your Honor.
9            THE COURT:  Let me just ask plaintiff's counsel this
10  question.  Regarding your first three requests, what happens,
11  hypothetically speaking, if this transaction doesn't take
12  place?  Aren't these first three requests totally moot at that
13  point?
14            MR. SULLIVAN:  Our understanding, your Honor -- and I
15  can base my answer only on the statements that have been made
16  in the press -- our understanding is that the New York office
17  of ADP is being closed.  The press release that was issued said
18  after consultation with the buyer, it has been determined to
19  close the office.  I don't know that that's going to change one
20  way or the other, depending on whether the sale takes place or
21  not.  I think that's a question you had have to oppose to
22  counsel.  If the office is being closed, then I have the same
23  concerns regarding the integrity of the discovery process, the
24  movement of documents, the availability of employees.
25  Obviously, there is no fraudulent transfer to take into account
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

DISMATCH

1    in that circumstance.  I just don't know, however.
2            THE COURT:  Regarding your concern about the
3    safekeeping of the documents, the safekeeping of other forms of
4    discovery, tell me more.  I understand why it is that you are
5    concerned about that.  I'm still trying to figure out
6    specifically what is it you want me to do.  What are you
7    suggesting I do about that in terms of the keeping of these
8    records and these other documents?  What exactly is it you are
9    asking me to do?  Wouldn't the defendants be subject to
10   sanctioning and other forms of discipline if they were to
11   destroy documents and not keep the documents as they are
12   required to?
13           MR. SULLIVAN:  Potentially, yes, your Honor.  I think
14   we are asking the Court to do two different things.  The first
15   instance, perhaps, to order the documents in New York be
16   maintained in New York and preserved in New York, pending the
17   completion of this litigation without regard of the sale of the
18   bank, if it proceeds in the manner that's been announced to the
19   media.
20           We have had already one disclosure that documents the
21   destruction policy intended to terminate employees was not
22   canceled until September of 2013.  That appears to be an
23   inadvertence, and we have accepted counsel's explanation for
24   how it happened, but the point is with respect to terminated
25   employees, one of them we view to be a critical witness,
                     SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

11
DISMATCH
1   documents have been destroyed through September 2013. I think
2   that we are in, because the parties are international in
3   nature, we are in a dicey situation where it's not easy to
4   control exactly what's happening.
5           Given all of that, Lazare Kaplan is extremely
6   concerned that interjecting this third party, who is not
7   subject to anyone's control in the equation may similarly
8   affect the ability to take discovery, documentary and
9   deposition, and proceed going forward.
10          Maintain the documents in New York. Maintain the
11  documents in Belgium that are relevant to this lawsuit, both
12  which your Honor can order, and then I think counsel do need to
13  talk and try to come to some understanding and present it to
14  the Court as to how we proceed, assuming counsel continues in
15  the case. I don't even know that to be the case.
16          THE COURT:  In a perfect world, who would be asking me
17  to order to keep these documents?
18          MR. SULLIVAN:  ADP, as an entity, continues to be
19  subject to the jurisdiction of the Court, even though the 100
20  percent shareholder is potentially about to be a third party
21  located in China.  The entity itself is subject to your
22  jurisdiction.  And counsel, of course.
23          THE COURT:  Who is it you would be asking, in a
24  perfect world, that I require to keep the documents?  I'm
25  trying to get a sense of what you would be asking me to do.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

DISMATCH

```
 1        MR. SULLIVAN:  It's a fair question.  I think from our
 2   point of view you would be ordering ADP and KBC to maintain in
 3   New York those documents that are in New York, relevant to this
 4   lawsuit, pending the completion of the litigation, and to
 5   maintain in Belgium, in some place similarly, those documents
 6   relevant to the lawsuit.  So that if the new owner of ADP
 7   decides to move all the documents to China, that cannot happen
 8   without your Honor being notified in some fashion.
 9        THE COURT:  In terms of you wanting me to order these
10   documents to be retained in Belgium, are there any concerns you
11   have about that?  If I have the authority to do that, there is
12   no problem with me doing that, then what is your other concern
13   about these documents disappearing, if it's your position that
14   I have unlimited authority to make sure that documents are
15   being retained wherever they may be?
16        MR. SULLIVAN:  I think, your Honor, it's because we
17   don't know all the details of the transaction.  I don't even
18   know that counsel will continue after the sale of the bank.  I
19   don't know who I'm going to be dealing with.  I don't know what
20   the circumstances are.  I can only look to the Court to issue
21   whatever order is appropriate under the circumstances.  I don't
22   know what's going to happen to the documents.  What I do know
23   is that the transaction on its face does not make any sense
24   whatsoever.  It doesn't make any economic sense.  It would
25   appear to be turning one of the defendants into a shell company
```

