# EXHIBIT C



**TransLingua**
YOUR MESSAGE IN TRANSLATION

# CERTIFICATE OF ACCURACY

This is to certify that the attached document, "Inadmissible Civil Action prepared by the Antwerp Public Prosecutor in re: *Lazare Kaplan International Inc. v. NV Antwerpse Diamantbank*, dated 19 April 2013, in response to Civil Action Suit filed by Lazare Kaplan International in Antwerp Court on 22 March 2013," has been translated from Flemish into English by staff members of TRANSLINGUA who are familiar with both the Flemish and English languages, and is to the best of our knowledge, ability and belief a true and accurate translation.

*[signature]*

For TRANSLINGUA

Sworn to and subscribed before me
this 15th day of May, 2014

*[signature]*

NOTARY

MARIA C. DAGOSTINO
Notary Public, State of New York
No. 01DA5047105
Qualified in Kings County
Commission Expires July 24, 2017

w York
East 43rd Street
te 1404
w York, NY 10017
12.697.2020
12.697.2891
yc@translingua.com

ulder
15 Pearl Street
te 215
ulder, CO 80302
03.442.3471
03.442.5805
oulder@translingua.com

w.translingua.com



[illegible]

# inadmissible civil action

record number
**AN25.99.000248-13**

THE PUBLIC PROSECUTOR,

> In view of the appointment as the party claiming damages of LAZARE KAPLAN INTERNATIONAL INC., a corporation under the law of Delaware (United States of America), 19 West 44th Street, 16th floor, represented by Francine WACHSSTOCK, attorney in Antwerp with offices at 2018 Antwerp, Van Bréestraat 20, and Hans RIEDER, attorney in Ghent with offices at 9000 Ghent, Recolletenlei 39-40, choosing as residence the offices of the abovementioned Francine WACHSSTOCK, by a deed drawn up by examining magistrate Ilse CAES in Antwerp, on March 22, 2013, the investigation being opened pursuant to this appointment as the party claiming damages;

In view of the civil action suit against:

> **NV ANTWERPSE DIAMANTBANK**
> **With headquarters at 2018 Antwerp, Pelikaanstraat 54**
> **With company number 0404.465.551**

In view of the civil action suit in which LAZARE KAPLAN INTERNATIONAL INC. claims to be aggrieved with regard to facts which it qualifies as:

<u>In Antwerp, and/or by association, elsewhere in the country,</u>

<u>Between January 1, 2007 and March 22, 2013, several times, on unspecified dates,</u>

Being guilty of active private bribery by proposing for itself or a third party an offer, promise or advantage in any form whatsoever, directly or via intermediaries, to a director or manager of a legal entity, representative or appointee of a legal entity or natural person, in order to perform or refrain from carrying out an act of its duties or an act facilitated by its duties, without the knowledge of the executive board or the general assembly, the mandator or the employer.

1.  LAZARE KAPLAN INTERNATIONAL INC. deposited a criminal complaint against ANTWERP DIAMOND BANK NV on March 22, 2013.

    On March 21, 2013, it served a direct summons on NV ANTWERPSE DIAMANTBANK – case known under record number AN.20.97.238/13, and of which a copy is appended as Exhibit 1 of the civil action suit.

    The Plaintiff supposedly wishes to appeal to one and the same legal entity; NV ANTWERPSE DIAMANTBANK therefore identifies itself with "NV ANTWERP DIAMOND BANK" and also with "X" as mentioned in the civil action suit.

2. In its civil action suit, LAZARE KAPLAN INTERNATIONAL INC. is requesting very far-reaching investigative measures (such as house searches of natural persons and legal entities), for which it provides no proof of interest and for which it imparts not a single piece of relevant evidence.

LAZARE KAPLAN INTERNATIONAL INC. has produced the following documents to substantiate the interest of its claim: a summons which it drew up and served itself (1), and two reports from an investigation bureau that it appointed itself (2-3). These documents do not justify such far-reaching investigative measures, as claimed by the party claiming damages.

The Public Prosecutor reviews these documents in order to ascertain if they show that there is (a beginning of) credibility to the Plaintiff's allegations of private corruption, and the Plaintiff has an interest in requesting such far-reaching investigative measures in a civil action suit.

