# EXHIBIT D

# CERTIFICATE OF ACCURACY

This is to certify that the attached document, FILE NAME LKI _ ADB - Procedure rechtstreekse dagvaarding _ Conclusie OM d.d. 14 juni 2013_ENG.pdf, has been translated from Flemish into English by staff members of TRANSLINGUA who are familiar with both the Flemish and English languages, and is to the best of our knowledge, ability and belief, a true and accurate translation.

For TRANSLINGUA

NOTARY

Sworn to and subscribed before me
this 8th day of May, 2014

MARIA C. DAGOSTINO
Notary Public, State of New York
No. 01DA5047105
Qualified in Kings County
Commission Expires July 24, 20

**New York**
211 East 43rd Street
Suite 1404
New York, NY 10017

T 212.697.2020
F 212.697.2891
E nyc@translingua.com

**Boulder**
1445 Pearl Street
Suite 215
Boulder, CO 80302

T 303.442.3471
F 303.442.5805
E boulder@translingua.com

**www.translingua.com**



**Public Prosecution Service**

**Public Prosecutor's Office of the Crown
ANTWERP
SECTION 300: FINANCIAL/FISCAL CRIME**

Case handled by:                        Venue: Prosecutor's Office – Bolivarplaats 20, Box 2, Antwerp
Paul Hannes
Tel: 03/257.90.53                       Mrs. Francine WACHSSTOCK
Fax: 03/257.90.48                       Attorney
Bolivarplaats 20, Box 2                 Via fax: 03 232 35 75
Antwerp
Paul.hannes@just.fgov.be

Number of handling office               Mr. Frank WANDEWALLE
314                                     Attorney
                                        Via fax: 03 248 49 73
Date
6/14/2013

| My Reference | Your Reference | Attachment | Copy to |
|---|---|---|---|
| AN.20.99.239/13 | LAZARE KAPLAN | Conclusion | |
| | ANTWERP DIAMOND BANK | Letter 6/13/2013 | |

Dear Madam Attorney
Dear Mr.  Attorney

Yesterday I sent you my conclusion via regular mail with the accompanying letter.

At the same time I am sending this by fax in order to respect the conclusion deadline (in case the version sent by mail has not reached you yet).
So the printed version will follow by regular mail, together with a copy of the attachments referenced in the conclusion.

I am adding a copy of this fax transmission to the case file.

Sincerely,
[Signature]
Paul Hannes
Public Prosecutor of the Crown

Website: http://openbaarministerie.be
OFFICE HOURS: from 8:30 a.m. to 4:30 p.m.

**Public Prosecution Service**

**Public Prosecutor's Office of the Crown
ANTWERP
SECTION 300: FINANCIAL/FISCAL CRIME**

| | |
|---|---|
| Case handled by: | Chamber: Prosecutor's Office – Bolivarplaats 20, Box 2, Antwerp |
| Paul Hannes | |
| Tel: 03/257.90.53 | Ms. Francine WACHSSTOCK |
| Fax: 03/257.90.48 | Attorney |
| Bolivarplaats 20, Box 2 | Via fax: 03 232 35 75 |
| Antwerp | Van Breestraat 20 |
| Paul.hannes@just.fgov.be | 2018 ANTWERP |
| | |
| Number of handling office | Mr. Frank WANDEWALLE |
| 314 | Attorney |
| | Generaal Van Merlenstraat 3 |
| Date | 2600 ANTWERP-BERCHEM |
| 6/13/2013 | |

| My Reference | Your Reference | Attachment | Copy to |
|---|---|---|---|
| AN.20.99.239/13 | LAZARE KAPLAN | | |
| | ANTWERP DIAMOND BANK | | |

Dear Madam Attorney
Dear Mr.  Attorney

Enclosed please find the conclusion of the Public Prosecution Service, with attachments in 4 parts.

I will add my conclusion to the case file.

At the hearing on 3/5/2013, LAZARE KAPLAN appeared with 4 attorneys and ANTWERP DIAMOND BANK with 3 attorneys. Given than the resources of the Public Prosecution Service are limited, I am not going to send 7 copies of this conclusion to 7 attorneys, but rather one copy to Ms. Wachsstock and one copy to Mr. Vandewalle.

 I would like to respectfully ask that you each share this conclusion with the attorneys that sat with each of you for LAZARE KAPLAN and ANTWERP DIAMOND BANK, respectively. I am going on the assumption that Mr. Rieder understands the reason for this and does not again start writing about courtesy.

I am also sending a copy of this letter to the clerk.

Sincerely,

Paul Hannes
Public Prosecutor of the Crown                                        COPY

**Public Prosecution Service**

**Public Prosecutor's Office of the Crown
ANTWERP
SECTION 300: FINANCIAL/FISCAL CRIME**

Case handled by:                    Chamber: Prosecutor's Office – Bolivarplaats 20, Box 2, Antwerp
Paul Hannes
Tel: 03/257.90.53                   **CONCLUSION OF THE PUBLIC PROSECUTION SERVICE**
Fax: 03/257.90.48
Bolivarplaats 20, Box 2
Antwerp
Paul.hannes@just.fgov.be

Number of handling office
314

Date
6/13/2013

Our identification
AN.20.97.238/13 = AN.20.99.239/13

The Public Prosecution Service refers to the written conclusion dated 4/19/2013, as submitted into the
case file, whose content affirms and is supplemented by the following.

Preliminary Case Documents:
-    The initial summons issued by the directly petitioning party, LAZARE KAPLAN INTERNATIONAL,
     INC.
-    The letter from the Public Prosecution Service to the directly petitioning party, dated 4/16/2013.
-    The written conclusion from the Public Prosecution Service dated 4/19/2013.
-    The conclusion of the defendant, Antwerp Diamond Bank, NV, dated  4/30/2013
-    The conclusion of the directly petitioning party, as delivered by Mr. Hans Rieder to the
     undersigned representative of the Public Prosecution Service, Paul Hannes, in the chambers of
     the Criminal Court of Antwerp, chamber 3C on 5/3/2013.
-    The conclusion of the directly petitioning party, as delivered by an office colleague of Mr. Hans
     Rieder to the undersigned representative of the Public Prosecution Service, Paul Hannes, on
     6/3/2013.

In the conclusion dated 6/3/2013 (margin numbers 1-3, page 4), the directly petitioning party sees
clearly what it had already concluded earlier, the very conclusion that the counselor Mr. Rieder
delivered to both the Public Prosecution Service and the attorneys of the accused party in the hearing
on 5/3/2013.

This conclusion – though shared with the Public Prosecution Service – has not yet been formally ruled,
and so it has not yet been entered into the case file.

The attorneys of the directly petitioning party demand, from their end, that each document they share with the Public Prosecution Service be entered into the case file.

- See the letter from Ms. Wachsstock of 5/2/2013, at 09:48 hours, to the judge of Chamber 3C (with a copy to the Public Prosecution Service):

  *During the last review of the file of the criminal clerk we determined that a complete record of the correspondence between the counselors of LAZARE KAPLAN INTERNATIONAL, INC. and the Prosecutor was missing.*
  *As a result of this, among other things, **the letter dated April 22, 2013, from the LAZARE KAPLAN INTERNATIONAL, INC. counselors to the Prosecutor, with <u>56 items</u> attached, is absent**.*
  *This also leads the counselors of ANTWERP DIAMOND BANK to assert that it is wrong that up to this point no items have been entered into the file.*
  *The Public Prosecutor's Office further uses the entry number AN.20.97.238/13 in its correspondence with the LAZARE KAPLAN INTERNATIONAL, INC. counsel, which is also the entry number noted on the document "conclusion of the Public Prosecution Service" that is in fact included in the file (this in contrast to **the missing letter of April 22, 2013 with 56 items attached**), while on the cover of the file a different entry number is noted, namely AN.20.99.239/13.*
  *In any case the counselors of LAZARE KAPLAN INTERNATIONAL, INC. cannot allow the correspondence exchanged with the Prosecutors Office to be absent, so a complete record of the correspondence must be submitted.*
      Attachment 1: The Public Prosecution Service's own copy

- See the letter from Ms. Wachsstock of 5/2/2013 at 11:44 hours, this one addressed to the Public Prosecution Service:

  *During the last review of the file of the clerk of the Criminal Court, the submitted correspondence between the counselors of LAZARE KAPLAN INTERNATIONAL, INC. and the Public Prosecution Service had not been entered into the case file with entry number AN.20.99.239/13, a file that is registered with the clerk's office for the attorneys with reference to the May 3, 2013 hearing in Chamber 3C of the Criminal Court of Antwerp.*
  *May we ask your office to enter the submitted correspondence into the case file and to notify the counselors of all parties that new items have been entered into the file, this in view of the hearing tomorrow.*
      Attachment 2

- See the conclusion of Mr. Rieder to the Public Prosecution Service issued in the courtroom of Chamber 3C on 5/3/2013, and that thus far cannot be found in the case file:

  *11. It is noteworthy that the Public Prosecution Service has not uttered one word about this accusation of money laundering. The only accusation about which the petitioning party has already shared supporting evidence with the Public Prosecution Service. **Items that were not entered into the file by the Public Prosecutor of the Crown, which more than proves his bias.***
      Conclusion dated 5/3/2013, number 11, the Public Prosecution Service's own copy

- See the conclusion that an office colleague of Mr. Rieder delivered to the Public Prosecution Service on 6/3/2013, and that at the same time was registered with the clerk (and as such can be found in the case file):

*139. It is noteworthy that the Public Prosecution Service, as it relates to this crime – about which the petitioning party has already delivered all the underlying items, that the **Public Prosecution Service failed to enter into the file** – remains completely silent. (**item 19**).*
Conclusion dated 6/3/2013, number 139, page 4 – The Public Prosecution Service's own copy

So the attorneys for the directly petitioning party postulate that (there must be) a policy, according to which everything that they share with the Public Prosecution Service, after being read by the Public Prosecution Service, must then be entered into the file – even if it is not explicitly requested in the item in question itself that it be added to the file.

Furthermore: If the Public Prosecution Service does not submit an item, this would be considered a demonstration of *bias* …

So it can be established that Mr. Rieder did not have the conclusion that he delivered to the Public Prosecution Service in the courtroom on 5/3/2013 entered into the file.

However, Mr. Rieder not only delivered the conclusion from the hearing on 5/3/2013 to the Public Prosecution Service, but also to the attorneys of the defendant. He also failed to give notice (by letter or any other means) that the conclusion delivered by him on 5/3/2013 should be considered non-existent.

According to the policy established by the attorneys for the directly petitioning party, each and every item that it provides to the Public Prosecution Service, after being read by the Public Prosecution Service, must be entered into the case file.  By doing this, the Public Prosecution Service would not be considered partisan by the attorneys for the directly petitioning party.

Therefore the Public Prosecution Service shall still add the conclusion to the file (as delivered in the courtroom of Chamber 3C on 5/3/2013 by Mr. Hans Rieder to the undersigned Assistant Prosecutor of the Crown, Paul Hannes), to be absolutely impartial, in conformance with the policy postulated by the attorneys for the directly petitioning party, though magistrate order (kantschrift) (**attachment 3**).

The attorneys for the directly petitioning party cannot pose any objection to or opposition against this, because one cannot simultaneously, on one hand reproach the Public Prosecution Service for withholding items from the file and accuse the Public Prosecution Service of being "biased," and on the other provide items to the Public Prosecution Service that one would not expect to end up in the case file.

In this conclusion the Public Prosecution Service shall determine in successive order the existence of a direct summons to the court (II), the (in)competence of the court (III), the procedure (IV), the appropriateness and admissibility (or lack thereof) of the charges brought by LAZARE KAPLAN INTERNATIONAL, INC. (V) or the lack of merit  of the same (VI).

