USDC SDNY
DOCUMENT ELECTRONICALLY FILED
DOC#: _____
DATE FILED: 6/30/17

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| LAZARE KAPLAN INTERNATIONAL INC., <br><br> Plaintiff, <br><br> -against- <br><br> KBC BANK N.V. and ANTWERP DIAMOND BANK N.V., <br><br> Defendants. | 11-cv-09490 (ALC) <br><br> <u>FINDINGS OF FACT</u> |

**ANDREW L. CARTER, JR., United States District Judge:**

On February 14 and 15, 2017, the Court held a hearing pursuant to *New Moon Shipping Co., Ltd. v. MAN B & W Diesel AG*, 121 F.3d 24 (2d Cir. 1997). The purpose of the hearing was to enable the Court to make findings of fact relevant to its determination regarding which of two contracts, and the forum selection clauses contained therein, govern venue in this action.

At the hearing, in addition to accepting voluminous documentary evidence, the Court heard testimony from three live witnesses: William H. Moryto, the Vice President and Chief Financial Officer of Plaintiff Lazare Kaplan International, Inc. ("Lazare"); Diane Grimmig, a Managing Director and General Counsel of Defendant KBC Bank, N.V. ("KBC"); and Veerle Snyers, currently a Special Risk Officer at KBC and previously serving in various capacities at Defendant Antwerp Diamond Bank, N.V. ("ADB").[1] The Court also heard testimony in the form of designated portions of videotaped depositions from Grimmig and Snyers, as well as from

---

[1] Lazare made a motion to strike Snyers' direct and re-direct testimony on the grounds that she lacks personal knowledge regarding the subjects of her testimony. ECF Nos. 216-18. As will become clear from the Court's recitation of its factual findings, the Court relied on Snyers' testimony to a very limited extent, and only where the Court determined that Snyers had an adequate basis for her testimony. Even though Snyers was not a percipient witness to much of Lazare's banking relationship, she has been employed by ADB or KBC since August 2001, and is competent to speak to ADB's ordinary practices and procedures. In any event, her testimony—even those portions not relied upon—often comported with statements by other witnesses, whose testimony Lazare has not sought to strike. Accordingly, Lazare's motion is denied.

Philippe Loral, formerly the Senior Vice President and Head of the International Division at ADB, and Marc Weiss, the former Senior Vice President and General Manager of ADB's New York representative office.

Having reviewed the testimony and exhibits presented at the *New Moon* hearing as well as the parties' post-hearing proposed findings of fact, *see* ECF Nos. 214-15, the Court makes the following factual findings:

**The Parties**

Plaintiff Lazare Kaplan International, Inc. is a diamond company headquartered in New York. Tr. 21:11-23 (Moryto).[2] Lazare does business in Belgium through its subsidiary, Lazare Kaplan Belgium, N.V. ("Lazare Belgium"). DCX-3 (Complaint), at ¶ 98; Tr. 22:10-14, 162:1-13 (Moryto). Lazare, whose business involves the buying and selling of rough and polished diamonds, finances its operations through working capital lines of credit (also known as revolving lines of credit) that it maintains at a number of financial institutions. Tr. 21:11-21, 22:20-23:17 (Moryto). At all times relevant to the allegations in the Complaint, Moryto was the Vice President and Chief Financial Officer of Lazare. Tr. 20:12-16, 21:24-22:1 (Moryto).

Defendants KBC Bank, N.V. and Antwerp Diamond Bank, N.V. are Belgian bank corporations. ECF No. 193-2 (Direct Testimony Declaration of Diane Grimmig ("Grimmig Decl.")), at ¶¶ 6-7. During the relevant period, ADB was in the business of providing loans—relevant here, overdraft facilities—to participants in the diamond industry. Transcript of Philippe Loral Deposition ("Loral Dep."), at 46:23-47:4, 216:2-12.[3] At the time of the conduct giving rise to this action, ADB was a subsidiary of KBC. Grimmig Decl. ¶¶ 7-8. On July 1,

---

[2] All citations to "Tr." are to the transcript of the *New Moon* hearing.

[3] Both parties designated portions of Loral's deposition testimony. Defendants filed their designations at ECF No. 200-1 and their counter-designations at ECF No. 204-1. Plaintiff's designations were filed at ECF No. 197-6. The Court will refer to the parties' designations collectively as "Loral Dep."

