# Exhibit A

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
LAZARE KAPLAN INTERNATIONAL INC.,    :

    :      11 Civ. 9490 (ALC)

        Plaintiff,    :

    :

    - against -    :      **FIRST AMENDED**

    :      **COMPLAINT**

KBC BANK N.V., in its own right    :

and as successor-in-interest to    :      **Jury Trial Demanded**

Antwerp Diamond Bank N.V.,    :

    :

        Defendant.

-----------------------------------------------------------------X

    Plaintiff Lazare Kaplan International Inc. ("Lazare"), by its attorneys, Schulte Roth &

Zabel LLP, as and for its complaint against Defendant KBC Bank N.V. ("KBC"), in its own right

and as successor-in-interest to Antwerp Diamond Bank N.V. ("ADB")[1] (KBC and ADB being

collectively referred to herein as the "Banks"), alleges upon knowledge with respect to itself, its

own acts, and much of the misconduct of the Banks and others, and upon information and belief

as to all other matters, as follows:

## NATURE OF THE ACTION

    1.    This is an action by Lazare, a once-thriving, publicly-listed New York diamond

company whose business was decimated by the actions of a racketeering enterprise led by the

Banks and their customer, Erez Daleyot ("Daleyot"), that engaged in the systematic theft, looting

and laundering of hundreds of millions of dollars of diamonds (the "LKI Diamonds") and

proceeds from the sale of diamonds (the "LKI Diamond Proceeds") belonging to Lazare and its

subsidiaries and affiliated companies.

---

[1] This action was originally filed in December 2011 against both KBC and its then-subsidiary, ADB.  On July 1, 2015, ADB was merged by acquisition and absorption by its parent, KBC, with retroactive effect to January 1, 2015. ADB no longer exists, and KBC is the successor-in-interest to ADB.  As such, KBC is responsible and liable for its own conduct and the conduct of its former subsidiary, ADB, as described herein.

2.      From at least in or about 2007 to in or about 2010, the Banks, Daleyot, senior officers of the Banks and various individuals and entities controlled by or associated with the Banks and Daleyot collectively formed an association-in-fact, referenced herein as the "Enterprise," that carried out a pattern of illegal and criminal conduct that included, without limitation, acts of international transportation and receipt of stolen property, wire fraud, money laundering, and extortion occurring in the United States and in violation of United States law (the "Illegal Scheme").

3.      The Banks, acting through their respective offices in New York ("KBC-NY" and "ADB-NY") and Belgium, were at the very center of the Illegal Scheme, directed the Illegal Scheme, knowingly participated and were complicit in the actions of Daleyot and his companies (the "Daleyot Entities") in furtherance of the Illegal Scheme, laundered proceeds of the Illegal Scheme through the U.S. banking system, and were the principal beneficiaries of the Illegal Scheme.

4.      Fundamental to the operation of the Illegal Scheme was a so-called "pooling" account (the "New York Pooling Account") that:  (i) KBC-NY required ADB to open and maintain at KBC-NY; (ii) KBC-NY agreed to operate in New York specifically for the use of ADB's diamond clients; and (iii) played a critical role in the implementation of the Illegal Scheme.  The Banks executed dozens if not hundreds of funds transfers representing LKI Diamond Proceeds through the New York Pooling Account, knowing the funds to be stolen, converted, and taken by fraud.  It was from the New York Pooling Account that the Banks misappropriated the stolen LKI Diamond Proceeds for the benefit of themselves and Daleyot and the Daleyot Entities.

5.      The Banks worked in concert with Daleyot and other members of the Enterprise to: (i) plan the theft of the LKI Diamonds and LKI Diamond Proceeds; (ii) transfer the diamonds through a series of legitimate and sham transactions that made them difficult to trace; (iii) launder LKI Diamond Proceeds through a network of legitimate and illegitimate businesses and accounts and the New York Pooling Account, and prevent such LKI Diamond Proceeds from reaching Lazare, including through Lazare's account at KBC-NY; (iv) use LKI Diamond Proceeds to repay certain financially disastrous loans that the Banks had made to Daleyot and his companies; (v) cover up their involvement in the Illegal Scheme; (vi) obstruct Lazare's investigation into the theft of its diamonds and sales proceeds thereof; (vii) attempt to put Lazare out of business; and (viii) personally enrich senior executives of the Banks and Daleyot.

6.      In 2006, the Banks provided two of the Daleyot Entities, DD Manufacturing N.V. ("DD") and K.T. Collections BVBA ("KT"), with a U.S. dollar denominated $120 million credit facility purportedly for use in connection with their diamond businesses. This credit facility was provided by ADB and approved, managed, monitored and controlled by KBC, which also guaranteed DD's and KT's repayment obligations thereunder.

7.      In direct contravention of ADB's stated purpose as a bank focusing exclusively on the diamond and diamond jewelry sector, the Banks authorized and caused Daleyot and his companies to draw down millions of dollars from the DD/KT credit facility for other, non-diamond-related purposes.  In particular, the funds were used for speculative real estate projects in Central and Eastern Europe — projects in which KBC had a financial interest — and for the purchase of fine art, private airplanes, a yacht, and other luxury items.  These borrowings were unsecured.

8.      Upon information and belief, as part of the Illegal Scheme and in order to cement the criminal conspiracy described herein and further its objectives, Daleyot paid bribes to senior officers of the Banks.  These bribes, upon information and belief, took the form of payments to accounts held by Bank officers at Swiss banks, financial interests held by Bank officers in Daleyot-controlled entities, and paid-for vacations, cash, vintage wine and other lavish gifts.

9.      When the global financial crisis hit in 2008, and both diamond prices and the value of real estate in Central and Eastern Europe (and other assets) fell precipitously, the Banks realized that the Daleyot Entities would be unable to repay the illicit and imprudent loans that the Banks had extended to DD and KT (totaling about $118 million at that time — approximately half of ADB's total capital of approximately €200 million) and that the Banks faced massive losses.  A default by the Daleyot Entities threatened to cause ADB to collapse, to trigger KBC's guarantee, and to expose the Banks' mismanagement and the wrongdoing of their senior officers.

10.     The Banks and the Daleyot Entities needed to find a source of funds to pay down the Daleyot Entities' debts.  The principal source of recovery the Banks seized upon was LKI Diamond Proceeds.  Upon information and belief, the Banks targeted Lazare expecting that: (i) Lazare would never discover the Banks' role in the Illegal Scheme; (ii) the Banks, as Lazare's main creditor, could exert substantial pressure on Lazare in collaboration with its other creditors; and (iii) the Banks could force Lazare to repay its outstanding obligations despite the loss of the LKI Diamond Proceeds.

11.     As part of legitimate diamond transactions, and in the normal course of business, Lazare consigned some of the LKI Diamonds to its Belgian subsidiary, Lazare Kaplan Belgium N.V. ("LKB"), which in turn consigned the diamonds to two of the Daleyot Entities, DD and KT, for ultimate sale to third parties.  Consistent with established practice in the diamond

4

industry, LKB, under the terms of the consignment, retained title to these diamonds until it received full payment from the consignee.  Lazare financed the purchase of the LKI Diamonds through its own and LKB's credit relationships with the Banks, and purchased certain of such LKI Diamonds using Lazare's KBC-NY account.

12.     Lazare further financed the purchase of other LKI Diamonds through a joint venture with Daleyot known as Gulfdiam DMCC ("Gulfdiam").  Operational control of Gulfdiam was vested in a Daleyot Entity called Mauridiam Investment and Consulting Ltd. ("Mauridiam").  As with the LKI Diamonds consigned by Lazare and LKB, Gulfdiam consigned LKI Diamonds for sale while retaining title to the diamonds until it received full payment.

13.     After taking delivery of the LKI Diamonds, DD, KT and Mauridiam, respectively, were to arrange for the sales of the LKI Diamonds to third-party purchasers so that the proceeds could be used for the benefit of Lazare, LKB and Gulfdiam (including to repay credit facilities held by Lazare, LKB and Gulfdiam used to purchase the LKI Diamonds).  That never happened. More than $135 million in LKI Diamonds vanished.  Lazare, LKB and Gulfdiam realized no economic value from them.

14.     Instead, the Banks and the Daleyot Entities employed the Illegal Scheme and the New York Pooling Account to steal and defraud Lazare, LKB and Gulfdiam out of the LKI Diamond Proceeds and use the LKI Diamond Proceeds to repay the Daleyot Entities' debts to the Banks.

15.     As part of the Illegal Scheme, certain of the Daleyot Entities, with the knowing participation of the Banks, took possession of the LKI Diamonds through various intermediary companies, including other clients of the Banks.  Instead of paying for them, these entities shipped the LKI Diamonds across various jurisdictions from one shell company associated with

5

Daleyot to another.  In so doing, the Banks and the Daleyot Entities disguised the shipments by way of bogus third-party sales to conceal and legitimize the illicit movement of the LKI Diamonds, to prevent Lazare from tracing the movement of the diamonds, and to allow the Daleyot Entities and the Banks to divert and misappropriate the sales proceeds from third-party purchasers for the benefit of themselves.

16.     All sales of the LKI Diamonds were U.S. dollar denominated transactions.  As such, the purloined funds from the sales of the LKI Diamonds were funneled into the New York Pooling Account at KBC-NY and then credited to the Daleyot Entities' outstanding loan balance owed to ADB.  Each and every transfer of LKI Diamond Proceeds into, through and out of the New York Pooling Account constituted violations of United States criminal law, including international transportation of stolen property (18 U.S.C. § 2314), receipt of stolen property in international commerce (18 U.S.C. § 2315), wire fraud (18 U.S.C. § 1343) and/or money laundering (18 U.S.C. § 1956).

17.     The Banks were fully aware that the LKI Diamond Proceeds that they were receiving in New York and misappropriating from the New York Pooling Account belonged, in fact, to Lazare and its affiliates and were being illegally diverted from their rightful owners. Consistent with the practice of diamond industry lenders to keep close watch on their borrowers' high-value and highly-portable inventory, the Banks, which had credit facilities with both Lazare and LKB and the Daleyot Entities, had complete visibility into, continuously monitored, and carefully reviewed detailed documentation concerning the commercial relationship between these parties and their dealings in LKI Diamonds.  As such, the Banks were uniquely positioned to know and understand, and did know and understand, that Lazare and its affiliates retained title

to the LKI Diamond Proceeds that flowed into and through the New York Pooling Account and were misappropriated by the Banks for their own benefit.

18.     In the aggregate, between 2008 and 2010, the Banks, together with Daleyot and the Daleyot Entities, stole and misappropriated more than $135 million worth of LKI Diamond Proceeds.  This amount includes at least $94 million consisting of sales proceeds of Formal Sector LKI Diamonds (as defined below) stolen from Gulfdiam (and Lazare) and at least $42 million consisting of sales proceeds of Informal Sector and Sight Rough LKI Diamonds (as defined below) stolen from Lazare and LKB.

19.     In addition, in 2007 and 2008, the Banks laundered another approximately $70 million in funds belonging to Gulfdiam (and Lazare) that originated with LKI Diamond Proceeds and were looted by Mauridiam and diverted through shell companies controlled by Daleyot for investment in KBC-related real estate investments and for Daleyot's personal benefit.

20.     After converting the LKI Diamonds and LKI Diamond Proceeds and wrongfully using them to pay down the illicit loans they had extended to the Daleyot Entities, the Banks and Daleyot took the Illegal Scheme even further.

21.     In early 2009, Lazare, unaware of the Illegal Scheme, expressed concern to senior officers at the Banks that it had not received from certain Daleyot Entities proceeds from the sales of the LKI Diamonds and that such proceeds, in part, appeared to have been paid by third parties to such Daleyot Entities' accounts at ADB.  Lazare also expressed concern that the Daleyot Entities had impermissibly posted LKI Diamonds as collateral with ADB.  Lazare repeatedly sought to enlist the Banks' assistance and cooperation in investigating what had happened to the LKI Diamonds and LKI Diamond Proceeds.  Among other things, Lazare asked

the Banks to conduct an internal audit or support an independent audit of the relevant books and records of the Daleyot Entities, Lazare and LKB.

22.     Aware of what such an investigation would reveal about their own wrongdoing, the Banks refused Lazare's entreaties to conduct their own audit or investigation and obstructed Lazare's investigation.  The Banks continued to do so even after Lazare presented them with irrefutable evidence of Daleyot's malfeasance, including deliberately falsified invoices from DD to LKB.  More remarkable still, even after Lazare explicitly warned the Banks that they were improperly holding Lazare's property as collateral for their loans to the Daleyot Entities, the Banks continued to misappropriate LKI Diamond Proceeds resulting from the liquidation of that collateral when the proceeds were transferred to the New York Pooling Account.

23.     The Banks tried to intimidate and extort Lazare by threatening Lazare with false and manufactured claims of defaults on Lazare's own (and its subsidiary LKB's) lines of credit if Lazare continued to investigate the Illegal Scheme.  In reality, there was no legitimate basis for any default.  Lazare and LKB had never missed a payment of interest or principal to ADB or any of Lazare's other lenders.  Lazare and LKB's lines of credit would have been fully repaid had the Banks properly applied the stolen LKI Diamond Proceeds to Lazare's and its affiliates' debts instead of intentionally misapplying those funds to the debts of the Daleyot Entities.

24.     In a series of meetings and conversations in New York City and elsewhere between representatives of Lazare and the Banks, the Banks threatened Lazare with an involuntary bankruptcy, urging Lazare's other lenders to join them.  When that did not materialize (due to the refusal of one of Lazare's other lenders to go along with the plan), the Banks then made good on their threats to terminate Lazare's and LKB's credit lines.

8

Termination of their credit lines had devastating effects on Lazare's and LKB's ability to conduct their business — as the Banks knew and intended.

25.     Based on information and documents revealed as a result of a multi-year investigation, Lazare ultimately uncovered the Enterprise and the Illegal Scheme perpetrated by the Banks, Daleyot, and the Daleyot Entities along with their myriad predicate acts of theft, fraud, money laundering and other crimes in violation of U.S. law.

26.     After being protected and defended for years by the Banks, which extended additional credit to certain Daleyot Entities in 2011 and continued to lend them money until 2014, Daleyot fled Belgium and went into hiding in Israel or South Africa.  The principal Daleyot Entities that he and the Banks used to effectuate the Illegal Scheme are now in bankruptcy.

27.     As a direct and proximate result of the Banks' illegal conduct, Lazare: (i) suffered damages from the loss of the LKI Diamonds and LKI Diamond Proceeds; (ii) was deprived of funds needed to finance its ongoing business operations in the United States and around the world; (iii) was unable to obtain new lines of credit from other lenders; (iv) lost critical contracts, markets and funding; (v) was forced to discontinue business lines in major countries of operation; (vi) was unable to file required financial reports with the United States Securities and Exchange Commission ("SEC"); (vii) had its stock delisted from the American Stock Exchange ("AMEX") and deregistered by the SEC; (viii) suffered business interruptions, including the termination and reduction of important operations, dramatic increases in insurance and other costs, and harm to its reputation and business prospects in the United States and elsewhere; (ix) lost its rough diamond sourcing abilities in several jurisdictions; and (x) lost some and had

reduced other of its "Sight" allocations from Diamond Trading Company ("DTC") — the rough

diamond sales and distribution arm of the De Beers Family of Companies ("De Beers").

28.     Lazare now seeks redress under the Racketeer Influenced and Corrupt

Organizations Act ("RICO"), 18 U.S.C. § 1961, *et seq.*, and state law, for these catastrophic

damages to its business and property caused by the Banks' operation of and knowing

participation in the Illegal Scheme.

## JURISDICTION AND VENUE

29.     This Court has subject matter jurisdiction over this action:

(a)     pursuant to 28 U.S.C. § 1331, because claims herein arise under the laws

of the United States, and specifically under RICO, 18 U.S.C. § 1964(c), which vests the federal

courts with jurisdiction over civil actions seeking recovery for violations of 18 U.S.C. § 1962;

(b)     pursuant to 28 U.S.C. § 1332, based on the diversity of the citizenship of

the parties, and the fact that the amount in controversy exceeds $75,000, exclusive of interest and

costs; and

(c)     pursuant to 28 U.S.C. § 1367(a), because state law claims asserted herein

are so related to the claims arising under the laws of the United States that they form part of the

same case or controversy.

30.     This Court has personal jurisdiction over KBC (both in its own right and as

successor-in-interest to ADB):

(a)     because KBC and ADB each maintain offices and do business in New

York;

(b)     pursuant to New York CPLR 301 and 302(a)(1), because KBC and ADB

each do business and transact business within the State and Lazare's causes of action relate to

and arise out of their business within the State; and

(c)      pursuant to CPLR 302(a)(2) and (3), because KBC and ADB each

committed tortious acts (including RICO predicate acts) within the State and without the State

causing injury to person or property within the State.