DISMATCH
1    with no assets.  I'm suspicious.
2              THE COURT:  Thank you.
3              Let me hear from defendants starting with KBC.
4              MR. MARTIN:  Good afternoon, your Honor.  I just want
5    to be perfectly clear.  We wrote to counsel for the plaintiffs,
6    and we wrote to the Court.
7              We stated in writing what I will state again today on
8    the record that KBC has committed to preserve all of the
9    documents that are relevant to this case.  The documents that
10   are in New York will stay in New York.  The documents that are
11   in Belgium will stay in Belgium.  I don't think I can be any
12   clearer than that.  We understand our obligations.  We said so
13   in this transaction, whether it is completed or not, will not
14   impact our commitment to preserve the documents that are
15   relevant to this case.  I think that answers questions one and
16   two.
17             The transaction itself, your Honor, is still in draft
18   form.  As the documents that Mr. Sullivan produced to the Court
19   say, KBC has been under an order by the Belgium government
20   since 2008, 2009, to divest itself of all of its subsidiaries
21   in connection with the bailout that occurred in 2008, 2009,
22   incurred with lots of banks around the world.  This was a
23   requirement.  It's been attempted twice to sell this bank.  It
24   hasn't worked.  The current proposal, so far as I know from
25   this morning from 4 o'clock Belgium time today, it is not
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

14

DISMATCH

1  completed.  It's still a draft.  I do not know whether the sale
2  will be completed.  I do know regardless of the outcome, the
3  documents that are relevant to this case will be preserved.  I
4  have said that.  I have said it in writing and I say it to the
5  Court.
6          I don't know how else to say it except I do want to
7  say that this transaction regarding the sale of ADP does not in
8  any way implicate the issues of the foreign clauses in this
9  case.  This is a transaction that will occur in 2014.  It has
10 absolutely nothing to do with the existence of the ADP account
11 from 2001 to 2009 or the KBC account of Lazare during that same
12 period.  It has nothing whatsoever to do with that.  In any
13 case, the documents that are relevant will be preserved.
14         THE COURT:  Thank you.  Can you address this issue of
15 the wanting to pull back the 650 pages of documents?  What is
16 that?
17         MR. MARTIN:  Yes, your Honor.
18         We produced documents according to the agreement that
19 we provided to the Court and the report that was prepared on
20 November 15 and forwarded to your Honor both in December and in
21 January.  It turns out that we produced documents in January
22 that were obtained from KBC in Belgium, and we did some
23 redaction, but we failed to complete the redaction for customer
24 confidential information, legal privilege and a good deal of
25 data privacy.  These were sent out before they were fully

DISMATCH
1   reviewed.
2           Pursuant to the protective order, as soon as we
3   discovered that, we wrote to plaintiff's counsel and asked,
4   under the order, that they return those documents for our
5   complete privilege review and data privacy redaction.  We have
6   said we will complete that.  We will provide the new revised
7   documents within two weeks.
8           There aren't necessarily redactions on every page, but
9   we indicated every document that we had produced that will need
10  additional redaction.  It will take us two weeks.  That's the
11  order that we agreed to, and it doesn't provide for them at
12  this point to question what we produced.  They return it.  We
13  redact it for privilege and other subjects.  This is the case
14  in virtually every protective order this Court enters.  Then we
15  reproduce the documents.  If they then have an issue, we have
16  said we will meet and confer about any redaction.  Until today
17  we have not been asked to join in any motion to have the Court
18  review those materials before we redact them.  In fact, the
19  Court should not review those materials until we redact them
20  because they contain privileged information.  We will review
21  that matter.  We will review and complete the redactions within
22  two weeks, which is before we will be getting documents from
23  the plaintiffs.  That is still within the time period we
24  indicated to the Court.
25          Your Honor, we request that we be permitted to
                    SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

DISMATCH
1    complete the redaction process as the order provides.
2              THE COURT:  Thank you.
3              The last point you just made about that I shouldn't
4    review these documents until they are redacted, tell me more
5    about that briefly.
6              MR. MARTIN:  They are issues of data privacy, which
7    require that we not produce documents without having identified
8    the personal information in them.  Also privilege.  Until we
9    identified it, we shouldn't be providing it to anybody else.
10   We take it back.  We indicate what those are.  If there is then
11   a question that is raised about the validity of the privilege,
12   it can be presented to the Court in camera.
13             THE COURT:  Thank you.  Let me hear from counsel frat
14   ADP.
15             MS. GREDD:  First of all, with respect to the New York
16   representative office, while we were waiting for the conference
17   to begin, I reiterated to counsel for Lazare an offer that I
18   made several times in e-mail, on the telephone, talk to us
19   about what your concerns are for the New York representative
20   office.  At the moment, the lights are still on.  The door is
21   still open.  There are individuals there.  We are happy to talk
22   to them about what we are planning to do to preserve documents.
23   As Mr. Martin said, documents relevant to this litigation will
24   remain.  Those that are in New York, will remain in New York.
25   Lazare is in the process of getting the vast majority of them,