2.1. **With regard to the Plaintiff's direct summons (Exhibit 1 of the civil action suit)**

The direct summons of the Plaintiff may be summarized as follows:

- nos. 1-3: summary of the alleged claims: abuse of trust, deception, money laundering,
- nos. 4-5: identity of the allegedly aggrieved persons,
- no. 6: identity of Defendant,
- nos. 7-9: identity of the DALEYOT Group,
- nos. 10-16: summary. NV ANTWERPSE DIAMANTBANK supposedly systematically planned "(i) to misappropriate diamonds from LAZARE, (ii) to complicate tracing these diamonds and the proceeds thereof by setting up a series of both legitimate and fake transactions, (iii) to launder the proceeds from these diamonds through a tangle of legal and illegal corporations and accounts (through ADB accounts), and (iv) to use the proceeds from the diamonds to repay the ADB loans to DALEYOT, and for other purposes of ADB",
- nos. 17-24: account of the "facts" concerning the "credit relationship LAZARE – ADB"
- nos. 25-32: account of the "facts" concerning the "commercial relationship LAZARE – DALEYOT"
- nos. 33-42: account of the "facts" concerning "the illegal banking relationship between DALEYOT and ADB"
- nos. 43-47: account of the "facts" concerning "the embezzlement of monies of GULFDIAM for, among other things, investments in real estate projects in Central and Eastern Europe"
- nos. 48-59: account of the "facts" concerning the "misappropriation of LAZARE diamonds", more specifically "misappropriation of 38,275,665 USD in diamonds delivered by LKB to DALEYOT"
- nos. 60-68: account of the "facts" concerning the "misappropriation of LAZARE diamonds", more specifically "misappropriation of diamonds supplied by GULFDIAM"
- nos. 69-84: account of the "facts" concerning the "misappropriation of LAZARE diamonds", more specifically "additional actions to hide the proceeds from the LAZARE diamonds". The bank has supposedly refused (to allow) an investigation/audit to be carried out at the request of LAZARE. The bank has supposedly taken collateral in the name of Erez DALEYOT. The bank has supposedly exploited a (back-to-back) guarantee with HSBC, disregarding the indicators of money laundering.

The businesses of the DALEYOT Group had accounts at NV ANTWERPSE DIAMANTBANK, and had outstanding credits with NV ANTWERPSE DIAMANTBANK – just as the Plaintiff had both an account and an outstanding credit with NV ANTWERPSE DIAMANTBANK.

In that regard, the bank requested company information from its borrowers (Plaintiff and the DALEYOT corporations), including information about the diamonds which they all purchased and sold themselves.

2.1.1. Having thoroughly reviewed the complaint, the Plaintiff states that it bought 38,275,665 USD in diamonds and consigned them to its (100%) subsidiary LAZARE KAPLAN BELGIUM N.V., which sold these diamonds under the condition of reservation of ownership to businesses in the DALEYOT Group.

This(These) buyer(s) did not pay for the diamonds, and sold them – allegedly disregarding the reservation of ownership.

Nevertheless, the Plaintiff made no complaint against the DALEYOT corporations, due to alleged abuse of trust. It is proceeding with a direct summons of the banker of the DALEYOT corporations – which was also its own banker.

The (sales) proceeds were transferred by the various buyers to the DALEYOT corporations' account with NV ANTWERPSE DIAMANTBANK.

The Plaintiff does not demonstrate that NV ANTWERPSE DIAMANTBANK was responsible for the fact that the buyers of the diamonds paid to the vendor DALEYOT corporations, and not directly to LAZARE KAPLAN BELGIUM NV, or the Plaintiff.

The DALEYOT corporations directed these transferred monies to their own account in order to pay off the DALEYOT credits with NV ANTWERPSE DIAMANTBANK. The DALEYOT corporations did not pass on the sales proceeds to either LAZARE KAPLAN BELGIUM NV or the Plaintiff.

The Plaintiff does not demonstrate that NV ANTWERPSE DIAMANTBANK was responsible for the fact that the vendor DALEYOT corporations decided to use the monies in their accounts to pay off the DALEYOT corporations' credits – instead of for another purpose (such as proceeding with the payment to KAPLAN BELGIUM NV or the Plaintiff, or proceeding with new purchases of diamonds).