Before establishing these items the Public Prosecution Service would like to preliminarily (I) inform the court about a number of points which LAZARE KAPLAN INTERNATIONAL, INC., during the initial hearing on 5/3/2013 as well as in its conclusions of 5/3/2013 and 6/3/2013, blatantly left out.

These points are superfluous and have no bearing on the determination of the competency, appropriateness, admissibility and/or merit of the charges – but are nevertheless made to show the aberrant procedural stance of LAZARE KAPLAN INTERNATIONAL, INC.

I.  **Prefaces**

**1.**
The Public Prosecutor's Office mistakenly issued two entry numbers, whereas there exists only one case file, with one single directly petitioning party summons from LAZARE KAPLAN INTERNATIONAL , INC.

The first entry number was created during the registration of this summons, and the second was erroneously created during the transfer of the signed summons within the prosecutor's office.

In its conclusion dated 5/3/2013, LAZARE KAPLAN INTERNATIONAL, INC. develops some very far-fetched theories about the existence of two different entry numbers.

> *11. … It seems very obvious that the Prosecutor's Office is planning its own investigation of the same facts, on its own initiative so to speak, but one that they do not want to reveal yet, but on the other hand bring about a swift denial of file 99 and strive to ensure that, that way, the interests of ANTWERP DIAMOND BANK are being served, which indicates that the Public Prosecution Service is acting in a partisan manner in this matter and so clearly serves interests other than those of the general public. But there is more that is fishy, also because the BBI asked to inspect file 99. The Prosecutor's Office that is confronted with a file that the BBI also shows interest in sees its strategy to support ANTWERP DIAMOND BANK go up on flames and so opens the same file but under a different number. Talk about manipulation.*
> Conclusion dated 5/3/2013, number 11

Because of the existence of two entry numbers the Public Prosecution Service would 1) want to serve the needs of the ANTWERP DIAMOND BANK…  2) act in a partisan manner… 3) have a *"strategy to serve the ANTWERP DIAMOND BANK"*… and 4) be manipulative…

LAZARE KAPLAN INTERNATIONAL, INC. does not need to look for a plot behind the temporary existence of two entry numbers – in the meantime the entry numbers have been entered into the computer system and the copy of the summons (as indicated to the representative of the Public Prosecution Service) has been put into the file, upon request from LAZARE KAPLAN INTERNATIONAL, INC.

For clarification: there exists only one single file, with one single directly petitioning party summons, wherein it is the responsibility of the directly petitioning party to add items to said file and convince the court. This is why in the header of this conclusion the entry numbers: AN.20.97.238/13 = AN.20.99.239/13 are noted.

For clarification: The Public Prosecution Service does not plan to conduct additional research in reference to the allegations made by LAZARE KAPLAN INTERNATIONAL, INC.

2.

Upon receipt of the summons the question of its foundation was immediately raised. The Public Prosecution Service was very curious about the pieces of evidence that would be needed to substantiate the many accusations.

From the clerk it was learned that not a single piece of evidence was submitted by the directly petitioning party – not a single item was added to the file at the time the summons was filed, but rather some time later (up to the date 6/3/2013).

Although this was not a formal infraction, this already gave a glimpse of the position that LAZARE KAPLAN INTERNATIONAL, INC., was going to take.

This is why the Public Prosecution Service asked the clerk of the court of commerce in Antwerp – where a case was in progress between on one side ANTWERP DIAMOND BANK, NV, as directly petitioning party and LAZARE KAPLAN INTERNATIONAL, INC., as defendant – for a copy of the file.

Based on this, the Public Prosecution Service could only receive a copy of the proceedings (such as the initial lawsuit summons, the correspondence exchanged regarding the judgment calendar, the orders for setting the judgment term, and the conclusions of the parties).

The Public Prosecution Service was unable to obtain copies from the clerk of the court of commerce of the pieces of evidence the parties were using.

One does not need to seek ill will behind this; it is possible that the clerk of the court of commerce did not make copies of pieces of evidence because these had not yet been submitted by the parties (which in court of commerce proceedings does not happen at the same time as the establishment of conclusions by the court clerk, although this does take place several days or weeks before the plea date).

LAZARE KAPLAN INTERNATIONAL, INC. seems to maintain until now that the unwillingness to provide copies of the evidentiary items is due to malice by the Public Prosecution Service…  and thus assumes that the Public Prosecution Service did receive a copy of such evidentiary items from the clerk of the court of commerce…

-   See the conclusion dated 5/3/2013:

    *2. From these same notes it appears that the Prosecutor of the Crown does not want to fully inform the court. The Prosecutor of the Crown allowed the procedural documents to be entered into the file. Those were requested by magistrate order (kantschrift). What the Prosecutor of the Crown did not allow to be entered is the items that the parties submitted. Since when can a Prosecutor of the Crown, when uncovering a crime, limit which items the necessary parties have access to for reaching their conclusions? In this regard the Prosecutor of the Crown also comes up pitifully short.*
    Conclusion dated 5/3/2013, number 2

After the Public Prosecution Service, in the 5/3/2013 hearing, clarified that it was not sent a copy of the evidentiary items by the clerk of the court of commerce – so the Public Prosecution Service could also

not establish what it does not have – LAZARE KAPLAN INTERNATIONAL, INC. continues to stick to its conclusion dated 6/3/2013 that the Public Prosecution Service is still in default...

> *110. Given the continuing default of the Prosecutor of the Crown, the petitioner itself provides the evidentiary items and corresponding inventory that was entered into the proceedings before the court of commerce (item 25)*
> Conclusion dated 6/3/2013, number 110, page 37

> *144. ...Apparently the Prosecutor did not find it necessary to enter the bundle of evidence  into the file and only put the conclusions established by the parties into the file.*
> Conclusion dated 6/3/2013, number 144, page 51

The Public Prosecution Service added to the case file what was provided by the clerk of the court of commerce – no more and also no less.

Also the argument presented during the initial hearing on 5/3/2013 – that the Public Prosecution Service had not produced all the conclusions, specifically the conclusions presented regarding the application of Article 4 of the Criminal Code – was not very serious, since the clerk of the court of commerce had been given no standing order to deliver each new incoming item (conclusion, letter of inquiry, decree) to the Public Prosecution Service in each instance.

On a certain date a copy of the file was requested, as it existed at that moment with the clerk of the court of commerce. Subsequently submitted items were also not immediately forwarded by the clerk of the court of commerce.

The Public Prosecution Service is not withholding any items from the court.

LAZARE KAPLAN INTERNATIONAL, INC. does not need to look for any plots.
3.
LAZARE KAPLAN INTERNATIONAL, INC. asked at the same time that the correspondence that its Belgian attorneys had sent to the Public Prosecution Service on 4/22/2013 be added to the case file (refer to the aforementioned conclusion in the introduction).

Although highly unusual – (why would a letter sent by an attorney to the Public Prosecution Service by definition be added to a file, unless the attorney specifically asked for this in the letter?) – this is a simple request in this situation.

LAZARE KAPLAN INTERNATIONAL, INC. does not need to look for any plots behind the fact the letter from Mr. Rieder, dated 4/22/2013, was not immediately introduced into the criminal file.

In spite of the clarification on this matter during the 5/3/2013 hearing (by the Public Prosecution Service), LAZARE KAPLAN INTERNATIONAL, INC. again wasted more paper in its conclusion on 6/3/2013:

> 139.  It is apparent that the Public Prosecution Service, with regard to this misdeed – for which the submitting party has already shared all the supporting items via letter that the **Public Prosecution Service did not add to the file** – remains completely silent (**item 19**).
> Conclusion dated 6/3/2013, number 139, page 46 – from the Public Prosecution Service's own copy.

It is sufficient that Mr. Rieder, in his correspondence to the Public Prosecution Service, asks that after reading the letter it be add it to the existing legal file. Moreover, the letter in question had already been added to the criminal file during the hearing on 5/3/2013, making this last statement (besides being bizarre in substance) also incorrect.

**II.  Direct Summons**

1.
LAZARE KAPLAN INTERNATIONAL, INC. filed a direct summons to the court.

It expected that upon being informed of this summons the Public Prosecution Service would conduct a legal investigation, or at least do some exploration.

The Public Prosecution Service fulfilled all its incumbent responsibilities (these are also cited by LAZARE KAPLAN INTERNATIONAL, INC.) by conducting a thorough analysis of the summons. At the same time it asked the clerk of the court of commerce for a copy of all available items, after which all the conclusions sent by the clerk's office were read and analyzed.

This research by (a representative of) the Public Prosecution Service led to an initial written comment from the Public Prosecution Service – though to the dissatisfaction of LAZARE KAPLAN INTERNATIONAL, INC..

The position was founded and rested on an analysis (within the framework of the responsibilities specific to the Public Prosecutor's Office).

LAZARE KAPLAN INTERNATIONAL, INC. cannot simultaneously assert that, based on the position presented, the Public Prosecution Service did not do its research (and therefore fell short "*in an insulting manner*" of any *'legal obligations in the application of Article 22, 28th §1 and 28th quarter section 3 of the Criminal Code,"* conclusion dated 5/3/2013, heading 1), and also complain that the Public Prosecution Service did in fact conduct an analysis of this position – which precisely  shows that the claim from LAZARE KAPLAN INTERNATIONAL, INC. was thoroughly investigated.

2.
The Public Prosecution Service could not investigate any items in the file before 6/3/2013, as before that time LAZARE KAPLAN INTERNATIONAL, INC. had not yet entered anything into the case file.

The only thing that did occur is that on 4/22/2013 one of its attorneys had sent a letter with 56 items to the Public Prosecution Service, with the objective of enabling its request that the Public Prosecution Service conduct its own legal investigation.

This letter with 56 items was also analyzed and researched by the Public Prosecution Service upon receipt, so the Public Prosecution Service has fully complied with its incumbent obligations.

The letter dated 4/22/2013 was intentionally sent only to the Public Prosecution Service by the LAZARE KAPLAN INTERNATIONAL, INC. lawyer, to convince the Public Prosecution Service to pursue a legal investigation, or at least an exploration.

The letter was intentionally not sent by the LAZARE KAPLAN INTERNATIONAL, INC. lawyer to the court clerk for entry into the file, nor was it shared with the attorneys of ANTWERP DIAMOND BANK, NV.

The letter dated 4/22/2013 was therefore not intended as an item for the proceedings (because in that case the attorneys for LAZARE KAPLAN INTERNATIONAL, INC. would have had to also share the letter with (the attorneys for) ANTWERP DIAMOND BANK, NV), but rather was only designed to convince the Public Prosecution Service to side with the directly petitioning party.

After analysis the Public Prosecution Service maintained its position previously entered into the file.

When this became clear, there followed numerous reproaches from LAZARE KAPLAN INTERNATIONAL, INC. that the letter dated 4/22/2013 should be entered into the file (refer also to the introduction to this conclusion above, with specific reference to the two letters from Ms. Wachsstock dated 5/2/2013 and the two conclusions dated 5/3/2013 and 6/3/2013).

Even after during the hearing on 5/3/2013 it was made clear by the Public Prosecution Service that the letter from 4/22/2013 had been "annotated," it was urged to enter the letter into the file as received and evaluated by the Public Prosecution Service. This has as an advantage in that this way the investigation tasks are visibly present in the file.

LAZARE KAPLAN INTERNATIONAL, INC. can, in other words, not complain that the letter from its attorney was not read and evaluated – since they themselves urged numerous times that this letter, as received and subsequently evaluated and annotated by the Public Prosecution Service, be put into the file.

3.
LAZARE KAPLAN INTERNATIONAL, INC. seems to believe that by means of 1) the formulation of accusations, 2) the creation of provisions, 3) blaming the Belgian state for negligence in its conclusions, and 4) launching media campaigns, it can intimidate or convince the Public Prosecution Service to still conduct a legal investigation or do an exploration.