2015, after Lazare had commenced this action, KBC absorbed ADB's business and operations. Tr. 289:3-9 (Grimmig); No. 193-3 (Direct Testimony Declaration of Veerle Snyers ("Snyers Decl.")), at ¶ 3.

KBC operates a branch office in New York ("KBC-NY"), while ADB was licensed to maintain a representative office there. Loral Dep. 149:20-150:4, 21:5-16, 22:1-13; Grimmig Decl. ¶ 2. During the relevant period, Marc Weiss was the Senior Representative Officer and later became a Senior Vice President and the General Manager of ADB's New York representative office. Transcript of Marc Weiss Deposition ("Weiss Dep."), at 16:13-17:13.[4] Philippe Loral served as a Senior Vice President and Head of the International Division at ADB, responsible for establishing and overseeing the New York office. Loral Dep. 19:14-21:16, 23:21-23; Weiss Dep. 21:2-19. Grimmig currently is a Managing Director and General Counsel of KBC and has been employed by KBC-NY for 29 years. Grimmig Decl. ¶¶ 1, 4.

Under the terms of ADB's representative office license, the representative office in New York could not provide banking services or make decisions about originating loans; those decisions were reserved for the ADB "Head Office" in Antwerp, Belgium. Loral Dep. 50:2-15, 149:20-150:4; Grimmig Decl. ¶ 11. As a result, ADB employees in the New York representative office were limited to conducting research on the United States market, marketing the bank, introducing New York-based clients to the Head Office, and monitoring those clients' activities. Loral Dep. 47:5-23, 50:2-52:21; Weiss Dep. 16:19-17:5. Although ADB employees at the New York representative office could negotiate credit arrangements with clients or potential clients, the members of ADB's credit committee at the Head Office ultimately were responsible for

---

[4] Both parties designated portions of Weiss' deposition testimony. Lazare's designations were filed at ECF No. 197-8 and also appear as Plaintiff's Exhibit 95. Defendants filed their counter-designations at ECF No. 204-1. The Court will refer to the parties' designations collectively as "Weiss Dep."

3

approving credit decisions with respect to the bank's clients. Loral Dep. 47:5-23. In some instances, KBC's credit committee also had to weigh in on the decision. Tr. 296:21-297:7 (Grimmig).

**The Services Agreement between ADB and KBC-NY**

By agreement dated October 15, 1999, ADB contracted with KBC-NY to provide certain services to ADB's clients in New York. ECF No. 190-40 (Pl's Ex. 20, Services Agreement). Because ADB's representative office was not licensed to open bank accounts or provide banking services in New York, under the terms of the Services Agreement, KBC-NY agreed to "provide certain operational services to ADB and ADB's clients . . . specifically allowing diamond clients to open current accounts in their books and effectuating both local and international payments and other banking services on behalf of the diamond clients." Services Agreement, Second Whereas Clause; *see also* Grimmig Decl. ¶¶ 11-12; Tr. 259:25-260:24 (Grimmig); Loral Dep. 215:19-219:15. This arrangement was designed to allow ADB clients in New York to receive their funds during the same business day, notwithstanding the six-hour time difference between New York and Belgium. Weiss Dep. 62:16-64:21. While KBC was "free to charge the diamond clients for transactions effectuated on their behalf," ADB was permitted to charge interest to those customers "[s]ince the credit risk [was] occurred and acted upon by ADB." Services Agreement ¶¶ 4-5.

Pursuant to the Services Agreement, KBC-NY would "communicate all payments effectuated by the diamond clients to ADB" so that ADB would be able to "make internal entries to adjust the customer's credit position." *Id.*, Third Whereas Clause. KBC-NY also maintained a "pooling account" in ADB's name "to fund the payments effectuated by KBC on behalf of the diamond clients." *Id.*, Fourth Whereas Clause.