31.      Venue is proper in the Southern District of New York:

(a)      pursuant to 18 U.S.C. § 1965(a), because KBC and ADB each are found

in, have an agent in, and transact affairs in this district;

(b)      pursuant to 28 U.S.C. § 1391(d), because KBC and ADB each maintain

offices in this district and is a foreign corporation or citizen;

(c)      pursuant to 28 U.S.C. § 1391(a)(3), because KBC and ADB each are

subject to personal jurisdiction in this district and there is no district in which the action may

otherwise be brought; and

(d)      because KBC-NY's Account Agreement and General Terms and

Conditions with Lazare governing Lazare's KBC-NY account mandates that "any claim or

action" that Lazare brings "must be brought before the courts of the County of New York, State

of New York, or the Federal Courts situated in the Southern District of New York." [2]

## PARTIES

32.      **Plaintiff Lazare** is a diamond manufacturing, distribution and trading company

incorporated in Delaware with its principal place of business at 19 West 44th Street, New York,

New York.  Beginning in 1972, Lazare was a public company in the United States whose

common stock was listed on the AMEX.  As the direct result of the unlawful conduct that is the

subject of this complaint, Lazare's common stock was delisted from AMEX on August 11, 2010

and deregistered by the SEC on March 1, 2016.

---

[2] The allegations in Paragraphs 30 and 31 are made as of the time the original complaint in this action was filed in December 2011, prior to ADB's merger by absorption into KBC in 2015.  KBC continues to maintain its branch office, KBC-NY, and remains licensed and regulated by the New York Department of Financial Services.

33.     **Defendant KBC**, upon information and belief, is a Belgium banking corporation that is established and existing under the laws of Belgium with a principal office at Havenlaan 2, Brussels 1080.  KBC is licensed under the New York Banking Law to do business, and is doing business, in New York.  At all relevant times, KBC has maintained a branch office in New York ("KBC-NY") at 1177 Avenue of the Americas (7th Floor), New York, New York.

34.     At all relevant times, KBC was the parent, sole owner, and guarantor of the obligations of ADB, a foreign banking corporation established and existing under the laws of Belgium with a principal office at Pelikaanstraat 54, B-2018, Antwerpen 1, Belgium.

35.     At all relevant times, KBC controlled ADB's Board of Directors, KBC held a majority of seats on ADB's Board, a senior officer of KBC served as the Chairman of the ADB Board, and KBC appointed the management of ADB.

36.     During the relevant period, ADB's commitments and those of its subsidiaries were guaranteed by KBC.  KBC provided a guarantee of capital to ADB, and provided ADB with a line of credit and capital to allow ADB to make loans, and guaranteed repayment of loans made by ADB in excess of ADB's lending limit.

37.     Pursuant to a series of internal KBC group protocols known as the IKB Counterparty Delegations and other agreements, KBC exercised control over ADB's lending operations, including ADB's loans to Lazare, LKB, and DD and KT.  All significant decisions relating to such credit facilities were made by KBC's Extended Credit Committee.

38.     At all relevant times, KBC-NY operated and effectuated all transactions involving the New York Pooling Account on behalf of ADB and ADB's diamond clients.

39.     KBC is the successor-in-interest to ADB, which was absorbed by merger into KBC effective as of January 1, 2015.  Upon information and belief, as a result of that merger, KBC acquired all of ADB's assets and liabilities in accordance with Belgian law.

40.     At all relevant times, ADB was licensed under the New York Banking Law to do business, and was doing business, in New York, and maintained a representative office (*i.e.*, ADB-NY) at the same address as KBC-NY at 1177 Avenue of the Americas (7th Floor), New York, New York.  ADB-NY maintained common office space and shared computer and back office systems with KBC-NY.

41.     ADB, which began servicing the diamond industry in 1934, held itself out to be a specialized bank "focusing exclusively on the diamond and the diamond jewelry sector" and one of the key lenders to the industry.  ADB was intimately familiar with the industry, the identification, tracking of and accounting for various categories of diamonds, the identity of the key companies in the industry and the special banking requirements of the industry.  ADB opened its representative office in New York in or about 1999 as part of a concerted effort by the Banks to target wholesale diamond industry customers in New York, including Lazare.

## THE ENTERPRISE

42.     KBC, KBC-NY, ADB and ADB-NY are all members of the Enterprise referenced herein, and, upon information and belief, each of them knowingly and intentionally directed, facilitated and participated in the Illegal Scheme to steal the LKI Diamonds and LKI Diamond Proceeds, along with other members of the Enterprise as described below.

43.     Daleyot and his affiliated companies referenced herein (*i.e.*, the Daleyot Entities) orchestrated and participated in the theft of the LKI Diamonds and LKI Diamond Proceeds. Daleyot-affiliated members of the Enterprise include:

(a)   **Erez Daleyot ("Daleyot")**, upon information and belief, is a citizen of Israel and Belgium and was a high-profile businessman in the diamond industry.  In addition, upon information and belief:

(i)    During the relevant period, Daleyot managed and/or controlled the business affairs of a web of offshore, tax haven and shell companies, which, under the direction and with the knowledge and participation of the Banks, were used to carry out the Illegal Scheme;

(ii)   Daleyot individually and certain of the Daleyot Entities were major customers of the Banks;

(iii)  on a number of occasions from 2006 through 2008, Daleyot traveled to the United States to transact business, including for the purpose of meeting with Lazare at its offices in New York City in regard to the diamonds at issue herein and in furtherance of the Illegal Scheme;

(iv)   Daleyot is reportedly under investigation by Belgium authorities for money laundering and tax evasion; and

(v)    in or about 2013 or 2014, Daleyot fled Belgium and reportedly was hiding out in Israel or South Africa, having left behind massive debts, including to Lazare.

(b)   **DDM Holding CVA ("DDMH")**, upon information and belief, is a Belgian shell company, created in 2007.  In addition, upon information and belief, DDMH had a U.S. dollar account at ADB, and all U.S. dollar transactions for that account were executed by KBC-NY and the relevant funds were debited and credited to the New York Pooling Account at KBC-NY.  In addition, upon information and belief:

(i)    the Banks and Daleyot used DDMH to effectuate the Illegal Scheme, and particularly as a conduit to channel and launder, from Mauridiam back to ADB, LKI Diamond Proceeds stolen from Gulfdiam (and ultimately Lazare); and

(ii)   DDMH has been declared bankrupt.

(c)   **D.D. Manufacturing N.V. ("DD") and KT Collection BVBA ("KT" and together "DD/KT")**, upon information and belief, are closely affiliated Belgian

14

corporations under the common management and control of Daleyot.  In addition, upon

information and belief:

> (i)    DD and KT:  (1) were diamond wholesalers and manufacturers that
> purchased rough diamonds from diamond producers and have cutting
> and polishing facilities worldwide; (2) financed their business
> operations, in part, through U.S. dollar loans from ADB and other
> lenders, which were personally guaranteed by Daleyot and his wife; (3)
> were holders of U.S. dollar accounts at ADB, and all U.S. dollar
> transactions for these accounts were executed by KBC-NY and the
> relevant funds were debited and credited to the New York Pooling
> Account at KBC-NY, including LKI Diamond Proceeds that were
> diverted and misappropriated by the Enterprise; and (4) both purchased
> and sold diamonds in the United States during the relevant time period;

> (ii)   DD and KT were used by the Banks in effectuating the Illegal Scheme,
> and, in particular, served as a conduit for the theft of the LKI Diamonds
> and LKI Diamond Proceeds, and for money laundering; and

> (iii)  DD and KT have been declared bankrupt.

(d)    **D.K.T. Diamonds Ltd. ("DKT")**, upon information and belief, is an

Israeli shell company.  DKT has only one shareholder, ILDIA Holdings Ltd., an Israeli company,

which in turn has one shareholder, Equalia Services Trust Reg. Vaduz, a Liechtenstein entity

registered by Mossack Fonseca, the law firm at the center of the so-called "Panama Papers"

controversy involving the use of shell corporations for illegal purposes.  In addition, upon

information and belief:

> (i)    the Banks and Daleyot used DKT to effectuate the Illegal Scheme, and
> particularly as a conduit to divert at least $20 million consisting, at least
> in part, of LKI Diamond Proceeds to KBC-NY, where such proceeds
> were credited to the New York Pooling Account and then applied in
> satisfaction of debts owed by the Daleyot Entities to ADB.

(e)    **E.D. Gems Ltd. (f/k/a F.T.D. Diamonds Ltd.) ("ED/FTD")**, upon

information and belief, is an Israeli company engaged in the business of buying and selling

diamonds.  In addition, upon information and belief:

(i)     ED/FTD is a wholly-owned subsidiary of the Daleyot owned and controlled company Mauridiam, which was utilized by the Banks and the Daleyot Entities as a conduit to divert the U.S. dollar LKI Diamond Proceeds away from Gulfdiam (and Lazare) directly to KBC-NY and the New York Pooling Account; and

(ii)    ED/FTD was involved in the purchase and sale in U.S. dollars of the diamonds stolen from Lazare, and was utilized by the Banks to facilitate the misappropriation of at least $94 million of the LKI Diamond Proceeds.

(f)     **Raphael Fass ("Fass")**, upon information and belief, is a long-time business associate of Daleyot.  In addition, upon information and belief:

(i)     Fass was the Chief Financial Officer responsible for managing the day-to-day affairs of Gulfdiam, DD, KT, Mauridiam, Gemport, ED/FTD and other Daleyot-related companies; and

(ii)    Fass was a shareholder in Daleyot-related companies, including DDMH.

(g)     **Gemport DMCC ("Gemport")**, upon information and belief, is a wholly owned Dubai subsidiary of Mauridiam, which in turn is owned and controlled by Daleyot.  In addition, upon information and belief:

(i)     the Banks and Daleyot used Gemport to effectuate the Illegal Scheme, and particularly as a conduit for the theft of the LKI Diamonds and U.S. dollar LKI Diamond Proceeds and for money laundering.

(h)     **Hatilem Enterprises Ltd. ("Hatilem")**, upon information and belief, is a Cyprus-based company, and is believed to invest in Central and Eastern European real estate.  In addition, upon information and belief:

(i)     the Banks and Daleyot used Hatilem to effectuate the Illegal Scheme, and particularly as a conduit for the Banks to channel and launder, including through the New York Pooling Account, from Mauridiam back to ADB, LKI Diamond Proceeds stolen from Gulfdiam (and Lazare).

(i)     **IL Investment Trust ("IL Investment Trust")**, upon information and belief, is a British Virgin Islands irrevocable discretionary trust created by Daleyot that was used

16

for, among other things, making illicit U.S. dollar payments and bribes to senior officers of the Banks to aid and abet the movement of the stolen LKI Diamonds and U.S. dollar LKI Diamond Proceeds.  In addition, upon information and belief, Pierre De Bosscher, the former Chief Executive Officer of ADB, is a beneficiary of the Il Investment Trust.

       (j)    **Kertalor Holding, N.V. ("Kertalor")**, upon information and belief, is a Belgian shell company.  In addition, upon information and belief:

       (i)    Daleyot is the President and Managing Director of Kertalor.  Daleyot and the Banks used Kertalor to effectuate the Illegal Scheme, and particularly as a conduit for the theft of the LKI Diamond Proceeds;

       (ii)    Kertalor maintained a U.S. dollar account at ADB and all U.S. dollar transactions for that account were executed by KBC-NY and the relevant funds were debited and credited to the New York Pooling Account at KBC-NY; and

       (iii)    Kertalor has been declared bankrupt.

       (k)    **Mauridiam Investment and Consulting Ltd. ("Mauridiam")**, upon information and belief, is a company incorporated in Mauritius.  In addition, upon information and belief:

       (i)    Mauridiam is 97% owned, managed and controlled by Daleyot, and served as the controlling shareholder of Gulfdiam, Gemport and ED/FTD at all relevant times; and

       (ii)    Daleyot and the Banks used Mauridiam to effectuate the Illegal Scheme, and in particular to funnel into KBC-NY and the New York Pooling Account the stolen LKI Diamond Proceeds.

    44.    Other members of the Enterprise include the following executives of the Banks, who knowingly and intentionally facilitated and participated in the Illegal Scheme:

       (l)    **Pierre De Bosscher ("De Bosscher")**, upon information and belief, was the Chief Executive Officer, Board Member, and a Managing Director of ADB at all relevant times.  In addition, upon information and belief:

(i)      De Bosscher was intimately familiar with the financial dealings of Daleyot and his companies;

(ii)      De Bosscher reported directly to Luc Gijsens at KBC;

(iii)     at all relevant times, De Bosscher's actions detailed herein were within the scope of his employment and served the interests of the Banks; and

(iv)     De Bosscher took and accepted payments and bribes from Daleyot.

(m)     **Luc Gijsens ("Gijsens")**, upon information and belief, was a member of the Executive Committee and Chief Executive Officer of the Merchant Banking business unit of KBC.  In addition, upon information and belief:

(i)      at all relevant times, Gijsens headed KBC's group in charge of Central and Eastern European real estate transactions, and simultaneously served on ADB's Board of Directors, including as Chairman;

(ii)      during the relevant period, Gijsens was a member of the KBC Extended Credit Committee that had decision-making authority over loans made by ADB to Lazare, LKB, DD and KT;

(iii)     at all relevant times, Gijsens's actions detailed herein were within the scope of his employment and served the interests of the Banks; and

(iv)     Gijsens took and accepted payments and bribes from Daleyot.

(n)     **Guy Snoeks ("Snoeks")**, upon information and belief, at all relevant times, was a Managing Director of ADB.  In addition, upon information and belief:

(i)      Snoeks held a senior position at KBC before joining ADB;

(ii)      in 2011, Snoeks was transferred from ADB back to KBC, and has been responsible for winding down ADB's operations;

(iii)     Snoeks was intimately familiar with the financial dealings of Daleyot and his companies; and

(iv)     at all relevant times, Snoeks' actions detailed herein were within the scope of his employment and served the interests of the Banks.

18

## MEANS AND METHODS OF THE ENTERPRISE

45.     Among the means and methods by which the Banks, Daleyot, the Daleyot Entities and the other Enterprise Members would and did operate, manage and conduct the affairs of the Enterprise and its racketeering activity were the following:

46.     The Enterprise created and utilized shell companies to serve as conduits for and to conceal the theft, movement and diversion of (i) LKI Diamonds and LKI Diamond Proceeds; and (ii) funds drawn down from DD's and KT's credit facility at ADB for use in Central and Eastern European real estate projects and for acquisition of luxury items.

47.     The Enterprise opened and utilized U.S. dollar bank accounts at the Banks and elsewhere on behalf of Daleyot Entities to promote the Enterprise's commission of violations of U.S. law and conceal and disguise the proceeds of the Enterprise's violations of U.S. law by funneling and laundering funds through the U.S. banking system.

48.     The Enterprise utilized offshore companies and the U.S. banking system for the payment of bribes to senior officers of the Banks.

49.     The Enterprise utilized the New York Pooling Account to funnel and launder stolen LKI Diamond Proceeds belonging to Lazare and its affiliates and conduct other U.S. dollar transactions relating to the Illegal Scheme.

(a)     The New York Pooling Account was a U.S. dollar denominated bank account that was used as a centralized bank account for all U.S. dollar denominated funds transferred or received on behalf of ADB's customers worldwide, whether or not the transactions had a diamond-related purpose, including DD/KT and Daleyot shell companies with accounts at ADB.

19

(b)     The New York Pooling Account was created pursuant to an Agreement With Respect to the Delivery of Operational Banking Services dated as of October 15, 1999 between ADB and KBC-NY (the "Services Agreement").  The purpose of the Services Agreement was for KBC-NY to effectuate, through the New York Pooling Account, local and international payments and other banking services specifically on behalf of ADB's "diamond clients" worldwide.  Pursuant to the Services Agreement, the New York Pooling Account was not a correspondent or clearing account.

(c)     Pursuant to the Services Agreement, among other things, KBC-NY accepted all payment orders from ADB's diamond clients, and accepted and registered all incoming funds in favor of ADB's diamond clients, which were then credited to the New York Pooling Account.  KBC-NY informed ADB by informational Swift message of each outgoing or incoming transfer of funds.  ADB then made the corresponding debit or credit to the diamond customer's account in its books.

(d)     The Services Agreement further provided for KBC-NY to follow the available credit of ADB's diamond clients so that it would know whether to process a payment order.  KBC-NY was thus aware of ADB's diamond clients and the status of their credit facilities.

(e)     Upon information and belief, KBC and ADB took steps to conceal the existence of the New York Pooling Account, including in prior proceedings in this litigation.

## **FACTUAL BACKGROUND**

### I.     **Lazare's Business and Dealings With the Daleyot Entities and the Banks**

50.     For more than 110 years, Lazare has been engaged in the buying and selling of "rough diamonds" (*i.e.*, natural, unpolished diamonds) and the cutting, polishing and selling of branded and non-branded (or commercial) diamonds and jewelry.