DISMATCH

1   in any event, through the discovery that's occurring, but we
2   are happy to talk to them about that, talk about specific
3   categories of documents like electronic, paper files.  I'm not
4   sure what it is that Lazare is including in what they are
5   asking the Court to do with respect to the New York
6   representative office, but I think it's premature because we
7   are saying talk to us.  Let's see if the parties can work
8   something out.  Then if we need to come to the Court, we will
9   certainly come to the Court.
10          With respect to the timing of discovery and
11  depositions, Mr. Sullivan mentioned two depositions from ADP,
12  but he didn't say who they were.  I can represent to your Honor
13  we are working very fast to get documents to Lazare in
14  connection with the Court's order.  That process will not be
15  complete by early March, just to give your Honor a few
16  statistics, we have produced to date approximately 20,000 pages
17  of documents.  We have nearly 150,000 additional pages in hand
18  with more on the way from Antwerp.  One of the things we have
19  been able to do is, I think successfully work cooperatively
20  with counsel for Lazare to deal with how to weed out
21  duplicative e-mails that the software doesn't initially catch,
22  how to deal with very long spreadsheets, only a small portion
23  of which relates to Lazare and the rest of which relates to
24  other customers.
25          We will be doing the rolling production we had agreed

18

DISMATCH

```
 1   with Lazare to do, but we have a ways to go, your Honor.  What
 2   I would very much prefer to do, because I think it furthers
 3   everyone's interest, rather than us spend time doing motions
 4   right now -- and I'm not even sure what motions we would be
 5   talking about except possibly the protective order which I will
 6   speak to in a moment -- we would like to keep our team working,
 7   getting the documents out the door as fast as possible.
 8          If Mr. Sullivan has concerns about individuals, I
 9   would be happy again to talk to him about who those individuals
10   are.  Thinking of the individuals who work in the New York
11   office, they are U.S. citizens, so I'm not sure what
12   Mr. Sullivan's concern is here.  Whether or not they continue
13   in the employ of ADP, they are U.S. citizens.  Again, I think
14   it's premature to be before your Honor proposing schedules and
15   concerns about the disappearance of individuals or documents
16   when the parties really haven't had an opportunity to talk to
17   one another.
18          One issue I am concerned about, however, your Honor,
19   is the proposed modification of the protective order.  If your
20   Honor is considering that, we very much would like an
21   opportunity to put in a submission and address that.  The
22   protective order, in its current form, was jointly agreed to by
23   the parties.  It was presented to the Court several times and
24   urged to be signed.  Our client is very concerned, your Honor,
25   as we come up on nearly the fourth anniversary of the
```

19
DISMATCH
1  commencement of litigation in Belgium, to collect the debt that
2  is owed us, and yet there is another effort to derail
3  proceedings that right now we are scheduled for hearing on
4  February 13.  Whether they will, in fact, go forward on that
5  day is anyone's guess, because Lazare's counsel in Belgium has
6  used many, many mechanisms for delay.  We would strongly
7  object, your Honor, to the modification of the protective order
8  that our clients have relied on, and as to which in this
9  circuit there is a presumption against modification.  If your
10 Honor is contemplating that, we would ask for the opportunity
11 to put in submissions.
12          Again, going back to the discovery and the documents,
13 we have offered multiple times and we renew the offer to sit
14 down in person or telephonically with counsel for Lazare and
15 discuss what their concerns are.
16          THE COURT:  Thank you.
17          MR. MARTIN:  Your Honor, can I add something to the
18 protective order that Ms. Gredd stated, if I may.
19          THE COURT:  Sure.
20          MR. MARTIN:  I think it might help the Court if I give
21 you a two-minute chronology.  We started to produce documents
22 pursuant to your Honor's order from July in September and
23 October.  We were acting under the protective order.  We were
24 in agreement.  The protective order said and says that these
25 documents will not be used in any other proceeding.  We jointly
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