Plaintiff believes that NV ANTWERPSE DIAMANTBANK has "misappropriated" its diamonds (title of nos. 48-59) because the DALEYOT corporations have sold the diamonds without having paid Plaintiff (or its Belgian subsidiary).

> *55. Indeed, ADB allowed the proceeds of the diamonds, which it knew came from LAZARE, to be deposited in accounts of DD/KT. In doing so, ADB covered its exposure to the illegitimate investments and debts of ADB and DALEYOT, to the detriment of LAZARE.*
> *(Direct summons, no. 55)*

This statement does not make sense, for several reasons:

- the Plaintiff does not demonstrate that NV ANTWERPSE DIAMANTBANK "*allowed*" the proceeds of the diamonds "*to be deposited*".
  *Since when is it the role of a bank to indicate on a sales invoice to which account the purchase price should be paid?*
  The DALEYOT corporations allegedly sold the diamonds, autonomously determining which accounts their buyers should pay into.

- once the buyers deposited the purchase prices into the account of the DALEYOT corporations, it was up to the holders of these accounts to determine what they would do with them: either pay the Plaintiff (or its Belgian subsidiary) with the monies, purchase new diamonds (or other company assets), or pay off the DALEYOT credits.
  *Since when does a bank have a legal obligation to insist that one of its (thousands of) account holders must first pay its contractual debts with another account holder with its incoming monies?*
  NV ANTWERPSE DIAMANTBANK, as a banker, is incapable of imposing imperative demands on the DALEYOT corporations, including any demand that they pay the Plaintiff.
  NV ANTWERPSE DIAMANTBANK, as a banker, is also incapable of simply drawing and transferring those monies transferred by buyers to the account of the DALEYOT corporations, to the account of the Plaintiff (or its Belgian subsidiary).

The bank accounts of both the Plaintiff and the DALEYOT corporations are completely independent of each other.

The bank could not just carry out transactions between these accounts at the request of the Plaintiff. In that case, the bank would indeed be liable with respect to the DALEYOT corporations, which had given no order or mandate to the bank to carry out such transactions.

By analogy with case law: a bank cannot carry out transactions itself between two accounts which belong to unmarried but de facto cohabiting account holders – the accounts are independent. See E. Wymeersch, R. Steennot and M. Tison, "Overzicht van rechtspraak. Privaat bankrecht (1999-2007) [Overview of case law: Private banking law]", TPR 2008, 1136, no. 124.

If a bank cannot carry out transactions between accounts of cohabiting partners who share a common life, why would a bank then have power over the accounts of account holders who have nothing to do with each other, except for the fact that one sells things to the other from time to time?

A bank should always follow up on credit loans, because a civil liability may arise towards third parties through the enforcement of an inappropriate credit. The bank should therefore have followed up on the conduct of both the Plaintiff (with a credit line of 45,000,000 USD) and the DALEYOT corporations (also with a credit line of tens of millions of USD).

But following up on company information may not lead to involvement in the management of a corporation: the risk then exists that the bank may be seen as an actual manager, particularly if the bank imposes management decisions (G. Schrans and R. Steennot, *Algemeen deel van het financieel recht* [General volume of financial law], Antwerp, Intersentia, 2003, 472, no. 621).

NV ANTWERPSE DIAMANTBANK obtained, as part of a check during the granting of credit:
- from the Plaintiff, the invoices which proved that it had sold its diamonds to the DALEYOT corporations, under the condition of reservation of ownership
- from the DALEYOT corporations, the invoices which proved that the diamonds were sold to third parties.

The bank had no obligation to make the management decisions (1) that the buyers of the diamonds should have paid the Plaintiff (or its Belgian subsidiary) directly, (2) that the vendor DALEYOT corporations should have transferred these monies to the Plaintiff on receipt of the purchase prices.

In addition, the bank had to make sure it adhered to its confidentiality obligation, which provides that the bank is required to exercise discretion concerning its client and may not provide any information about the financial situation of a certain account holder to third parties.