_____

[Footnotes]
1.  In the conclusion dated 5/3/2013 there are numerous statements like "*The Prosecutor of the Crown is not limited by too much knowledge of the law*" (no. 3). See also margin number 12 of this conclusion: "*the legal organization that comes up pitifully short in terms of its legal action and moreover demonstrates it is not limited by too much knowledge of the law.*"

The question points to the value added by such sarcastic taunts.

How exactly does LAZARE KAPLAN INTERNATIONAL, INC. intend in this way to either convince the Public Prosecution Service to conduct a legal investigation based on their summons, or convince the court to convict ANTWERP DIAMOND BANK, NV?

- Refer to the conclusion dated 5/3/2013 (margin numbers 1, 6, 10, 12 and 13, here only margin number 1 is cited):

1. *Given the fact that the Prosecutor of the Crown, in his April 19, 2013 memo, issued in the May 3, 2013 hearing, asserts that "Essentially this is about a provocative and frivolous complaint with slanderous implications." Whereas herein the petitioner suggests negligence on the part of the Belgian State based on Article 1382 §e of the Civil Code. The petitioner requests relevant documentation reserved for the matter. The Prosecutor of the Crown is shamefully remiss in the performance of his duties before the petitioner in the application of Article 22, 28th §1 and 28th quarter, section 3 of the Criminal Code.*

- Refer to the conclusion dated 6/3/2013 (margin numbers 109, 115, 136, 143, here only margin number 143 is cited):

    *143 … The position of the Public Prosecution Service raises serious concerns and only proves the great prejudice with which the Public Prosecution Service has approached his matter.*

So LAZARE KAPLAN INTERNATIONAL, INC. is complaining both about the alleged failure to have investigated the data provided by them, as well as about the position that the Public Prosecution Service assumed after analysis of the data provided by LAZARE KAPLAN INTERNATIONAL, INC.…

By not investigating the position taken by LAZARE KAPLAN INTERNATIONAL, INC., the Public Prosecution Service would have been shamefully remiss in its legal obligations toward LAZARE KAPLAN INTERNATIONAL, INC…  but at the same time LAZARE KAPLAN INTERNATIONAL, INC. acknowledges that the Public Prosecution Service has already analyzed the data provided by them – it is just that LAZARE KAPLAN INTERNATIONAL, INC. is does not agree with this analysis.

Precisely for having carefully investigating the position of LAZARE KAPLAN INTERNATIONAL, INC., the Public Prosecution Service is accused by LAZARE KAPLAN INTERNATIONAL, INC. of *"blatant partisanship"* (conclusion dated 5/3/2013, margin number 10). The views of to the Prosecutors Office, according to LAZARE KAPLAN INTERNATIONAL, INC., are "*gratuitous,"* (conclusion dated 5/3/2013, margin number 4), *"denigrating,"* (conclusion dated 5/3/2013, margin number 6), *"more than scandalous,"* (conclusion dated 5/3/2013, margin number 9), *"filthy,"* (conclusion dated 5/3/2013, margin number 10), *"seriously upsetting"* (conclusion dated 6/3/2013, margin number 143), "*in bad faith,"* (conclusion dated 6/3/2013, margin number 144) – merely because the Public Prosecution Service does not support the positions of LAZARE KAPLAN INTERNATIONAL, INC..

The complaints from LAZARE KAPLAN INTERNATIONAL, INC. are not very serious: the Public Prosecution Service has continually evaluated all the items provided by them, beginning with the summons. Then the file from the criminal court clerk was reviewed, even though LAZARE KAPLAN INTERNATIONAL, INC. had not allowed one single item to be entered. Subsequently all the conclusions were read that were entered into the commercial proceedings in the court of commerce. Next the letter from the LAZARE KAPLAN INTERNATIONAL, INC. attorneys dated 4/22/2013 with 56 items was examined. On 6/3/2013 a conclusion was delivered, with 24 items. The conclusion was thoroughly analyzed, and the items examined. Then the attorneys for LAZARE KAPLAN INTERNATIONAL, INC. even provided the missing items 25 and 26, and these too were examined.

The Public Prosecution Service has therefore complied with all its incumbent responsibilities.

LAZARE KAPLAN INTERNATIONAL, INC. cannot allege that this is just an "inquiry" when magistrate orders (kantschriften) are sent to one or more police services by the Public Prosecution Service or an investigative judge. There has been a complete investigation through the analysis of all the conclusions and items delivered by LAZARE KAPLAN INTERNATIONAL, INC. to the Public Prosecution Service.

If all these conclusions and items are not convincing, and the Public Prosecution Service has determined that it does not need any further investigation (beyond what has already been done by the representative, who analyzed all the conclusions, letters and items), then LAZARE KAPLAN INTERNATIONAL, INC. cannot continue to say that it is dissatisfied or has been misled.

The party who files a direct summons to the Court cannot expect the Public Prosecution Service to order a criminal trial each and every time.

When the Public Prosecution Service (after reviewing the summons, the correspondence, the conclusions issued in the criminal court proceedings, the evidentiary items from the parties, and even the conclusion pending before the court of commerce) determines that the summons constitutes procedural misconduct, then there shall be no trial ordered nor shall police resources be wasted on the unproven claims of the complaining party.

4.
The Public Prosecution Service serves the general public interest.

This means that the Public Prosecution Service autonomously decides whether the claims of a directly petitioning party are plausible and merit further investigation (by a unit of the police, but not in the framework of a separate legal investigation).

The directly petitioning party cannot compel such a decision if it does not present convincing evidence.

The Public Prosecution Service on the other hand does not have to pursue the defense of the petitioner, and in that case shall also not reply to each conclusion, sentence and paragraph in the conclusion from LAZARE KAPLAN INTERNATIONAL, INC. issued on 6/3/2013.

It suffices to say that the Public Prosecution Service can establish that the accusations made by LAZARE KAPLAN INTERNATIONAL, INC. are unfounded.

Nevertheless, the Public Prosecution Service still wants to notify and inform the court on the following topics, among others about several procedural points (competence, connection with the civil case, witness statements). The Public Prosecution Service also issues a conclusion that, if for no other reason than the inappropriateness and lack of foundation, the arguments from LAZARE KAPLAN INTERNATIONAL, INC. contradict the law.

**III.  Competence**

During the criminal court hearing on 5/3/2013 the judge asked all parties to take a stand on the matter exposed in the preliminary complaint that fake transactions were being reported by ANTWERP DIAMOND BANK, NV. See margin number 56 of the summons:

*56. ANTWERP DIAMOND BANK even went so far in this regard that it recorded fake transactions in its own books to make this scam work. So in the bank records of DD, the invoices issued by LKB were recorded as if there were multiple payments made against them. This while ANTWERP DIAMOND BANK knew full well that there was never a payment made against these invoices and that these invoices also appeared as open in the LKB files at the bank. So ANTWERP DIAMOND BANK regularly sent its own summary of the LKB account where the open DD invoices were reported as cover and ANTWERP DIAMOND BANK reported the open invoices as collateral for credit to the business auditors of LKB.* **With this cunning trick***, ANTWERP DIAMOND BANK was able to artificially maintain the credit of DALEYOT in good standing, through which LAZARE would continue to believe in a positive result and continue to deliver to DALEYOT.*

From direct summons no. 56 – from copy made by the Public Prosecution Service.

In its conclusion dated 6/3/2013, LAZARE KAPLAN INTERNATIONAL, INC. does not take a stand…

Either they did not pay attention during the hearing on 5/3/2013, or this is another ploy in the procedural misconduct being carried out by LAZARE KAPLAN INTERNATIONAL, INC., whereby they are intentionally waiting to issue a conclusion on this, intending to continue the delays in furthering the proceedings.

Reading the conclusions in the commercial proceedings before the court of commerce confirms this pattern, where LAZARE KAPLAN INTERNATIONAL, INC. does not comment on everything in its initial conclusions, in order to then formulate new arguments only in its final conclusion, to which the opposing party then has to respond and the case once again needs to be postponed.

Before taking a position on the question of competence of the jurisdiction – as one cannot issue a direct summons for crimes like fraudulent documentation – LAZARE KAPLAN INTERNATIONAL, INC. repeats in its conclusion dated 6/3/2013 the allegation of fraudulent documentation:

*57. ADB even went so far in this regard that it recorded fake transactions in its own books to make this swindle work. So in the bank records of DD, the invoices issued by LKB were recorded as if there were multiple payments made against them* **(item 1l)***. This while ADB knew full well that there was never a payment made against these invoices and that these invoices also appeared as open in the LKB files at the bank. So ADB regularly sent its own summary of the LKB account where the open DD invoices were reported as cover* **(items 1a-g and 1k)** *and ADB reported the open invoices as collateral for credit to the business auditors of LKB* **(item 1r)***.*
**With this cunning trick** *ADB was able to artificially maintain the credit of DALEYOT in good standing, through which LAZARE would continue to believe in a positive result and continue to deliver to DALEYOT.*
*…*
*66. The petitioner had no knowledge of the plan to set up fake companies and certainly knew nothing about the flabbergasting participation of ADB in this (hiding money in offshore companies,* **two sets of books***, taking in proceeds from diamonds belonging to and/or financed by LAZARE…)*

Conclusion dated 6/3/2013, numbers 57 and 66 – from the Public Prosecution Service's own copy

The accusation of fraudulent documentation is at the heart of the matter: LAZARE KAPLAN INTERNATIONAL, INC. accuses ANTWERP DIAMOND BANK of "*receiving*" proceeds from (the sale of) diamonds that its Belgian subsidiary LAZARE KAPLAN BELGIUM and/or its domestic affiliate GULFDIAM sold to DALEYOT Erez. companies, after which the "*goods not received*" were hidden though fake bookkeeping. Through this "*double bookkeeping*" ANTWERP DIAMOND BANK would be able to "*artificially*" keep DALEYOT's credit in good standing, which LAZARE KAPLAN INTERNATIONAL, INC. qualifies as a "**cunning trick.**"

So LAZARE KAPLAN INTERNATIONAL, INC. repeats several times – both in its initial summons and in its conclusion dated 6/3/2013 – the link between on the one hand the crimes of embezzlement and abuse of trust it has alleged, and on the other, the *"fake transactions"* or specifically the *"double bookkeeping."* Also refer to the conclusion dated 6/3/2013, numbers 254-259, where LAZARE KAPLAN INTERNATIONAL, INC. explains how the bookkeeping at ANTWERP DIAMOND BANK, NV could have been "*manipulated.*"

A direct summons is not possible for a crime like fraudulent documentation, even if the facts of the crime can be brought before the criminal court indirectly through extenuating circumstances.  A direct summons is also not possible in cases of single confluence, when the facts can be described as a crime and a misdemeanor (Bart DE SMET, "Direct summons for the jurist," CABG 2004/3, p. 40).

Bart DE SMET follows by pointing out that such a single confluence almost always comes up in cases of swindles, because the accused acquire money or goods through fraudulent means.

The court is obligated to assign the appropriate classification to the criminal act and to ascertain whether the facts presented in the direct summons fall under the class of "fraudulent documentation." If it appears that the classification of fraudulent documentation in fact applies, then the court must declare the direct summons inadmissible (Bart DE SMET, "Direct summons for the jurist," CABG 2004/3, p. 40).

The court may in such a case not consider extenuating circumstances that were not known at the moment the summons was filed, even if the accused (i.e. the ANTWERP DIAMOND BANK, NV) does not object (Bart DE SMET, "Direct summons for the jurist," CABG 2004/3, p.56).

Since LAZARE KAPLAN INTERNATIONAL, INC. itself – both in the summons (no. 56) and in the conclusion dated 6/3/2013 (no. 57 and 66) – claims that crimes were committed as part of a *"cunning trick"* on the part of the accused, consisting of *"fraudulent transactions",* the court must forfeit its competency (given that the crime of fraudulent documentation does not fall under the authority of the criminal court without taking extenuating circumstances into consideration), as well as declare the direct summons inadmissible.