4

In more practical terms, when an ADB client in New York desired to draw down on its line of credit from ADB to, for example, fund a diamond purchase, that payment order went to KBC-NY. *Id.* ¶ 1. KBC-NY then confirmed that the client had sufficient credit available in its ADB credit line and that there were sufficient funds in ADB's pooling account. *Id.*; Tr. 242:14-243:1, 262:14-263:6 (Grimmig). Assuming the client had sufficient credit and the pooling account had sufficient funds, KBC-NY would "debit[] the diamond client['s] account" and carry out the payment as directed. Services Agreement ¶ 1. If, however, ADB had insufficient funds in its pooling account, KBC-NY could choose to effectuate the client's payment by overdrafting ADB's pooling account. *Id.*; Tr. 266:19-267:3 (Grimmig); Grimmig Dep. 201:18-202:6, 272:22-273:11.[5] Upon making the payment, KBC-NY would alert ADB to the payment so that ADB could "debit[] the diamond customer['s] account in its books against the KBC pooling account." Services Agreement ¶ 1; *see also* Tr. 244:6-23 (Grimmig). In the opposite direction, KBC-NY also "accept[ed] and registrate[d] all incoming funds" to ADB's customers, crediting those clients' accounts and sending the information to ADB so that it could "credit[] the diamond clients' accounts in its books against the KBC pooling account." Services Agreement ¶ 2.

The Services Agreement provides that, "[e]ach day, KBC clears the customer's account via ADB's pooling [account]." *Id.* ¶ 3. Typically, this final reconciliation between a client's KBC account and the ADB pooling account happened at the end of the day rather that intra-day. Tr. 243:2-244:5, 264:7-20 (Grimmig); Grimmig Dep. 200:7-201:17. The parties refer to this daily reconciliation alternatively as "clearing," "zeroing-out," or "sweeping" the customer's credit or debit activity into ADB's pooling account with KBC. Grimmig Decl. ¶ 16; Weiss

---

[5] Both parties designated portions of Grimmig's deposition testimony. Lazare's designations were filed at ECF No. 197-5. Defendants filed their counter-designations at ECF No. 204-1. The Court will refer to the parties' designations collectively as "Grimmig Dep."

5

Dep. 65:21-67:8; Loral Dep. 245:17-246:12. For this reason, KBC and ADB representatives refer to clients' accounts at KBC-NY as "zero balance accounts." *See, e.g., id.*; Tr. 258:15-259:24 (Grimmig); *see also* Tr. 175:1-10 (Moryto). As a result of this end-of-day reconciliation process, during the course of the day, either the client's or KBC-NY's funds were the funds being used to satisfy ADB's clients' payment requests. Tr. 264:7-20 (Grimmig); Grimmig Dep. 202:16-204:14. However, by day's end, KBC-NY would be made whole via ADB's pooling account, unless the bank chose to allow ADB to overdraft its pooling account. Grimmig Dep. 202:7-15, Tr. 266:19-267:3 (Grimmig).[6]

**Lazare's Credit Facility from ADB**

Sometime in the summer of 2000, Moryto and Loral began discussing Lazare obtaining a line of credit from ADB. Tr. 24:2-25:5, 26:24-28:13 (Moryto); Loral Dep. 102:14-103:1. Lazare Belgium already had a line of credit with ADB, but Lazare did not. Tr. 25:6-17 (Moryto). As a result of those discussions, by letter dated December 14, 2000, ADB and Lazare entered into an agreement by which ADB extended Lazare a $10 million credit line. ECF No. 193-7 (DX-2, Credit Agreement, dated Dec. 14, 2000); Tr. 37:18-38:25 (Moryto). The credit limit was extended several times over the course of the next ten years, reaching $45

---

[6] While, in connection with this hearing, Lazare has described its KBC-NY account as an overdraft account that could "go negative" intra-day, the documents Lazare relies on in support of this argument, in fact, support Defendants' explanation of how the KBC-NY account functioned. *See* ECF No. 215 (Lazare's Proposed Findings of Fact), at ¶ 49 (citing Pl's Exs. 2, 3, 67, 68, 81). For instance, Plaintiff's Exhibit 2 shows Lazare's KBC-NY account activity on May 2, 2007. *See* ECF No. 190-2. Lazare received a $59,061.19 payment into its account from an outside source (reflected as a credit). Lazare then received an additional $1,750,360.75, reflected as "Zero Balance Movement," prior to making a payment of $1,809,421.94 (the sum of the previous two credits) to VTB Bank out of its KBC-NY account. This suggests to the Court that KBC-NY made the approximately $1.75 million payment into Lazare's zero balance account so that the account would "zero out" upon effecting the $1.8 million payment on Lazare's behalf. The same is true in Plaintiff's Exhibit 1, which shows a Zero Balance Movement credit of $519,862.56 being made into Lazare's KBC-NY account on August 20, 2007, prior to a payment of the same amount from Lazare's account to a third party's bank account the same day. ECF No. 190-1 at 2. When Moryto discussed this transaction at the *New Moon* hearing, he inexplicably described the payment to the third party as taking place prior to the Zero Balance Movement. Tr. 49:1-52:5 (Moryto).

million by the time the parties terminated their relationship. *See* DX-2, ECF Nos. 193-30 to -34 (DX-14 to DX-18, Subsequent Credit Agreements dated Oct. 12, 2001 to Feb. 2, 2008).