51.     The LKI Diamonds were rough diamonds.  The LKI Diamonds came from three separate sources:  (i) industrial scale mines in Angola, known as the "Formal Sector;" (ii) local, government licensed, artisanal miners in Angola, known as the "Informal Sector;" and (iii) elsewhere in the world (the "Sight Rough") acquired directly from DTC, the rough diamond sales and distribution arm of De Beers.[3]

52.     For many years, Lazare sold Informal Sector and Sight Rough diamonds through certain Daleyot Entities, including DD and KT.  Lazare consigned diamonds to LKB, which in turn consigned diamonds to DD and KT.

53.     These consignments were made by Lazare and LKB with full reservation of title, as is standard in the industry.  In other words, the diamonds were delivered to DD and KT pursuant to written consignment agreements, with ownership of and title to the diamonds remaining vested in the consignor, unless and until DD and KT remitted full payment for the diamonds.  LKB's invoices to DD and KT specifically reflected the parties' agreement that "the property of the merchandise referred to *will only be transferred to the buyer after full payment of the invoice*."

54.     Beginning in or about 2006, Lazare also participated as a joint venture partner with Daleyot in Gulfdiam, which sourced and sold Formal Sector diamonds.  Gulfdiam was established pursuant to a Dubai Trading Shareholders Agreement, dated May 16, 2006, and was owned 45% by Mauridiam, a Daleyot Entity, 30% by Lazare's subsidiary, Serenity 2 Ltd. ("Serenity"), and 25% by a third party.

55.     Through Mauridiam, Daleyot and his business associate Fass managed the day-to-day affairs of Gulfdiam.  Lazare, which was not involved in Gulfdiam's day-to-day sales or

---

[3] DTC is the world's largest supplier (by value) of rough diamonds.  DTC supplies De Beers rough diamonds on a contract basis to "DTC Sightholders" (*i.e.*, a select group of companies that are authorized bulk purchasers of rough diamonds).  Lazare was a DTC Sightholder.

administration, helped finance the venture, guaranteeing payment of a portion of a credit facility that Gulfdiam obtained from ABN-AMRO to purchase diamonds.

56.     After Gulfdiam purchased the diamonds, it invoiced them to, among others, Gemport, a Daleyot Entity, for sale to third parties for Gulfdiam's benefit, on the express condition that "until full receipt of payment of this document the mentioned merchandise will be considered *in consignment and remain our exclusive property*."

57.     In December 2000, Lazare and ADB agreed to a $10 million working capital line of credit (the "Lazare Credit Facility").  ADB executives came to New York to solicit Lazare to enter into the Lazare Credit Facility as part of ADB's expansion into the New York market, as reflected by the opening of the ADB-NY representative office in 1999.  The Lazare Credit Facility was negotiated in New York, where all of Lazare's senior management is located, and by its terms is governed by New York law.

58.     Over time, the Lazare Credit Facility grew to permit Lazare to borrow up to $45 million on an unsecured basis.  Lazare renewed its $45 million credit facility with ADB in New York on February 20, 2008.

59.     Lazare's Belgian subsidiary, LKB, also maintained a $25 million credit facility with ADB (the "LKB Credit Facility").  At all relevant times Lazare was a guarantor of the LKB Credit Facility.

60.     In connection with the Lazare Credit Facility, the Banks required Lazare to maintain a bank account at KBC-NY (*i.e.*, the Lazare KBC-NY Account).  On May 31, 2001, Lazare entered into a written agreement in New York with ADB and KBC (the "May 31, 2001 Agreement"), which required that all disbursements and payments under the Lazare Credit Facility be effectuated through the Lazare KBC-NY Account.  That agreement, which KBC-NY

required as part of its account opening process, also provided that KBC and ADB could fully exchange all information concerning Lazare.

61.     From 2001 to 2010, pursuant to the May 31, 2001 Agreement, KBC-NY exclusively funded and administered all disbursements for and payments by or on behalf of Lazare under the Lazare Credit Facility via the Lazare KBC-NY Account in New York, all of which were in U.S. dollars.  The value of such transactions exceeded $2 billion.

62.     The Lazare Credit Facility was serviced and administered primarily by bank personnel located at KBC-NY and ADB-NY.

63.     During the relevant period, Lazare, in order to purchase rough diamonds (including certain of the LKI Diamonds), drew on its Credit Facility by submitting transfer requests to KBC-NY.  KBC-NY executed Lazare's transfer requests and paid third parties for the diamonds pursuant to Lazare's requests from the Lazare KBC-NY Account in New York.

64.     Lazare received funds representing proceeds of diamond sales into the Lazare KBC-NY Account, including proceeds from sales of diamonds consigned to DD and KT, which Lazare used to pay down the Lazare Credit Facility.

65.     Before becoming aware of the Illegal Scheme and the conspiracy between the Banks and the Daleyot Entities, Lazare used the Lazare Credit Facility and the Lazare KBC-NY Account in the manner described above to purchase some of the very LKI Diamonds at issue here, which were then consigned to DD and KT.

II.     **The Banks' Illicit Relationship with Daleyot and the Daleyot Entities**

66.     Between 2006 and 2008, ADB, with the approval and at the direction of KBC, extended to DD and KT a $120 million credit facility, ostensibly to finance DD's and KT's diamond transactions (the "DD/KT Credit Facility").

67.     This level of credit granted to DD and KT was irresponsibly high in comparison to the published net capital of ADB (which, according to ADB's public filings, was approximately €200 million) and, upon information and belief, violated internal bank rules designed to prevent such a high concentration of risk in one client.  As of 2008, the outstanding amount owed under the DD/KT Credit Facility was approximately $118 million or approximately half of ADB's total capital.  Because of the size of the DD/KT Credit Facility, KBC guaranteed DD's and KT's repayment obligations to ADB.

68.     The DD/KT Credit Facility specified that funds were to be drawn down for diamond-related purposes.  Borrowings for other purposes required the "explicit consent" of ADB and KBC.  Before the financial crisis of 2008, the Banks orchestrated, approved and facilitated borrowings under the DD/KT Credit Facility of large sums that were not to be used in DD's or KT's business — diamond buying and selling — but rather were intended to fund speculative investments by other Daleyot Entities in Central and Eastern European real estate projects in which KBC had an interest and to fund purchases of extravagant, luxury items, including private airplanes, a yacht and works of fine art.  These non-diamond-related borrowings were unsecured.

69.     When the financial crisis came to a head in 2008, the Daleyot Entities' debts to ADB became unsustainable.  Because the Banks had orchestrated the diversion of so much money into illiquid and unprofitable non-diamond investments and had siphoned so much money out of the credit line for extravagant luxury purchases – all on an unsecured basis – the Banks recognized that Daleyot's diamond companies lacked the means to meet their debt obligations.

70.     These illicit banking transactions used to divert significant funds to non-diamond-related activities and the Daleyot Entities' inability to repay the DD/KT Credit Facility with

ADB (guaranteed by KBC), described in more detail below, provide a compelling motive for the thefts of LKI Diamonds and LKI Diamond Proceeds described herein.

**A.    Daleyot's Borrowings Under the DD/KT Credit Facility for Central and Eastern European Real Estate Transactions in Which KBC Had an Interest**

71.    Although ADB held itself out as a specialized bank focusing exclusively on the diamond industry, the Banks and Daleyot used the DD/KT Credit Facility at ADB to plow tens of millions of dollars into speculative real estate transactions in Central and Eastern Europe.

72.    One of KBC's main lines of business during the relevant time period was serving as a lender and/or financial advisor for real estate transactions in Central and Eastern Europe. Upon information and belief, KBC received millions of dollars in fees and interest payments relating to these transactions.

73.    Upon information and belief, the Banks in collusion with DD and KT utilized a sham corporate structure and the money laundering technique known as layering in order to surreptitiously divert and obscure enormous amounts of unsecured borrowings under the DD/KT Credit Facility for use in illiquid and speculative real estate transactions for which KBC or its subsidiaries served as a financial advisor and/or lender. KBC and ADB orchestrated, facilitated, and explicitly consented to each of the borrowings under the DD/KT Credit Facility for this purpose and the ensuing money movements.

74.    First, funds borrowed via the DD/KT Credit Facility at ADB were funneled to another account at ADB in the name of DDMH, a Daleyot-affiliated non-diamond shell entity created in 2007. DDMH then acted as a conduit to funnel the same funds, on the same day, to Swiss bank accounts for offshore companies or to another ADB account held by a Daleyot-affiliated shell company. Through this circuitous and opaque route, the Banks and Daleyot

diverted funds that were purportedly for use in diamond transactions into KBC-related real estate projects.

75.    To the extent these money movements were in U.S. dollars, the transfers were executed by KBC-NY through the New York Pooling Account maintained by ADB.

76.    For example, from January to September 2007, at least $8.2 million in funds ostensibly for use in the diamond industry were improperly transferred through DD and DDMH accounts at ADB to a Swiss account for Hatilem, a Cyprus-based company, for investment in KBC-related Central and Eastern European real estate projects through a company known as "Longbridge," which is owned by Hatilem.

77.    Upon information and belief, Kredyt Bank, an 80% subsidiary of KBC in Poland, was also serving as a lender to Longbridge at that time.  Kredyt Bank's headquarters are located in "Chorzowska 50," an office building in Katowice, Poland that was developed by Longbridge.

78.    Specifically, and to illustrate the flow of funds:

> (a)    on January 31, 2007, ADB, on behalf of DD, channeled $3 million to DDMH's account at ADB;
>
> (b)    the same day, January 31, 2007, KBC-NY, on behalf of DDMH, channeled the same $3 million through the New York Pooling Account to the Credit Suisse (Zurich) account of Hatilem;
>
> (c)    on February 9, 2007, ADB, on behalf of DD, channeled $2 million to DDMH's account at ADB;
>
> (d)    the same day, February 9, 2007, KBC-NY, on behalf of DDMH, channeled the same $2 million through the New York Pooling Account to the Credit Suisse (Zurich) account of Hatilem;
>
> (e)    on July 2, 2007, ADB, on behalf of DD, channeled $1.5 million to DDMH's account at ADB;
>
> (f)    the same day, July 2, 2007, KBC-NY, on behalf of DDMH, channeled the same $1.5 million through the New York Pooling Account to the Credit Suisse (Zurich) account of Hatilem;

(g)    on September 11, 2007, ADB, on behalf of DD, channeled $1.7 million to DDMH's account at ADB; and

(h)    the same day, September 11, 2007, KBC-NY, on behalf of DDMH, channeled the same $1.7 million through the New York Pooling Account to the Credit Suisse (Zurich) account of Hatilem.

79.    Similarly, from May 2007 through February 2008, the Banks channeled approximately $20.5 million ostensibly loaned to DD and KT for use in the diamond industry to DDMH's account at ADB and then through the ADB account for Kertalor, another Daleyot shell company, and then on to accounts for Olimpia Euro Construction B.V. ("Olimpia") and Olimpia (Kiev), which both invested in KBC-related real estate projects.  These transfers were routed through these companies and accounts in the same layered and circuitous route described above (*e.g.*, on May 10, 2007, ADB, on behalf of DD, channeled €5.8 million (approximately $7.9 million) to DDMH's account at ADB, which funds were then channeled on the same date from DDMH's account at ADB to Kertalor's account at ADB, which funds were then channeled again on the same date from Kertalor's account at ADB to an account for Olimpia at Bank Leumi (U.K.)).

80.    Upon information and belief, the reason for the diversion of these funds is that KBC had a significant financial interest in the well-being of its clients Olimpia Real Estate Holdings Ltd. ("Olimpia RE"), an Israeli company, and that company's subsidiaries, Olimpia and Nanette Real Estate N.V. ("Nanette").  At the same time that ADB and Daleyot were improperly channeling funds into Olimpia, KBC Peel Hunt (at that time a subsidiary of KBC) was serving as an advisor to Olimpia RE.  KBC Peel Hunt also served as a "liquidity provider" for Nanette.

81.     Daleyot similarly had significant debt and equity investment in, and exposure to, Olimpia and Nannette.  Moreover, an original shareholder in Nanette was The Equalia Group ("Equalia Group"), a Daleyot-affiliated Swiss entity.

82.     The Banks, together with Daleyot, used DDMH to channel funds borrowed ostensibly for diamond transactions to Swiss bank accounts for two other offshore companies involved in Eastern European real estate projects in which, upon information and belief, KBC had a financial interest:

(a)     On March 1, 2007, ADB, on behalf of KT, channeled €2.5 million (approximately $3.2 million) to DDMH's account.  On the same day, ADB, on behalf of DDMH, channeled €2.5 million (approximately $3.2 million) to an account at Credit Suisse (Zurich) for Riverton Trading, a Cyprus-based company; and

(b)     Between April 5, 2007 and May 15, 2008, ADB, on behalf of DD and KT, channeled €8.9 million (approximately $12.3 million) to DDMH's account.  ADB, on behalf of DDMH, immediately transferred all of those same funds to an account at Credit Suisse (Zurich) for M.L.A.Z. Finance Management Ltd., another Cyprus-based company.

83.     The Banks and the Daleyot Entities all shared a common interest in investing in such Central and Eastern European real estate projects.  Accordingly, the Banks and the Daleyot Entities had a common interest in funneling non-diamond-related borrowings out of ADB into the real estate projects of KBC clients Olimpia, Longbridge and Olimpia (Kiev).

**B.     Daleyot's Borrowings Under the DD/KT Credit Facility for Private Airplanes, A Yacht, Fine Art and Other Personal Luxury Items**

84.     In addition to using the DD/KT Credit Facility to funnel money through DDMH to support KBC's Central and Eastern European real estate projects, the Banks, together with Daleyot, improperly used the DD/KT Credit Facility and the ADB accounts of DD and DDMH for other non-diamond-related purposes, including to fund Daleyot's purchases of private planes,

a yacht, fine art and home improvements.  KBC and ADB explicitly consented to these non-diamond-related drawdowns.

85.     The scheme for diverting funds (purportedly for diamond-related business) from ADB through DDMH and on to EKT Air Services Ltd. ("EKT") (a Cyprus non-diamond company and wholly-owned subsidiary of DDMH) was similar to the scheme used to divert funds through DDMH to Riverton and MLAZ and to Hatilem and Kertalor and then on to Olimpia, Longbridge, and Olimpia (Kiev).

86.     Between July 2007 and January 2008, at least $15.2 million in funds ostensibly for use in the diamond industry were funneled from the DD/KT Credit Facility for the purpose of buying luxury items.  There were eight series of such transfers during this period, all of which followed the same highly suspicious pattern indicative of money laundering:  same-day (or occasionally next-day) transfers in the same amount, first from either DD or KT's account at ADB, then to the ADB account of DDMH, and then, through the New York Pooling Account at KBC-NY, to an account for EKT at Credit Suisse (Genève).

87.     These credit borrowings and funds transfers were specifically approved and executed by ADB and KBC to enable Daleyot to purchase and/or lease, among other things, private airplanes and a yacht.  For example, in or about October 2007, EKT purchased a $48,750,000 airplane from Bombardier, Inc. with the first two payments totaling $2,500,000 due by the end of the year.  In addition, in or about March and April 2008, EKT negotiated for the purchase of a $59,500,000 aircraft from Gulfstream Aerospace Corporation, and paid Gulfstream a $500,000 deposit.  In or about April 2008, EKT negotiated for the purchase of a yacht from SNP Boat Service S.A. at a purchase price of €27,000,000.

88.     In addition, upon information and belief, the Banks facilitated and explicitly consented to personal borrowings by Daleyot of approximately $36 million under the DD/KT Credit Facility.  KBC-NY made U.S. dollar payments directly on Daleyot's behalf from the New York Pooling Account to auction houses, art galleries, home construction companies and other providers of personal luxury items contracted for by Daleyot.

89.     During the January through July 2008 period alone (leading up to the global financial crisis), payments made through the New York Pooling Account for Daleyot's purchases of fine art totaled approximately $13.5 million.

90.     DD and KT, of course, remained in debt to ADB under the DD/KT Credit Facility that was used to borrow the funds funneled for these purchases of luxury items for Daleyot as well as for investment in Central and Eastern European real estate.

91.     The effect of the above detailed transactions was to: (i) extract money from Daleyot's heavily leveraged diamond businesses on the eve of the global financial crisis and economic recession while enabling the Banks to earn huge profits from interest and fees; (ii) loot DD and KT of assets and thereby undermine their ability to repay Lazare and other creditors; (iii) maintain and prioritize ADB's security interests via Daleyot's personal guarantee to ADB; (iv) create significant indebtedness of DD and KT to ADB that was not secured by diamonds, diamond proceeds or other assets; and (v) incentivize the Banks and Daleyot to locate another source of cash to satisfy the outsized obligations of DD and KT (guaranteed by KBC) to ADB.

### C.     <u>Daleyot's Bribery of Senior ADB and KBC Officers</u>

92.     Upon information and belief, including information provided by witnesses, Daleyot paid bribes to senior executives of ADB and KBC during the relevant period.

93.     Upon information and belief, Daleyot made payments to Pierre De Bosscher, ADB's Chief Executive Officer, and Luc Gijsens, KBC's Chief Executive Officer for Merchant

Banking, through offshore structures and financing arrangements related to Daleyot's business interests, including investments in Central or Eastern European real estate.