DISMATCH

1   sent that protective order to your Honor for signature.  The
2   last time we were in this courtroom, after we had discussed the
3   scope of discovery, the data protection act, I asked on page 45
4   of the transcript from the hearing on November 8, I said that
5   the parties had presented you with a protective order.  One of
6   our great concerns was that the plaintiffs would seek to use
7   the documents that were being produced in this discovery in the
8   Belgian proceeding to further delay that proceeding.  We then
9   presented a joint order, a joint order by the two of us, by
10  both parties, asking you to enter the order and you did that on
11  November 21.  Less than two weeks later Mr. Sullivan wrote to
12  his counsel in Belgium, a letter which he attached to a motion.
13  In that letter, which we attached to our response to Lazare's
14  request for this premotion hearing, Mr. Sullivan correctly
15  acknowledged that we are engaged in nonmerits discovery
16  relating to the forum clauses in this case and told his
17  cocounsel in Belgium that we had insisted on this protective
18  order, but the Antwerp court might find that this was an
19  interesting topic, and had the Antwerp court were to order ADP
20  in Belgium to produce the documents, that would be fine.  Two
21  days later his counsel made that application seeking an order
22  from the Belgium court, the Antwerp court, to direct ADP to
23  produce these.  It's pending in front of the Belgium court.  We
24  don't need to modify this order.  If the Belgian courts wants
25  those documents, it will say so.  It's not for Mr. Sullivan to

DISMATCH

1  modify the order after we relied on it in producing the
2  documents that contain privilege material to try to circumvent
3  the order, and it was not proper conduct to write to counsel to
4  suggest to the Belgian court that it order something that is
5  contrary to the order entered by this Court.  The case law in
6  this circuit, as Ms. Gredd said, imposes a strong presumption
7  against modification after parties, like us, have produced
8  documents in reliance on it.  What clearly has happened is that
9  they agreed to the order.  They allowed us to make the
10 production.  As soon as it was done, within two weeks of that
11 order being entered, they tried to circumvent it in Belgium.
12          In any event, your Honor, if the Belgian courts wants
13 ADP to produce those documents, it can direct it.  It's not for
14 Mr. Sullivan to decide what should be given to them when he has
15 already entered into a protective order.
16          THE COURT:  Let me say this before plaintiff's counsel
17 starts.  As I said at the beginning of this hearing, I won't
18 make any kind of decision based on just statements that are
19 being made here in court.  I need to get some briefs on this.
20 I need law and I want to give the parties an opportunity the
21 flush out their thoughts a little bit more clearly regarding
22 the issue with the protective order.  I will give plaintiff's
23 counsel an opportunity to brief that for me if that's something
24 that plaintiff's counsel wishes to raise, which it appears it's
25 something they want to raise.  If that's something that the

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

22
DISMATCH

1   parties will not be able to agree on, which I don't think they
2   will, my intention is to give the parties a brief period of
3   time to meet and confer to see if the parties can come to some
4   sort of resolution on some of these issues, and then set a
5   briefing schedule quickly so week move this forward on the
6   remaining issues or all of the issues.
7           Having said that, I will give plaintiff's counsel an
8   opportunity to speak, but I'm not going to make any decision
9   today.
10          MR. SULLIVAN:  I will say something without gilding
11  the lily too much.  I will very brief, your Honor.
12          We do think it appropriate under the circumstances,
13  particularly given we are six months into document discovery,
14  to set some control dates on the process, because it seems to
15  be stretching out, and we think that we can identify the
16  parties to be deposed.  We can proceed with alacrity.  It can
17  take place in March.  It would be an effective control on a
18  situation where counsel have trouble agreeing to anything
19  without your Honor's assistance.
20          I would ask the Court to consider ordering documentary
21  discovery to be complete by the end of February and to schedule
22  the depositions, very abbreviated depositions we need here in
23  New York, to prepare this case.  I think that would aid
24  tremendously the process.
25          Secondly, with respect to the clawback of documents,

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

DISMATCH
1    if you will, heavily redacted as they are, the stipulated
2    protective order does contemplate presentation to the Court.  I
3    would ask permission, your Honor, as part of a motion or
4    otherwise, to pick out six documents to show you.  Documents
5    that do not implicate any privacy considerations -- an issue,
6    by the way, that we believe you already ruled on.  Counsel
7    disagrees, we tabled it for the moment so we can move forward
8    with document production.  We believe the Court to have
9    rejected the privacy considerations, as Judge Scheindlin did
10   very recently in a similar case at the last hearing.  Either
11   way, counsel agreed to set it aside for the moment.  Six
12   documents that do not implicate any privacy considerations,
13   that don't mention any customer names.  They talk about KBC
14   funding this loan.  That, your Honor, is something that
15   directly contradicts the statements Mr. Martin made to this
16   Court and that his client submitted sworn declarations on.  It
17   directly contradicts what they are saying in Belgium.  Six
18   documents that we will show to the Court as part of our request
19   that these not be clawed back.
20          THE COURT:  I guess my initial thoughts on that is it
21   does seem to be appropriate under the parties' stipulated
22   protective order to give the defendants an opportunity to
23   receive those documents and redact those documents as they see
24   fit.  Again, the parties haven't been able to agree on a whole
25   lot.  I think that your opinion regarding what is privileged