In other words, the bank could not inform the Plaintiff that the monies from the sale of the diamonds had actually moved into the account of the DALEYOT corporations, because then the bank would have violated its obligation of discretion with the DALEYOT corporations.

The Plaintiff believes that it sufficed to complain to the bank that it was not paid by its own buyer (the DALEYOT corporations), apparently expecting that the bank would itself draw the money from the account of the DALEYOT corporations, acting as a *deus ex machina*...

The Plaintiff cannot expect a bank – with thousands of account holders – to act as its agent, even if its commercial counterparty also held accounts with the same bank.

2.1.2. Another part of the complaint states that in the same manner – through payment to the account of the vendor DALEYOT corporations with NV ANTWERPSE DIAMANTBANK, of the sales proceeds of diamonds sold under the condition of reservation of ownership – diamonds owned by GULFDIAM in the amount of 94,147,422.65 USD were supposedly misappropriated.

However, GULFDIAM itself has filed no complaint.

The Plaintiff believes that it suffices to have held 30% of the shares in the GULFDIAM joint venture, in which a DALEYOT corporation held 45% of the shares. This obviously does not suffice: GULFDIAM is apparently not lodging a complaint about an abuse of trust and/or deception through the sale of its diamonds.

The Plaintiff also believes that NV ANTWERPSE DIAMANTBANK has created a "*fraudulent structure in order to misappropriate the GULFDIAM proceeds*", for "*among other things, investments in real estate projects in Central and Eastern Europe*" (summons, margin nos. 43-47). Nevertheless, once again no complaint from GULFDIAM has been submitted.

The Plaintiff should respect the corporate rights of the corporation in which it holds 25% of the shares. It cannot issue a direct summons for abuse of corporate assets of the GULFDIAM corporation (margin nos. 43-47) or abuse of trust through the sale of GULFDIAM diamonds (margin nos. 60-68).

In this respect, the direct summons is inadmissible, as the Plaintiff has no legitimate interest.

2.1.3. **Decision on Exhibit 1: Plaintiff's own direct summons**

The direct summons is not evidence that in any way substantiates or makes a reasonable case for the allegations of private corruption. On the contrary, the direct summons shows that the claims of the Plaintiff are entirely implausible and far-fetched.

2.2. **With regard to the investigative reports (Exhibits 2 and 3 of the civil action suit)**

- Exhibit 2 is a summary of a summary, of a single paragraph all told, in which the pure allegation of the existence of "*a corrupt relationship*" is mentioned without referring to any evidence whatsoever. There is only a reference to "*recent prosecution measures*" which have no connection to the Plaintiff itself.

- Exhibit 3 is a one-and-a-half-page summary which makes no reference to any evidence. The document states that two witnesses (whose names and positions are not given) supposedly described an international network of money launderers in which ADB (Switzerland) SA was supposedly involved as well as HSBC (Switzerland). These "*findings*" – which prove nothing and are not even substantiated by a beginning of written evidence – were supposedly "*reinforced by recent enforcement actions*", including the tax investigation by the BBI into bank information of Belgian residents with HSBC and an Antwerp investigation allegedly against Erez DALEYOT.

**Decision on Exhibits 2 and 3: reports by the Plaintiff's own investigators**

The summaries/investigative reports are not evidence that in any way substantiate or make a reasonable case for the allegations of private corruption.

3. The Plaintiff is filing a complaint of "active and private bribery" because during its private investigation, it supposedly "*encountered very serious indications that several members of the ADB board had been bribed by DALEYOT into creating and maintaining the fraudulent system*".

Of all these "serious indications", not a single piece of evidence has been submitted – it is a matter of pure speculation. The submitted documents are the Plaintiff's own direct summons and two reports of its self-appointed bureau – already mentioned above.

The "serious indications" are the following:

- DALEYOT and board members of NV ANTWERPSE DIAMANTBANK keep accounts – either directly or through certain corporations – with HSBC Switzerland (Geneva).
    - No piece of evidence has been imparted of this: no account statements, no corroboration by HSBC – nothing at all.
    - There are doubtless hundreds of thousands of clients at HSBC in Switzerland. The fact that a number of natural persons keep or kept accounts there does not mean that each of these account holders was in contact with one another in one criminal network or another.
    - Furthermore, it is no crime in itself to keep a foreign account: Belgian residents should indeed declare the existence of such an account for tax purposes – yet an American business may hardly believe it would suffer any damage because a Belgian resident either fails to declare the existence of a foreign account on the Belgian personal tax return or not.