Insofar as necessary: the Public Prosecution Service shall not take any action on its own with regard to any crime, and shall therefore not involve itself in the case of LAZARE KAPLAN INTERNATIONAL, INC.

The Public Prosecution Service shall not remedy this procedural irregularity (wherein is included that LAZARE KAPLAN INTERNATIONAL, INC. duly accuses ANTWERP DIAMOND BANK of fraudulent

documentation, in single confluence with the exposed crimes of swindling, abuse of trust and money laundering).

**IV.  PROCEDURAL POINTS**

1.

LAZARE KAPLAN INTERNATIONAL, INC. filed a civil complaint on 3/22/2013 for civil court proceedings before the investigative judge of Antwerp.

The Public Prosecution Service immediately issued a final ruling in this case, since the claim is inadmissible. LAZARE KAPLAN INTERNATIONAL, INC. responded with a letter of request to establish "forthcoming" investigative action.

LAZARE KAPLAN INTERNATIONAL, INC. maintains in its conclusion dated 6/3/2013 (numbers 83-85) that there is a connection between its complaint file with the civil court and its direct summons file, a connection that becomes clear based on margin number 42 of its own summons.

Likewise both matters would be interdependent in the sense of Article 227 of the Criminal Code (conclusion dated 6/3/2013, number 86).

Article 227 of the Criminal Code offers a definition of correspondence in the framework of a procedure for the indictment court, which by its own judgment makes decisions about interdependent crimes about which the evidence is presented simultaneously (Art. 226 of the Criminal Code). This article is not applicable in this case.

With respect to the Public Prosecution Service, one party cannot itself artificially fabricate interdependence or a connection by issuing a direct summons *and* filing a complaint with the civil court.

This is exactly what LAZARE KAPLAN INTERNATIONAL, INC. is attempting to do by trying to link its civil accusation to the direct summons (and thereby include the former item in its accusation) and now referring to the civil claim in these proceedings.

Trying to initiate multiple proceedings and in each of these point through cross-reference to the (existence) of the other proceeding(s) does not artificially establish an interdependence. Interdependence is factual and not "creatable" through the initiation of as many judicial proceedings as possible.

These cross-references, in the efforts of LAZARE KAPLAN INTERNATIONAL, INC., serve to try to create the longest possible delay:

-    LAZARE KAPLAN INTERNATIONAL, INC. maintains that the in case before the court of commerce the handling of the commercial dispute must be delayed until a verdict has been issued in the criminal direct summons (refer to the "*supplementary conclusion*" issued during the hearing in the Court of Commerce in Antwerp on 3/22/2013 and to the set of criminal files in this file added by the Public Prosecution Service via magistrate order (kantschrift) on 4/11/2013).

-    In this criminal case (of the direct summons), LAZARE KAPLAN INTERNATIONAL, INC. again wants these criminal proceedings to be postponed to await the outcome of the handling of the civil complaint. See the conclusion dated 6/3/2013, page 32, no. 88: "*Under these circumstances the*

*petitioner asks the Court to postpone a firm date for this case in anticipation of the further outcome of the investigation and ruling in the judgment of the case with respect to the corruption matter. "*

So the court of commerce is supposed to wait for the verdict from the criminal court… and for which the criminal court must await the progress of the investigative judge…

LAZARE KAPLAN INTERNATIONAL, INC.,  which quickly finds itself wronged, immediately claims that it would be a violation of Article 6 EVRM if the court does not postpone the handling of this case pending the ruling in the matter of its civil complaint (conclusion 6/3/2013, nos. 92-94). Because the case is still in the preliminary investigation stage, LAZARE KAPLAN INTERNATIONAL, INC. also cannot provide a copy of the file.

There is no violation of Article 6 EVRM when the court states there is no need to wait, because (once again) LAZARE KAPLAN INTERNATIONAL, INC. is negligent: it can in fact issue a request for a copy of the legal research (i.e. the file of its civil complaint), which it has not done up to this point.
- See the new 61st Article in the Criminal Code, appended to Article 25 of the Code of December 27, 2012 regarding various judicial stipulations (Belgian State Journal (Belgisch Staatblad), January 31, 2013).

So LAZARE KAPLAN INTERNATIONAL, INC. can certainly request the investigative judge for a copy of the legal research file (in order to thus submit this copy into this file), but it does not do this… to then postulate to the court that the handling of its own direct summons should be postponed…

2.
LAZARE KAPLAN INTERNATIONAL, INC. further asserts that its rights to defense – as the claimant and directly petitioning party? – have been violated in a case of a *"decision to not hear from the witnesses or a decision to make hearing from the witnesses a part of the merit of the case"* (conclusion dated 6/3/2013, no. 97).

Once again LAZARE KAPLAN INTERNATIONAL, INC.'s procedural strategy is remarkable:

- First it reserves its right to summon witnesses (conclusion 6/3/2013, no. 95). But herein is does not offer any clarification as to which witnesses it is referring to in terms of not being allowed/able to summon.

- Where first still a "provision" is made to summon people as witnesses, it then follows immediately that hearing from "*these witnesses*" will be absolutely essential because the file does not "*name a single person involved*" and whereby a second provision follows with the conclusion: "*about this necessity with regard to each and every concrete witness to be heard*" (conclusion dated 6/3/2013, no. 96).
  But who are *"these witnesses"*?
  Why couldn't LAZARE KAPLAN INTERNATIONAL, INC. just list the names of the witnesses it wants to hear from in its conclusion dated 6/3/2013?
  Why are they unable to explain the necessity of the witness testimony of each of the persons

whose name they provide?

The fact that the direct summons file does not get any attention – in the sense of police attention by an officer of the correctional police, with full disclosure to the person under investigation of the rights provided under the Belgian Criminal Code under Article 47bis – is a result of LAZARE KAPLAN INTERNATIONAL, INC.'s own choice to issue a direct summons to the court.  This in itself implies that there is no convincing need to hear from all the "persons involved" in session.

- LAZARE KAPLAN INTERNATIONAL, INC. thus immediately claims that its *"right to defense"* has been violated (conclusion dated 6/3/2013, no. 97).

- LAZARE KAPLAN INTERNATIONAL, INC. then cites a decision from the Court of Cassatie:  *"A witness whose testimony is essential to uncovering the truth must be summoned to the trial to guarantee the right of rebuttal (Cass, April 27, 1999, A.C. 1999, no. 241)."*
  The Public Prosecution Service does not refute this decision, but because only the court can decide whether a witness's testimony *"is essential,"* the court needs to know the names of the witnesses as well as the reason why the testimony of each witness is deemed essential.
  Based on the facts of the case, LAZARE KAPLAN INTERNATIONAL, INC. offers no names, and offers no reason for any imminent necessity – besides its statement that there is no police report on file, which is the result of its own choice to bring this directly to the court via direct summons.

- LAZARE KAPLAN INTERNATIONAL, INC. continues in its margin number 104 as follows:
  *"Taking into account the **necessity expressed by the petitioner** of hearing from the witnesses (…) and the immediacy expressed above, Your Court should then also hear from **the aforementioned persons** as witnesses"*  (conclusion dated 6/3/2013, no. 104, from the Public Prosecution Service's own copy).
  It is difficult to support the stance of the directly petitioning party – it has not demonstrated anything.
  It offers no reason whatsoever as to why even one person needs to be summoned to testify at the hearing – in fact on the contrary, it wants to wait until later to make a decision about this.
  The only thing it offers in the way of support for *"necessity"* is the absence of a police report – a result of its own choice to issue a direct summons to the court (that was signed one day before the hearing in the court of commerce in Antwerp, where the case about the repayment of LAZARE KAPLAN INTERNATIONAL, INC.'s loans with ANTWERP DIAMOND BANK would be heard).
  It also did not name a single person whose testimony it deems important. So what do the references to *"these witnesses"* (conclusion dated 6/3/2013, no, 96) and *"aforementioned witnesses"* (conclusion dated 6/3/2013, no. 104) refer to?

- Obviously LAZARE KAPLAN INTERNATIONAL, INC. repeats that because of the failure to heed all its (expressed) wishes and lamentations, that Article 6.1 EVRM has been violated (conclusion dated 6/3/2013, no. 105) – even though it did not mention a single name in its conclusion, and offers not a word about the nature of the necessity to hear from any person (who?) in the hearing…

## V.    Inadmissibility and Inappropriateness of the Claim

1.

LAZARE KAPLAN INTERNATIONAL, INC. avails itself not only of judicial means but also of the media: each step in the case is accompanied by articles written by its journalist friends in various papers. Refer also to the article submitted by ANTWERP DIAMOND BANK, NV as an enclosure in the conclusion dated 4/30/2013.

[An objection to this (needless to say) is that only reports about its own stance appear, but no reports about the procedural ill will of LAZARE KAPLAN INTERNATIONAL, INC.
In these same newspapers there is, for example, no mention of the fact that during the initial hearing, LAZARE KAPLAN INTERNATIONAL, INC. spent two hours pleading in the end to not go ahead with representing itself in the case… because the plaintiff had not turned over any items to the court clerk (to be introduced into evidence), to the Public Prosecution Service or to the accused party…]

On the day before the date set for the drafting and issuing of its conclusion, yet another article appeared in DE TIJD about the "*war with KBC*" and the supposed "*unsavory practices at the Antwerp Diamond Bank.*"

These articles were added to the file by the Public Prosecution Service itself, because in several paragraphs they demonstrate how essential the positions taken by LAZARE KAPLAN INTERNATIONAL, INC. are **(attachment 4)**.

These positions make it possible to see the forest through the trees (the conclusion with 129 pages): what exactly LAZARE KAPLAN INTERNATIONAL, INC. is making an accusation about in the direct summons:

> *We talked in a five star hotel, close to the Great Market in Brussels. Before us sat Leon Tempelsman. Relaxed, well spoken, friendly, lavish with compliments, in the American way. Is this the archenemy of KBC? The man who wants to bring the Antwerp Diamond Bank, a subsidiary of KBC, to its knees with a damage claim of half a billion dollars? "Well, there are more fun things to do in life, but when there is so much money on the table, you have to do what is necessary," quips Tempelsman.*
> *We are not allowed to take photos. You also won't find one on the web. From the father, Maurice Tempelsman, you will find a lot of snapshots. Especially since the top diamond specialist – and dealer – in 1980 became the life partner of the iconic presidential wife, Jackie Kennedy Onassis. They lived together in New York until her death in 1994.*
> *The Tempelsman father, born in Antwerp and who fled to New York during the Second World War, is now 83 years old. But in the U.S. he still has access to a network reaching up to the highest political ranks. Vacationing with the Clintons, visits to the White House, you name it. And they would have known that at the Antwerp Diamond Bank and KBC. The Templesman family has fully played out its political influence over the last four years in its war with KBC. Top Belgian politicians were also brought in by the family to intervene in the conflict.*
> *"When my father and I bought a majority share in the diamond company Lazare Kaplan International in 1984, we were more interested in the political aspect of the diamond trade," says Leon Tempelsman, "Like the future of developing countries and the new balance between north and south in the world. Simply making money is not enough for us. That's not how our family looks at life. And that's not why we are brilliant diamond dealers. You have to be more*

*ruthless for that: you have to be ready to kill your grandmother for a cent. That's why we spent years working with a diamond broker in Antwerp who had those capabilities and was successful."*

*"We worked closely together until the crisis in 2008. That was like a tidal wave: as soon as the wave retreated you could see who was still wearing their bathing suit and who wasn't. (laughs). **Our successful business partner Erez D. was apparently drowning in debt and then he and our banker got together and stole our diamonds, worth 135 million dollars,** testifies Tempelsman.*