Section 2 of each Credit Agreement states that "the aforesaid credit is only to be utilized for overdrafts in current accounts." *Id.* As employees of both ADB and KBC explained, "current accounts" were accounts that ADB's clients had with the bank in Belgium and were the means by which ADB extended credit to its customers. Tr. 308:8-14 (Grimmig); Loral Dep. 128:2-21. According to Loral, a client could not have an overdraft facility from ADB without also being an account holder there. Loral Dep. 37:4-38:4, 131:17-132:10. Both Loral and Snyers explained that, as a general matter, a customer who had a line of credit from ADB in the form of an overdraft facility accessed that credit by overdrafting its ADB account; that is, withdrawing more funds than were deposited. Loral Dep. 37:4-22, 107:22-108:8; Snyers Decl. ¶¶ 12-17.

Additionally, each Credit Agreement provides that "[t]he granting of this credit is governed by our *General Conditions for Banking Operations* and by our *General Credit Granting Conditions* of which you already received a copy and to which you already explicitly agreed . . . ." DX-2 ¶ 4; *see also* DX-14 to DX-18, at ¶ 4. Footnotes following the reference to each of these "General Conditions" documents reflect that the documents were registered in Antwerp on November 2, 2000 and March 11, 1999, respectively. *Id.* In connection with the first Credit Agreement, Lazare and ADB also entered into an addendum, dated the same day, modifying certain provisions of the General Conditions for Banking Operations and General Credit Granting Conditions. DX-2 at p.4.

Despite these many and varied references to the General Conditions for Banking Operations and General Credit Granting Conditions, Moryto testified that he did not receive or

sign a copy of either document at the time he executed the December 14, 2000 Credit Agreement because Loral told him the documents were not yet written and/or were not applicable to Lazare. Tr. 39:1-40:14, 120:6-122:12 (Moryto). He further testified that he did not see a copy of either document until 2004 or 2005. Tr. 40:15-18 (Moryto). Loral testified to the contrary, recalling that Moryto did, in fact, review the General Conditions for Banking Operations and General Credit Granting Conditions and had edits to those documents that required approval by ADB's Head Office. Loral Dep. 300:22-301:2, 301:4-303:6.

The Court finds that Moryto's testimony on this point is not credible. First, it strains credulity that Moryto, as the Chief Financial Officer of a publicly traded corporation, would sign a document stating that Lazare had seen and agreed to be bound by separate documents that Moryto had, in fact, not seen. Second, the December 2000 Credit Agreement indicates that these documents had already been registered in Antwerp, making their allegedly incomplete status unlikely. DX-2 at ¶ 4 & nn.1-2. Third, as previously noted, Lazare negotiated certain modifications to both the General Conditions for Banking Operations and General Credit Granting Conditions by addendum dated the same day as the Credit Agreement. *Id.* at p.4. Moryto offered no explanation for how he could have negotiated modifications to agreements he never received and that allegedly were not extant (or at least not complete) at the time. Fourth, when Lazare's Board of Directors passed resolutions connected with the ADB credit line, they explicitly authorized the opening of an account consistent with the General Conditions for Banking Operations. ECF No. 193-10 (DX-5, Board Resolutions dated Dec. 20, 2000), at ¶ 1. And fifth, as discussed further below, when Lazare applied to open an account at ADB later in December 2000, Moryto handwrote onto the application that the account would be subject to the General Conditions for Banking Operations and General Credit Granting Conditions, "except as

modified by the letter agreements as of December 14, 2000." ECF No. 193-8 (DX-3, ADB Account Opening Form); Tr. 209:13-210:17 (Moryto).

> Article 37 of the General Conditions for Banking Operations provides that:
>
> > Each of the account holder, any correspondent, surety, guarantor, third-party pledgor and other third party hereby further agree that the courts of Antwerp, Belgium shall have exclusive jurisdiction with respect to any action brought against the Bank.
>
> ECF No. 193-38 (DX-22, English translation of General Conditions for Banking Operations).