94.     Upon information and belief, Daleyot's bribes to De Bosscher include a financial interest held by De Bosscher in or through IL Investment Trust, a British Virgin Islands company created by Daleyot that maintained one or more Swiss bank accounts at HSBC (Genève).

95.     Upon information and belief, other senior ADB executives maintained accounts at HSBC (Genève), which were managed by the same HSBC official that handled Daleyot's accounts at the bank.  Together with Daleyot, ADB executives also, upon information and belief, were beneficiaries of offshore entities that maintained accounts at HSBC (Genève).

96.     In addition, upon information and belief, Daleyot bribed ADB executives by paying for expensive vacations for them and providing them with cash, vintage wine and other lavish gifts.

97.     Upon information and belief, Daleyot's bribes to ADB and KBC officers were intended to, and did, induce those executives to knowingly participate in the Illegal Scheme to steal LKI Diamonds and LKI Diamond Proceeds and to obstruct Lazare's efforts to investigate and recover the property to which it was rightfully entitled.

III.    **The Banks and the Daleyot Entities Siphon Off Formal Sector LKI Diamond Proceeds for Central and Eastern European Investments and Personal Loans to Daleyot**

98.     During the period from October 2007 through August 2008, Daleyot Entity Gemport transferred to Mauridiam approximately $70 million in funds originating from the sale of Formal Sector diamonds (the "Formal Sector LKI Diamonds") that had been sold on behalf of the Gulfdiam venture.  These funds should have been injected back into Gulfdiam and used for the benefit of all the venture partners, including Lazare.  Instead, these funds were diverted and laundered by Mauridiam and the Banks to further support the KBC-related Central and Eastern

31

European real estate investments made by Daleyot Entities and as a source of cash for Daleyot personally.

99.     These funds fell into three categories:  (i) $15 million diverted by Mauridiam to DD's account at ADB; (ii) approximately $30 million diverted from Mauridiam through Hatilem and then to DD's account at ADB; and (iii) approximately $24 million diverted to Olimpia via an entity known as Pentolon Trading Limited ("Pentolon"), which maintained a U.S. dollar account at Credit Suisse (Zurich).

100.    On June 6, June 26 and August 4, 2008, KBC and ADB and Daleyot orchestrated a transfer of $15 million via three $5 million transfers from Mauridiam, ostensibly as "loans from Mauridiam to Daleyot."[4]  Mauridiam, working in concert with KBC and ADB, transferred these funds to ADB from its account at the Barclays Bank in Mauritius.

101.    These transfers were executed in U.S. dollars by KBC-NY, and deposited into the New York Pooling Account for the benefit of DD and credited to DD's account at ADB.

102.    The effect of these transfers was to launder through the U.S. banking system $15 million of ill-gotten proceeds held in Mauritius.  KBC and ADB were essential and knowing participants in this scheme to divert and launder $15 million from Gulfdiam via Mauridiam to KBC-NY where it was deposited into the New York Pooling Account and credited to DD's outstanding debt to the Banks.

103.    Mauridiam, through its control over Gulfdiam and at KBC and ADB's direction, also took $30 million in funds belonging to Gulfdiam (and ultimately Lazare) and transferred such funds to Hatilem.

---

[4] The "loans" from Mauridiam to Daleyot included provisions stating "[t]he loan shall be interest free" and "[t]he loan will be unsecured."

104.    Upon information and belief, at the direction of KBC and ADB and the Daleyot

Entities, Mauridiam made the following transfers to Hatilem on the following dates:

| Date of Transfer From Mauridiam (Barclays Bank PLC Mauritius Account Number ***7383) | Amount Transferred To Hatilem (Credit Suisse (Zurich) Account Number *********1082) |
|---|---|
| October 21, 2007 | $ 4,000,000.00 |
| December 19, 2007 | $ 3,250,000.00 |
| March 25, 2008 | $ 2,500,000.00 |
| April 11, 2008 | $ 3,000,000.00 |
| April 21, 2008 | $11,000,000.00 |
| May 27, 2008 | $ 4,200,000.00 |
| August 4, 2008 | $ 2,513,508.00 |
| Total | $30,463,508.00 |

105.    From Hatilem, $30 million of funds quickly traveled back to the New York

Pooling Account for the benefit of DDMH's account at ADB and then to DD's account at ADB.[5]

106.    Those funds were then applied to reduce DD/KT's debts to ADB despite the fact

that, upon information and belief, KBC and ADB knew such funds belonged to Gulfdiam and

Lazare.

107.    Upon information and belief, the Banks caused Mauridiam (the 45% owner of

Gulfdiam) to transfer $30 million first to Hatilem and then (through the New York Pooling

Account to DDMH's account at ADB) to DD's account at ADB in order to:  (i) give the false

appearance that such funds were the legitimate return on the loans previously made by ADB to

DD/KT; (ii) disguise the fact that such funds were actually stolen proceeds from the sales of the

LKI Diamonds; and (iii) use such funds to reduce the Banks' exposure to the Daleyot Entities

and facilitate the reinvestment of such funds in KBC-related real estate projects.

---

[5] In addition, $0.4 million transferred from Hatilem to DDMH was converted from U.S. dollars to Euros and then transferred from Hatilem to MLAZ.

108.    In other words, KBC — having already developed an effective route that obscured the movement of funds drawn from the DD/KT Credit Facility at ADB through DDMH and Hatilem into KBC-related real estate projects — simply used the same obscure route in reverse to send siphoned off, ill-gotten cash stolen by Mauridiam from Gulfdiam (and Lazare) back through the New York Pooling Account for it to be credited against DD's outstanding debt to the Banks.

109.    Mauridiam, through its control over Gulfdiam, and at the Banks' direction, also took funds belonging to Gulfdiam and transferred such funds to Pentolon, which then invested those funds in Olimpia.

110.    Upon information and belief, at the direction of KBC, Mauridiam made the following transfers to Pentolon on the following dates:

| Date of Transfer From Mauridiam (Barclays Bank PLC Mauritius Account Number ***7383) | Amount Transferred To Pentolon Trading Limited (Credit Suisse (Zurich) Account Number ****-****82-82) |
| --- | --- |
| November 20, 2007 | $7,100,000.00 |
| November 23, 2007 | $16,650,000.00 |
| Total | $23,750,000.00 |

111.    Upon information and belief, KBC caused Mauridiam to transfer this $23.75 million to Pentolon in order to further transfer such funds into KBC-related real estate projects.

112.    The ongoing and systematic scheme to divert funds from Gulfdiam (and Lazare), via Mauridiam, into real estate projects, and to funnel $45 million from Gulfdiam, via Mauridiam, (*i.e.*, $15 million directly and $30 million indirectly) to ADB, provided the Enterprise with a proven, secretive structure within which to conduct the Illegal Scheme.

34

113.     But for the onset of the worldwide financial crisis, which exposed the Daleyot Entities' financial fragility and revealed the Banks' improper dealings, the Illegal Scheme may have continued undetected.

114.     As of the end of 2010, according to an auditor's confirmation letter, Mauridiam still had a $71 million unpaid debt to Gemport, representing LKI Diamond Proceeds diverted from Gulfdiam into Gemport and then over to Mauridiam (and ultimately to benefit the Banks) in connection with the above referenced scheme.

115.     Because Mauridiam never repaid Gemport, Gemport never paid Gulfdiam, and Lazare was deprived of its economic interest in Gulfdiam.  That money instead went to ADB and to KBC-related real estate projects.

116.     The transfer, receipt, and misapplication of funds belonging to Gulfdiam (and Lazare) through, to, in and from the New York Pooling Account as described above constituted the crimes of international transportation of stolen property (18 U.S.C. § 2314), receipt of stolen property in international commerce (18 U.S.C. § 2315), wire fraud (18 U.S.C. § 1343) and money laundering (18 U.S.C. § 1956) on the part of the Banks and Daleyot members of the Enterprise.

## IV.   The Banks and the Daleyot Entities Steal the LKI Diamonds and LKI Diamond Proceeds in Order to Repay the Daleyot Entities' Loans to the Banks

### A.   The Daleyot Entities' Potential Defaults Arising from the Financial Crisis

117.     In 2008, a series of events led to the worldwide financial crisis, a severe downturn in the diamond industry, widespread illiquidity in markets, and the massive devaluation of Central and Eastern European real estate and luxury assets such as private airplanes, yachts and fine art.

118.     These events had a devastating impact on the value of the real estate investments and other assets purchased by Daleyot and the Daleyot Entities with funds borrowed under the DD/KT Credit Facility.  For example, in late December 2008, in the midst of the global financial crisis, the outstanding bonds of both Olimpia RE and Nanette were downgraded and their share price plummeted by more than 70%.

119.     As a result, Hatilem, Kertalor, MLAZ, Riverton and EKT could not repay DDMH, and DDMH therefore was not able to repay DD and KT.

120.     Accordingly, DD and KT could not repay the amounts borrowed under the DD/KT Credit Facility that had been diverted into KBC's Central and Eastern European real estate transactions and other unsecured, non-diamond purchases.

121.     The Banks' exposure to losses sustained by Daleyot and the Daleyot Entities was enormous, and the debt owed by the Daleyot Entities was unlikely to be repaid.  As ADB's loans to DD and KT amounted to approximately half of ADB's capital, a default by DD and KT threatened ADB's very existence.  KBC, as guarantor of the DD/KT Credit Facility, would likely have to honor its guarantee and sustain massive losses.

122.     Moreover, a default by DD and KT would have had a ripple effect on DD's and KT's customers and counterparties in the diamond industry, many or most of which also banked at ADB.  A cascade of defaults by other ADB clients would even more seriously imperil ADB and magnify KBC's potential liability under its guarantees.

123.     The Banks also faced the likelihood of serious regulatory inquiries, which would expose the Banks' misuse of funds that should have been used solely for diamond business lending, and the wrongdoing of the Banks' senior officers in connection therewith.

124.     To attempt to remedy their joint problem, the Banks and the Daleyot Entities decided to steal and misappropriate the LKI Diamonds and the LKI Diamond Proceeds.  The scheme involved both Formal Sector LKI Diamonds that had been purchased and consigned by Gulfdiam and Informal Sector and Sight Rough Diamonds that had been purchased and consigned by Lazare and LKB.

**B.     The Theft of Formal Sector Diamonds**
 **and Sales Proceeds Belonging to Gulfdiam**

125.     The Banks and the Daleyot Entities misappropriated the sales proceeds of the Formal Sector LKI Diamonds primarily through the theft of nine shipments of Formal Sector LKI Diamonds purchased by Gulfdiam in 2008.

126.     Between July and October 2008, Gulfdiam purchased in excess of $108 million worth of Formal Sector LKI Diamonds in Angola, using in part the money it borrowed under its credit facility with ABN-AMRO (which was partially guaranteed by Lazare).

127.     Mauridiam, which had operational control of Gulfdiam, was responsible for arranging for the sale of these diamonds for the benefit of Gulfdiam and all its stakeholders, including Lazare.  And Mauridiam did arrange for the sale of the diamonds — but Gulfdiam (and Lazare) did not receive the benefits to which they were entitled.  Approximately $94 million of Gulfdiam's invoices for the Formal Sector LKI Diamonds were never paid.

128.     Instead, as described below, Mauridiam, with the knowing participation of the Banks, diverted these nine shipments of diamonds, and the sale proceeds thereof, for the exclusive benefit of other Daleyot Entities and the Banks.

129.     Through its investigation into the whereabouts of the missing LKI Diamonds and LKI Diamond Sales Proceeds, Lazare has been able to trace the movement of these Formal Sector LKI Diamonds through various Daleyot-related entities to the transfer, between July 2008

and January 2009, of at least $77 million of proceeds from the sale of these diamonds into the New York Pooling Account to reduce the amounts owed by DD and KT to ADB and guaranteed by KBC.

### 1. The Disappearance of the Formal Sector LKI Diamonds

130.    The trail begins with Mauridiam's delivery of the diamonds — ostensibly on behalf of Gulfdiam — to three different entities:  (i) five shipments to Gemport, in Dubai; (ii) two shipments to A.D. Middle East FZE ("ADME"), in Dubai; and (iii) two shipments to Overseas Diamond Hong Kong Ltd. ("ODHK"), in Hong Kong.

131.    The five shipments of LKI Diamonds that Mauridiam, on behalf of Gulfdiam, delivered to its subsidiary, Gemport, were invoiced for a total of $79.7 million.  The invoices from Gulfdiam to Gemport expressly stated that the diamonds would remain Gulfdiam's exclusive property until Gulfdiam received full payment.

132.    Neither Gemport nor any other Daleyot Entity, or anyone else, paid Gulfdiam for most of the LKI Diamonds received from Gulfdiam, nor did they return the diamonds or explain what happened to them.

133.    Instead, the LKI Diamonds invoiced by Gulfdiam to Gemport were moved through Daleyot shell companies to DD and KT in Belgium.

134.    The LKI Diamonds initially were shipped to Diamco Services SA ("Diamco") in Switzerland, a shell company affiliated with David Salama, a close Daleyot associate.  From there the LKI Diamonds were shipped to ED/FTD (another company owned entirely by Mauridiam) in Israel.  Then, ED/FTD transferred the diamonds to DD and KT in Belgium, where they were sold to third-party customers who were instructed to remit payment to DD's and KT's accounts at ADB.

135.    The table below describes the specific invoices between Gulfdiam and Gemport and the movement of the diamonds via Diamco and ED/FTD:

| Date of Shipping Invoice from Gulfdiam to Gemport | Carat Amount | Shipped From | Receiving Party in Tel Aviv | Date of Arrival in Tel Aviv | Amount Invoiced to Gemport |
|---|---|---|---|---|---|
| 7/27/08 | 217,193.90 | Diamco, Genève | ED/FTD | 7/30/08 | $26,404,350 |
| 8/6/08 | 27,701.40 | Diamco, Genève | ED/FTD | 8/9/08 | $17,669,840 |
| 8/21/08 | 7,618.90 | Diamco, Genève | ED/FTD | 8/23/08 | $2,339,966 |
| 9/28/08 | 6,409.47 | Diamco, Genève | ED/FTD | 10/2/08 | $1,249,319 |
| 9/28/08 | 359,798.45 | Diamco, Genève | ED/FTD | 10/2/08 | $32,058,101 |
| Total | 618,722.12 | | | | $79,721,576 |

136.    The two shipments of LKI Diamonds that Mauridiam, on behalf of Gulfdiam, delivered to ADME were invoiced for approximately $20.3 million on September 24, 2008. Gulfdiam has received substantially no payment on these invoices.

137.    The specific invoices between Gulfdiam and ADME are described below:

| Invoice Date | Invoice No. | Carat Amount | Invoice Amount | Due Date of Invoice |
|---|---|---|---|---|
| 9/24/08 | 08/024 | 33,816.25 | $19,047,659.36 | 11/23/08 |
| 9/24/08 | 08/025 | 5,168.57 | $1,274,632.73 | 11/23/08 |
| Total | | 38,984.82 | $20,322,292.09 | |

138.    The two shipments of LKI Diamonds that Mauridiam, on behalf of Gulfdiam, delivered to ODHK were invoiced on October 26, 2008 for approximately $17.3 million. Gulfdiam has received no payment on these invoices.

139.     The specific invoices at issue between Gulfdiam and ODHK are described below:

| Invoice Date | Invoice No. | Carat Amount | Invoice Amount | Due Date of Invoice |
|---|---|---|---|---|
| 10/26/08 | 08/028 | 31,179.43 | $16,058,922.56 | 12/25/08 |
| 10/26/08 | 08/029 | 5,903.80 | $1,240,101.67 | 12/25/08 |
| Total | | 37,083.23 | $17,299,024.22 | |

140.     After the theft, through extensive efforts and the cooperation of whistle-blowers, Lazare has been able to document the movement of the diamonds from Gulfdiam to ODHK and from ODHK to ED/FTD.

141.     In the case of the diamonds sold to ADME, Lazare has tracked the diamonds to Diamco in Switzerland, and then to ED/FTD in Israel.

142.     Lazare has learned that, in order to funnel the money to ADB, Fass fraudulently instructed both ADME and ODHK in writing that they did not owe or need to pay any money to Gulfdiam.

**2.     The Banks' Knowing Misappropriation of the Stolen LKI Diamond Proceeds From the New York Pooling Account**

143.     Between July 2008 and January 2009, DD — which had no entitlement whatsoever to these diamonds or their proceeds — issued invoices to its customers for payment of the stolen Formal Sector LKI Diamonds totaling at least $77,736,872.31, instructing the customers to send the money to accounts at ADB, which accounts were pledged to ADB as collateral for ADB's loans to DD.