DISMATCH
```
 1    and not privileged is going to be vastly different than KBC's
 2    opinion on that matter.  Before we run into other issues and
 3    then have KBC saying that you are trying to make arguments here
 4    or present me with documents that I shouldn't be hearing,
 5    because this all contains privileged material, it seems to me
 6    as a practical matter, it makes sense, especially given the
 7    fact that you have already seen the documents, to give the
 8    defendants an opportunity to redact those documents.  If, in
 9    fact, these six pages that you are referring to don't implicate
10    any privilege issues or don't implicate any privacy issues,
11    that's fine.  If the defendants claim that they do, then
12    obviously I will get those documents, and I will make a
13    determination as to whether there is some privilege or privacy
14    issues or other issues that need to be addressed with that.
15            Again, I think that procedurally it would be improper
16    at this point, given the parties' stipulated to protective
17    order for me to allow you to sort of cherry pick these
18    documents for me to start looking at them to make this
19    determination.
20            MR. SULLIVAN:  I appreciate that, your Honor.  Since
21    the agreement is silent on the subject, and they serve us with
22    their redactions, if you will, we need to compare them with the
23    documents we have to see if they are appropriate or not.
24            For example, they are proposing to us we should return
25    everything that we already have, and they will reserve it as
```

DISMATCH

```
 1    redacted.  I need it in order to respond to their proposed
 2    redaction, and I would go so far as to tell you that our
 3    counsel, Lazare's other counsel believes some of these
 4    documents evidence a crime under Belgian law.  It's of that
 5    severity.  If they want to serve a further redacted version, so
 6    be it.  We will compare it and litigate the issue to your
 7    Honor.  To engage in some kind of shell game, I don't think
 8    would be appropriate and it's not called for by our agreement.
 9              Your Honor will direct us how to proceed in terms of
10    motion practice.
11              THE COURT:  I don't have the agreement in front of me,
12    I thought it was clearer on that.
13              MR. MARTIN:  I have it.  It's paragraph 17.2.  It says
14    receiving party must properly return or destroy the specified
15    information and copies thereof.
16              We haven't asked them to do that.  We just asked them
17    to return it.  That is what the order provides.  That is what
18    we asked them to do.  That's what Mr. D'Angelo said he would
19    do.
20              MR. SULLIVAN:  Actually --
21              THE COURT:  Just so the record is clear, counsel has
22    approached me and handed me a copy of the stipulated protective
23    order.  Hold on a second.  Let me just look at this.  I will
24    look at paragraph 17.
25              MR. SULLIVAN:  I think it's the last clause, your
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

DISMATCH
1   Honor, little i, Roman numeral IV.
2           THE COURT:  Just hold on a second.
3           MR. SULLIVAN:  I will simply point out that the last
4   clause requires the party in Lazare's position promptly present
5   the information to the Court under seal for determination.
6   Obviously, we need the documents in order to do that, and we
7   need the documents in order to respond.  As counsel, we have
8   the documents that have been produced to us, which are heavily
9   redacted, many of them blank.  If they want to further redact
10  them, I need to be able to demonstrate to the Court that the
11  further redaction is, in fact, inappropriate.  I think the
12  contemplation here was that counsel would retain the documents
13  and your Honor would make the decision.  Otherwise, it makes no
14  sense whatsoever.
15          MR. MARTIN:  I disagree.  This says what it says.
16          THE COURT:  In subsection four it says, "And may
17  promptly present the information to the Court under seal for a
18  determination of the claim."  Last sentence says, "The
19  producing party must preserve the information until the claim
20  is resolved."
21          What is plaintiff's counsel's position?
22          MR. SULLIVAN:  It says the receiving party must
23  present to the Court and producing party must preserve the
24  information.  Presumably, the information is the originals of
25  the documents being produced.  Since I'm under an obligation to
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

DISMATCH

1    present it to your Honor under seal, I can only do that if I
2    have it, and there is no way for me to respond or argue to the
3    Court that the invoked privilege is appropriate without having
4    the document.  Clearly, I need the document in order to proceed
5    in front of your Honor.
6            THE COURT:  Obviously, you are not under obligation to
7    present it me.  You are under an obligation, if you present it,
8    you present it under seal.  You may promptly present it.  They
9    must preserve the information.
10           MR. SULLIVAN:  I think it's a question of common
11   sense.  We believe that at least six, if not more, of these
12   documents are, in fact, critical, are, in fact dispositive of
13   the issue before us, and the fact that they are being recalled
14   -- do you mind not laughing when I'm speaking?
15           The fact that are being recalled after being heavily
16   redacted in the form of 650 out of 1,100 documents produced in
17   the context of what's going on with respect to the sale of ADP,
18   we think requires the Court's attention.
19           THE COURT:  Let me ask this question.  What is your
20   position, given subsection four, that it is clear that the
21   receiving party has the opportunity to present the information
22   to the Court under seal for determination of the claim?  Let me
23   ask you?  What is your reading of that?
24           MR. MARTIN:  We have done a lot of these.  This
25   language is not different from any other.  The procedure that

28
DISMATCH
1  varies is the following:  We ask for the documents back.
2  Because they are supposed to be privileged, they are subject to
3  immediate return or destruction at our request.  The claim is
4  what is discussed in sub four, not the documents.
5           They don't get the keep documents that we claim are
6  privileged for the purpose of making a claim to the Court.  The
7  claim is what the Court will decide, based on the redactions,
8  and the Court can ask for the documents under seal without the
9  redaction.
10           THE COURT:  I guess that's what my follow-up question
11  was going to be.  Obviously, this section seems to indicate
12  that obviously the plaintiffs are not supposed to be holding on
13  to these documents, or copies of these documents.  As a
14  practical matter looking at this, what would be the problem
15  with the plaintiffs providing a copy of those documents to the
16  Court under seal that they don't get to keep copies of, and
17  then return all the originals and other copies they have of
18  those documents to defense counsel for further redaction?
19  Therefore, the only documents that have not been redacted any
20  further will be in the possession of either defense counsel or
21  the Court under seal?  What's the problem with that?
22           MR. MARTIN:  Your Honor, I don't mind that.  They
23  don't get the keep the documents so they can later compare
24  them.
25           THE COURT:  What is the problem with that?
                 SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

29
DISMATCH