- Both Erez DALEYOT and the members of the NV ANTWERPSE DIAMANTBANK board are supposedly "*the subject of a current investigation conducted by the Bijzondere Belastinginspectie [Special Tax Inspection Service*" (BBI)]. The BBI has also supposedly sent letters to these natural persons "*in the context of the accounts they keep with HSBC Suisse Bank in Geneva*".
    - No piece of evidence has been imparted of this.
    - How is it relevant for an American company that the Belgian BBI conducts a tax investigation against a Belgian resident (or non-resident)? This investigation will at most lead to a tax assessment (an official assessment or amendment notice) being sent.
    - As an American legal entity, the Plaintiff is foreign to the possible investigation of HSBC by the Belgian tax authority into its Belgian tax obligations.

- Erez DALEYOT is supposedly "*the subject*" of a "*pending criminal investigation by the Public Prosecutor in Antwerp, known as file number AN.79.F1.23.502/12*".
    - No piece of evidence has been imparted of this.
    - How is it relevant for an American company that there is an investigation allegedly against Erez DALEYOT in Antwerp? The American company did not request to view this file, and can hardly know its contents or state of affairs.
    - As an American legal entity, the Plaintiff is foreign to the investigation of the Public Prosecutor's office in Antwerp.

- A "*thorough investigation conducted by the internationally renowned private investigation bureau, the Good Governance Group (G3), has revealed serious indications of a possible corrupt relationship between DALEYOT and members of the ADB board*".
    - These documents were already discussed above.

    Having thoroughly reviewed the civil action suit, the Plaintiff offers no indication but only rumors that both Erez DALEYOT and the "top bankers" of NV ANTWERPSE DIAMANTBANK kept an account with HSBC in Switzerland.

    Supposedly, hundreds of thousands of people had an account with HSBC in Switzerland, including thousands of Belgian residents.

    This can hardly be a sufficient reason for a judicial investigation against the bank itself – which is not accused of having had an account with HSBC in Switzerland – on top of which house searches have been requested of natural persons, against whom no suit has been explicitly filed.

4.     In Antwerp, there is currently a commercial dispute pending before the Court of Commerce between NV ANTWERPSE DIAMANTBANK as the plaintiff and the Plaintiff as the defendant.

    The Public Prosecutor has requested the procedural documents of this civil procedure, in view of the fact that the civil action suit should be read against the background thereof. The Plaintiff disputes the jurisdiction of the Antwerp Court of Commerce, but offers no defense on the merits – apart from the statement that there is no conventional interest due. The Plaintiff did file a counterclaim of 500,000,000 USD.

    The present civil action suit is merely designed to prevent the Court of Commerce from reaching a verdict, allegedly in accordance with Article 4 Prior Title of the Code of Criminal Procedure.

5.     **CONCLUSION**

    The Plaintiff submits not a single piece of evidence that even remotely substantiates that it was aggrieved by a criminal act or offense in accordance with Article 63 of the Code of Criminal Procedure.

    What the American Plaintiff is requesting is an abuse of Belgian criminal procedure law, a pure fishing expedition with no other reason than, on the one hand, to gather evidence for its American procedures, and on the other hand, to slow down the pending commercial case before the Antwerp Court of Commerce between itself and the NV ANTWERPSE DIAMANTBANK as much as possible.

    The appointment as the party claiming damages is therefore not admissible, in the absence of a legitimate interest (Art. 17 and 18 of the Judicial Code).

In view of Articles 23, 63, 68, 127, 162 para. 2, 194, 226 and 227 of the Code of Criminal Procedure;

**REQUESTS** that the court, having heard the report of the examining magistrate and the evidence and arguments of the party claiming damages,

find that the appointment as the party claiming damages is not admissible, and order the party claiming damages to pay the costs.

Antwerp, April 19, 2013

[signature]

Paul Hannes