*"Because of that, Lazare Kaplan was delisted on the stock exchange and I had to fire people because I had to spend all my time trying to recover those millions in losses. We even had to hire several private investigation firms. With investigative teams in 18 different countries. Our detectives followed the same investigative strategy that brought Watergate to light: follow the money. We followed the money trail and the result was appalling. Our money had been diverted to all sorts of tax havens, by all kinds of companies that were totally not suited for the diamond trade. And we discovered that some banks, among them Antwerp Diamond Bank, also collaborated in these unsavory transactions."*

*"We tried to share our discovery with the top guys at Antwerp Diamond Bank and KBC, but they didn't want to hear anything about it. This even though they, in fact, have legal responsibilities in the battle against money laundering. Did they not want to know the truth? But they have also never denied the accusation. All they say is that we have no proof. Since that time they clearly see us as a hot potato they want to get rid of."*

*"The stance of KBC is remarkable. Our other banking relationship, ABN AMRO, did have our findings thoroughly reviewed by an independent team and concluded that there was something fishy going on. **ABN AMRO then forgave our outstanding loan with them.** They even gave the shares they had in Lazare Kaplan (26%) back to us. Banks don't just get on their knees like that because of my beautiful eyes. But they do because they realize that they really made a mistake. **Our insurers also ultimately saw this and paid us 60 million dollars, the largest settlement ever in the diamond sector.** Doesn't that say enough?"*

*"So why do KBS and the Antwerp Diamond Bank keep sticking their heads in the sand? Did they just gamble that we would go belly up and then the storm would subside? It was a good gamble but it didn't work."*

*"**To me it's crystal clear that the Antwerp Diamond Bank took in money it was not entitled to receive.** Period. It overstepped the anti-money laundering rules. That was actually already apparent in another court case about diamond fraud. The Antwerp Diamond Bank says that it has been working exclusively for the diamond trade for over 70 years: so it knows how the sector works. It doesn't have offices in tax havens for nothing. **It knew full well what was going on when our diamonds and the revenue from them were stolen.** It knowingly lent two clients – us and our business partner – money against the same guarantee. It is a basic principle of banking not to do that. **So we therefore became the victim of a serious financial crime: and because of its misdeeds we lost 135 million dollars, a huge sum of money."***

*The only thing I am interested in is recovering the **stolen money**. But I don't think the Belgian courts and the tax inspector will put their heads in the sand. I also understand that the diamond sector is important for Antwerp. Our determinations of fraud and money laundering that we reached are so detailed that any judge can easily follow them. Don't the Belgian people deserve that? Do you really think I am filing a criminal claim against the bank just for the fun of it? That's not my idea of a good time. But the truth needs to be told."*

Article from DE TIJD, dated 6/1/2013 – from the Public Prosecution Service's own copy

The advantage of this article is that is crystallizes and concisely summarizes LAZARE KAPLAN INTERNATIONAL, INC.'s position:

- A "*serious financial crime*" would have been committed: the so-called "*Erez D.*" would have supposedly "*stolen*" diamonds *"worth 135 million dollars"* together with ANTWERP DIAMOND BANK, NV.
- For part of the diamonds a loan was issued by ABM AMRO – but ABN AMRO forgave the loan to LAZARE KAPLAN INTERNATIONAL, INC.
- The diamonds would have been insured, and the insurer paid LAZARE KAPLAN INTERNATIONAL, INC. *"60 million dollars, the largest settlement ever in the diamond sector."*

This summary immediately suggests that the direct summons cannot lead to a successful conviction:

- Notwithstanding the fact that the theft of diamonds "*worth 135 million dollars"* may have occurred, there is no accusation against the supposed thief. Nowhere in the world was a charge filed against Erez DALEYOT and/or his companies. How credible is an assertion from a party that claims to have had a sum on the scale of $135,000,000 USD stolen from it, yet never filed a complaint anywhere in the world?
- LAZARE KAPLAN INTERNATIONAL, INC. claims to have been the owner of $135,000,000 USD worth of diamonds. So a check was done to ascertain if this claim was correct, and ultimately to determine if this was about a personal and direct interest.
- It would have taken out loans from one the one hand ABN AMRO and on the other ANTWERP DIAMOND BANK, NV. But the loans at ABN AMRO have already been forgiven, so it makes one wonder what the outstanding claims in the mind of LAZARE KAPLAN INTERNATIONAL, INC. could be for the part of the diamonds that were financed by ABN AMRO.
- Moreover the diamonds would have been insured. After the "theft" (about which no notice was given or complaint filed), the insurers would have paid out $60,000,000 USD. One must wonder which damages were covered by this.

2.

According to Belgian criminal law the injured party must show that it suffered damages as a result of the crime, and has a legitimate interest in the punishment – Article 3 of the Preface Title of the Criminal Code. If the injured party does not have a legitimate interest, then the case cannot be tried and the court cannot issue a conviction.

*De action popularis* is not allowed: only persons who have been directly injured by a crime and have suffered real harm can file a civil suit.

Persons who only suffered indirect harm cannot file a criminal case (Bart DE SMET, "Direct summons for the jurist," CABG 2004/3, p. 33). Merely having an interest in the criminal conviction is not sufficient.

So first we have to carefully research whether LAZARE KAPLAN INTERNATIONAL, INC. 1) suffered direct harm as the result of some crime, and 2) whether it (still) has a legitimate interest.

3.

What LAZARE KAPLAN INTERNATIONAL, INC. maintains in the press is that its diamonds "*worth 135 million dollars"* were stolen, in its conclusion the truth appears to be different: LAZARE KAPLAN INTERNATIONAL, INC. clarifies on pages 22 and 27, under numbers 49 through 65, how "its" diamonds were supposedly embezzled:

- *"Embezzlement of $38,275,665 USD in diamonds delivered by LKB to DALEYOT"* (Heading of E.a., page 22)
- *"Embezzlement of diamonds from GULFDIAM"* (heading of E.b., page 25)

According to LAZARE KAPLAN INTERNATIONAL, INC.'s own conclusion, it would not be its diamonds that were "embezzled" but rather diamonds belonging on one hand to its Belgian subsidiary LAZARE KAPLAN BELGIUM for a value of $38,275,665 USD and on the other to its affiliate company GULFDIAM for a value of $94,147,422.65 USD (conclusion dated 6/3/2013, no. 60).

So LAZARE KAPLAN INTERNATIONAL, INC. was never the actual owner of the diamonds *"worth 135 million dollars"* (this being the sum of $38,275,665 USD and $94,147,422.65 USD). So this bring up the question of what its real interest in this is, in terms of whether it is direct – as it certainly was not the owner of diamonds that would have been "embezzled."

4.
The directly petitioning party explains its material interest as follows:

> *118. So, LKI was unjustly sued for payment by ADB before the Court of Commerce in Antwerp, and its legal standing will improve, hence its interest in the juridical meaning of the word, if ADB were to be convicted of the indictment as charged.*
> Conclusion dated 6/3/2013, number 118

How the legal standing of LAZARE KAPLAN INTERNATIONAL, INC. could improve through a conviction of ANTWERP DIAMOND BANK, NV in the specific case of "swindling" is also explained by the directly petitioning party:

> *126. It is evident that the indemnity claimed by ADB of $43,295,452.90 USD against LKI would be completely erased if the facts of the swindle are declared to have been proven. So therefore LKI has a direct material interest.*
> Conclusion dated 6/3/2013, number 126.

The Public Prosecution Service would love to learn the rationale behind this **fantasy** of LAZARE KAPLAN INTERNATIONAL, INC. Why would a *contractual* loan with a bank no longer need to be repaid, even if it is accepted that the bank committed an *extra-contractual,* punishable crime with respect to the debtor/account holder?

If one declares such a position as legal, then it must also be supported under Belgian law, and possibly foreign law (since in the case before the court of commerce it is established that foreign law is applicable to the credit relationship between ANTWERP DIAMOND BANK, NV and LAZARE KAPLAN INTERNATIONAL, INC.).

Under Belgian law a debtor must repay its contractual debts, and presumably this is the same under New York law.

One can dream all one wants, but to suggest to the court that there is an interest in the direct summons because in case of a conviction by the Belgian court under Belgian criminal law process (in the matter of swindling), the contractual debts as governed by New York law would be canceled, is incorrect.

5.

At the same time LAZARE KAPLAN INTERNATIONAL, INC. claims to have a moral interest in its claim for the alleged facts of the "swindle," for which it is entitled to file a complaint for moral damages:

> *128. LKI has been a DTC sightholder for over 70 years and a preferred firm for the handling of diamonds by the De Beers group. Pending such important contracts with DTC (the sales arm of De Beers), ADB canceled LKI's credit (and also that of its subsidiary LKB). This gravely tarnished the reputation of LKI. The irregular termination of the credit relationship by ADB is an essential element of the fraud committed by ADB.*
> Conclusion dated 6/3/2013, number 128

The moral interest would stem from damage to its reputation, as a result of "*the irregular termination of the credit relationship.*"

Leaving aside that LAZARE KAPLAN INTERNATIONAL, INC. has already filed an appeal with the court of commerce in Antwerp, and that according to the conclusions of ANTWERP DIAMOND BANK, NV, contractually any loan can be unilaterally rescinded at any time, this alleged moral complaint (that is not supported by anything) is not directly related to the crimes for which the complaint was filed.

Whatever supposed reputation damage was suffered stems from the stoppage of credit, this being a contractual decision about which the parties are pleading and arguing before the court of commerce in Antwerp, and not from extra-contractual, criminally punishable acts for which LAZARE KAPLAN INTERNATIONAL, INC. issued its direct summons to the court.

Persons who have suffered only indirect damage may not issue a legal complaint for damages (Bart DE SMET, "Direct summons for the jurist," CABG 2004/3, p. 33).

LAZARE KAPLAN INTERNATIONAL, INC. will also claim it suffered moral damages from the other crimes (abuse of trust and money laundering), which it points to earlier in its conclusion (abuse of trust: conclusion dated 6/3/2013, number 137; money laundering: conclusion dated 6/3/2013, number 142). Of course this reference will impact its number 128, which has been refuted here.


6.

LAZARE KAPLAN INTERNATIONAL, INC. continues with an explanation of its interest in the alleged matter of "abuse of trust":

> *131. …LKI has indeed suffered direct damage with regard to embezzled diamonds and the proceeds from those since those diamonds belonged to it under reserved ownership or at least were financed by it. So LKI does have a direct material interest.*
> Conclusion dated 6/3/2013, number 131

LAZARE KAPLAN INTERNATIONAL, INC. does not put much importance on the question of whether it was the actual owner of the diamonds "*worth 135 million dollars*" or just the financier. This would be an "*artificial discussion*" (conclusion dated 6/3/2013, No. 133)…

Yet this really gets to the essence of the question of whether LAZARE KAPLAN INTERNATIONAL, INC. has a direct interest: did the diamonds in fact belong to it or to one of its other enterprises?

In the latter case, can LAZARE KAPLAN INTERNATIONAL, INC. then claim that it suffered damages directly as a result of the crime – or is such harm the result of contractual failure on the part of its own subsidiaries to which it had provided financing?

 6.1

With regard to the first subheading a, *"embezzlement of diamonds with a value of $38,275,665 USD,"* LAZARE KAPLAN INTERNATIONAL, INC. admits that the diamonds were consigned to its Belgian subsidiary LAZARE KAPLAN BELGIUM, after which it was the latter company that sold the diamonds with the stipulation of reserved ownership.

So LAZARE KAPLAN INTERNATIONAL, INC. had a contractual alliance with its subsidiary, which in turn had a contractual interaction (based on payment of the purchase price) with the buyer of the diamonds.

LAZARE KAPLAN BELGIUM sold the diamonds not in the name of and to the account of LAZARE KAPLAN INTERNATIONAL, INC. – on the contrary, the Belgian subsidiary company sold the diamonds under its own name and under its own account, as if it were itself the owner of the diamonds.