**Lazare's Accounts at ADB and KBC-NY**

At approximately the same time that Lazare entered into the December 2000 Credit Agreement, Lazare also applied to open banks accounts at ADB and KBC-NY. *See* DX-3; ECF Nos. 190-27 to -28 (Pl's Exs. 7-8, KBC Account Opening Documents dated Dec. 20, 2000); Tr. 58:03-17 (Moryto). According to Moryto, Loral suggested that Lazare apply for accounts at both banks because he was not sure whether ADB's New York representative office would be able to provide banking services. Tr. 34:16-35:5 (Moryto). However, it seems unlikely that Loral would have described the situation to Moryto in that way because he knew that ADB's representative office in New York did not have the ability to open bank accounts. *See, e.g.,* Loral Dep. 29:15-31:17. Moreover, as Loral and others testified, a client needed to have an account at ADB in order to receive an overdraft facility from the bank. Loral Dep. 37:4-38:4.

Moryto further contended that Loral subsequently told him ADB was unable to provide Lazare with the requested bank account, so KBC-NY would open an account for Lazare instead, a fact which also does not comport with Loral's understanding of how ADB credit facilities worked or the representative office's capabilities. Tr. 42:16-43:1 (Moryto). As a result, while Moryto acknowledges that Lazare opened an account at KBC-NY in connection with Lazare's

9

credit facility from ADB, he maintains that he was not aware that Lazare opened an account at ADB in Belgium in connection with its overdraft facility. Tr. 41:5-11 (Moryto).

The Court finds that Moryto's testimony on the topic of applying for, and ultimately opening (or not), an account at ADB, is not credible for several reasons. First, after completing the paperwork to open an account at ADB, Moryto, on behalf of Lazare, submitted 24 payment requests to ADB from Lazare's "ADB account," sometimes referring to Lazare's assigned account number (640-0433401-48). *See* ECF No. 193-12 (DX-7, Lazare Transfer Orders).[7] While Moryto attempted to distinguish between "bank" and "loan" accounts, the Court is not persuaded. Tr. 74:9-23, 76:14-77:3, 112:13-114:21 (Moryto). Lazare also received payments into that account. ECF No. 193-13 (DX-8, Record of Payment to Lazare dated May 29, 2001). Second, when Lazare and ADB agreed to modify certain provisions of the General Conditions for Banking Operations in connection with the first Credit Agreement, one of the provisions modified was article 34, which governs ADB's rights to close its clients' accounts there. DX-2 at p.4; DX-22 at art. 34. Third, Lazare's Board seemed to understand that an account with ADB in Belgium was part and parcel with receiving the line of credit. DX-5 at ¶ 1 (authorizing individuals "to open a bank account or accounts with Antwerpse Diamantbank NV . . . .").

---

[7] As Lazare highlights, on its application for an ADB account, the final two digits of the account number assigned are different than the number Lazare ultimately used. *See* DX-3 (listing account number as 640-0433401-**81** rather than 640-0433401-**48**). Moryto testified that he understood 640-0433401-81 was the account number that "was going to be assigned if we had opened a bank account . . . ." Tr. 80:25-81:1 (Moryto). However, Defendants explain that the difference in the last two digits was the result of a computing error; if this account had ended in "81," it would be a non-functioning account number. Loral Dep. 203:20-205:17, 316:1-317:1; ECF No. 193-56 (DX-40, ADB Account Number Sheet), at 2; Snyers Decl. ¶¶ 24-28; ECF No. 193-6 (DX-1, Register of European Account Numbers), at 14-15. Lazare also identifies two instances in which the number "4345" appeared in the middle of the account number on Lazare paperwork rather than "4334." Pl's Ex. 100, Tabs 8-9. Snyers testified that this likely was a mistake then copied from the earlier document into the later document. Tr. 398:15-399:25 (Snyers). Notwithstanding Snyers' lack of involvement in the drafting of the documents, the Court finds this to be a reasonable explanation, particularly in the absence of a counter-proposal by Lazare.