144.     The table below describes these invoices issued by DD:

| Invoice Date | Invoice Due Date | Invoice No. | Carats | U.S. $ Payable to ADB |
|---|---|---|---|---|
| 7/24/08 | 9/22/08 | 08/0372 | 20,366.00 | 7,452,600.00 |
| 7/25/08 | 8/14/08 | 08/0373 | 4,375.00 | 9,857,000.00 |
| 7/25/08 | 08/22/08 | 08/0375 | 437.09 | 1,232,337.03 |

| Invoice Date | Invoice Due Date | Invoice No. | Carats | U.S. $ Payable to ADB |
|---|---|---|---|---|
| 8/22/08 | 09/19/08 | 08/0402 | 503.31 | 4,473,842.20 |
| 9/05/08 | 10/20/08 | 08/0424 | 2,220.23 | 5,002,244.80 |
| 9/12/08 | 09/12/08 | 08/0443 | 1,332.15 | 3,000,000.00 |
| 9/22/08 | 11/21/08 | 08/0463 | 1,829.46 | 4,000,039.00 |
| 9/26/08 | 11/25/08 | 08/0480 | 60,124.98 | 5,010,214.58 |
| 10/03/08 | 12/02/08 | 08/0486 | 30,061.57 | 11,002,534.62 |
| 10/27/08 | 12/26/08 | 08/0522 | 34,633.00 | 5,194,950.00 |
| 10/27/08 | 12/26/08 | 08/0521 | 241,697.79 | 290,021.10 |
| 10/29/08 | 12/28/08 | 08/0530 | 47,543.00 | 7,131,450.00 |
| 11/05/08 | 1/04/09 | 08/0544 | 4,295.71 | 6,070,611.46 |
| 11/12/08 | 1/11/09 | 08/0556 | 6,986.79 | 7,913,823.35 |
| 1/29/09 | 1/29/09 | 09/0019 | 44,937.11 | 105,204.17 |
| | | Total | 501,343.19 | $77,736,872.31 |

145.   Adhering to these instructions, the customers remitted payment to DD's account at ADB through the New York Pooling Account at KBC-NY. The Banks then misappropriated the funds to pay down the DD/KT Credit Facility and reduce the Banks' exposure to the imprudent and illicit loans they had made under that credit facility for non-diamond-related purposes.

146.   The Banks, upon information and belief, knew that the Formal Sector LKI Diamond Proceeds represented property belonging to Gulfdiam, yet willfully misappropriated the funds all the same. The Banks were fully aware of Lazare's stake in Gulfdiam (indeed, the Banks had granted permission to Lazare to guarantee a portion of Gulfdiam's debt), of Mauridiam's operational control of the venture, and of Mauridiam's obligation to act for the benefit of the venture. As evidenced by a November 28, 2007 email from Daleyot's financial officer, Fass, to Kurt Beckers at ADB, the Banks also had first-hand knowledge of the companies

41

involved in the theft of the Formal Sector LKI Diamonds, including Diamco, and ED/FTD, and the fact that ED/FTD (which transferred the Formal Sector LKI Diamonds to DD and KT) was a subsidiary of Mauridiam.  Further, as described above, the Banks were aware of the illicit uses of Mauridiam to launder funds and siphon off Formal Sector LKI Diamond Proceeds from the Gulfdiam venture for use in KBC-related real estates projects and for Daleyot's personal benefit.

147.    As a result of the Banks and the Daleyot Entities' scheme, Gulfdiam and Lazare were never paid the amounts owed to them for the Formal Sector LKI Diamonds, leaving Gulfdiam and Lazare unable to repay their own credit facilities (and leaving Lazare responsible, as guarantor, for Gulfdiam's credit facility with ABN-AMRO).

148.    The transfer, receipt, and misapplication of stolen Formal Sector LKI Diamond Proceeds through, to, in and from the New York Pooling Account as described above constituted the crimes of international transportation of stolen property (18 U.S.C. § 2314), receipt of stolen property in international commerce (18 U.S.C. § 2315), wire fraud (18 U.S.C. § 1343) and money laundering (18 U.S.C. § 1956) on the part of the Banks and Daleyot members of the Enterprise.

**C.    The Theft of Informal Sector and Sight Rough
Diamonds and Sales Proceeds Belonging to Lazare and LKB**

**1.    The Disappearance of the Informal Sector and Sight Rough LKI Diamonds**

149.    Between May 2008 and November 2008, Lazare purchased approximately $28.2 million of the LKI Diamonds from local Angolan diamond sellers in the "Informal Sector" (the "Informal Sector LKI Diamonds").  To make these purchases, Lazare, unaware of the Banks' and the Daleyot Entities' criminal intentions, borrowed from the Lazare Credit Facility and instructed KBC-NY to wire the funds from the Lazare KBC-NY Account.  The Banks complied

with Lazare's instructions, fully aware that those LKI Diamonds and LKI Diamond Proceeds would be captured by the Banks as part of their Illegal Scheme.

150.     Between August 2008 and October 2008, Lazare purchased approximately $14 million of "Sight Rough" diamonds from DTC (the "Sight Rough LKI Diamonds").  LKB (on behalf of Lazare) financed the purchase of these diamonds through LKB's Credit Facility with ADB.

151.     Lazare consigned the Informal Sector LKI Diamonds and the Sight Rough LKI Diamonds to LKB, which in turn consigned the Informal Sector LKI Diamonds and the Sight Rough LKI Diamonds to DD and/or KT.

152.     With regard to the Informal Sector LKI Diamonds, between June and October 2008, LKB delivered such diamonds to DD and/or KT for sale to third parties on the condition that title would not pass until full payment was made to LKB (and ultimately to Lazare).  DD and/or KT signed consignment notes under which LKB retained title to the Informal Sector LKI Diamonds.

153.     Following their receipt of the Informal Sector LKI Diamonds, DD and/or KT reported to LKB that they had customers that wanted to buy a total (in the aggregate) of $24,388,547.16 of the Informal Sector LKI Diamonds.

154.     Accordingly, LKB sent invoices to DD and/or KT for such diamonds (with full reservation of title).  Specifically, on June 30, 2008 and July 24, 2008, LKB issued two invoices to KT totaling $11,618,294.00, and from September 18, 2008 through October 31, 2008, LKB issued four invoices to DD totaling $12,770,253.16.

43

155.    Neither DD nor KT paid LKB or Lazare for any amount of the $24,388,547.16 invoiced for the Informal Sector LKI Diamonds.  In addition, DD and KT did not pay for the remaining $4,073,210.00 in Informal Sector LKI Diamonds that it held on consignment.

156.    With respect to the Sight Rough LKI Diamonds, after receiving notice from DD that it had invoiced the Sight Rough LKI Diamonds to third parties, on August 31, 2008 and October 30, 2008, LKB (with full reservation of title) invoiced DD $6,951,419.90 and $6,935,698.58, respectively, for a total of $13,887,118.48.

157.    DD has not paid LKB or Lazare for any amount of the $13,887,118.48 invoiced for the Sight Rough LKI Diamonds.

158.    Although purporting to accept delivery of the Informal Sector and Sight Rough LKI Diamonds on consignment, DD and KT, as part of the Illegal Scheme and with the Banks' knowledge, never intended to honor the terms of the consignments and intended from the outset to steal and convert these diamonds.  This is evident from, among other things, DD and KT's financial accounting polices, which the Banks were fully familiar with and which (unbeknownst to Lazare and LKB at the time) falsely treated the consigned LKI Diamonds as owned inventory (*i.e.*, owned by DD and KT).  Upon information and belief, the Banks knew that DD and KT were systematically recording inventory consigned to them (including the LKI Diamonds) as inventory they owned.

### 2.    The Banks' Knowing Misappropriation of the Stolen LKI Diamond Proceeds from the New York Pooling Account

159.    Upon information and belief, consistent with past practices, DD and/or KT, upon selling the Informal Sector LKI Diamonds and the Sight Rough LKI Diamonds to third parties, invoiced the third parties (with a reservation of title) indicating that such invoices were payable to DD and/or KT's account at ADB.

160.     Pursuant to the instructions in the invoices, the funds were sent to the New York Pooling Account at KBC-NY and from there, they were credited to DD's and/or KT's accounts with ADB and used to pay down the DD/KT Credit Facility.

161.     The Banks knew that the funds that they were misappropriating to pay down the DD/KT Credit Facility belonged to LKB and Lazare.  Under their respective credit lines with Lazare and LKB and DD, the Banks could and did demand, obtain and carefully review on a continuous basis detailed documentation from both sides of the parties' transactions relating to the Informal Sector LKI Diamonds and the Sight Rough LKI Diamonds.  That documentation included, among other things, the type of diamonds purchased; the invoices issued by LKB to DD and KT; the invoices issued by DD and KT to their customers; monthly reports from LKB showing DD's and KT's outstanding unpaid invoices to LKB; and records showing the dates, amounts and customer name of payments sent to DD and KT.

162.     Based on the wealth of information in their possession, their review of that information, and their face-to-face meetings and discussions with Lazare, DD and KT, the Banks were aware of, among other things: that the Informal Sector LKI Diamonds and Sight Rough LKI Diamonds were consigned to DD and KT; that Lazare and/or LKB retained ownership of those diamonds until its invoices had been paid in full; that DD and KT had not paid those invoices; that DD and KT were receiving payment themselves for those diamonds from their customers; and that ownership of the diamonds and the sales proceeds thereof therefore remained vested in Lazare and/or LKB.

163.     Despite knowing full well that the Informal Sector LKI Diamond Proceeds and the Sight Rough LKI Diamond Proceeds were the property of Lazare and LKB, the Banks

nevertheless misappropriated these monies in collusion with Daleyot and the other Enterprise Members for their own benefit and in furtherance of their Illegal Scheme.

164.     The transfer, receipt, and misapplication of stolen Informal Sector LKI Diamond Proceeds and Sight Rough LKI Diamond Proceeds through, to, in and from the New York Pooling Account as described above constituted the crimes of international transportation of stolen property (18 U.S.C. § 2314), receipt of stolen property in international commerce (18 U.S.C. § 2315), wire fraud (18 U.S.C. § 1343) and money laundering (18 U.S.C. § 1956) on the part of the Banks and the relevant Daleyot members of the Enterprise.

### 3.     ADB's Manipulation of Its Books to Protect the Daleyot Entities

165.     In furtherance of their unlawful conspiracy, ADB and the Daleyot Entities also colluded to fraudulently manipulate ADB's books and records to facilitate their theft of the Informal Sector and Sight Rough LKI Diamond Proceeds.

166.     When LKB received payments from DD or KT, LKB's process was to apply them to the specific outstanding invoices due from DD or KT to which they related.  LKB then promptly advised ADB in writing of the precise manner in which such payments were to be applied.  After receipt of such funds, LKB would confirm the details of all invoices that remained outstanding in monthly reports that LKB would deliver to ADB.

167.     ADB maintained one set of books to this effect.

168.     Unbeknownst to LKB, however, ADB, upon information and belief, was secretly maintaining a second, very different, set of books on behalf of itself and DD and/or KT for the very same transactions.  In this second set of books, ADB carefully manipulated the application of cash payments made to LKB on behalf of DD and/or KT so as to falsely attribute the payments to the wrong invoices.

169.    For example, at the end of October 2008, LKB received two bank transfers made by ADB on behalf of DD, totaling $9,467,528.76 for an invoice issued by LKB to DD on July 23, 2008.  LKB instructed ADB to allocate the payments to that invoice, which was past due. From LKB's perspective, ADB appeared to comply with those instructions, and the invoice was removed from LKB's borrowing base with ADB (*i.e.*, the amount of money a lender will loan to a company based on the value of the collateral).

170.    In ADB's books for DD, however, these payments were allocated to entirely different invoices.  On October 31, 2008, Marc Houben of ADB manually inserted entries that allocated portions of the funds as partial payment of three separate invoices issued by LKB to ADB.  Those invoices were all more recent than the July 23, 2008 invoice and none of them was past due (indeed, one of them did not even exist at the time the payment falsely allocated to it was received).

171.    Just four days earlier, on October 27, 2008, ADB's Kurt Beckers sent an email to Fass (Chief Financial Officer of DD) and to DD's assistant Chief Financial Officer, with a copy to another ADB executive and Daleyot, entitled "D.D.M. Shortage of cover."  The email explained that, unless DD provided evidence of new collateral it was faced with the possibility of having to immediately repay approximately $17 million to ADB or default on the DD/KT Credit Facility.

172.    By maintaining two internally contradictory sets of books and falsely attributing DD payments to later-issued LKB invoices, ADB was able to create the illusion of "fresh collateral" to allow DD to continue drawing on the DD/KT Credit Facility.

173.    In addition, ADB's two sets of books created an artificial basis for DD and KT to pretend — as they did pretend — that LKB's outstanding invoices had been paid.  ADB attested

in writing on September 21, 2009 to the certified auditor of LKB that as of May 31, 2009, LKB had open invoices of $38 million on local claims domiciled at ADB.  This corresponded to the amount of unpaid DD/KT invoices claimed by LKB.

174.    Simultaneously and without LKB's knowledge or consent, ADB intentionally recorded those same invoices as paid in a separate set of books and records which it maintained for the benefit of itself and the Daleyot Entities.  ADB made the direct collection of these invoices impossible by misapplying cash payments from DD and KT to those invoices rather than to the correct outstanding invoices — thereby providing a fabricated excuse for the Daleyot Entities not to pay valid invoices due and owing to LKB.

### 4.    The Unlawful Posting of LKI Diamonds as Collateral for DD and KT

175.    In late 2008, still fearful of a DD/KT default and its potential repercussions, the Banks sought additional collateral from DD and/or KT.  Despite knowing that DD and KT had no ownership interest in (and hence no legal right to pledge) the LKI Diamonds in its possession, ADB accepted a pledge of $46 million in diamonds and/or diamond receivables from DD and/or KT that included, upon information and belief, LKI Diamonds.

176.    On February 3, 2009, Lazare learned that $17.6 million in diamonds were pledged to ADB on January 8, 2009 — the same date that, as described below, LKB formally notified ADB that DD and KT had failed to pay approximately $42.8 million on LKB invoices that included a reservation of title.  Lazare learned about this pledge because a "Trust Receipt" relating to the diamonds was mistakenly faxed to LKB's offices *by DD*.

177.    On February 10, 2009, LKB sent a letter to ADB, DD and KT attaching a copy of the Trust Receipt.  LKB's letter expressed alarm that DD or KT may have given LKI Diamonds in pledge to ADB while owing LKB such substantial amounts, noting that "all our invoices mention that we remain full owner till full payment to us and this is known to you [ADB] as a

48

professional banker." The letter asked for full disclosure and clarification as to which diamonds were given in pledge.

178.    ADB did not deny that it was holding LKI Diamonds as collateral. In a written response on February 16, 2009, ADB claimed that "banker's discretion" prevented it from "comment[ing] on our relationship with other customers." It subsequently continued to refuse to provide a substantive response to Lazare's repeated expressions of concern that ADB had unlawfully converted LKI Diamonds to its own use.

179.    In truth and in fact, ADB had unlawfully converted LKI Diamonds. Although kept secret from Lazare and LKB at the time, an internal memo from senior officials at ADB to senior officials at KBC in August 2009 acknowledged that "*we have already taken all collateral we could find for the credit facilities towards DD Mfg.*" Recognizing that ADB was at risk for improperly taking LKI Diamonds as collateral, the memo proposed guaranteeing $6-7 million of DD's and KT's debt to Lazare and LKB.

180.    Upon information and belief, the Banks, despite knowing that they had unlawfully converted property belonging to Lazare or its affiliates by accepting a pledge of LKI Diamonds as collateral, intentionally concealed that fact from Lazare. Instead, the Banks liquidated the LKI Diamonds and/or allowed DD and/or KT to liquidate the LKI Diamonds and caused the proceeds to be transferred to the New York Pooling Account and used in satisfaction of amounts owed to ADB under the DD/KT Credit Facility.

181.    The transfer, receipt, and misapplication of stolen LKI Diamond Proceeds through, to, in and from the New York Pooling Account as described above constituted the crimes of international transportation of stolen property (18 U.S.C. § 2314), receipt of stolen property in international commerce (18 U.S.C. § 2315), wire fraud (18 U.S.C. § 1343) and

money laundering (18 U.S.C. § 1956) on the part of the Banks and the relevant Daleyot members
of the Enterprise.

### 5. The Banks Procure $20 Million from HSBC (Genève) Through a Back-to-Back Guarantee

182.    In June 2009, with full knowledge of Lazare's complaint that its diamonds and
sales proceeds had been stolen, ADB received $20 million in six separate installments pursuant
to illicit, cash-collaterized Letters of Guarantee (numbers ***5510 and ***6361) from HSBC
(Genève) to ADB guaranteeing DD's debts to ADB.  The back-to-back guarantees from HSBC
(Genève) were issued on behalf of DKT for the benefit of DD.

183.    Upon information and belief, DKT opened account (number ****5843) at HSBC
(Genève) on or around May 26, 2009, just one week before the payments began.  From June 2,
2009 to June 30, 2009, the account (number ****5843) was funded by six separate transfers,
ranging from $3 million to $4 million, all reflected merely as "by order of a client."  On the same
day that the funds were credited to DKT's account (or the next day), HSBC (Genève) transferred
the same amount of funds from the DKT account for the benefit of DD's account at DD, for a
total of $20 million.