```
 1          MR. MARTIN:  I don't have a problem with your Honor.
 2  The other issue is they don't know what we are going to redact.
 3  Neither will the Court.  It may and probably will be moot on
 4  these issues, but I don't care if the Court wishes to keep the
 5  documents that are in their present form, that's fine.  I don't
 6  think the plaintiff should.  I think that's prohibited.
 7          THE COURT:  What's plaintiff's counsel position on
 8  that?
 9          MR. SULLIVAN:  Your Honor, I think if we are
10  proceeding in front of the Court in this matter we should deal
11  with the privilege issue, the Belgian privacy privilege issue,
12  because the sole basis for redacting is this supposed privilege
13  under Belgian law.  That's the issue that, following the last
14  hearing, we tabled in order to allow document production.
15          THE COURT:  That's a separate issue.
16          MR. SULLIVAN:  That is the basis for the redaction.
17          MR. MARTIN:  It's not.
18          THE COURT:  There is a protective order that you
19  agreed to.  Under the protective order you are required to
20  return those documents.  You are not allowed to keep those
21  documents.  Would you agree with that under the protective
22  order?  I know you want me to modify the protective order, but
23  under the order that you greed to in its current form -- tell
24  me if I'm misreading this -- but it's clear to me that you
25  aren't allowed to keep these documents under the protective
```

DISMATCH
```
 1   order that you agreed to; is that correct?
 2           MR. SULLIVAN:  I would respectfully disagree to this
 3   extent, although I will defer to how you rule on this issue.
 4   As long as you see the documents, that's the important thing.
 5   I would disagree to the extent I'm presenting the documents to
 6   you for a ruling.  I have no ability to interact with the Court
 7   to argue my client's position, unless I have a copy of the
 8   documents.  The fact that the clause is ambiguously written
 9   doesn't mean counsel can't participate in a meaningful
10   discussion with the Court on whether the invoked privilege is
11   affected.  If you come back with the question about the
12   documents, and I don't have them, how can I participate?  It
13   doesn't make any sense.
14           MR. MARTIN:  This is the way it operates in any
15   courtroom in the United States.
16           MR. SULLIVAN:  It doesn't.
17           THE COURT:  Hold on.
18           I don't see this as a huge issue.
19           MR. SULLIVAN:  My only concern is you see the
20   documents and you rule on privilege.  I will defer to the Court
21   on the point.  I don't think it makes sense if we don't have a
22   copy of the documents.  But if your Honor wants to take the
23   documents.
24           THE COURT:  One of the reasons I typically have
25   premotion conferences, and in this case with these parties,
```
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

DISMATCH
1   it's usually particularly helpful in that much of what we have
2   been discussing here is, if not premature, certainly
3   hypothetical.  There really may not be an issue with any of the
4   things that are being raised here.  Maybe there will be.  But
5   it very well may be that you give me these documents, I look at
6   these documents if there are six documents you want me to look
7   at.  I prefer to look at six as opposed to 650.  If I need to
8   look at 650, I will look at 650.  You can give me the documents
9   and return all copies of those documents to defendants under
10  the protective order, and the defendants may make their
11  redactions.  It seems to me that at that point we are going one
12  of two directions.  Either the information that you feel is
13  extremely important will be redacted by the defendants or it
14  won't.  If it's not redacted by the defendants, there is no
15  issue, right?
16          MR. SULLIVAN:  Correct, your Honor.
17          The submission to you, do you want us to explain why
18  we are selecting those documents to give you some context or to
19  just give you the documents?
20          THE COURT:  I think the first instance it makes sense
21  just to give me the documents because we're assuming that there
22  is going to be an issue that there may not be.  If this is
23  really that clear, and I don't know if it is or isn't, I
24  haven't seen the documents, it may be that defendants don't
25  wish to redact them.  If, on the other hand, the defendants

32

DISMATCH
1    decide they think that those documents should be redacted, then
2    certainly at that point, I agree with plaintiff's counsel, I
3    wouldn't want to prevent plaintiff's counsel from being able to
4    make the arguments that you wish to make.  But my sense is that
5    the arguments that you are making will not be wholly dependent
6    on every single word in those documents.  To that extent,