So as a result LAZARE KAPLAN INTERNATIONAL, INC. cannot say that it has reserved ownership to itself, as it maintains it its conclusion dated 6/3/2013 (no. 132, page 43)[2].

---

[2] LAZARE KAPLAN INTERNATIONAL, INC. states the following: *"This reservation of ownership was final for LKI given than LKB only received the goods under consignment from LKI"* (conclusion dated 6/3/2013, no. 132, page 43).

This stance is incorrect: LKB sold under its own name and under its own account. According to Article 1165 of the Civil Code, agreements only benefit third parties in the case foreseen by Article 1121 of the Civil Code – a provision for the benefit of a third party, which is not the same as a provision for reserving ownership. LKI had only a personal (i.e. not business) contractual claim from the alleged consignment.

Only when there is a case of subrogation could it be claimed that the provision for reserved ownership (as accessory to the damage claim) could be applied. (see E. DIRIX and R. DE CORTE, *Securities Law,* in *Principles of Belgian Private Law,* Mechelen, Kluwer, 2006, no. 593, p. 413).
[Footnote continued...]
LKI, in its capacity as parent company and owner of 100% of the shares or as consigner, cannot lay a claim to reserved ownership, stipulated by its subsidiary/consignee in a purchase and sale that its subsidiary/consignee did under its own name and under its own account.

> *132. ...Whatever you want to say, the final proceeds made their way to LKI who had financed the diamonds.*
> Conclusion dated 6/3/2013, number 132 – From the Public Prosecution Service's own copy

*"Whatever you want to say"* is not exactly judicial terminology.

It is plausible to claim that 100% of the proceeds from a subsidiary company, in which the parent company owns 100% of the shares, would go to the parent company – but this still does entitle the parent company to claim direct harm as the result of an alleged crime of which the subsidiary becomes the victim.

This discussion is not "artificial" but gets to the root of the question of whether this claimed "damage" – because the final buyer fails to make payment of the purchase price owed to the subsidiary of the petitioner – is in fact direct.

Can a parent company that is only financing the purchase of goods by its subsidiary – as LAZARE KAPLAN INTERNATIONAL, INC. admits in its conclusion dated 6/3/2013, no. 132 – claim to have suffered direct harm, when the person to whom the subsidiary sold the financed goods, under its own name and under its own account, fails to pay the purchase invoice to the subsidiary?

6.2
This question applies even more in the second subheading b, "*embezzled diamonds in the context of GULFDIAM,*" conclusion dated 6/3/2013, page 44 and the next.

The interest of LAZARE KAPLAN INTERNATIONAL, INC. in these allegedly embezzled diamonds "*worth a value of $94,147,422.65*" would be multifold (conclusion dated 6/3/2013, no. 135, pages 44-45):

> "*LKI financed the purchase of these diamonds by making itself the 50% guarantor for the financing of these diamonds by ABN AMRO BANK (item 2). ABN Bank also effectively and directly looked to LKI to pay the proceeds reaped under the line of credit for the purchase of the disappeared diamonds.*"
> "*Furthermore, LKI has... an interest of 30% in GULFDIAM (item 2) via its subsidiary SERENITY 2, Ltd., and was deprived of all the proceeds that should have been collected by GULFDIAM (but that ultimately remained in GEMPORT and from there were transferred to the account of DD at ADB via MAURIDIAM among others.)*"

As it relates to the first part, it is established that insofar as it would ever have suffered direct damage – quod non: LAZARE KAPLAN INTERNATIONAL, INC. only acted as guarantor, who provided security – such damage has ceased to exist: why else would the head of LAZARE KAPLAN INTERNATIONAL, INC. admit in the newspapers that ABN AMRO had forgiven all outstanding loans – and even returned the 26% share that ABN AMRO owned in the petitioning party itself (see above in **attachment 4**)?

As it relates to the second part, it is remarkable that LAZARE KAPLAN INTERNATIONAL, INC. can maintain that it has a direct interest: it does not itself own any shares in GULFDIAM, but rather via a foreign subsidiary PINNACLE that would in turn hold all its shares in SERENITY 2 (conclusion dated 6/3/2013, no. 260)...

So LAZARE KAPLAN INTERNATIONAL, INC. would have direct damage as a result of a crime, supposedly committed by whomever bought the diamonds from GULFDIAM and who never paid GULFDIAM for them, even though GULFDIAM does not claim to have been harmed, because LAZARE has a subsidiary that in turn owns 100% of the shares in another subsidiary that in turn owns 30% of the shares in GULFDIAM?

LAZARE KAPLAN INTERNATIONAL, INC. claims that the Public Prosecution Service wantonly sees an "artificial argument" in this, because "*it can certainly recoup its damages directly from all physical and*

*legal persons who, through their criminal activity, contributed to the **loss of its interest in GULFDIAM"*** (conclusion dated 6/3/2013, no. 136 – from the Public Prosecution Service's own copy).

So now all of a sudden the damage is the "*loss of its interest in GULFDIAM."* Whereby LAZARE KAPLAN INTERNATIONAL, INC., for the sake of convenience, skirts around the fact that it does not have any interest in GULFDIAM itself, but only in fact in a foreign subsidiary company that does not even itself, but through yet another subsidiary of the subsidiary company (!), in turn own shares in GULFDIAM... which again is a development that leads to further distancing, rather than showing a direct connection or direct damages.

7.
LAZARE KAPLAN INTERNATIONAL, INC. claims that it is also entitled to direct damages for direct material harm caused by the money laundering scam – without however having to prove this. Its interest could "*possibly be denied*" (conclusion dated 6/3/2013, no. 138), even in the sense that the Public Prosecution Service "*remains completely silent*" (conclusion dated 6/3/2013, no. 139).

The Public Prosecution Service does not remain silent: LAZARE KAPLAN INTERNATIONAL, INC. does **not** have a direct interest, stemming from personal damage to itself, in order to issue a direct summons to the court for the money laundering swindle it alleges. In this case the exact wording is important:

> *138. ...ADB has hereby appropriated funds that should have been used to **pay off LKI's loan with ADB.***

> *140 ...ADB apparently did not carefully read the direct summons from LKI since the petitioner made it clear even in the header that this concerns **efforts to hide the proceeds from the sale of diamonds belonging to LKI.***
> Conclusion dated 6/3/2013, numbers 138 and 140, page 46 – from Public Prosecution Service's own copy

So the heart of the matter is that LAZARE KAPLAN INTERNATIONAL, INC. claims that the proceeds of $135 million in diamonds would have gone to LAZARE KAPLAN INTERNATIONAL, INC., while this is not indicated in one single piece of evidence.

According to LAZARE KAPLAN INTERNATIONAL, INC., this money would have served to pay off its own loans with ANTWERP DIAMOND BANK, NV, so it would have been entitled to the entirety of the proceeds of the sale. Because of the alleged money laundering swindle, it was unable to pay off its loans.

So in other words, LAZARE KAPLAN INTERNATIONAL, INC. tries to make the connection (via the money laundering swindle) to having a direct material and personal interest, again (the collection of the proceeds of sale) for "*diamonds belonging to LKI*"... while earlier in this conclusion it was already pointed out that LAZARE KAPLAN INTERNATIONAL, INC. does not have a direct and personal interest because it merely financed the purchase of diamonds as parent company.

> *132. ...Whatever you want to say, the final proceeds made their way to LKI **who had financed the diamonds.***
> Conclusion dated 6/3/2013, number 132, from the Public Prosecution Service's own copy

LAZARE KAPLAN INTERNATIONAL, INC. financed the purchase of $38,275,665 USD in diamonds that its own (100% owned) subsidiary company LAZARE KAPLAN BELGIUM **purchased under its own name and under its own account** and sold, after which the purchase amount was not paid to the seller – the seller being LAZARE KAPLAN BELGIUM and not LAZARE KAPLAN INTERNATIONAL, INC..

This is fundamental, because it is these sale proceeds – in being owed to LAZARE KAPLAN BELGIUM (as seller) and not to LAZARE KAPLAN INTERNATIONAL, INC. (although it owns 100% of the seller's shares) – that would have been laundered following the alleged "appropriation" by ANTERP DIAMOND BANK, NV.

LAZARE KAPLAN INTERNATIONAL, INC. was also 50% guarantor of the financing that GULFDIAM received from ABN AMRO Bank for the purchase – by GULFDIAM and not by LAZARE KAPLAN INTERNATIONAL, INC. – of $94,147,422.65 USD in diamonds (conclusion dated 6/3/2013, no. 135, page 44).

So there was never a case where a sum of (50% of) $94,147,422.65 belonged to LAZARE KAPLAN INTERNATIONAL, INC. – let alone that the proceeds from the sale of diamonds (the sale of diamonds belonging to GULFDIAM, and by GULFDIAM) would in total (or in the amount of 50% thereof) be destined for LAZARE KAPLAN INTERNATIONAL, INC. to use to pay off its loans with ANTWERP DIAMOND BANK, NV.

Furthermore: LAZARE KAPLAN INTERNATIONAL, INC. apparently did not even own any shares in GULFDIAM, but only in a foreign subsidiary – which in turn would have owned shares its own subsidiary company (PINNACLE), which then in turn had shares in GULFDIAM (SERENITY 2).

How can LAZARE KAPLAN INTERNATIONAL, INC. claim to have a material personal interest entitling it to a direct summons to the court for money laundering, asserting that *"this concerns efforts to hide the proceeds from the sale of diamonds belonging to LKI,"* (conclusion dated 6/3/2013, no 140, page 46) when the diamonds did not belong to it but to GULFDIAM, in which it at best held shares indirectly (via a subsidiary of a subsidiary)?

Furthermore LAZARE KAPLAN INTERNATIONAL, INC. is unacceptably imprecise in its claims. It feels it is sufficient on one hand to point to saving a bank guarantee of $20,000,000 USD and on the other to maintain that *"this concerns efforts to hide the proceeds from the sale of diamonds belonging to LKI."* (conclusion dated 6/3/2013, no. 140, page 46).

Through such incorrect inferences LAZARE KAPLAN INTERNATIONAL, INC. misrepresents the demand that the (alleged) harm must have been caused by the following crime:

> *The alleged damage must have been caused by the crime that is the subject of the criminal charge…*
> *It is not enough to circumscribe a random fact in such a way that it appears to produce a crime or misdemeanor, thereby entitling the party who claims to have been harmed by it to then file a civil suit…*
> *According to the appeals ruling of June 19 1967 (…) it is required that the damage be caused by the act or abstention that is the substance of the crime itself.*
> Raf VERSTRAETEN, *Criminal Handbook,* 5th Ed., Antwerp, Maklu, p. 207, no. 341

So LAZARE KAPLAN INTERNATIONAL, INC. cannot just circumscribe a random fact into a money laundering charge, and then claim based on common sense that *"this concerns efforts to hide the*

*proceeds from the sale of diamonds belonging to LKI."* (conclusion dated 6/3/2013, no. 140, page 46) to distill this into having a personal direct interest in the matter.

The Public Prosecution Office remarks that LAZARE KAPLAN INTERNATIONAL, INC. is not the Public Prosecution Office and does not have the right to issue an *action popularis*.

8.

The directly petitioning party that claims to have suffered harm has issued both a criminal charge and a civil claim. But if the Public Prosecutor's Office does not proceed with this, as in this case, then the civil court is the only venue that is appropriate for settling this complaint.

In this, the civil petitioner must not only prove that the damage suffered was personal and was caused by the following crime – but the damage must in the first place be real: *"A civil court settlement shall thus be unsuitable when a settlement has been reached with regard to all civil repercussions of the crime"* (Raf VERSTRAETEN, *Criminal Handbook*, 5th Ed., Antwerp, Maklu, p. 201, no. 335).