10

Ultimately, whether or not Moryto believed that Lazare had a bank account at ADB, the bank, in fact, opened an account for Lazare. According to Snyers, the application appearing as Defendants' Exhibit 3 contains all of the necessary signatures to open an account. Tr. 412:8-19 (Snyers). Additionally, in a fax sent from Peter Driesen in ADB's New York representative office to Dirk De Roeck, the head of ADB's Administrative Secretariat in Belgium, on January 2, 2001, Driesen stated that he was sending all of the account opening documents and that Lazare "would like to make use of its account on Thursday (January 4)." ECF No. 193-9 (DX-4); Tr. 384:12-20 (Snyers). Snyers testified that the handwritten notation at the bottom of the fax reads "OK" followed De Roeck's signature, "DDR," and the date January 3, 2001. DX-4 at 1; Tr. 388:16-389:16, 413:8-17 (Snyers). While Lazare argues that Snyers' testimony on this topic has no value because she was not employed at ADB until later that year, the document speaks for itself, and, to the extent the Court must rely on Snyers' testimony to identify De Roeck's signature, her presence for its signing is not required. She and De Roeck overlapped at ADB and she is competent to speak about ADB's practices, generally. *See, e.g.*, Tr. 335:23-336:2 (Snyers). Furthermore, following this fax communication, ADB provided regular account statements to Lazare bearing the account number 640-0433401-48. *See, e.g.* ECF Nos. 193-14 (DX-9), 193-15 (DX-10), 193-71 to -82 (DX-55) (Account Statements). The account number is preceded by the acronym "IBAN," which stands for International Bank Account Number. *Id.*; *see also* DX-1 at 9.

As noted above, at the same time that Lazare applied for an account at ADB, it also applied for an account at KBC-NY. Pl's Exs. 7-8; ECF No. 190-29 (Pl's Ex. 9, Memorandum of Call on Jan. 23, 2001); Tr. 58:22-59:18, 60:1-61:14 (Moryto). Lazare also successfully opened an account there. The account at KBC-NY became operational on November 16, 2001 and had

the account number 24079801. ECF No. 190-35 (Pl's Ex. 15, Letter from KBC-NY to Lazare dated Nov. 16, 2001). With the exception of certain "straight loans," *see, e.g.* ECF No. 193-29 (DX-13, Lazare ADB Statement dated Nov. 25, 2008), from the time that Lazare's account at KBC became operational in November 2001, there is no dispute that Lazare used that account as the exclusive vehicle for all payments and disbursements under its credit facility with ADB.

The Account Agreement and General Terms and Conditions from KBC-NY, which Lazare signed some time after March 29, 2001, also contains a forum selection clause. Section 35 of the Agreement provides that:

> Any claim or action you bring must be must be brought before the courts of the County of New York, State of New York, or the Federal Courts situated in the Southern District of New York, which you agree shall have exclusive jurisdiction over these Terms and Conditions or any other agreements you have with KBC Bank relating to any accounts or disputes arising thereunder.

ECF No. 190-31 (Pl's Ex. 11), at ¶ 35.

While Lazare was in the process of opening an account at KBC-NY, Moryto, on behalf of Lazare, signed a letter drafted by Loral in which Lazare requested that "all disbursements and payments under our credit facility with [ADB] shall be effected through our account with [KBC-NY] and shall result in a same day debit or credit to our loan balance with ADB." ECF No. 190-34 (Pl's Ex. 14, Letter from Lazare dated May 31, 2001); Loral Dep. 208:3-209:6. It further allowed KBC and ADB to exchange "all credit, financial and any other information concerning [Lazare] and [Lazare's] accounts." Pl's Ex. 14. Loral explained that it was preferable, from ADB's perspective, to have ADB's clients direct transactions through a single account, rather than through both their KBC-NY and ADB accounts. Loral Dep. 211:23-213:8; *see also* Weiss Dep. 58:01-59:11. Nevertheless, nothing in the record states that a KBC-NY zero-balance account was required for a credit line with ADB; rather, to the extent a New York-based client

wanted convenient access to their credit line during New York business hours, ADB would prefer that all debits and credits go exclusively through the KBC-NY account.

* * *

Defendants are hereby granted leave to move to dismiss the Complaint on the basis of the Court's findings of fact. The Court sets the following briefing schedule:

| | |
|---|---|
| Defendants' Motion to Dismiss: | July 28, 2017 |
| Plaintiff's Opposition: | August 25, 2017 |
| Defendants' Reply, if any: | September 1, 2017 |

Defendants' response to Lazare's previously-filed motion for sanctions, ECF Nos. 219-21, also is due on July 28, 2017, with any reply by Lazare to be filed on or before August 25, 2017.

The Clerk of the Court is respectfully requested to close Docket Entry Number 216.

**SO ORDERED.**

Dated: June 30, 2017
New York, New York

**ANDREW L. CARTER, JR.**
**United States District Judge**

13