184.    Upon information and belief, DKT is a shell company that has only one
shareholder, the Israeli company ILDIA Holdings Ltd., which in its turn has only one
shareholder, Equalia Services Trust Reg. Vaduz in Liechtenstein.

185.    Each transfer comprising the $20 million was authorized in writing by Daleyot's
associate, David Salama.  Upon information and belief, each transfer was made to the New York
Pooling Account and the funds were then credited to DD's account at ADB.

186.    Upon information and belief, some or all of the $20 million transferred from
DKT's account at HSBC (Genève) represent missing LKI Diamond Proceeds.

## V.   **The Banks' Extortionate Demand that Lazare Pay Down LKB's Credit Facility**

187.    Having facilitated the diversion of diamonds and money from Lazare, LKB and Gulfdiam, and used the stolen funds to repay outstanding DD and KT loans for their benefit, the Banks then attempted to use ADB's position as a creditor to extort further funds from Lazare and LKB by demanding that Lazare pay off the LKB Credit Facility.

188.    In late 2008, ADB advised LKB that accounts receivable from DD and KT would no longer qualify as collateral for LKB's loans from ADB, and that, as a result, no new borrowings would be permitted without new collateral.  ADB further required that LKB's credit line be repaid by Lazare in New York.

189.    Incredibly, despite telling LKB that accounts receivable from DD and KT could no longer be used by LKB as collateral for LKB's line of credit, ADB, at KBC's direction, continued to finance DD and KT.

190.    Unaware of the Banks' duplicity, Lazare provided additional liquidity to LKB in the form of diamonds.  In addition, Lazare drew down on its own lines of credit to further collateralize and pay off entirely the balance ADB claimed was due under the LKB Credit Facility.

191.    For example, at the insistence of Philippe Loral (a Senior Vice President at ADB) at a meeting in Lazare's offices in New York, Lazare wired $1,550,000 to repay the LKB Credit Facility at ADB.

192.    As a result, at the end of 2009, when ADB maliciously terminated the Lazare Credit Facility and the LKB Credit Facility, LKB's Credit Facility was fully repaid while the Lazare Credit Facility was almost fully drawn.

193.     ADB thereby saddled Lazare with the unfinanceable, unpaid invoices of DD and

KT that were owed to LKB, which ADB knew would not be repaid, while misappropriating

Lazare's own property to pay off DD's and KT's debts to itself.

**VI.     The Banks Refuse to Undertake Any Investigation Into**
**the Disappearance of the LKI Diamonds and LKI Diamond Proceeds**

194.     Despite repeated requests by Lazare, KBC and ADB refused to investigate

Lazare's allegations regarding the Illegal Scheme.

195.      By letter dated January 8, 2009, LKB formally notified ADB that DD and KT

had failed to pay $42,793,317.89 that was due and owing (including interest and contractual 10%

indemnity) for diamonds that LKB had invoiced to DD and KT with a reservation of title.

196.     In late 2008 and throughout 2009 and 2010, Lazare, unaware of KBC's role in

orchestrating and executing the Illegal Scheme, informed KBC and ADB's senior officers and

counsel of Daleyot's financial difficulties and failure to pay for diamonds belonging to Lazare,

and provided them with supporting documents.

197.     Lazare informed KBC and ADB in great detail about Daleyot and the Daleyot

Entities' wrongdoing, and warned that the Banks' failure to assist in the recovery of Lazare's

funds would have serious, negative financial consequences for Lazare.  Lazare met with De

Bosscher and Snoeks of ADB in 2009, and throughout 2009 shared letters and emails with KBC

and ADB to provide them with detailed descriptions of, among other things, false documentation

filed by Daleyot and the Daleyot Entities in Antwerp Commercial Court.

198.     Lazare requested that the Banks conduct an audit of the relevant books and

records of it and LKB and of the Daleyot Entities, or support the retention of an independent

third party to conduct such an audit.  KBC and ADB refused that request.  Upon information and

belief, lower level employees at KBC and ADB, who may not have been aware at that time of

the Banks' role in the Illegal Scheme but saw the outsized exposure to DD and KT and the

irregular lending practices relating thereto, sought to commence an internal investigation.  Upon

information and belief, senior officers of KBC and ADB halted the investigation before any

wrongdoing could be revealed.

199.    On June 11, 2009, at a meeting with Lazare's management and after ADB began

to receive such illicit funds from the Daleyot Entities' accounts at HSBC, ADB's Snoeks

announced to Lazare that ADB had decided not to conduct a forensic audit of DD and KT.

200.    Snoeks' stated reason to Lazare was that DD and KT were supposedly companies

in good financial standing and that there was "no need for an audit" as Lazare's charges "did not

warrant an investigation."

201.    The statements by Snoeks were knowingly false and intended to deceive Lazare.

For example, Snoeks knew that ADB had refused to accept invoices from DD and KT as

collateral from LKB because of their questionable legitimacy and/or collectability.   Further,

Snoeks knew there was a need for an audit of DD and KT because Snoeks himself, on March 13,

2009, had notified DD and KT that "company experts from KBC Bank" would be conducting an

onsite visit and would need to review detailed financial information and data "regarding the real

estate projects (in Central and Eastern Europe)" and "regarding the net position towards LKI and

LKB," among other things.

202.    On July 9, 2009, members of Lazare's management again traveled from the

United States to meet with senior management of ADB at ADB's offices in Antwerp, Belgium.

At that meeting, Lazare brought to the attention of ADB's senior management invoices and

related documentation pertaining to Lazare's consignments to DD and KT, explained to ADB

why DD's and KT's records were fraudulent, and updated ADB on Lazare's efforts to obtain an accounting from DD and KT.

203.    By letter and facsimile to Lazare from ADB's Dirk Dullaert, the Senior Vice President & Head of International Relations at ADB, and Theo Strous, the Managing Director of ADB, dated July 10, 2009, ADB advised Lazare that ADB "cannot intervene in the affairs of and the disputes between two diamond companies and as we are not an arbitrator, we suggest you to look for assistance through professional arbitration party as customary in your industry."  Yet the Banks knew full well that this was not merely a dispute between two diamond companies, but that Lazare had been victimized by the Banks' own actions and knowing participation in the Illegal Scheme with Daleyot and the Daleyot Entities.

204.    By letter dated July 22, 2009, LKB presented to Theo Strous, Dirk Dullaert and Veerle Snyers of ADB specific and detailed information surrounding the Daleyot Entities' fraud with respect to diamonds belonging to Lazare.

205.    Specifically, LKB's letter showed how DD had falsified certain documents to make it appear that LKB owed approximately $6.5 million to DD, when in fact the true and original documents only reflected the return of consigned goods to LKB.  LKB attached to its letter copies of the true and original documents, which were signed by representatives of DD and did not contain the fraudulent information subsequently added by DD to make the documents falsely appear to be invoices to LKB.  Lazare urged the bank to take action to set the record straight.

206.    ADB never responded to the July 22, 2009 letter.

207.    Lazare also sought ADB's cooperation with the investigation by Lazare's insurers of the missing diamonds.  ADB refused to cooperate with any insurance investigation and even

joined forces with Daleyot in seeking to quash a subpoena issued by the United States District Court for the Southern District of New York simply requesting access to relevant accounting information in ADB's possession in connection with Lazare's now settled lawsuit against its insurers.

208.   ADB refused to appoint an independent auditor or to conduct an internal audit or to cooperate with the insurance investigation because, upon information and belief, ADB knew the whereabouts of the LKI Diamonds, used a large portion of the LKI Diamond Proceeds to repay itself, and was concerned that its knowledge of and role in the Illegal Scheme and other schemes involving Daleyot might be uncovered.

## VII.   **The Banks Attempt to Destroy Lazare**

209.   As Lazare began to uncover the Illegal Scheme and push for an investigation, the Banks recognized they were at risk.  In an internal memo written by Snoeks in August 2009, ADB's Local Credit Committee proposed to the KBC Extended Credit Committee that ADB guarantee a portion of DD/KT's debt to Lazare/LKB in the hopes that the matter could be settled and never see the light of day.  When settlement efforts failed, however, the Banks took a new tack and engaged in a series of actions designed to destroy Lazare and cover up the theft, money laundering and fraud.

### A.   **The Banks Manufacture False Defaults Under Lazare's and LKB's Credit Facilities**

210.   By letter dated August 6, 2009, and emails dated September 15 and September 28, 2009 from Dirk Dullaert of ADB to Lazare in New York, ADB falsely accused LKB of causing an event of default under the LKB Credit Facility.

211.   ADB claimed that this supposed default was caused by LKB allegedly securing a $5.2 million credit facility with another financial institution without first obtaining permission

from ADB.  ADB claimed that the new credit facility was reported on the database of "the
Central Bank of Belgium."

212.    In fact, LKB had secured no such credit facility, and LKB promptly informed
ADB that ADB's information, and the claimed basis for the default, were wrong.  Nonetheless,
ADB informed Lazare/LKB that it "will have to suspend the credit agreement for LKB
immediately."

213.    Ultimately, Lazare uncovered the truth that, in continuation of the collusion
between KBC and ADB, it was actually KBC itself that made the false filing with the Belgian
banking authority, which led to this alleged false default.

214.    In another email dated September 28, 2009, ADB claimed, among other things,
that Lazare's failure to file its audited financials "also causes an event of default" under the
Lazare Credit Facility.

215.    The failure to file its audited financials, however, was a result of the Banks' own
actions and the outstanding issues regarding the LKI Diamonds and LKI Diamond Proceeds
stolen from Lazare.

216.    Based on this manufactured default, ADB, together with Lazare's two other
lenders, ABN-AMRO and Bank Leumi (USA), then attempted to force Lazare into involuntary
bankruptcy.  On November 2, 2009, Lazare received a letter from the three banks demanding
financial information from Lazare — information, which, as the Banks were well aware, Lazare
could not provide as a direct result of the Banks' complicity in the theft of the LKI Diamonds
and LKI Diamond Proceeds — and threatening to declare a default if Lazare did not provide the
information.

217.    The Banks' effort to drive Lazare into involuntary bankruptcy failed when Bank Leumi withdrew from the plan.

**B.      The Banks Terminate Lazare's and LKB's Credit Facilities**

218.    Notwithstanding the Banks' attempt to force Lazare into an involuntary bankruptcy, Lazare attempted to restore a constructive dialogue by offering to provide financial information to all of its lenders, including ADB, at a meeting scheduled for January 6, 2010. ADB agreed to attend that meeting.  As of December 28, 2009, KBC and ADB were discussing with Lazare the kind of information Lazare should supply at the meeting, who would attend, and other relevant matters.

219.    On or about December 28, 2009, in the middle of the Christmas holidays and in violation of the agreement to conduct the aforementioned meeting nine days later on January 6, 2010, KBC directed ADB to terminate LKB's already fully repaid $25 million Credit Facility and the $45 million Lazare Credit Facility in New York, and ADB did so.

220.    Upon information and belief, the termination of Lazare's lines of credit constituted the first time that a diamond lender canceled credit lines of a DTC Sightholder who was not in a monetary default.  Neither Lazare nor LKB had ever missed a payment of principal or interest during their more than 10-year relationship with ADB, including throughout this period of global financial crisis.

221.    The Banks knew that even under normal circumstances, much less on the eve of an international holiday during a financial crisis, it would be impossible for a diamond company to repay its credit line of more than $40 million in a short period of time. Having failed in its earlier attempt to declare a manufactured event of default and then to put Lazare into involuntary bankruptcy, the Banks used termination of the line of credit to create a liquidity crisis for Lazare.

222.   Indeed, ABN-AMRO sent Lazare a notice dated January 11, 2010 alleging that a default had occurred under the Lazare Credit Facility with ABN-AMRO as a result of ADB's termination notice.

223.   KBC was aware that due to cross-default provisions, its decision to have ADB terminate the Lazare Credit Facility and the LKB Credit Facility would cause ABN-AMRO to declare Lazare to be in cross-default of Lazare's credit facility at ABN-AMRO (ABN-AMRO subsequently terminated its credit line with Lazare in March 2010 but later settled its dispute with Lazare).

224.   On February 22, 2010, after failing to persuade ADB through correspondence and a face to face meeting to take any action to investigate the disappearance of the LKI Diamond Proceeds, Lazare's Chairman traveled to Brussels to meet with Luc Gijsens of KBC and Pierre De Bosscher of ADB.  (The meeting was arranged by KBC's Chief Executive Officer, Jan Vanhevel.)

225.   At that meeting, Lazare's Chairman explained what Lazare had learned about the Illegal Scheme, and that evidence existed implicating ADB officers in the scheme.  Lazare's Chairman urged KBC to take immediate and appropriate steps to investigate the evidence. Gijsens agreed that an investigation should be conducted by KBC and that information in the possession of Lazare would be immediately relayed directly to KBC for its review.

226.   Four days later Gijsens reneged on that agreement.

227.   Instead of conducting the agreed upon investigation, on March 3, 2010, KBC instructed ADB to issue a demand letter (the "Demand Letter") to Lazare stating that the Lazare Credit Facility was terminated on March 1, 2010, and that "[t]he current outstanding principal

balance, plus accrued interest due and owing under the [ADB] Credit Facility as of the Termination Date is $43,295,452.90."

228.    The Demand Letter, signed by ADB's Head of Credit Department and by Guy Snoeks, further stated that "Demand is hereby made by ADB for Lazare's immediate and full repayment of all sums due and owing under the [ADB] Credit Facility."

229.    By letter dated March 7, 2010, Lazare responded that "the debt alleged to be due under the [ADB] Credit Facility is sharply disputed by Lazare," because "ADB has already been paid in full," in light of the fact that ADB "has received and taken in repayment of other obligations, monies and other assets belonging to Lazare and its affiliates that exceed the stated balance due under the [ADB] Credit Facility."

230.    By letter dated March 14, 2010, Lazare advised Gijsens that it was prepared to make a presentation to Gijsens and to Pieter Vandendriessche, the Head of ADB's Audit Committee, regarding the misappropriation of the LKI Diamond Proceeds and ADB's receipt thereof.

231.    No reply to the March 14, 2010 letter ever came.  KBC and ADB continued to stonewall Lazare, and obstruct any investigation.

232.    At the same time, the Banks and their senior officers continued to support Daleyot and his companies, in furtherance of their ongoing conspiracy and the Enterprise.  For example, despite Lazare's demonstration of DD's fabrication of invoices and despite ADB's knowledge that DD was drowning in debt, on December 16, 2009, Guy Snoeks wrote a letter to a major diamond mining company, Rio Tinto Diamonds N.V., in support of DD's business.  Snoeks told Rio Tinto that DD "had the financial capacity to be involved in business of great importance,"

that DD and Daleyot "enjoy an excellent reputation" and are "capable and trustworthy," and that

Snoeks "would very much appreciate any help and courtesy you would extend them."

**VIII.  The Catastrophic Injuries to Lazare's Business
        and Property Caused by the Banks' Wrongdoing**

233.    As a direct result of the Illegal Scheme described herein, Lazare has suffered

catastrophic injuries to its business, business prospects, reputation and property.

234.    As a direct and proximate result of the Banks' wrongful conduct, Lazare has been

damaged by the outright theft of more than $135 million of LKI Diamond Proceeds and an

additional $70 million in LKI Diamond Proceeds diverted from the Gulfdiam venture.

235.    The Banks' wrongful conduct further deprived Lazare of the funds needed to

finance its ongoing business operations in the United States and elsewhere, resulting in millions

of dollars of additional damages, the loss of critical contracts, markets and funding, the

discontinuation of business lines in major countries of operations, delisting of Lazare's stock on

the AMEX (resulting in a decrease in the price, the volume of trading and the overall liquidity of

Lazare's shares), the deregistration of Lazare's common stock by the SEC, business

interruptions, the termination and reduction of certain operations, substantial reductions in staff,

dramatic increase in insurance costs, loss of its rough diamond sourcing abilities in several

jurisdictions, loss of some and reduction of other of its "sight" allocations with DTC, and

tremendous harm to its reputation.

236.    The Bank's wrongful conduct further resulted in Lazare having to make

substantial payments in connection with the LKB Credit Facility and in connection with Lazare's

guarantee of the credit facility for the Gulfdiam venture.

237.    In addition, Lazare has incurred substantial legal, forensic and management costs

in pursuing a global investigation into the Illegal Scheme.

238.     The Banks' wrongful actions (and failure to disclose their wrongful actions) were committed intentionally, willfully, with malice and with intentional disregard for the rights and interests of Lazare.

239.     In carrying out the Illegal Scheme to injure Lazare and other victims, such as the general investing public in the United States, the Banks violated multiple criminal laws, including, but not limited to:  18 U.S.C. § 2314 (transportation of stolen property); 18 U.S.C. § 2315 (receipt of stolen property); 18 U.S.C. § 1341 (mail fraud); 18 U.S.C. § 1343 (wire fraud); 18 U.S.C. § 1956 and 1957 (money laundering); and 18 U.S.C. § 1951 (extortion).