7    again, as a practical matter, I would think the protective
8    order would allow the Court, at some conference, to loan a copy
9    of the unredacted document to plaintiff's counsel so that
10   plaintiff's counsel could have that document, and then return
11   it to the Court or destroy it or whatever the case may be.  I
12   think the issue that's really clear in the protective order is
13   you can't keep an actual copy of the document.  To me it seems
14   as a practical solution there would be no problem with the
15   Court or defense counsel loaning a copy of that document to
16   plaintiff's counsel to then later be destroyed.
17          MR. SULLIVAN:  Your Honor, if I may suggest, we are
18   concerned obviously about delay here.  We will provide the
19   Court with the documents that we believe the Court should
20   review, subject to the redaction, if you will, by Monday.
21   Maybe one week to deliver the redacted, redacted version.  Many
22   of the documents, this is an example, say "privilege" and
23   nothing else on them, and this is being recalled for further
24   redaction.  Obviously, not a lot of thought has gone into the
25   effort.  I think one week to further redact, and then we will

33
DISMATCH

1 find out whether we have an issue or not, if I may ask, your
2 Honor.
3          THE COURT:  That's fine.  Let's try to keep away from
4 the attacks.  We don't need the extra parting shots after every
5 argument here.  Lawyers typically throw privilege on a lot of
6 things.  Sometimes lawyers are overinclusive on a privilege log
7 and stamping documents with privilege.
8          Let me hear from defense counsel about my most recent
9 suggestion.  It seems that would be within the spirit of the
10 protective order.  Again, I think a lot of this is
11 hypothetical.
12          MR. MARTIN:  Your Honor, perhaps I misunderstood.  I
13 thought the Court's suggestion was you get all of the documents
14 that may be redacted, the current production they shouldn't
15 keep.  I'm happy for the Court to have a copy of that now.  For
16 them to select six documents out of 650 pages, they are really
17 asking the Court to look at merits issues.  I don't think
18 that's appropriate or called for.  Either they give everything
19 to the Court or they give nothing.  Either way, we are likely
20 not to redact things that relate to anything other than other
21 customers identification, legal privilege or data privacy.  We
22 didn't.  In the materials we produced, we produced stuff that
23 had no relationship.  We overproduced.
24          THE COURT:  I understand.  What I will say in response
25 to that is I am willing to look at 650 documents.  I prefer to
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

34

DISMATCH
1   look a six.  It doesn't matter to me.  I'm not a jury.  Even if
2   these issues touch upon the merits, I can certainly separate,
3   in my mind, any of these merits issues from issues I have to
4   deal with here.
5           MR. MARTIN:  All I'm saying, as to those six pages, I
6   have no idea until I see them whether we are going to make any
7   redactions.
8           THE COURT:  Counsel in this case haven't been able to
9   agree on a lot.  It seems to me that if I'm given 650
10  documents, we could still be in a position where plaintiff's
11  counsel will say these are the six documents that are really
12  important, as opposed to giving me the six documents.
13          MR. MARTIN:  If you want to tell us what it is, we
14  will accelerate our review of those.
15          THE COURT:  Again, as I said at the beginning, to me
16  it gives make sense to give counsel an opportunity to meet and
17  confer to see if there is resolution.  There may not be an
18  issue.
19          MS. GREDD:  Thank you, your Honor.  I just wanted to
20  be briefly heard again on schedule.  Since Mr. Sullivan was
21  suggesting end of February --
22          THE COURT:  I would say I don't mean to cut you off,
23  but I guess I am cutting you off.  I will let you continue if
24  you wish.
25          I am not inclined to make that sort of change to the
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

35

DISMATCH

1  schedule at this point.
2          MS. GREDD:  Thank you, your Honor.  I won't try to
3  talk you out of that then.  What I would suggest, your Honor,
4  as I suggested to counsel before the conference again, we are
5  happy to meet and confer with them on schedule, on ways to
6  speed up certain things and on any concerns they have about the
7  whereabout of individuals.  That has been our position.  That
8  remains our position.  We are happy to talk to them.
9          THE COURT:  Thank you.  Let's have counsel meet and
10  confer.  Will February 5 be enough time for counsel to meet and
11  confer?  Do you need more time than that?  That's next
12  Wednesday, I believe.