The Public Prosecution Office referred in its written conclusion on 4/19/2013 to the existence of a settlement, since this was mentioned in the conclusions issued in the case before the court of commerce in Antwerp.

The existence of this settlement is likewise confirmed by the head of LAZARE KAPLAN INTERNATIONAL, INC. in the aforementioned newspaper article from 6/1/2013 (**attachment 4**).

So it is up to LAZARE KAPLAN INTERNATIONAL, INC. to demonstrate that the damage it claims is in fact real. It bears this responsibility because it is the one who brought forth the direct summons to the court, and it is the one who is asking for an exception (*"reus in excipiendo fit actor"*).

The Public Prosecution Office points to the existence of a settlement, in which LAZARE KAPLAN INTERNATIONAL, INC. received a sum of $60,000,000 USD. This allows one to assume that all civil consequences of any crime have already been compensated. If LAZARE KAPLAN INTERNATIONAL, INC. claims that all its damages were not compensated and that it reserves the right to continue prosecuting this settlement, then it bears the burden of proof for this.

The argument that a settlement exists (of which LAZARE KAPLAN INTERNATIONAL, INC. intentionally did not submit the text), whose validity makes the direct summons inappropriate given that the past damage has already been compensated, is not *"rude," "seriously upsetting"* (conclusion dated 6/3/2013, no. 143) or *"in bad faith"* (conclusion dated 6/3/2013, no 144).

It is a serious argument that LAZARE KAPLAN INTERNATIONAL, INC. must respond to in substance – which it does not do by citing from a press article that it set up itself… It needs to submit the text of the settlement itself, whereby it cannot hide behind a condition of trust agreed to by itself. If should have handled this better itself and stipulate that the text be included in the subsequent proceedings that it decided to pursue.

LAZARE KAPLAN INTERNATIONAL, INC. conveniently even once again brings up the existence of moral damages (conclusion dated 6/3/2013, no. 144), as the court would accept that there was no more material damage after the collection of the $60,000,000 USD insurance payout.

This moral damage is not substantiated. The only thing mentioned about this in its conclusion has already been refuted above: this reputation damage in the diamond sector (vis-à-vis DTC and DE BEERS) would have been the result of the termination of the line of credit, and not from any crime for which it filed a claim.

9.
_Decision_

Raf VERSTRAETEN maintains that the court must do a five-part check to ascertain the plausible nature of the "allegations" of a candidate for civil process (Raf VERSTRAETEN, _Criminal Handbook,_ 5th Ed., Antwerp, Maklu, p. 201, no. 334 and next).

1) The damage must be real at the moment of filing of the direct summons with the court, whereby a settlement that has already been reached with regard to all civil repercussions of the crime makes the case inadmissible in civil court (R. VERSTRAETEN, _o.c._, no. 335)
   - In this case there is a settlement, and LAZARE KAPLAN INTERNATIONAL, INC. has collected the sum of $60,000,000 USD. It does not provide the text of this settlement, whereby the claim to the continued existence of damages is implausible.

2) The damage must be personal: The "allegation" must relate to harm that the candidate for civil process has itself suffered – a civil process (or direct summons) is excluded for damages suffered by a third party (R. VERSTRAETEN, _o.c._, no. 336).
   - In this case LAZARE KAPLAN INTERNATIONAL, INC. financed, as parent company, the purchase of diamonds by its (direct) Belgian subsidiary LAZARE KAPLAN BELGIUM, and its (indirect) foreign subsidiary GULFDIAM. These subsidiaries sold diamonds after which the buyers did not pay the price. This crime was thus committed against the subsidiaries – not against LAZARE KAPLAN INTERNATIONAL, INC.
   - LAZARE KAPLAN INTERNATIONAL, INC. maintains that the damage is personal, because the proceeds from the sale were supposed to be used to pay off its loans to ANTWERP DIAMOND BANK. But since it was not a seller of the diamonds, it can also not claim that it should have owned the proceeds – these proceeds only went to its subsidiaries.
   - LAZARE KAPLAN INTERNATIONAL, INC. also maintains that its moral damage was personal. This is possible, yet is refuted below.

3) The "alleged" damage must have been caused by the crime that is the subject of the criminal charge as established through a direct summons to the court. It is not enough to circumscribe a random fact to appear to produce a crime, thereby entitling the party who claims to have been harmed by it to then file a civil suit party (R. VERSTRAETEN, _o.c._, no. 341).
   - LAZARE KAPLAN INTERNATIONAL, INC. also maintains that it has suffered moral damage itself, with regard to the diamond companies DE BEERS and DTC. It acknowledges that the reputation damage was the result of a termination of the line of credit, whereby it could no longer purchase any new diamonds. This reputation damage was not caused by any of the crimes for which it filed a complaint.
   - LAZARE KAPLAN INTERNATIONAL, INC. takes a very strong stance with respect to the crime of laundering $20,000,000 USD worth of money. I can, however, not simply point to a random occurrence and then claim based on common sense that _"this concerns efforts to hide the proceeds from the sale of diamonds belonging to LKI."_ (conclusion

dated 6/3/2013, no. 140, page 46). This "alleged" damage was not caused by the money laundering as indicated in the direct summons filed with the court.

4)  The judge must be authorized to grant an indemnification (R.  VERSTRAETEN, *o.c.*, no. 342).

5)  The injured party asks for the indemnification of damages (R.  VERSTRAETEN, *o.c.*, no. 343)
The case was ruled inadmissible for lack of interest (and personal, direct damage).

### VI.  Lack of merit of the claim

Regarding the merit of the claim the Public Prosecution Service refers to its own written conclusion dated 4/19/2013, as entered into the case file.

However, the Public Prosecution Service would like to present several arguments before the court, because the position taken by LAZARE KAPLAN INTERNATIONAL, INC. is inaccurate.


1.

According to LAZARE KAPLAN INTERNATIONAL, INC. a bank could never be banker to parties that have conflicting interest, like for example a renter and landlord, or a buyer and seller.

Suppose that a bank has given a business loan to both a buyer and a seller, and the bank fulfills its oversight obligations as well as its operational activities with respect to both parties. Then the bank would receive both documentation from the buyer about which goods were purchased (from the seller, among others), and from the seller about which goods were sold (to the buyer, among others).

Then suppose that through its banking relationship and oversight activities it uncovers two possible problems with the buyer:
-   Either the buyer does not have enough money to pay for the goods purchased from the seller;
-   Or the buyer does have the money (because, for example, he has already sold the goods forward to someone else), but does not use this money to pay his vendor

In each of the two cases the seller can and may not, as debtor and bank customer, be informed due to on one hand the confidentiality pact with the banker and on the other the "Chinese walls" that banks use in the exercise of these confidentiality pacts:
-   The banker may not notify the seller that there are financial problems with the buyer, with the consequence that the seller may sell goods to the buyer that the buyer is unable to pay. Within the framework of the oversight requirement, the bank will need to more closely monitor the buyer.
-   The banker may not notify the seller that money has been deposited by the buyer, but that the buyer had chosen on its own not to put that money toward paying the seller's invoices.

LAZARE KAPLAN INTERNATIONAL, INC. maintains that in such a scenario the bank *is* obligated to inform the seller.

It makes the specific accusation that ANTWERP DIAMOND BANK, NV, by virtue of managing both loan holders (LAZARE KAPLAN INTERNATIONAL, INC. and the DALEYOT companies), knew:

- Which diamonds the subsidiary of LAZARE KAPLAN INTERNATIONAL, INC. sold to the DALEYOT companies;
- That the invoices that the LAZARE KAPLAN INTERNATIONAL, INC. subsidiary (for the sale of these diamonds) issued to the DALEYOT companies remained unpaid;
- That the DALEYOT companies did take moneys into their account, though this was not from the sale of the diamonds purchased from the subsidiary of LAZARE KAPLAN INTERNATIONAL, INC., and that these moneys were not used by the DALEYOT companies to pay the invoices from the subsidiary of LAZARE KAPLAN INTERNATIONAL, INC.

It makes the specific accusation that ANTWERP DIAMOND BANK, NV, had this knowledge and did nothing to notify it (LAZARE KAPLAN INTERNATIONAL, INC.) about it – and whereby the subsidiary of LAZARE KAPLAN INTERNATIONAL, INC. continued to sell diamonds to DALEYOT companies:

> *167: Summary … Between June and October its diamonds shipments were embezzled, with active participation of the ADB. In this way more than $30,000,000 USD was pilfered. During this period ADB set everything up to let DD and DALEYOT believe in an imaginary credit. **LKI only delivered the diamonds because it believed that based on the letters of guarantee and securities on its side and like in a mirror on the side of DD and DALEYOT it could rely on getting paid.** In December it became apparent that the opposite was true. The petitioner was therefore the victim of breach of trust and swindling.*
> Conclusion dated 6/3/2013, number 167, page 66-67 – from the Public Prosecution Service's own copy

Leaving aside that it was not LAZARE KAPLAN INTERNATIONAL, INC. that delivered the diamonds but its subsidiary (which is still quite essential), LAZARE KAPLAN INTERNATIONAL, INC. makes the accusation that its company banker did not inform it of the financial situation of the other client … which is an accusation for which the bank cannot be punished.

The bank had a "mirror" with company information from both the seller (a subsidiary of LAZARE KAPLAN INTERNATIONAL, INC. – not LAZARE KAPLAN INTERNATIONAL, INC. itself…) and the buyer (the DALEYOT companies), and as a result could continuously monitor the outstanding credit lines of both the buyer and seller. But this "mirror" could hardly be used to by the bank to notify LAZARE KAPLAN INTERNATIONAL, INC. that money had come into the account of the buyer, but that the buyer did not use this to pay the invoices of the subsidiary of LAZARE KAPLAN INTERNATIONAL, INC.

According to LAZARE KAPLAN INTERNATIONAL, INC., the "dirty dealings" came about because the DALEYOT companies' credit was not canceled, and because LAZARE KAPLAN INTERNATIONAL, INC. continued to believe that the DALEYOT companies were still getting credit, more diamonds were delivered – by its subsidiary company.

The bank has no legal obligation to notify LAZARE KAPLAN INTERNATIONAL, INC., and the mere fact that the ANTWERP DIAMOND BANK, NV did not cancel the DALEYOT companies' credit but managed it, can hardly be called a cunning trick as the basis of a crime of swindling and abuse of trust.

2.
LAZARE KAPLAN INTERNATIONAL, INC. continues by saying that the ANTWERP DIAMOND BANK, NV was completely on top of:

- Which goods were purchased by: LAZARE KAPLAN INTERNATIONAL, INC. (conclusion dated 6/3/2013, no. 192)
- What was sold, when and to whom by the DALEYOT companies, where the bank "*obviously*" sees "*the payments from the sale coming in*" (conclusion dated 6/3/2013, no. 201)

LAZARE KAPLAN INTERNATIONAL, INC. then tries to take the next step to turn the fact that only the bank (by way of a "*mirror*") had knowledge of all the information, into an active deed (of withholding) by the bank.

This takes this step in its argument on the basis of security law:

> *204. ADB could therefore not, given the pledge and the invoice conditions with retention of ownership, reveal that the proceeds from the sale were used for other ends than the payment of the goods.*

> *205. To allow DD to regularly apply the revenue to ends other that the payment of goods that were delivered under retention of ownership is at the very least complicity in the abuse of trust.*

> *206. What is the conclusion? … The complicity of ADB arises from the fact that the invoices with retention of ownership were used as a guarantee to cover various transactions.*
> Conclusion dated 6/3/2013, numbers 204-205-206, pages 78-79.

LAZARE KAPLAN INTERNATIONAL, INC. points to two security bonds, from which it show that goods were given to ANTWERP DIAMOND BANK, NV as a guarantee (conclusion dated 6/3/2013, no. 193).