240.     Accordingly, Lazare is entitled to an award of treble and punitive damages, both as punishment and to discourage such wrongful conduct in the future, and the other relief sought herein.

## FIRST CLAIM FOR RELIEF
### Violation of 18 U.S.C. § 1962(c)

241.     Lazare repeats and realleges each and every allegation set forth in paragraphs 1 through 240 above as if set forth in full herein.

242.     At all relevant times, KBC and ADB were "persons" within the meaning of 18 U.S.C. § 1961(3).

243.     At all relevant times, KBC and ADB as alleged herein engaged in the operation or management of the Enterprise, which is an enterprise as defined by 18 U.S.C. § 1961(4), the activities of which affect interstate and foreign commerce within the meaning of 18 U.S.C. §1962(c).

244.     At all relevant times, KBC and ADB conducted the Enterprise's affairs through a pattern of racketeering activity as alleged herein since at least 2007.

245.    The Enterprise:  (i) is an ongoing association-in-fact with a decision making framework or mechanism for controlling the association; (ii) has associated members with a common purpose that function as a continuing unit; and (iii) is separate and apart from the pattern of racketeering activity.

246.    As alleged herein, the purpose of the Enterprise was to obtain money and property to which KBC and ADB and the other Enterprise Members were not entitled, including through the theft and laundering of LKI Diamonds and LKI Diamond Proceeds.

247.    The Enterprise Members worked in concert to:  (i) extend credits and loans to Daleyot and the Daleyot Entities for improper and illicit purposes; (ii) obtain LKI Diamonds and LKI Diamond Proceeds belonging to Lazare and its affiliates by means of a scheme to defraud and by false and fraudulent representations, pretenses and promises; (iii) steal and unlawfully convert such LKI Diamonds and LKI Diamond Proceeds; (iv) transfer the LKI Diamonds through a series of both legitimate and sham transactions to make them difficult to trace; (v) launder the LKI Diamond Proceeds through a network of legitimate and illegitimate businesses and accounts; and (vi) use such LKI Diamond Proceeds to enrich KBC and ADB and the other Enterprise Members at the expense of Lazare and its affiliates.

248.    All of the Enterprise Members are participants in the Illegal Scheme in different capacities, functions, and roles calculated to enrich and expand the Enterprise so that it could continue to perpetrate the Illegal Scheme.

249.    KBC's and ADB's role was to:  (i) lend or facilitate the lending of exorbitant amounts of money to Daleyot and his companies for use within and outside of the diamond industry (*i.e.,* for investments in Central and Eastern European real estate and the purchase of private airplanes, a yacht, fine art and other luxury items); (ii) exert pressure over Lazare and

LKB through ADB's role as lender to Lazare and LKB for the purchase of LKI Diamonds; (iii) participate in the theft of LKI Diamonds and LKI Diamond Proceeds belonging to Lazare and its affiliates by directing and allowing Daleyot to move the diamonds through shell companies; (iv) launder and misappropriate the LKI Diamond Proceeds and apply them to debts owed by Daleyot and his companies to the Banks; (v) attempt to hold Lazare and LKB responsible for amounts borrowed by Lazare and to obtain the LKI Diamonds and LKI Diamond Proceeds stolen through the Illegal Scheme; (vi) quash Lazare's efforts to trace and investigate the stolen LKI Diamonds and LKI Diamond Proceeds; (vii) intimidate Lazare into abandoning its efforts to recover the diamonds and proceeds; and (viii) destroy Lazare's business and its ability to operate as a going concern.

250.    The role of Daleyot and the Daleyot Entities was to:  (i) bribe key senior officers of KBC and ADB; (ii) use the DD/KT Credit Facility for non-diamond related transactions including investments in Central and Eastern European real estate and purchases of private airplanes, a yacht, fine art and other luxury items; (iii) find a source to facilitate and cover their wrongdoing when the Daleyot Entities were unable to pay their loans; (iv) steal and obtain by fraud the LKI Diamonds and LKI Diamond Proceeds belonging to Lazare and its affiliates to cover the Daleyot Entities' debts; (v) convert the stolen LKI Diamonds into cash proceeds and launder the proceeds; (vi) deposit such LKI Diamond Proceeds into the accounts of Daleyot's companies at ADB so that ADB could misappropriate them to pay back the loans; (vii) interfere with Lazare's efforts to trace and investigate the stolen LKI Diamonds and LKI Diamond Proceeds; and (viii) intimidate Lazare into abandoning its efforts to recover the diamonds and proceeds.

251.     Moreover, all acts noted above attributable to ADB are attributable to KBC.  As parent and full owner of ADB, KBC exercised such control and domination over ADB that ADB became a mere instrumentality of KBC in carrying out the Illegal Scheme.

252.     Governance of the Enterprise occurred through frequent communications and transactions among its members by means of interstate and international wire communication, via telephone and e-mail and wire transfers in interstate and foreign commerce, in addition to travel to and from New York and internationally.

253.     At all relevant times, the Banks and the Enterprise Members, acting in concert, conducted or participated, directly or indirectly, in the conduct of the Enterprise's affairs through a "pattern of racketeering activity" within the meaning of 18 U.S.C. § 1961(5), in violation of 18 U.S.C. § 1962(c).

254.     The predicate acts are all part of a common criminal plan to perpetrate the Illegal Scheme and enrich the Enterprise through criminal and fraudulent conduct.

255.     All of the predicate acts relate to one another because they represent a common scheme to further the Illegal Scheme and enrich the Enterprise and its members.  The predicate acts are attributable to KBC and ADB and the Enterprise and progressed in a logical fashion without interruption from at least 2007 through the present.

256.     The predicate acts include the following violations of United States law.

257.     In the course of, and in furtherance of, this racketeering conduct, KBC and ADB transported, transmitted, and transferred in interstate and foreign commerce goods, wares, merchandise, securities and money, of the value of $5,000 and more, knowing the same to have been stolen, converted and taken by fraud, in violation of 18 U.S.C. § 2314, to wit, and among

64

other things, transfers of funds to, from and through the New York Pooling Account involving LKI Diamond Proceeds as described above.

258.    In the course of, and in furtherance of, this racketeering conduct, KBC and ADB received, possessed, concealed, stored, bartered, sold, and disposed of goods, wares, and merchandise, securities, and money of the value of $5,000 and more, which crossed a State and United States boundary after being stolen, unlawfully converted, and taken, knowing the same to have been stolen, unlawfully converted, and taken by fraud, in violation of 18 U.S.C. § 2315, to wit, and among other things, transfers of funds to, from and through the New York Pooling Account involving LKI Diamond Proceeds as described above.

259.    In the course of, and in furtherance of, this racketeering conduct, KBC and ADB devised and intended to devise a scheme and artifice to defraud Lazare and its affiliates, and to obtain money and property by means of false and fraudulent pretenses, representations, and promises, and transmitted and caused to be transmitted by means of wire communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, in violation of 18 U.S.C. § 1343, to wit, and among other things, wire transfers of funds to, from and through the New York Pooling Account involving LKI Diamond Proceeds in furtherance of the scheme to defraud Lazare and its affiliates of the LKI Diamonds and LKI Diamond Proceeds as described above.

260.    In the course of, and in furtherance of, this racketeering conduct, KBC and ADB conducted, and attempted to conduct, financial transactions which, in fact, involved the proceeds of specified unlawful activity (to wit, and among other things, violations of 18 U.S.C. §§ 2314, 2315, 1341 and 1343), knowing that the transactions were designed in whole and in part to conceal and disguise the nature, the location, the source, the ownership, and the control of the

65

proceeds of specified unlawful activity, in violation of 18 U.S.C. § 1956(a)(1), to wit, and among other things, transfers of funds to, from and through the New York Pooling Account involving LKI Diamond Proceeds as described above.

261.    In the course of, and in furtherance of, this racketeering conduct, KBC and ADB transported, transmitted and transferred, and attempted to transport, transmit, and transfer, funds from a place in the United States to or through a place outside the United States, and to a place in the United States from or through a place outside the United States, with the intent to promote the carrying on of specified unlawful activity (to wit, and among other things, violations of 18 U.S.C. §§ 2314, 2315, 1341 and 1343), in violation of 18 U.S.C. § 1956(a)(2), to wit, and among other things, transfers of funds to, from and through the New York Pooling Account involving LKI Diamond Proceeds as described above.

262.    In the course of, and in furtherance of, this racketeering conduct, KBC and ADB knowingly engaged and attempted to engage in monetary transactions in criminally derived property of a value greater than $10,000 that was derived from specified unlawful activity  (to wit, and among other things, violations of 18 U.S.C. §§ 2314, 2315, 1341 and 1343), in violation of 18 U.S.C. § 1957, to wit, and among other things, transfers of funds to, from and through the New York Pooling Account involving LKI Diamond Proceeds as described above.

263.    In the course of, and in furtherance of, this racketeering conduct, KBC and ADB obstructed, delayed, and affected commerce and the movement of an article and commodity in commerce, between a state and a point outside thereof, by extortion, that is by obtaining property from another, with his consent, induced by wrongful use of actual and threatened force, violence, and fear, and under color of official right, and attempted and conspired so to do, in violation of 18 U.S.C. § 1951, to wit, and among other things, KBC and ADB extorted Lazare into paying off

the LKB Credit Facility as described above and attempted to extort Lazare by threatening to drive it out of business unless Lazare paid amounts falsely claimed to be due and owing to ADB and dropped its investigation into the missing LKI Diamonds and LKI Diamond Proceeds, as described above.

264.    The acts of racketeering activity referred to in the previous paragraphs constituted a "pattern of racketeering activity" within the meaning of 18 U.S.C. § 1961(5).

265.    The acts alleged were related to each other by virtue of common participants, common victims (Lazare), a common method of commission, and a common purpose and result.

266.    KBC's and ADB's pattern of unlawful activity and corresponding violations of 18 U.S.C. § 1962(c) proximately and/or directly caused Lazare to suffer injury to its business or property within the meaning of 18 U.S.C. § 1964(c); to wit, Lazare suffered damages in an amount in excess of $500 million.

267.    The damages suffered by Lazare were reasonably foreseeable and intended by KBC and ADB and/or were anticipated as a substantial factor and a natural consequence of their pattern of unlawful activity.

268.    Lazare's business and property has been injured by reason of a violation of 18 U.S.C. § 1962 and it is entitled to treble damages and attorneys' fees and costs under 18 U.S.C. § 1964(c).

## SECOND CLAIM FOR RELIEF
### Violation of 18 U.S.C. § 1962(d)

269.    Lazare repeats and realleges each and every allegation set forth in paragraphs 1 through 268 above as if set forth in full herein.

270.    KBC and ADB conspired with Daleyot and the Daleyot Entities to engage in the racketeering conduct described herein in violation of 18 U.S.C. § 1962(c).

271.     KBC and ADB committed and caused to be committed a series of overt acts in furtherance of the conspiracy and to affect the objects thereof, including but not limited to the acts set forth above.

272.     By engaging in the overt acts and other conduct alleged herein, KBC and ADB agreed and conspired with Daleyot and the Daleyot Entities to engage in illegal predicate acts that formed a pattern of racketeering activity as defined by 18 U.S.C. § 1961(5) and otherwise agreed to violate 18 U.S.C. § 1962(c), in violation of 18 U.S.C. § 1962(d).

273.     Given the complexity and far-reaching nature of the conspiracy, coupled with the number of instances in which KBC and ADB engaged in the overt acts alleged herein, the overt acts committed by KBC and ADB could not have been committed without coordination and agreement among KBC, ADB, Daleyot and the Daleyot Entities to knowingly participate in the conspiracy.

274.     KBC, ADB, Daleyot and the Daleyot Entities are each members of the Enterprise and therefore each conspired to perpetrate the Illegal Scheme.

275.     As co-conspirators, KBC and ADB are liable for all of the actions committed by all of the co-conspirators within the conspiracy and are liable for all of the damages sustained by Lazare that were caused by any members of the conspiracy, regardless of whether either KBC or ADB were directly involved in a particular aspect of the Enterprise.

276.     As a direct and proximate cause of the violations set forth above, Lazare has been injured in its business and property and has suffered damages in an amount in excess of $500 million.

277.     Lazare's business and property has been injured by reason of a violation of 18 U.S.C. § 1962 and it is entitled to treble damages and attorneys' fees and costs under 18 U.S.C. § 1964(c).

### THIRD CLAIM FOR RELIEF
**Conversion**

278.     Lazare repeats and realleges each of the allegations contained in paragraphs 1 through 277 above as if set forth in full herein.

279.     KBC and ADB improperly exercised unauthorized dominion and control over monies and property belonging to Lazare and its affiliates, and improperly prohibited Lazare and its affiliates, which at all relevant times were entitled to specifically identifiable proceeds from the sale of LKI Diamonds, either directly or indirectly, from receiving the same.  KBC and ADB did this by, among other things, exercising dominion and control over LKI Diamond Proceeds transferred to, from and through the New York Pooling Account and applying such monies to the accounts of others which were not entitled to the funds and to the payment to ADB of debts owed by Daleyot and the Daleyot Entities, for the benefit of KBC and ADB and Daleyot and the Daleyot Entities.

280.     KBC and ADB were aware at all relevant times that the LKI Diamonds and LKI Diamond Proceeds belonged to Lazare and its affiliates and did not belong to the Daleyot Entities.

281.     KBC and ADB's conduct was willful and malicious and intended to cause harm to Lazare.

282.     As a result of the foregoing, Lazare has suffered significant damages in amount to be proven at trial.

## FOURTH CLAIM FOR RELIEF
**Fraud**

283.    Lazare repeats and realleges each of the allegations contained in paragraphs 1 through 282 above as if set forth in full herein.

284.    KBC and ADB engaged in a scheme to defraud Lazare and its affiliates of LKI Diamonds and LKI Diamond Proceeds and to obtain such diamonds and proceeds by means of false and fraudulent representations, pretenses and promises, while secretly intending to steal and convert the LKI Diamonds and LKI Diamond Proceeds for their own benefit.

285.    KBC and ADB made a series of material misstatements, misrepresentations and omissions concerning, among other things, their involvement in the Illegal Scheme and their knowledge of the whereabouts of the LKI Diamonds and LKI Diamond Proceeds, their theft of the LKI Diamonds and LKI Diamond Proceeds, their diversion of monies belonging to Lazare through the use of the New York Pooling Account for the benefit of Daleyot and the Daleyot Entities, and their application of payments from DD and KT to particular LKB invoices.

286.    KBC and ADB knew that their misstatements, misrepresentations and omissions were false and misleading.

287.    In addition to the false and misleading statements referenced above (all of which are incorporated herein by reference), KBC and ADB knowingly made the following material misstatements, or intentionally omitted the following material information, in written and oral communications with Lazare:

> (a)    Snoeks falsely stated that ADB had decided not to proceed with a forensic audit because DD and KT were supposedly companies in good financial standing and that there was "no need for an audit" as Lazare's charges "did not warrant an investigation," even though (i) ADB refused to accept invoices from DD and KT as collateral from LKB because of their questionable legitimacy and/or collectability, and (ii) Snoeks himself, on March 13, 2009, had notified DD and KT that KBC experts needed to

70

audit their books regarding, among other things, their dealings with Lazare and LKB.

(b)     KBC and ADB demanded payment from Lazare with regard to the Lazare Credit Facility when, in truth, KBC and ADB knew that it had used the proceeds from the sales of the stolen Lazare diamonds to pay down debts owed by the Daleyot Entities to ADB and for investment in KBC-related real estate projects.

288.     As a result of its longstanding business relationship with KBC and ADB, Lazare trusted the Banks and justifiably relied on the Banks to properly conduct their own affairs and to manage and maintain Lazare's affairs, including matters related to the sale of the LKI Diamonds and the distribution of the LKI Diamond Proceeds.

289.     In reliance on the material misstatements and omissions by KBC and ADB, Lazare participated, and continued to participate, in business relationships with KBC, ADB and the Daleyot Entities.

290.     Lazare's reliance was entirely reasonable and justifiable.  The misstatements and omissions at issue in this case were made by banks, with whom Lazare had a longstanding business relationship, and which had duties and obligations to Lazare as a customer.

291.     As a result of the foregoing, Lazare has suffered significant damages in an amount to be proven at trial, but believed to be not less than $500 million in addition to punitive damages.

## FIFTH CLAIM FOR RELIEF
### Aiding and Abetting ADB's Fraud

292.     Lazare repeats and realleges each of the allegations contained in paragraphs 1 through 291 above as if set forth in full herein.

293.     ADB engaged in a scheme to defraud Lazare and its affiliates of LKI Diamonds and LKI Diamond Proceeds and to obtain such diamonds and proceeds by means of false and

fraudulent representations, pretenses and promises, while secretly intending to steal and convert the LKI Diamonds and LKI Diamond Proceeds for their own benefit.