13          MR. MARTIN:  I think it would be more helpful if we
14  completed this redaction, so that we can either crystallize or
15  eliminate that big issue for us, and they won't have provided
16  us with documents.  They said the first time we will get theirs
17  is on the 14th and then later on the 28th.  I suggest that we
18  try to complete this process of exchanging documents, and then
19  meet and confer because a lot of these issues, as you said, may
20  go away.
21          THE COURT:  Hold on a second.  When you say
22  "exchanging documents," are you talking about the six pages or
23  something else?  What I'm suggesting is there are a lot of
24  issues that have been bought out here today.  Counsel haven't
25  really met and conferred on really any of these.  If counsel
             SOUTHERN DISTRICT REPORTERS, P.C.
                   (212) 805-0300

36

DISMATCH

 1  can meet and confer about all of these issues between now and
 2  February 5, and any way that counsel sees fit, if they want to
 3  exchange documents, to do that, if you want to sit on the
 4  phone, if you want to meet at a coffee shop, if you want to
 5  Skype FaceTime, whatever you want to do.  Counsel meet and
 6  confer.  Then I'm certain, unfortunately, there will be at
 7  least some issues that counsel won't agree on.  There may be
 8  many that counsel have agreed on, and then we will go ahead and
 9  set a briefing schedule, and we can do that now to try to move
10  things along because I would like to move this long.  I suggest
11  we give counsel an opportunity to meet and confer.  I'm
12  suggesting February 5.  If that's not enough time, I will give
13  more time.
14            MR. SULLIVAN:  We agree to the 5th.
15            THE COURT:  Hold on.  Then we can set the briefing
16  schedule.
17            MS. GREDD:  Your Honor, I would suggest a little bit
18  more time, because I do think there are large areas,
19  particularly relating to the New York office and certain other
20  issues where we should be able to agree and not burden the
21  Court.  If you would give us another week with all of the
22  issues on the table, I think that's likely to be productive.
23  In the meantime, we will be continuing working hard to get the
24  documents out the door to plaintiffs.
25            MR. MARTIN:  I agree with that as well.  I do think by
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

37
DISMATCH
1  that time we will have crystallized what the issues are, and we
2  will reduce the number of issues that were identified by
3  Mr. Sullivan with an additional week.
4              THE COURT:  What is plaintiff's counsel position in
5  terms of that time to meet and confer?
6              MR. SULLIVAN:  Your Honor, my father used to say
7  history is a better guide than good intentions.  Given that
8  history suggests we can't agree on anything, instead of
9  Wednesday the 5th, maybe the following Monday.  I would like to
10 keep this on a tight time frame, and I think we need to know
11 whether we are proceeding by motion in front of your Honor and
12 to what extent.
13             THE COURT:  That's the 10th.
14             MR. SULLIVAN:  Monday, the 10th.
15             THE COURT:  Let's make it February 11th.  Counsel will
16 meet and confer and on February 11 let's go ahead and have
17 counsel submit a joint status report detailing whatever counsel
18 have been able to agree upon, if anything.
19             Let's go ahead and give you a briefing schedule on
20 whatever issues are remaining after that.  If there are no
21 issues, then there is no need for any briefs.  Let's say
22 February 20.  Does that give plaintiff's counsel enough time
23 for this?
24             MR. SULLIVAN:  Yes, your Honor.  I think that's fine.
25             THE COURT:  February 20 for plaintiff's opening brief.
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

Let's say March 3 for defendants. Does that work?

MS. GREDD: Your Honor, that could be a very tight time table depending on how many motions we are talking about here. I would ask your Honor to let us confer, see how many motions we have and then try to jointly propose a briefing schedule. We have been able to agree on some things notwithstanding what Mr. Sullivan says.

THE COURT: Counsel for KBC, any position on this?

MR. MARTIN: No. I agree with Ms. Gredd.

THE COURT: Well, hope springs eternal. I will give counsel a chance to try to agree on a briefing schedule.

MS. GREDD: Thank you, your Honor.

MR. SULLIVAN: You are an optimist.

THE COURT: We will get the status report and then see if you can set a briefing schedule. I think that takes care of everything today.

Is there anything we need to deal with today?

MR. SULLIVAN: No, you know. I think that's very helpful. Thank you again for your time.

THE COURT: From KBC.

MR. MARTIN: No, your Honor.

THE COURT: ADP.

MS. GREDD: No, your Honor. thank you for your patience.

(Adjourned)