> These "*two security bonds*" (dated when? For transactions in August 2009?) were not presented (barring any mistake by the Public Prosecution Service), either in this case or in the case before the court of commerce in Antwerp.

> There are however two security bonds in the file dated June 4, 2004, part of the otherwise unnumbered **item 7B from LAZARE KAPLAN INTERNATIONAL, INC.**
> Are there security bonds relevant to transactions made in 2009?
> The items are, by absence of numbering, unclear.

> LAZARE KAPLAN INTERNATIONAL, INC. needs to provide clarification about this, and submit the items upon which it rests its case.

This guarantee would then again be related to the reservation of ownership provision: "*Whereas the goods were given as a guarantee to the bank their ownership cannot be transferred if payment is not made*" (conclusion dated 6/3/2013, no. 196).

These assertions are incorrect and misrepresent (in a legal sense also) the practices in the diamond sector.

2.1

As long as the buyer of goods, purchased with a **reservation of ownership provision**, has not paid the purchase price, he may in principle not have them at his disposal. Parties may agree otherwise through an agreement, and if there is nothing that can be established contractually, then trade practices prevail

(E. DIRIX and R. DE CORTE, *Securities Law* in *Principles of Belgian Private Law,* Mechelen, Kluwer, 2006, no. 594, page 414 – see also Art. 1153 of the Civil Code about the events that define "in practice" in an agreement).

In the diamond sector, diamonds are constantly given under consignment and sold with a reservation of ownership, after which the diamonds are further processed and the sellers pay the sellers/consigners with the proceeds of those sales.

LAZARE KAPLAN INTERNATIONAL, INC. cannot deny these "practices" in the sense of Article 1135 BW, because it gave its own diamonds under consignment to LAZARE KAPLAN BELGIUM, and the latter then sold the diamonds (under its own name and own account) without being their owner (contrary to Article 1599 of the Civil Code: "*The sale of someone else's item is null and void").*

2.2
**Liens** are also applied very loosely in the diamond sector.

For clarification for all: A lien is a business agreement, that assumes not having possession. This applies not only to civil liens (governed by Articles 2071-2091 of the Civil Code) but also to commercial liens (governed by the law of May 5, 1972[sic]) (E. DIRIX and R. DE CORTE, *Securities Law* in *Principles of Belgian Private Law,* Mechelen, Kluwer, 2006, nos. 460-485, pages 310-327). The requirement of not having possession is maintained by the Commercial Liens Law of May 5, 1872 [sic] (E. DIRIX and R. DE CORTE, *o.c.* no. 484).

> *CIVIL LIEN*
>
> *469. A lien is first established when the lien is actually executed by the creditor or by the third party about whom the parties have agreed…*
>
> *470. …The dispossession is not only necessary in relation to the third party, but also between parties. So the lien is a business agreement.*
>
> *473. The lien may also be turned over to a third party that the parties have agreed to. In this case it is required that the third party agrees to handle the transaction in the name and to the account of the creditor.*
>
> *COMMERCIAL LIEN*
> *484. The requirement of dispossession is maintained in the Commercial Liens Law of May 5, 1872.*
> E. DIRIX and R. DE CORTE, *Securities Law* in *Principles of Belgian Private Law,* Mechelen, Kluwer, 2006, nos. 469, 470, 473 and 484.

Several fundamental problems thus arise with LKI's claim of lien rights:
- Items that are not the property of the pledger cannot be pledged as collateral. Goods that are leased, rented or given under consignment may NOT be pledged as collateral (E. DIRIX and R. DE CORTE, *o.c.* no. 525).

- In the case of LAZARE KAPLAN INTERNATIONAL, INC., it maintains that it had ownership of the diamonds that it had only given under consignment to its subsidiary LAZARE KAPLAN BELGIUM.

- For this the Belgian subsidiary would have signed a "security bond," whereby it would have given the bank a "lien right" – but such a security bond can have no merit for goods given under consignment whose legal owner was not LAZARE KAPLAN BELGIUM.

**The Public Prosecution Service remarks that the two security bonds dated July 4, 2004, which LAZARE KAPLAN INTERNATIONAL, INC. produces as its <u>item 7B,</u> may constitute written falsehoods, since LAZARE KAPLAN BELGIUM declares it is the *"full owner"* of the "*pledged goods*" – while it was, in fact, not an owner of these diamonds at all but instead LAZARE KAPLAN INTERNATIONAL, INC. had only given the diamonds under consignment to LAZARE KAPLAN BELGIUM.**

**This raises the question of the veracity of a consignee who openly lies to a bank in writing that it is the "full owner" of the pledged diamonds, in order to obtain or maintain credit, while he/she is not the "full owner" but only has these diamonds under consignment…**

- The right to lien is a business contract that only becomes valid through possession by the pledger.

The only type of pledge that does not require dispossession is the pledge of a business, governed by the Law of October 25, 1919. The jurisdiction is strict in the application of this law: the Law of October 25, 1919 may not normally be used to pledge certain portable items – like one specific load of diamonds – without dispossession. Such a pledge is not the pledge of a business, but a conventional commercial lien where the business agreement is not executed by lack of dispossession. (E. DIRIX and R. DE CORTE, *o.c.* no. 521).

By the failure to submit the two "*security bonds*" that LAZARE KAPLAN INTERNATIONAL, INC. talks about repeatedly, (and that will not be submitted[3]), it poses the question as to what type of pledge LAZARE KAPLAN INTERNATIONAL, INC. has made: civil lien, commercial lien, pledge of the business?
- It cannot be one of first two types (civil lien and commercial lien), because no right to lien through dispossession emerges, while it is precisely the intent that the diamonds would be sold by the pledger (who would apparently sell the goods with a provision to retain ownership). The business agreement is not executed.
- It can also not have been last type (pledging of the business), because the goods pledged by LAZARE KAPLAN INTERNATIONAL, INC. did not legally belong to it.

The story told by LAZARE KAPLAN INTERNATIONAL, INC. is judicially of little merit.

"*Whereas the goods were given as a guarantee to the bank their ownership cannot be transferred if payment is not made*"
Conclusion dated 6/3/2013, no. 212, page 80

How is this position judicially supported (contractually or in terms of guarantees), unless the position is supposed to be self-explanatory?

_____

[3] The only security bonds that were submitted by LAZARE KAPLAN INTERNATIONAL, INC. were dated June 4, 2004, as part of **<u>item 7B</u>**.

Any additional security bond – barring a mistake by the Public Prosecution Service – is not to be found in the 26 items from LAZARE KAPLAN INTERNATIONAL, INC., or in the items the latter availed itself of in the commercial case before the court of commerce in Antwerp. In the inventory of 22 pages in this commercial case there are items submitted about "pledge of the business" from DALEYOT companies, but not the two security bonds that LAZARE KAPLAN INTERNATIONAL, INC. repeatedly mentions in its conclusion dated 6/3/2013.

The Public Prosecution Service would like to receive "*the two security bonds*" that LAZARE KAPLAN INTERNATIONAL, INC. repeatedly talks about (conclusion dated 6/3/2013, nos. 193 and 210), or the clarification that this refers to the items that are included in its item 7B (dated June 4, 2004).

_____

If the diamonds had actually been pledged to the bank as collateral through a commercial lien, in the first place they could not have been given to LAZARE KAPLAN BELGIUM under consignment from LAZARE KAPLAN INTERNATIONAL, INC., and then sold by LAZARE KAPLAN BELGIUM to DALEYOT companies…

In reality the practices in the diamond sector are much looser, where goods are pledged without being dispossessed, where goods are pledged that have been given under consignment (and that legally do not belong to the pledger) and where goods purchased under a provision of reserved ownership are then in fact sold on by the buyer.

The practices in the diamond sector are looser and "vague," but this means that LAZARE KAPLAN INTERNATIONAL, INC. cannot suddenly become all formal in order to now artificially try to create a deliberate act of conspiracy with respect to a banking institution.

When the DAYELOT companies received money into their accounts (at the ANTWERP DIAMOND BANK, NV), the knowledge on one hand of the existence of invoices issued by LAZARE KAPLAN BELGIUM (which contained a provision of reserved ownership) and on the other having established a lien against LAZARE KAPLAN BELGIUM, does not mean that the bank as banker had an active obligation to tell another client of the bank, also the buyer, to pay LAZARE KAPLAN BELGIUM.

As the lienholder, the bank was not responsible for ensuring that the diamond buyer (who bought diamonds with a provision of reserved ownership by the seller, the (false) pledger, LAZARE KAPLAN BELGIUM) applied the money coming into his account exclusively toward paying the purchase invoices.

Such a correlation between a figurative commercial lien (possibly established via a false security bond in which the pledger falsely lies that it is the *"full owner"* while the pledger was in fact simply the consignee…) and a provision for reserved ownership is unfounded under contractual jurisdiction – but then give it a criminal dimension through some kind of a "conspiracy" in the sense of Article 66 of the Criminal Code (conclusion dated 6/3/2013, no. 240) is more than going a bridge too far.

## VII. Decision

LAZARE KAPLAN INTERNATIONAL, INC. builds its position in the case from the absurd:
- It claims that it was robbed by Erez DAYELOT[4], yet never files a charge against him but does file a direct summons with the court…
- It wages a media campaign for having been *"robbed"* of the sum of $135,000,000 USD, but was never the owner of this value in diamonds. It only financed the purchase by subsidiaries – so the subsequent proceeds from the sale would then also have gone to the subsidiary companies…
-

It accuses ANTWERP DIAMOND BANK, NV of having reported *"fake transactions"* which means that its complaint cannot lead anywhere: it is impossible to file a direct summons with the court for falsified documentation. Perhaps LAZARE KAPLAN INTERNATIONAL, INC. knows this so it did not expressly include the charge of falsified documentation in its planned indictment, but it could not resist accusing ANTWERP DIAMOND BANK, NV, in the direct summons and in its conclusion dated 6/3/2013, of having committed *"fake transactions."* So it also has to live with the consequences of this.

- It claims that hearing from witnesses is absolutely essential – but never declares which witnesses should be heard from, or why…
- It refers to two security bonds to establish the connection between the knowledge of the existence of invoices with a provision of reserved ownership and an active obligation on the part of a banker (also the lienholder) to obligate one client of the bank to first pay the invoices of another client of the bank (also the pledger) – but it never presents these security bonds…

---

[4] LAZARE KAPLAN INTERNATIONAL, INC. identifies Erez DALEYOT in its conclusion dated 6/3/2013 by name, and calls him a "*criminal*" (conclusion dated 6/3/2013, no. 153). So why did it not file charges against this "criminal"? Why only a direct summons before the court against the bank?

---

This court is incompetent based on a lack of admissibility, pursuant to the facts of falsified documentation that LAZARE KAPLAN INTERNATIONAL, INC. accuses the ANTWERP DIAMOND BANK, NV of in its conclusion dated 6/3/2013. Perhaps at the very least the summons is hereby hindered by an inadequacy that leads to the inadmissibility of the case.

The complaint or claims of LAZARE KAPLAN INTERNATIONAL, INC. are inadmissible for absence of a personal and direct interest.

The case is frivolous and without merit.

With due respect to the court

Antwerp, June 13, 2013


Paul Hannes
Prosecutor of the Crown

**ENCLOSURES:**

1. The letter from Ms. Wachsstock to the Public Prosecution Service on 5/2/2013 with attachment of the correspondence directed to the judge of Chamber 3C of the criminal court, at 09:48 hours

2. The letter from Ms. Wachsstock to the Public Prosecution Service on 5/2/2013, at 11:44 hours

3. The magistrate order (*kantschrift)* to the clerk of the criminal court, to be added to the file of the conclusion that Mr. Rieder delivered to the Public Prosecution Service in the chambers of the criminal court of Antwerp, Chamber 3C, on 5/3/2013

4. Article in DE TIJD from 6/1/2013