294.    KBC had actual knowledge of ADB's fraudulent scheme and that ADB was intentionally misrepresenting and concealing from Lazare information about the LKI Diamonds and LKI Diamond Proceeds and wrongfully applying monies belonging to Lazare and its affiliates to pay down the DD/KT Credit Facility.

295.    KBC had actual knowledge of ADB's scheme to defraud and intentional misrepresentations and omissions through multiple sources, including Gijsens, ADB and ADB's agents, De Bosscher and Snoeks.  Further, KBC knew that transactions taking place in the Daleyot Entities' accounts at ADB and in the New York Pooling Account on behalf of the Daleyot Entities did not coincide with any legitimate enterprise, and thus could only be plausibly explained by fraud.

296.    KBC provided substantial assistance and encouragement to ADB in furtherance of its fraudulent scheme by, among other things:  (i) directing ADB to apply the stolen proceeds from the LKI Diamonds to the debts that the Daleyot Entities owed to ADB; (ii) helping to conceal the illicit use of the LKI Diamond Proceeds; (iii) directing ADB to authorize the Daleyot Entities to funnel money to entities investing in Central and Eastern European real estate; (iv) providing access to the New York Pooling Account for the Daleyot Entities and executing transactions on their behalf; and (v) falsely and fraudulently informing the Belgian Central Bank that LKB had a $5.2 million credit facility with another institution in order to create a sham event of default and enable ADB to declare an event of default under the LKB Credit Facility and the Lazare Credit Facility.

297.     As detailed above, KBC benefited as a result of its misconduct, including by the diversion of monies to Daleyot and the Daleyot Entities for the purpose of paying down loans which had been issued by ADB, but which were guaranteed by KBC.

298.     As a result of the foregoing, Lazare has suffered significant damages in an amount to be proven at trial, but believed to be not less than $500 million.

**SIXTH CLAIM FOR RELIEF**
**Aiding and Abetting the Daleyot Entities' Fraud**

299.     Lazare repeats and realleges each of the allegations contained in paragraphs 1 through 298 above as if set forth in full herein.

300.     Daleyot and the Daleyot Entities engaged in a scheme to defraud Lazare and its affiliates of LKI Diamonds and LKI Diamond Proceeds and to obtain such diamonds and proceeds by means of false and fraudulent representations, pretenses and promises, while secretly intending to steal and convert the LKI Diamonds and LKI Diamond Proceeds for their own benefit.

301.     KBC and ADB had actual knowledge of the Daleyot Entities' fraudulent scheme and that the Daleyot Entities were intentionally misrepresenting and concealing from Lazare information about the LKI Diamonds and LKI Diamond Proceeds and wrongfully applying monies belonging to Lazare and its affiliates to their own accounts.

302.     KBC and ADB had actual knowledge of the Daleyot Entities' scheme to defraud and intentional misrepresentations and omissions through multiple sources, including ADB's agents, De Bosscher and Snoeks.  Further, both KBC and ADB knew that certain transactions taking place in the Daleyot Entities' accounts did not coincide with any legitimate enterprise, and thus could only be plausibly explained by fraud.

303.    KBC and ADB had a financial incentive to assist the Daleyot Entities with their theft of the LKI Diamonds and LKI Diamond Proceeds since the Daleyot Entities used the proceeds of their fraudulent scheme to pay down debts which the Daleyot Entities had with ADB, which totaled more than $100 million.

304.    KBC and ADB provided substantial assistance and encouragement to the Daleyot Entities in furtherance of their fraudulent scheme by, among other things:  (i) executing transactions, including through the New York Pooling Account, to facilitate the Daleyot Entities' fraud and laundering of the proceeds thereof; (ii) applying the stolen proceeds from the sales of LKI Diamonds to the debts that the Daleyot Entities owed to ADB; (iii) helping to conceal the illicit use of Lazare's and its affiliates' diamond proceeds; (iv) intentionally misapplying payments made by the Daleyot Entities to the wrong LKB invoices to give the Daleyot Entities a fabricated basis to contest those invoices; (v) refusing to investigate when Lazare and LKB brought the wrongdoing to their attention and repeatedly asked them to audit the books and records of the Daleyot Entities; and (vi) wrongfully declaring a default of Lazare's and LKB's credit facilities in an attempt to dissuade Lazare from further investigation.

305.    As detailed above, KBC and ADB benefited as a result of its misconduct, including by the diversion of monies to Daleyot and the Daleyot Entities for the purpose of paying down loans which had been issued by ADB, but which were guaranteed by KBC.

306.    As a result of the foregoing, Lazare has suffered significant damages in an amount to be proven at trial, but believed to be not less than $500 million.

### SEVENTH CLAIM FOR RELIEF
**Tortious Interference with Prospective Business Advantage**

307.    Lazare repeats and realleges each of the allegations contained in paragraphs 1 through 306 above as if set forth in full herein.

74

308.     KBC and ADB knowingly interfered with Lazare's prospective business relations with other lenders and with Lazare's business partners, suppliers and customers by making false and misleading representations that Lazare was in default of its credit facilities.

309.     KBC and ADB undertook certain actions, including wrongfully declaring an event of default and wrongfully and dishonestly terminating credit facilities which had been extended to Lazare and LKB.  In particular, KBC's instruction to ADB to terminate the Lazare Credit Facility and the LKB Credit Facility was wrongful and dishonest because it was intended to accelerate Lazare's and LKB's loans so that ADB and KBC could collect the proceeds from the loans that were not actually due and owing and to threaten Lazare with financial ruin as a result of Lazare's investigations into the missing LKI Diamonds.

310.     Further, KBC and ADB knew that by helping the Daleyot Entities divert funds it would generate a loss for Lazare that would preclude Lazare from filing timely audited financial reports.

311.     As a result of KBC's and ADB's wrongful interference, Lazare's business relationship with other lenders has been damaged due to cross-defaults of its credit facilities. Lazare's business reputation in the United States and elsewhere has also been severely damaged, making it impossible to proceed fully and actively with and conduct Lazare's ongoing operations.  Moreover, Lazare's costs to obtain necessary insurance for business operations going forward have increased dramatically due to KBC's and ADB's actions.

312.     As a result of the foregoing, Lazare has suffered significant damages in an amount to be proven at trial, but believed to be not less than $500 million.

## EIGHTH CLAIM FOR RELIEF
**Commercial Bad Faith**

313.   Lazare repeats and realleges each of the allegations contained in paragraphs 1 through 312 above as if set forth in full herein.

314.   As described in detail above, KBC and ADB, along with Daleyot and the Daleyot Entities, conducted an ongoing Illegal Scheme to misappropriate LKI Diamonds and LKI Diamond Proceeds thereof, and to double-collect on purported Lazare and LKB debts and obstruct Lazare's investigation into the Illegal Scheme.

315.   KBC and ADB knowingly accepted and diverted LKI Diamond Proceeds belonging to Lazare and its affiliates, and used a portion of such monies to pay down the outstanding loans and debts owed by the Daleyot Entities, and for investment in KBC-related real estate projects.

316.   Among other things, KBC's and ADB's acceptance of and diversion of LKI Diamond Proceeds belonging to Lazare and its affiliates, their improper preference of the Daleyot Entities' interests and their own interests over the interests of Lazare, their creation and maintenance of two sets of books concerning application of Daleyot Entities payments to LKB, their fabricated "events of default" under the Lazare Credit Facility and the LKB Credit Facility, and their refusal to investigate including after Lazare brought to their attention certain fake invoices provided by the Daleyot Entities to a Belgian court, were all done in bad faith.

317.   As a result of the foregoing, Lazare has suffered significant damages in an amount to be proven at trial, but believed to be not less than $500 million.

318.   The aforesaid conduct by KBC and ADB was purposeful and contumacious. Despite being aware of the Illegal Scheme and its effect on Lazare, both KBC and ADB continued to do so in order to preserve its banking relationship with the Daleyot Entities.

76

319.    Accordingly, punitive damages should be awarded to Lazare.

## NINTH CLAIM FOR RELIEF
### Negligence

320.    Lazare repeats and realleges each of the allegations contained in paragraphs 1 through 319 above as if set forth in full herein.

321.    At all relevant times, KBC and ADB provided banking services to Lazare and LKB, and as such, owed a cognizable duty of care, as a matter of law, to Lazare and LKB, as their customer.

322.    As described above, the Banks possessed knowledge that the Daleyot Entities were engaged in the Illegal Scheme detailed herein, including, without limitation, by utilizing for their own benefit LKI Diamond Proceeds belonging to Lazare and its affiliates.

323.    Despite this knowledge, the Banks, among other things:  (i) misappropriated monies belonging to Lazare and its affiliates; (ii) ignored and/or failed to monitor transactions by the Daleyot Entities; (iii) refused Lazare's request to conduct an audit to determine what happened to the sales proceeds owed to Lazare and its affiliates; (iv) refused to assist or cooperate with Lazare's insurance investigation; and (v) terminated the Lazare Credit Facility and the LKB Credit Facility and demanded payment from Lazare in an amount in excess of $43 million without inquiry.

324.    These actions constitute a breach of the duty of care that the Banks owed to Lazare.

325.    As a result of the foregoing, Lazare has suffered significant damages in an amount to be proven at trial, but believed to be not less than $500 million.

## TENTH CLAIM FOR RELIEF
**Breach of the Covenant of
Good Faith and Fair Dealing**

326.    Lazare repeats and realleges each of the allegations contained in paragraphs 1 through 325 above as if set forth in full herein.

327.    KBC-NY's Account Agreement and General Terms and Conditions with Lazare constitutes a valid and binding contract that is subject to the covenant of good faith and fair dealing.

328.    ADB's and KBC's May 31, 2001 Agreement with Lazare constitutes a valid and binding contract that is subject to the covenant of good faith and fair dealing.

329.    The Lazare Credit Facility entered into between Lazare and ADB on February 20, 2008 constitutes a valid and binding contract that is subject to the covenant of good faith and fair dealing.

330.    Pursuant to each of these contracts, Lazare had the right to expect that KBC and its subsidiary ADB would not make false claims regarding outstanding amounts due, and would enable funds deposited into accounts at ADB, which ADB knew belonged to Lazare or its affiliates, to be deposited into the Lazare KBC-NY Account and/or otherwise applied to outstanding debts owed by Lazare and/or LKB to ADB.

331.    Instead, KBC and ADB accepted such funds and, among other things, applied them to outstanding obligations of the Daleyot Entities.

332.    As a result of the foregoing, Lazare has suffered significant damages in an amount to be proven at trial, but believed to be not less than $500 million.

## ELEVENTH CLAIM FOR RELIEF
### Unjust Enrichment

333.    Lazare repeats and realleges each and every allegation set forth in paragraphs 1 through 332 above as if set forth in full herein.

334.    Throughout the relevant time period, ADB, at the direction of KBC, made improperly large loans to the Daleyot Entities in light of ADB's relatively small capitalization. KBC is the guarantor of ADB's debts, including the loans which ADB made to Daleyot and the Daleyot Entities.

335.    KBC and ADB have been enriched by their refusal to return to Lazare the proceeds from the sale of the stolen LKI Diamond Proceeds and through the Illegal Scheme which resulted in ADB's loans to the Daleyot Entities being repaid using LKI Diamond Proceeds.  This enrichment is at Lazare's expense, in that Lazare is now without the use of the sales proceeds from the stolen LKI Diamonds.

336.    The circumstances are such that good conscience and equity require that KBC and ADB make restitution to Lazare.

337.    KBC and ADB, at the very least, have been unjustly enriched at Lazare's expense by the: (i) amounts stolen and converted from Lazare and its affiliates; (ii) revenues and profits generated by using such stolen and converted funds; and (iii) return on investment generated by the amounts described in (i) and (ii).  As a matter of equity and good conscience, KBC and ADB should make restitution to Lazare in an amount equal to these sums.

338.    As a result of the foregoing, Lazare has suffered significant damages in an amount to be proven at trial.

**TWELFTH CLAIM FOR RELIEF**
**Money Had and Received**

339.     Lazare repeats and realleges each of the allegations contained in paragraphs 1 through 338 above as if set forth in full herein.

340.     As detailed above, ADB willfully and improperly received LKI Diamond Proceeds belonging to Lazare and its affiliates in an amount to be determined at trial and has benefited from receipt of such money.  As parent and full owner of ADB, KBC exercised such control and domination over ADB that ADB became a mere instrumentality of KBC in carrying out the Illegal Scheme.

341.     In equity and good conscience, ADB should not be permitted to keep the money it wrongfully received which rightfully belongs to Lazare and its affiliates.

342.     Lazare is entitled to restitution in the amount to be determined at trial.

**THIRTEENTH CLAIM FOR RELIEF**
**Declaratory Judgment**

343.     Lazare repeats and realleges each of the allegations contained in paragraphs 1 through 342 above as if set forth in full herein.

344.     As discussed in detail above, ADB, based on KBC's decision, sent a written Termination Notice to Lazare seeking to terminate the Lazare Credit Facility. ADB sent this notice after diverting LKI Diamond Proceeds (in an amount exceeding the amount owed under the Lazare Credit Facility) away from Lazare toward, among other things, the payment of the Daleyot Entities' debts to ADB.

345.     Accordingly, it is Lazare's position that it has no monies due and owing under the Lazare Credit Facility as the Lazare Credit Facility has been repaid in full.  KBC's conflicting

position that Lazare owes money under the Lazare Credit Facility has created a controversy that cannot be resolved without intervention by the Court.

346.    An actual and justiciable controversy exists between Lazare and KBC, as successor-in-interest to ADB.

347.    Adjudication of the dispute is within the Court's jurisdiction.  A present adjudication of the controversy is necessary to determine the rights of the parties and to guide the course of future dealings under the Lazare Credit Facility.

348.    There are no other remedies available to Lazare at this time.

## FOURTEENTH CLAIM FOR RELIEF
### Accounting

349.    Lazare repeats and realleges each of the allegations contained in paragraphs 1 through 348 above as if set forth in full herein.

350.    KBC and ADB have diverted payment owed to Lazare for the missing LKI Diamonds toward, among other things, the payment of debts owed by Daleyot and the Daleyot Entities to ADB.

351.    ADB has claimed that certain sums are due and owing from Lazare.

352.    ADB has refused to account for or offer any explanation for their actions with respect to the missing monies, or to facilitate an accounting or audit, as agreed, with respect to the missing LKI Diamonds and LKI Diamond Proceeds.

353.    Lazare is entitled to an accounting from KBC, as successor-in-interest to ADB, with respect to all payments, monies and collateral they have received from the Daleyot Entities during the period of the Illegal Scheme.

**WHEREFORE**, Plaintiff Lazare Kaplan International Inc. demands judgment against KBC Bank N.V., both in its own right and as successor-in-interest to ADB, jointly and severally as follows:

1. ***With respect to the First and Second Claims for Relief (violations of 18 U.S.C. § 1961, et seq.):*** damages, including interest, jointly and severally, for threefold such actual damages sustained by Plaintiff along with costs of suit, attorneys' fees, and litigation expenses, all pursuant to 18 U.S.C. § 1964(c), and such additional compensatory and punitive damages, costs of suit, and other relief as the Court deems just and equitable.

2. ***With respect to the Third Claim for Relief (Conversion), the Fourth Claim for Relief (Fraud), the Fifth Claim for Relief (Aiding and Abetting Fraud), the Sixth Claim for Relief (Aiding and Abetting Fraud), the Seventh Claim for Relief (Tortious Interference with Prospective Business Advantage), the Eighth Claim for Relief (Commercial Bad Faith), the Ninth Claim for Relief (Negligence), the Tenth Claim for Relief (Breach of the Covenant of Good Faith and Fair Dealing), and the Twelfth Claim for Relief (Money Had and Received):*** (i) actual and consequential damages to be determined by the trier of fact; and (ii) punitive damages.

3. ***With respect to the Eleventh Claim for Relief (Unjust Enrichment):*** (i) all amounts by which KBC and ADB have been unjustly enriched; and (ii) punitive damages.

4. ***With respect to the Thirteenth Claim for Relief (Declaratory Judgment):*** a declaratory judgment that: (i) ADB's Notices of Termination and Default Letters are invalid; and (ii) there are no monies due and owing from Lazare to ADB under the Lazare Credit Facility.

5. ***With respect to the Fourteenth Claim for Relief (Accounting):*** an equitable accounting for all benefits, consideration and profits received, directly or indirectly, by ADB, including the imposition of a constructive trust, the voiding of unlawful transfers, and the disgorgement of all ill-gotten gains and profits.

6. With respect to all Claims for Relief, such other and further relief to which Plaintiff is justly entitled.

## JURY DEMAND

Lazare respectfully demands a trial by jury on all of its legal claims herein.


Dated: New York, New York
      September 8, 2017

SCHULTE ROTH & ZABEL LLP

By: */s/ Adam S. Hoffinger*
    Adam S. Hoffinger
    Gary Stein

919 Third Avenue
New York, New York 10022
Tel:  (212) 756-2000
Fax: (212) 593-5955

adam.hoffinger@srz.com
gary.stein@srz.com

*Attorneys for Plaintiff Lazare Kaplan
International Inc.*