UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------

LAZARE KAPLAN INTERNATIONAL INC.,

              Plaintiff,

              -against-

KBC BANK N.V., in its own right and as successor-
in-interest to Antwerp Diamond Bank N.V.,

              Defendant.

------------------------------------------------

Civil Action No.: 11-CV-9490 (ALC)

## KBC BANK N.V.'S MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S POST-TRIAL MOTION FOR SANCTIONS

Peter A. Bicks
Stephen G. Foresta
Aaron M. Rubin
ORRICK, HERRINGTON & SUTCLIFFE LLP
51 West 52nd Street
New York, NY 10019-6142
Telephone: (212) 506-5000
Facsimile: (212) 506-5151
pbicks@orrick.com
sforesta@orrick.com
amrubin@orrick.com

*Attorneys for Defendant KBC Bank N.V.*

Helen Gredd
LANKLER SIFFERT & WOHL LLP
500 Fifth Avenue
New York, NY 10110
Telephone: (212) 921-8399
HGredd@lswlaw.com

*Attorneys for Defendant KBC Bank N.V., as
Successor in Interest to Antwerp Diamond
Bank N.V.*

## TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................... 1

BACKGROUND ........................................................................................ 3

I.     THE ORIGINAL MOTIONS TO DISMISS ................................. 3

II.    THE APPEAL AND REMAND .................................................... 5

III.   THE *NEW MOON* HEARING AND RELATED MOTIONS PRACTICE ..................... 6

IV.    THE COURT'S FINDINGS OF FACT ......................................... 8

V.     LAZARE'S ADDITIONAL MOTION PRACTICE .................... 10

ARGUMENT .......................................................................................... 12

I.     DEFENDANTS DID NOT COMMIT FRAUD ON THE COURT, AND LAZARE HAS NOT MET ITS BURDEN TO PROVE OTHERWISE ........................ 12

       A.     The Governing Legal Standard ......................................... 12

       B.     Application Of The Governing Legal Standard To Lazare's Allegations ........... 14

              1.     The Services Agreement Was Not "Concealed" .................... 14

              2.     The Banking Arrangements Among The Parties Were Not Misdescribed ........... 17

              3.     The Court's Findings Refute The Fundamental Premise Underlying Lazare's Motion ................... 19

II.    LAZARE'S "PROPOSED RELIEF"—AS WELL AS THE TIMING OF ITS MOTION—CONFIRMS LAZARE'S MOTIVATION IN PURSUING THIS MOTION ................... 22

CONCLUSION ....................................................................................... 24

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*A.I.A. Holdings, S.A. v. Lehman Bros, Inc.*,
  97-cv-4978, 2002 WL 1271722 (S.D.N.Y. May 29, 2002) ....................................................13

*Ali v. A & G Co., Inc.*,
  542 F.2d 595 (2d Cir. 1976)............................................................................................24

*Arbitration Between Karaha Bodas Co., LLC v. Minyak*,
  21-MC-98, 2007 WL 1284903 (S.D.N.Y. Apr. 30, 2007)................................................14, 23

*Brandt v. Vulcan, Inc.*,
  30 F.3d 752 (7th Cir. 1994) ...........................................................................................24

*Bullock v. Reckenwald*,
  15-cv-5255, 2016 WL 5793974 (S.D.N.Y. Aug. 24, 2016) ...........................................12, 23

*Cerruti 1881 S.A. v. Cerruti, Inc.*,
  169 F.R.D. 573 (S.D.N.Y. 1996) ...................................................................................13, 14

*Chambers v. NASCO, Inc.*,
  501 U.S. 32 (1991)..........................................................................................................12

*Chen v. Wai? Cafe Inc.*,
  10-cv-7254, 2016 WL 722185 (S.D.N.Y. Feb. 19, 2016) .....................................12, 13, 17, 22

*Crown Awards, Inc. v. Trophy Depot, Inc.*,
  15-cv-1178, 2017 WL 564885 (S.D.N.Y. Feb. 13, 2017) ...............................................12, 22

*Gleason v. Jandrucko*,
  860 F.2d 556 (2d Cir. 1988)............................................................................................16

*Gutman v. Klein*,
  03-cv-1570, 2010 WL 4916722 (E.D.N.Y. Nov. 24, 2010) ...............................................24

*Hazel-Atlas Glass Co. v. Hartford-Empire Co.*,
  322 U.S. 238 (1944)........................................................................................................23

*Kupferman v. Consolidated Research and Manufacturing Corporation*,
  459 F.2d 1072 (2d Cir. 1972)..........................................................................................13

*Lazare Kaplan International Inc. v. KBC Bank N.V.*,
  528 F. App'x 33 (2d Cir. 2013) .........................................................................................6

*Marfia v. T.C. Ziraat Bankasi, New York Branch*,
    100 F.3d 243 (2d Cir. 1996)......................................................................................23

*McMunn v. Memorial Sloan-Kettering Cancer Center*,
    191 F. Supp. 2d 440 (S.D.N.Y. 2002).....................................................................14

*New Moon Shipping Co., Ltd. v. MAN B & W Diesel AG*,
    121 F.3d 24 (2d Cir. 1997)................................................................................ *passim*

*Passlogix, Inc. v. 2FA Technology, LLC*,
    708 F. Supp. 2d 378 (S.D.N.Y. 2010).............................................................13, 22

*Satterfeld v. Pfizer, Inc.*,
    04-cv-3782, 2005 WL 1765708 (S.D.N.Y. July 18, 2005), *aff'd*, 208 F. App'x
    59 (2d Cir. 2006)......................................................................................................17

*Scholastic, Inc. v. Stouffer*,
    221 F. Supp. 2d 425 (S.D.N.Y. 2002).....................................................................14

*Sun World, Inc. v. Olivarria*,
    144 F.R.D. 384 (E.D. Cal. 1992) ............................................................................23

*In re Teligent, Inc.*,
    358 B.R. 45 (S.D.N.Y. 2006)...................................................................................24

*United States v. Seltzer*,
    227 F.3d 36 (2d Cir. 2000).......................................................................................12

Defendant KBC Bank N.V. ("KBC"), on its own and as successor in interest to Antwerp Diamond Bank N.V. ("Antwerp Bank"), respectfully submits this memorandum of law in opposition to Plaintiff Lazare Kaplan International, Inc.'s ("Lazare") Motion for Sanctions ("Lazare's Motion" or the "Motion").

## PRELIMINARY STATEMENT

Having plainly—if belatedly—recognized that it cannot reasonably hope to prevail on the merits of the pending venue dispute in this action, Lazare contends that KBC and Antwerp Bank (collectively, the "Banks") engaged in misconduct that entitles Lazare to a ruling in its favor on venue (without regard to the merits), or even to a $1.5 billion default judgment on the underlying action (again, without regard to the merits). As Lazare would have it, the Banks committed fraud on the court by: (1) concealing the existence of an agreement (the "Services Agreement") between Antwerp Bank and KBC's New York branch ("KBC-NY") that governed the handling of accounts that Antwerp Bank's New York-based customers opened at KBC-NY; and (2) misdescribing how those accounts were handled in two of the declarations that were submitted in support of the Banks' motions to dismiss. But neither purported instance of misconduct in fact occurred.

To the contrary, KBC expressly noted the existence of the Services Agreement in one of the declarations submitted in support of its motion to dismiss the original Complaint—namely, the April 4, 2012 declaration of KBC's in-house counsel, Walter Haeck. *See* [Dkt. 29 ¶ 6]. In addition, as confirmed by the Findings of Fact recently issued by the Court in this action (the "Court's Findings"), the two declarations Lazare criticizes—namely, the June 15, 2012 declaration of Diane Grimmig and the June 14, 2012 declaration of Veerle Snyers—correctly described the banking operations provided for in the Services Agreement.

Indeed, the Court's Findings—which were made after receiving extensive evidence and

1

briefing in connection with a *New Moon* evidentiary hearing, and after having had the

opportunity to evaluate the credibility of Ms. Grimmig, Ms. Snyers, and others who testified at

the hearing—confirm that the banking arrangements among the parties were exactly as

Ms. Grimmig and Ms. Snyers described in their respective declarations.

      In addition, and more broadly, the Court's Findings flatly reject the fundamental premise

underlying both Lazare's Motion and its position on venue.  Both rely on the notion that Lazare

never had a bank account with Antwerp Bank and instead KBC-NY was the key player in

Lazare's banking relationship, in which case, Lazare asserts, Article 37 of Antwerp Bank's

General Conditions for Banking Operations (which mandates that any action by an Antwerp

Bank customer be brought in Belgium) must not apply to Lazare's lawsuit here.  But the Court's

Findings refute Lazare's claim that the Services Agreement supports its position on venue, and

instead make clear that the Services Agreement is fully supportive of the Banks' position.

      To state the obvious, there would have been no reason to conceal an agreement that fully

supports the Banks' position on venue.  Instead, as Ms. Grimmig reasonably and credibly

explained, it was regarded at the time as sufficient to simply describe the arrangement that

existed between KBC-NY and Antwerp Bank, without detouring into the contractual specifics

that had created the arrangement.  And, plainly, Lazare itself likewise regarded the contractual

specifics as an unnecessary level of detail.  Despite having been put on notice of the existence of

the Services Agreement through Mr. Haeck's declaration, Lazare did not request a copy of the

Services Agreement or suggest at any point during the briefing of the motions to dismiss that it

regarded the contract as important to resolving the parties' venue dispute.

      Nor, of course, did the Banks have an independent obligation to attach the Services

Agreement to their motions to dismiss or to produce a copy of a document that Lazare had

shown no interest in.  At the time the motions to dismiss were briefed, discovery was stayed

pending resolution of the motions.  And when this Court (after remand from the Second Circuit)

later lifted the stay and opened discovery regarding the specifics of the banking relationships

among the parties, the Services Agreement was among the first documents KBC produced.

Lazare's Motion is nothing more than the latest in a series of efforts to avoid the effect of

the forum-selection clause to which it repeatedly agreed.  The Motion is wholly without merit

and should be denied.

## BACKGROUND

## I.    THE ORIGINAL MOTIONS TO DISMISS

Lazare filed the Complaint on December 23, 2011.  [Dkt. 1].  The Complaint spanned

155 pages, 812 paragraphs, and 15 counts.  *See id.*  The thrust of the Complaint centered on

international issues and events, many of which occurred in Belgium.  *See id.*  The Complaint also

contained numerous allegations regarding different transactions and entities, including

allegations concerning "Lazare's Banking Relationship with [Antwerp Bank]" and Lazare's

credit facility at Antwerp Bank.  *Id.* at Heading I, ¶ 144; *see* Feb. 14, 2017 Tr. (Moryto) at

137:24-139:9, 139:21-140:20, 142:3-17.  It also included allegations related to the pooling

account that Antwerp Bank maintained at KBC-NY, alleging that some of Lazare's claims

involved "[Antwerp Bank's] U.S. dollar denominated accounts at KBC's branch in New York"

and that "Lazare made payments on its own and LKB's lines of credit with [Antwerp Bank] by

depositing funds into [Antwerp Bank's] account at KBC's New York branch."  [Dkt. 1 ¶¶ 53,

108].

Notably, the Complaint did not include a single allegation regarding Lazare's zero-

balance account at KBC-NY (the "KBC-NY Account") or the Account Agreement and General

Terms and Conditions between Lazare and KBC-NY governing that account (the "KBC Account

Agreement"). Lazare, of course, had full knowledge of the KBC Account Agreement before the Complaint was filed (since it was a party to the Agreement) and received regular bank statements showing the zero-balance feature of the KBC-NY Account. [Dkt. 227 at 11]; DX-32; DX-57.

On March 5, 2012, as Lazare acknowledges in its Motion, this Court stayed all discovery pending the filing of and ruling on motions to dismiss. [Dkt. 18]; [Dkt. 220 at 1]. On April 6, 2012, the Banks moved to dismiss on numerous grounds, including the mandatory Belgian forum-selection clause in Article 37 of Antwerp Bank's General Conditions for Banking Operations; *forum non conveniens*; failure to state a RICO claim due to reliance on almost entirely foreign conduct; failure to plead fraud with particularity under Fed. R. Civ. P. 9(b); and failure to state a plausible claim as to the ten other counts asserted under New York law. [Dkts. 24-33].

In connection with the briefing of the motions to dismiss, the parties (including Lazare) submitted various declarations. [Dkts. 25, 29-33, 39-41, 50, 52-54, 56, 58]. In the Declaration of Walter Haeck, attached to KBC's motion to dismiss, Mr. Haeck testified that "KBC's New York branch acts as a correspondent bank for Antwerp Bank pursuant to a **service agreement**." [Dkt. 29 ¶ 6] (emphasis added).[1] Further, in a June 15, 2012 declaration accompanying KBC's reply memorandum, Diane Grimmig, a Managing Director and General Counsel of KBC, described the manner in which KBC-NY and Antwerp Bank handled the accounts of Antwerp Bank's New York-based customers. [Dkt. 54 ¶¶ 10-11]. Similarly, in a June 14, 2012 declaration accompanying Antwerp Bank's reply brief, that was based both upon information derived from the declarant's own work at Antwerp Bank and upon consultation with her

---

[1] For this reason, KBC respectfully disagrees with the Court's statement in its Order denying Plaintiff's reconsideration motion that "[t]here is no dispute that Defendants did not mention the Services Agreement [...] during the first round of briefing." [Dkt. 241 at 8]. KBC does in fact dispute this point.

4

colleagues at the bank, Veerle Snyers, the Legal Manager of Credits at Antwerp Bank, likewise described the manner in which the accounts of Antwerp Bank's New York-based customers were handled.  [Dkt. 50, ¶¶ 1, 11-14].

Despite Mr. Haeck's express reference to the Services Agreement—and the description of the banking arrangements contained in the declarations of Ms. Grimmig and Ms. Snyers—Lazare never requested the Services Agreement during the briefing on the motions to dismiss. Nor did Lazare claim that it was entitled to see the Services Agreement, or that it needed to review the Services Agreement in connection with the motions to dismiss.

Lazare's lack of interest in the Services Agreement during the briefing on the motions to dismiss was anything but surprising.  The "Agreement with Respect to the Delivery of Operational Banking Services," dated October 15, 1999—referred to as the "Services Agreement"—is a contract entered into between KBC-NY and Antwerp Bank.  [Dkt. 193-2 ¶ 11]; DX-24; *accord* [Dkt. 227 at 4].  Lazare is not a party to, and has no rights or obligations under, the Services Agreement, and the Services Agreement does not contain a forum-selection clause.  DX-24; Feb. 15, 2017 Tr. (Grimmig) at 286:1-6; *accord* [Dkt. 227 at 4].  Rather, the Services Agreement establishes a framework and procedures to allow Antwerp Bank's New York-based diamond clients, such as Lazare, to open non-borrowing accounts with KBC-NY and use these accounts to draw on and pay down their overdraft facilities with Antwerp Bank in Belgium during New York banking hours.  [Dkt. 193-2 ¶ 12]; *accord* [Dkt. 227 at 4].

On September 5, 2012, the Court dismissed Lazare's Complaint on *forum non conveniens* grounds without deciding which of two forum-selection clauses that the parties identified governed.  [Dkts. 62, 63].

## II.    THE APPEAL AND REMAND

Lazare appealed the Court's decision to the Second Circuit, which vacated and remanded.

*Lazare Kaplan Int'l Inc. v. KBC Bank N.V.*, 528 F. App'x 33 (2d Cir. 2013). The Second Circuit held that a mandatory forum-selection clause typically must be enforced, and that this Court was required to determine which forum-selection clause applied in order to evaluate the propriety of the forum. *Id.* at 35-36. That task, the Second Circuit held, required this Court to make factual findings resolving certain "factual disputes over the banking arrangements between Lazare and defendants." *Id.* at 36. In so holding, the Second Circuit indicated that evidence regarding the "banking arrangements between Lazare and defendants" and the "particular claims and/or particular parties" at issue were relevant to resolving which forum-selection clause governs. *Id.*

Accordingly, on remand, this Court was tasked with resolving the factual disputes identified by the Second Circuit and deciding which of two forum-selection clauses applies to Lazare's claims. To that end, on July 8, 2013, this Court ordered that the parties proceed with discovery related to which forum-selection clause applies and the banking arrangements among the parties. [Dkt. 71].

The parties thereafter engaged in extensive deposition and document discovery focused on the nature of the parties' banking relationships. One of the first documents KBC produced in discovery was the Services Agreement, which was attached to a letter that KBC sent to this Court and Lazare on September 9, 2013, **over four years ago**. [Dkt. 220 at 4].[2]

**III.    THE *NEW MOON* HEARING AND RELATED MOTIONS PRACTICE**

On July 31, 2015, at Lazare's urging, this Court ordered a hearing pursuant to *New Moon Shipping Co., Ltd. v. MAN B & W Diesel AG*, 121 F.3d 24 (2d Cir. 1997), to resolve which of the two forum-selection clauses applied to the claims in Lazare's Complaint. [Dkt. 151]. On

---

[2] KBC's September 9, 2013 letter was not docketed, but Lazare acknowledges it in its Motion. [Dkt. 220 at 4, 18]. For convenience, a copy of KBC's letter is provided as an exhibit to this Memorandum. *See* Declaration of Peter A. Bicks ("Bicks Decl.") Ex. A.

February 22, 2016, soon after the completion of deposition discovery, and with the *New Moon*

hearing approaching, Lazare filed a letter with the Court requesting a pre-motion conference in

advance of filing a motion for sanctions.  [Dkt. 161].  It was in this letter—filed nearly **four**

**years** after KBC noted the existence of the Services Agreement and more than **two years** after it

produced that agreement—that Lazare first alleged that KBC had committed "fraud on the court"

by purportedly not disclosing the existence of the Services Agreement or describing certain

details of KBC's and Antwerp Bank's performance under the agreement during the briefing on

the motions to dismiss or before the Second Circuit.  *Id.*  Lazare requested as relief that the Court

decide the forum-selection clause dispute in Lazare's favor.  *Id.*

KBC promptly responded, contending that the letter was Lazare's latest tactic designed to

distract the Court's attention from the flaws in Lazare's case and avoid litigating this case in its

proper forum: Belgium.  [Dkt. 162].  KBC also noted that if Lazare's motion were permitted and

denied, Lazare was certain to present the same evidence and argument at the *New Moon* hearing,

and that the Court should not be burdened with duplicative briefing.  *Id.*  On March 4, 2016, this

Court denied Lazare's request for a pre-motion conference and agreed with KBC that Lazare's

"motion would result in duplicative litigation."  [Dkt. 163].

The *New Moon* hearing was held on February 14-15, 2017.  Both parties presented

evidence regarding the two forum-selection clauses and the banking arrangements between the

parties.  As relevant here, this Court reviewed and considered the Services Agreement and heard

extensive and detailed testimony (both on direct and cross-examination) about the Services

Agreement.  *See* PX-20; [Dkt. 193-2 ¶¶ 10-18]; Feb. 15, 2017 Tr. (Grimmig) (*passim*).  In

addition, the Court heard testimony from Ms. Grimmig regarding why her June 15, 2012

Declaration had not expressly referred to the Services Agreement.  Ms. Grimmig explained that

she had regarded it as unnecessary detail to recite the contractual underpinnings of the banking arrangements described in her declaration.  Deposition Testimony of  Diane Grimmig [Dkt. 192-12] ("Grimmig Dep. Test.") at 113:4-24; *see also* Feb. 15, 2017 Tr. (Grimmig) 310:13-311:2 (further noting that she regarded the Services Agreement as fully supportive of KBC's position on venue).[3]

On March 1, 2017, two weeks after the *New Moon* hearing and nearly a year after the Court denied Lazare's earlier attempt to bring a sanctions motion, Lazare filed the instant Motion.  Lazare did so without waiting for the Court to make its findings, informing anyone of its intention to file the motion, or requesting a pre-motion conference.  Lazare's Motion presumed that the Court would resolve certain factual disputes in its favor and requested as relief either "a default judgment against [the Banks] with respect to all of Lazare's claims" or for the Court to "strike [the Banks'] venue and forum selection clause arguments, and rule in favor of Lazare with respect to the proper venue for this action."  [Dkt. 220 at 20].  On March 6, 2017, following both parties' submission of letter correspondence, the Court determined that it would not address Lazare's Motion until after issuing its findings of fact.  [Dkt. 224].

## IV.    THE COURT'S FINDINGS OF FACT

This Court issued those Findings of Fact on June 30, 2017.  [Dkt. 227].  The Court principally relied on the testimony of the Banks' witnesses Diane Grimmig of KBC-NY and Philippe Loral of Antwerp Bank, and further found that Veerle Snyers of Antwerp Bank was "competent to speak to Antwerp Bank's ordinary practices and procedures."  *See id* at 1 n.1*; see also id.* at 11.

---

[3] Although Ms. Snyers traveled from Belgium to make herself available for questioning at the *New Moon* hearing, Lazare elected not to question her on whether she believed that the Services Agreement should have been referenced in her June 14, 2012 declaration.

In contrast, the Court found that the testimony of Lazare's sole witness, William Moryto, was "not credible" regarding whether he had reviewed the relevant agreements. *Id.* at 8. The Court found that "it strain[ed] credulity that Moryto, as the Chief Financial Officer of a publicly traded corporation, would sign a document stating that Lazare had seen and agreed to be bound by separate documents that Moryto had, in fact, not seen." *Id.* The Court also found that "Moryto's testimony on the topic of applying for, and ultimately opening (or not), an account at [Antwerp Bank], [was] not credible for several reasons." *Id.* at 10. Among those reasons was that Moryto "submitted 24 payment requests to [Antwerp Bank] from Lazare's 'ADB Account,' sometimes referring to Lazare's assigned account number." *Id.*

The Court's Findings confirmed KBC's positions that Lazare had an account at Antwerp Bank and on how the Services Agreement operated. The Court's Findings also expressly contradict numerous points that Lazare asserted in this Motion (which, as noted above, was filed before this Court's Findings were issued). Nevertheless, Lazare continues to press this Motion, which is premised on the already disproven theory that if this Court had access to the Services Agreement (which it did for the *New Moon* hearing), the Court would have been compelled to find that (1) Lazare was not an account holder at Antwerp Bank and (2) the KBC-NY Account was more than just a zero-balance account that allowed Lazare to access its Antwerp Bank account during New York business hours. [Dkt. 220 at 1-15].

Lazare's theory is disproven because this Court reviewed the Services Agreement and reached the opposite conclusion on both points in the Court's Findings. The Court found that the Services Agreement operated exactly as the Banks described. [Dkt. 227 at 4-6]. The Court further found, as the Banks had represented, that the purpose of the arrangement in the Services Agreement was "to allow [Antwerp Bank] clients in New York to receive their funds during the

same business day, notwithstanding the six-hour time difference." *Id.* at 4.

The Court also found, again in accord with the Banks' description, that the Services Agreement confirmed that "the credit risk was [incurred] and acted upon by [Antwerp Bank]." *Id.* And, the Court found that after KBC-NY effectuated a payment, it would "alert [Antwerp Bank] to the payment so that [Antwerp Bank] could 'debit the diamond customers' account in its books against the KBC pooling account.'" *Id.* at 5. When KBC-NY accepted funds, it sent "the information to [Antwerp Bank] so that it could 'credit the diamond clients' accounts in its books against the KBC pooling account.'" *Id.*

All of these findings are fully consistent with the descriptions provided in the two declarations that Lazare now challenges. The Court's Findings also affirm the Banks' contentions concerning the existence and purpose of Lazare's bank accounts. The Court found that Lazare had a bank account at Antwerp Bank. *Id.* at 11. And, the Court rejected Lazare's contention that the KBC-NY Account was an overdraft account, finding instead that the evidence confirmed the Banks' "explanation of how the KBC-NY account functioned." *Id.* at 6 n.6.

## V.    LAZARE'S ADDITIONAL MOTION PRACTICE

On July 14, 2017, Lazare filed a motion for reconsideration of the Court's Findings, in which it accused the Court of "overlook[ing], misquot[ing] and/or misinterpret[ing] important documents and testimony." [Dkt. 231 at 2].[4] Lazare argued in that motion that three of the Court's Findings—relating to: (1) the existence of Lazare's bank account at Antwerp Bank; (2) the functioning of Lazare's bank account at KBC-NY; and (3) KBC's role in connection with Lazare's credit facility—were all refuted by the record. *See id.* at 4-14. Lazare also asserted that

---

[4] Lazare's motion for reconsideration was filed three days after it received a letter from KBC requesting that Lazare withdraw the instant Motion in light of the Court's Findings. Should the Court wish to review KBC's letter or Lazare's response, KBC stands ready to provide the correspondence.

the Court had overlooked KBC's and Antwerp Bank's purported "fraud on the court" in making its findings. *See id.* at 16.  KBC opposed Lazare's motion, primarily on the grounds that the Court's Findings had "ample support in the evidentiary record."  [Dkt. 236].

The Court denied Lazare's reconsideration motion.  [Dkt. 241].  The Court rejected all of Lazare's arguments, finding that they largely rehashed arguments Lazare had previously made and lost.  *Id.* at 3, 5.  The Court again rejected Lazare's claim that it did not have a bank account at Antwerp Bank, reiterating that Mr. Moryto's testimony on that scope was "not credible."  *Id.* at 5.  The Court also reaffirmed its findings regarding the KBC-NY Account and KBC's relationship with Antwerp Bank that (1) the KBC-NY Account was not an overdraft account; (2) not every Antwerp Bank credit decision required approval by KBC's credit committee; and (3) "a KBC-NY account was not required to open a line of credit at [Antwerp Bank]."  *Id.* at 5-7.

The Court also noted that it had not "'overlooked' Lazare's contention that the Banks committed fraud on the Court" in making its Findings of Fact.  *Id.* at 7.  The Court observed that "the import of" the Banks' alleged failure to disclose the Services Agreement during the initial briefing of the motions to dismiss "depends, in large part, on how the Court understands that the relationship between [Antwerp Bank] and KBC-NY functioned."  *Id.* at 8.

Lazare then moved to amend its Complaint, [Dkt. 245], which KBC opposed, [Dkts. 248-49].  On September 25, 2017, this Court granted Lazare leave to amend its Complaint.  [Dkt. 250].  The Court stated, however, that with respect to this Motion and the forthcoming motion to dismiss, "to the extent any of Lazare's allegations in the Amended Complaint could be construed as conflicting with the Court's Findings of Fact […] the Court's Findings of Fact control."  *Id.* Lazare filed its First Amended Complaint on September 26, 2017.  [Dkt. 251].

**ARGUMENT**

**I.    DEFENDANTS DID NOT COMMIT FRAUD ON THE COURT, AND LAZARE HAS NOT MET ITS BURDEN TO PROVE OTHERWISE**

Far from supporting its position, the case law cited by Lazare makes clear that the serious charge of "fraud on the court" is reserved for extreme circumstances that bear no resemblance whatsoever to the allegations that form the basis for Lazare's Motion.  In addition, and no less significantly, the record makes clear that Lazare's allegations are in any event groundless.  The Services Agreement was not "concealed" from the Court or Lazare.  Nor were the banking arrangements called for by the Services Agreement misdescribed in any of the declarations submitted in connection with the Banks' motions to dismiss.  Instead, as the Court's Findings demonstrate, the Services Agreement fully supports the Banks' position on venue and confirms the accuracy of the declarations previously submitted.

**A.    The Governing Legal Standard**

While the Court has the inherent power to sanction misconduct, this power "must be exercised with restraint and discretion."  *Chambers v. NASCO, Inc.*, 501 U.S. 32, 44 (1991); *Crown Awards, Inc. v. Trophy Depot, Inc.*, 15-cv-1178, 2017 WL 564885, at *5 (S.D.N.Y. Feb. 13, 2017).  Thus, "the threshold finding required to justify sanctions under the inherent powers doctrine is **extremely high**."  *United States v. Seltzer*, 227 F.3d 36, 41 n.2 (2d Cir. 2000) (emphasis added); *Crown Awards, Inc.*, 2017 WL 564885, at *5.

Lazare must show fraud on the court by "clear and convincing evidence, that is, evidence that makes the fact to be proved highly probable."  *Chen v. Wai? Cafe Inc.*, 10-cv-7254, 2016 WL 722185, at *4 (S.D.N.Y. Feb. 19, 2016).  The "heavy burden of proof" is on Lazare; the Banks "ha[ve] no obligation […] to 'disprove' fraud."  *Bullock v. Reckenwald*, 15-cv-5255, 2016

12

WL 5793974, at *19 (S.D.N.Y. Aug. 24, 2016).  To meet that standard, Lazare must produce

evidence that is not "loose, equivocal, or contradictory."  *Chen*, 2016 WL 722185, at *4.

Specifically, to show fraud on the court, Lazare must establish by clear and convincing

evidence that the Banks "ha[ve] sentiently set in motion some unconscionable scheme calculated

to interfere with the judicial system's ability impartially to adjudicate a matter by unfairly

hampering the presentation of the opposing party's claim or defense."  *Passlogix, Inc. v. 2FA*

*Tech., LLC*, 708 F. Supp. 2d 378, 393 (S.D.N.Y. 2010); *accord A.I.A. Holdings, S.A. v. Lehman*

*Bros, Inc.*, 97-cv-4978, 2002 WL 1271722, at *2 (S.D.N.Y. May 29, 2002) (denying motion for

sanctions for fraud on the court where movants did not meet their burden "of proving, by clear

and convincing evidence, that plaintiffs knowingly committed a fraud on the Court and

attempted to hinder the fact finder's fair adjudication of the case").  "The essence of fraud on the

court is when a party lies to the court and his adversary intentionally, repeatedly, and about

issues that are central to the truth-finding process."  *Passlogix*, 708 F. Supp. 2d at 393.  Fraud on

the court "does not merely embrace any conduct of an adverse party of which the court

disapproves; rather, it embraces only that species of fraud which does, or attempts to, defile the

court itself."  *Id.* at 394 (quoting *Kupferman v. Consol. Research & Mfg. Corp.*, 459 F.2d 1072,

1078 (2d Cir. 1972)).

Further still, the cases Lazare cites confirm that courts cannot and do not invoke their

inherent power to sanction a party for fraud on the court in the absence of misconduct that is both

clearly established and extreme.  For example, in *Cerruti 1881 S.A. v. Cerruti, Inc.*, 169 F.R.D.

573 (S.D.N.Y. 1996), the sanctioned party fabricated records purporting to show that it used a

trademark in connection with a dispute over the abandonment of that trademark.  The court noted

that this was not a "peripheral or an incidental matter," but misconduct that affected the entirety

of the case.  *Id.* at 583.  Similarly, in *Scholastic, Inc. v. Stouffer*, 221 F. Supp. 2d 425 (S.D.N.Y. 2002), the sanctioned party falsified numerous pieces of evidence to show that it used a trademark.  The court found that there was "clear and convincing evidence" that the plaintiff had employed an unconscionable and purposeful scheme to interfere with the judicial system by forging this evidence to make out its claim.  *Id.* at 439-45.  In *McMunn v. Memorial Sloan-Kettering Cancer Ctr.*, 191 F. Supp. 2d 440 (S.D.N.Y. 2002), the defendant purposefully and intentionally destroyed critical evidence that went to the heart of the case.  Finally, in *Arbitration Between Karaha Bodas Co., LLC v. Minyak*, 21-MC-98, 2007 WL 1284903 (S.D.N.Y. Apr. 30, 2007), the court sanctioned a party for intentionally lying about an essential fact in the case during a deposition.

### B. Application Of The Governing Legal Standard To Lazare's Allegations

Although Lazare's Motion strains mightily to create the contrary impression, the record refutes rather than supports any claim of fraud on the court.  The Services Agreement was not "concealed" from Lazare or the Court during briefing on the Banks' motions to dismiss.  The banking arrangements called for by the Services Agreement were not misdescribed.  And, in any event, none of Lazare's claimed misconduct, even if it occurred, would bear any resemblance to the extreme conduct that must be demonstrated to prevail on a claim of fraud on the court.

### 1. The Services Agreement Was Not "Concealed"

The core of Lazare's claim of "concealment" is the "failure" of the Banks to include the Services Agreement in their motion papers and the "failure" of the declarations submitted by Ms. Grimmig and Ms. Snyers to make reference to the Agreement.  In the conspiracy theory spun by Lazare, those "failures" were deliberate efforts to prevent the Court from learning facts that would lead it to rule in Lazare's favor on the venue issue.

The fatal flaw in that theory is obvious:  The Court in fact reviewed the Services

14

Agreement in connection with the *New Moon* hearing, and the Court's Findings soundly and thoroughly reject Lazare's reading of the Services Agreement. [Dkt. 227 at 4-6]. Thereafter, the Court rejected Lazare's reconsideration motion, making clear once again that Lazare's reading of the Services Agreement was erroneous and contrary to the record as a whole. [Dkt. 241 at 5-7]. Stated another way, the Court confirmed what KBC had stated four years earlier when it produced the Services Agreement: The Agreement fully supports KBC's position on venue. *See* [Dkt. 226-2].

Obviously, a party would have no incentive to conceal a document that is favorable to its position. And that alone would be sufficient basis for rejecting Lazare's claim that the Services Agreement was concealed from the Court. But the record provides still further confirmation that Lazare's claim of concealment is baseless.

Importantly, the document that Lazare characterizes as having been concealed was in fact expressly referenced in Paragraph 6 of the April 6, 2012 Declaration of Walter Haeck, filed in support of KBC's motion to dismiss. In that paragraph, Mr. Haeck stated that "KBC's New York branch acts as a correspondent bank for Antwerp Bank ***pursuant to a service agreement***." [Dkt. 29 ¶ 6] (emphasis added). Plainly, Mr. Haeck could have omitted reference to the Services Agreement without having the sentence appear incomplete. Yet, Mr. Haeck included the reference, which confirms that the Banks felt no need to conceal the existence of the agreement from Lazare or the Court. Indeed, it is impossible to posit a theory under which a party bent on concealing the existence of a document would then expressly reference that document in a filing.

Further still, despite Lazare's repeated efforts to suggest in its questioning of Ms. Grimmig that her "failure" to make reference to the Services Agreement in her June 15, 2012 Declaration could only be explained as an effort to conceal the document from the Court,

Ms. Grimmig reasonably and credibly replied that she regarded it as sufficient simply to explain how the banking arrangements among the parties operated, without detouring into the weeds of the contractual underpinnings of those banking arrangements.  Grimmig Dep. Test. at 113:4-24; *accord* Feb 15, 2017 Tr. (Grimmig) 310:13-311:2 (confirming, under oath, that she had no intent to conceal the Services Agreement, and that she in fact regarded the agreement as favorable to KBC's position).  Moreover, Ms. Grimmig could scarcely have regarded herself as participating in a conspiracy to conceal the Services Agreement from the Court since her colleague Mr. Haeck had already expressly referred to the Services Agreement in his own declaration.

Notably, the Banks were not alone in their view that resolution of the pending motions to dismiss did not require review of the Services Agreement.  Instead, as the record makes clear, Lazare shared that view as well.  Despite having been alerted by Mr. Haeck's declaration to the existence of the Services Agreement, Lazare at no time contended in its briefing or argument on the motions to dismiss that a copy of that Agreement should be made available.[5]  Nor did Lazare ask KBC for an opportunity to review the document referred to in Mr. Haeck's declaration.  As a result, Lazare cannot now contend that the Services Agreement was obviously critical to resolution of the motions to dismiss.

Nor can Lazare's "concealment" claim be salvaged by converting it to a claim that the Banks should be sanctioned for failing to produce the Services Agreement even in the absence of a request for it.  ***First***, it is well settled that failing to disclose a document in discovery is an insufficient basis for a claim of fraud on the court.  *Gleason v. Jandrucko*, 860 F.2d 556, 559-60

---

[5] That Lazare was put on notice of the Services Agreement in Mr. Haeck's declaration is evidenced by Lazare's First Set of Document Requests to Defendant KBC Bank N.V., dated July 23, 2013 (just one month after the Second Circuit's decision), in which Lazare requested "The services agreement between ADB and KBC referenced in Paragraph 6 of the Haeck Declaration."  Bicks Decl. Ex. B at Request 18.  Notwithstanding Lazare's knowledge of the existence of the Services Agreement, Lazare had not previously requested it until serving the document requests, and KBC produced the Services Agreement a month and a half after Lazare served these document requests.  *See id.* Ex. A.

(2d Cir. 1988) (holding that "allegations of nondisclosure during pretrial discovery" alone are not sufficient for a court to find fraud on the court); *Satterfield v. Pfizer, Inc.*, 04-cv-3782, 2005 WL 1765708, at *9 (S.D.N.Y. July 18, 2005) (same), *aff'd*, 208 F. App'x 59 (2d Cir. 2006); *Chen*, 2016 WL 722185, at *4 (same). ***Second***, discovery was stayed during the briefing of the motions to dismiss.[6]

### 2.    The Banking Arrangements Among The Parties Were Not Misdescribed

The record likewise refutes Lazare's claim that the Banks committed fraud on the Court by submitting declarations that deliberately misdescribed the banking arrangements described in the Services Agreement. As the Court's Findings make clear, the declarations of Ms. Grimmig and Ms. Snyers were entirely accurate and fully consistent with the Services Agreement.

Thus, for example, Ms. Grimmig's June 15, 2012 declaration explained—and the Court agreed—that the "main purpose of the [KBC-NY Account] was that it allowed Lazare to draw on its credit line with Antwerp Bank during regular New York business hours, as opposed to Antwerp Bank's operating hours in Belgium, six time zones away." [Dkt. 54 ¶ 8]; *accord* [Dkt. 227 at 4] (Court's Finding consistent with Ms. Grimmig's statement). Ms. Grimmig further

---

[6] Lazare suggests in passing that the Banks sought to stay discovery for the very purpose of concealing the Services Agreement. [Dkt. 220 at 3]. But wholly apart from the evidence refuting any suggestion of intent to conceal the Agreement, the timeline of events does not support Lazare's theory. As is typical in private actions alleging fraud, the stay of discovery was sought and obtained before motion practice began (*see* [Dkt. 18])—and thus well before the Banks could have anticipated a need to respond to Lazare's remarkable claim, made for the first time in its response to the Banks' motion to dismiss (and in direct conflict with the allegations in its own Complaint), that Lazare's only "banking relationship" was with KBC-NY.

Similarly, Lazare is no less fanciful in its passing claim that counsel for KBC attempted to, in effect, conceal the concealment of the Services Agreement by "falsely" claiming to the Court that Ms. Grimmig had referred to the Services Agreement in her June 14, 2012 declaration. [Dkt. 220 at 4]. To be sure, counsel's letter (which Lazare elected not to include in its motion papers, but which is attached as Exhibit A to this Memorandum) could have included mention of the declarant who had *expressly* referred to the Services Agreement. (It was, in fact, Mr. Haeck, not Ms. Grimmig; Ms. Grimmig described generally how the banks operated consistent with the Services Agreement.) But that cannot plausibly be characterized as an effort to mislead the Court (which, like Lazare, had all of the declarations before it). And Lazare's effort to suggest otherwise simply underscores the depths to which Lazare is prepared to stoop to avoid a ruling on the merits of the pending venue dispute.

described the process by which, upon receiving a request from Lazare to draw on its credit from Antwerp Bank, KBC "would disburse the requested funds into the [KBC-NY Account] and then route the funds to the payee designated by Lazare," [Dkt. 54 ¶ 10]. That description is likewise consistent with the Court's Findings. [Dkt. 227 at 5]; *see also* DX-24 ¶ 1.

Ms. Grimmig also explained, and the Court agreed, that:

- "KBC would inform Antwerp Bank (via an automated interbank message) of each disbursement made on behalf of Lazare so that Antwerp Bank could make a corresponding debit in the Lazare Antwerp Bank Account." [Dkt. 54 ¶ 11]; *accord* [Dkt. 227 at 5] (Court's Finding consistent with Ms. Grimmig's statement); DX-24 ¶ 1; and

- At the end of Lazare's business day in New York, if the amount deposited in the KBC-NY Account exceeded the amount withdrawn, "the excess funds would be 'swept' out of the account [...] and credited to the Lazare Antwerp Bank Account." [Dkt. 54 ¶ 11]; *see also* [Dkt. 227 at 5-6] (Court's Finding consistent with Ms. Grimmig's statement); DX-24 ¶¶ 2-3.

Similarly, the description of banking operations provided by Ms. Snyers in her June 14, 2012 declaration is—as the Court's Findings have confirmed—fully consistent both with the Services Agreement and with the testimony of Ms. Snyers's colleagues at KBC and Antwerp Bank. Indeed, each of the "inaccuracies" cited by Lazare as evidence of Ms. Snyers's "fraud on the court" are in fact directly echoed by statements that this Court credited in its Findings. *Compare* [Dkt. 220 at 6-7] (criticizing Ms. Snyers's declaration for (i) describing Lazare's account at KBC-NY as a "zero balance account" and stating that "any funds transferred into the [...] account are automatically credited to (or swept into) the customer's bank account at [ADB] at the end of the day"; (ii) describing a credit to Lazare's KBC-NY Account as "representing a transfer from the Lazare Antwerp Bank Account"; and (iii) describing zero balancing movements as "representing an automatic transfer or 'sweep' of [...] credits into the Lazare Antwerp Bank Account") *with* [Dkt. 227 at 5-6] (finding that customer accounts at KBC-NY were routinely

referred to as "zero balance accounts"; funds transferred into or out of a KBC-NY Account were credited or debited to the customer's bank account at Antwerp Bank; and the end-of-the day reconciliation that was effected via Antwerp Bank's pooling account was alternatively referred to as "clearing," "zeroing out," or "sweeping" the customer's credit or debit activity).

    **3.**    **The Court's Findings Refute The Fundamental Premise Underlying Lazare's Motion**

    It bears emphasis that Lazare's Motion ***necessarily*** fails because it is based on the faulty premise that the Services Agreement supports Lazare's position on the forum issue. The crux of Lazare's argument in the Motion is that if the Banks had disclosed the Services Agreement during the briefing of the motions to dismiss, this Court would have learned that: (1) Lazare was not an account holder at Antwerp Bank and (2) the KBC-NY Account was more than just a zero-balance account that allowed Lazare to access its Antwerp Bank account during New York business hours. But in its evidentiary findings, this Court reviewed the Services Agreement and found that it supported the Banks' arguments—reaching the opposite conclusion from the one pressed by Lazare. [Dkt. 227 at 4, 11-13].

    ***Lazare had an account at Antwerp Bank.*** Since the time it opposed KBC's motion to dismiss, all the way through the *New Moon* hearing, Lazare's primary argument to avoid litigating this case in Belgium has been premised on the assertion that it did not have a bank account at Antwerp Bank. Lazare made this argument because, as it concedes in its Motion, the Belgian Forum Clause "could be applicable" if Lazare maintained a bank account at Antwerp Bank in Belgium. [Dkt. 220 at 9 n.11]. Lazare suggests that the Services Agreement supports its argument, but this Court found otherwise. After considering the Services Agreement, this Court found—just as the Banks argued throughout the litigation—that Antwerp Bank "opened an account for Lazare." [Dkt. 227 at 11]; *accord* [Dkt. 50 ¶¶ 2-9]; Deposition Testimony of

19

Philippe Loral ("Loral Dep. Test.") at 37:11-38:10, 46:23-47:4, 107:22-108:8, 132:22-133:3; Deposition Testimony of Marc Weiss ("Weiss Dep. Test.) at 64:25-65:4, 66:17-67:8; [Dkt. 193-3 ¶ 12].  The Court explicitly reaffirmed this finding after Lazare moved for reconsideration.  [Dkt. 241 at 2-5].  This Court has thus determined that Lazare is an account holder at Antwerp Bank— which, the Banks contend, means that the mandatory forum-selection clause contained in Article 37 of the General Conditions for Banking Operations governs.  DX-22 at 6.

Lazare attempts to revisit groundless argument by alleging that "there is no reference whatsoever in the Services Agreement to current accounts with Antwerp Bank, as the entire Agreement is focused on the creation and operation of customer bank accounts at the New York Branch of KBC."  [Dkt. 220 at 5]. This is simply not true.  *See* DX-24 ¶¶ 1 (1st and 6th bullet), 2 (3rd bullet), 4, 5.  The Services Agreement indeed discusses the operation of KBC-NY zero-balance accounts.  But, as the Services Agreement makes clear, accounts at KBC-NY could only be created and operated in order to facilitate the customers' access to their already existing bank account at Antwerp Bank.  [Dkt. 193-2 ¶ 15]; DX-24 ¶¶ 1 (6th bullet), 2 (3rd bullet), 4, 5 (Antwerp Bank debits or credits the diamond clients' account against the KBC pooling account.); Feb. 15, 2017 Tr. (Grimmig) at 239:18-241:5; Loral Dep. Test. at 37:11-19, 121:25-122:7, 132:1-5.

All of this is in accord with the Court's Findings that Lazare was an account holder at Antwerp Bank and that the KBC-NY Account was designed to facilitate access to this account. [Dkt. 227 at 4, 11] ("This arrangement was designed to allow [Antwerp Bank] clients in New York to receive their funds during the same business day, notwithstanding the six-hour time difference between New York and Belgium."); (Antwerp Bank "in fact, opened an account for Lazare.").

***KBC-NY Account was to facilitate access to Lazare's Antwerp Bank account.***  Lazare's Motion also relies on Lazare's assertion that the KBC-NY Account "played the central and critical role of funding, administering, and executing Lazare's transactions under the Credit Facility."  [Dkt. 220 at 3].  Lazare further asserts that the Services Agreement shows that KBC-NY "extended loans or credit to Lazare, at least on an intraday basis."  *Id.* at 7.

The Court's Findings, however, directly refute both of these assertions, completely undermining Lazare's claim that this Court would have decided the motion to dismiss differently if it had considered the specific terms of the Services Agreement.  Indeed, the Findings confirm that the KBC-NY Account operated exactly as KBC had described.  [Dkt. 227 at 4]; *accord* [Dkt. 54 ¶¶ 8-14]; [Dkt. 193-2 ¶ 27].[7]

Lazare likewise misstates the record in contending that KBC had other agreements with Lazare that KBC did not disclose.  [Dkt. 220 at 8].  The only document Lazare cites to support this baseless assertion is a May 31, 2001 letter that it signed and submitted to Antwerp Bank.  *Id.* That letter is not an agreement between KBC and Lazare—though Lazare labels it as such.  Indeed, this Court did not agree with Lazare's characterization of the letter.  Instead, the Court found it to be simply a letter by which "Lazare requested that 'disbursements and payments under our credit facility with [Antwerp Bank] shall be effected through our account with [KBC-NY] and shall result in a same day debit or credit to our loan balance with [Antwerp Bank]." [Dkt. 227 at 12]; PX-14.  The Court further found, as KBC argued, that nothing in the letter or anywhere else "states that a KBC-NY zero-balance account was required for a credit line with

---

[7] Lazare asserts in passing that KBC committed fraud on the court by not disclosing the pooling account during the motion-to-dismiss briefing, which Lazare contends would have led the Court to a different result.  [Dkt. 220 at 8].  That is also disproven by the Court's Findings, after the *New Moon* hearing, where it received a great deal of evidence concerning the pooling account.  More to the point, Lazare's argument ignores that its own Complaint discussed the pooling account.  *See, e.g.*, [Dkt. 1 ¶¶ 53, 108].  It is nonsense to argue that the Banks were actively concealing an account that was in Lazare's Complaint.

[Antwerp Bank]; rather, to the extent a New York-based client wanted convenient access to their credit line during New York business hours, [Antwerp Bank] would prefer that all debits and credits go exclusively through the KBC-NY account."  [Dkt. 227 at 12-13]; *see also* [Dkt. 241 at 6].

## II.     LAZARE'S "PROPOSED RELIEF"—AS WELL AS THE TIMING OF ITS MOTION—CONFIRMS LAZARE'S MOTIVATION IN PURSUING THIS MOTION

Because KBC committed no fraud on the Court, and Lazare has failed to meet its high burden to establish otherwise by clear and convincing evidence, it is not necessary for the Court to even consider whether or what type of sanctions are warranted.  *Chen*, 2016 WL 722185, at *4; *see also Crown Awards, Inc.*, 2017 WL 564885, at *13; *Passlogix*, 708 F. Supp. 2d at 394. Nonetheless, several aspects of Lazare's claim for relief warrant brief comment.

*First*, just as there is no support for Lazare's claims of misconduct, Lazare's claims of prejudice flowing from that purported misconduct are utterly baseless.  Lazare cites to no support for its suggestion that the Banks' conduct is the reason "its business operations were devastated." [Dkt. 220 at 5].  In fact, Lazare defaulted on its $40 million credit facility with Antwerp Bank in 2010, almost two years before this litigation commenced.  PX-19.  Similarly, Lazare argues that KBC's purported non-disclosure of the Services Agreement caused its stock to be delisted.  [Dkt. 220 at 5] ("While Defendants' fraud played out, Lazare's stock was de-listed.").  But, in fact, as Lazare itself alleges in its First Amended Complaint, its stock was delisted from the American Stock Exchange on August 11, 2010—over a year before the Complaint was filed.  *See* [Dkt. 251 ¶ 32] ("Lazare's common stock was delisted from AMEX on August 11, 2010.").

*Second*, the specific relief sought by Lazare—namely, a $1.5 billion default judgment on its 14 claims in this action or, at minimum, the "striking" of the forum-selection clause in Article 37 of the General Conditions for Banking Operations—is nothing short of extraordinary

22

and speaks volumes about Lazare's motivation in bringing this Motion.

It is well settled that a default judgment is "the most drastic remedy, **used only in extreme circumstances**, and as a last, not a first resort." *Marfia v. T.C. Ziraat Bankasi, N.Y. Branch,* 100 F.3d 243, 249 (2d Cir. 1996) (emphasis added); *see also Bullock*, 2016 WL 5793974, at *17. In addition, notwithstanding Lazare's contention that "a default judgment […] would be warranted under the cited precedents" ([Dkt. 220 at 20]), the conduct at issue in the cases cited by Lazare (*id.* at 19 n.19) does not remotely resemble the allegations in Lazare's Motion. As a result, even if Lazare's allegations were true—and, as demonstrated above, they are not—Lazare still would not be entitled to the relief it seeks.

The primary case on which Lazare relies, *Sun World, Inc. v. Olivarria*, 144 F.R.D. 384 (E.D. Cal. 1992), involved a party who submitted false documents, perjured himself on multiple occasions, mocked the court, and purposefully delayed the case to further his strategic objectives. Accordingly, neither the facts of that case nor the language of the decision—which noted that "dismissal under the court's inherent powers is justified in *extreme circumstances*," *id.* at 390 (emphasis added)—provides any support for Lazare's requested relief.[8] Indeed, Lazare's requested remedy is so farfetched that there is only one logical explanation for it: It is a Hail Mary pass from a party that recognizes it is about to lose on the pending forum dispute, and hopes at all costs to avoid litigating in Belgium.

***Third***, and finally, the woeful untimeliness of Lazare's Motion provides further reason to question its motivation—as well as an independent basis for denying Lazare's requested relief.

---

[8] Lazare also inaccurately cites to a Supreme Court case from "1994" that it claims sanctioned a party for fraud by vacating a judgment. But the Court's decision, from 19*44*, actually involved vacating judgment under the equivalent of Rule 60(b)(3)—which simply has the effect of reopening proceedings, not entering an adverse judgment—and that decision, in any event, has since been overturned in part. *See Hazel-Atlas Glass Co. v. Hartford-Empire Co.*, 322 U.S. 238, 246 (1944). Similarly, one of Lazare's other "cited precedents" did not grant a default as a sanction at all. *See Karaha Bodas Co.*, 2007 WL 1284903, at *6 (instead granting monetary sanctions).

Lazare has known of the existence of the Services Agreement for no less than five years (*i.e.,* since April 2012, when its existence was noted in Mr. Haeck's declaration), and Lazare has had a copy of the agreement for no less than four years (*i.e.,* since September 2013, when KBC attached a copy to correspondence with the Court).  Yet, Lazare waited until February 2016—after venue discovery had been completed, and as the Court was about to schedule the *New Moon* hearing that Lazare had previously insisted upon—to argue that the merits of the parties' dispute need not even be reached because KBC's "misconduct" in "concealing" the Services Agreement warranted a ruling in Lazare's favor.

In analogous circumstances, courts in this Circuit have not hesitated to deny motions for sanctions as untimely.  *See, e.g.*, *Ali v. A & G Co., Inc.*, 542 F.2d 595, 596 (2d Cir. 1976) (denying Rule 37 motion for sanctions for failure to submit to discovery brought on eve of trial); *Gutman v. Klein*, 03-cv-1570, 2010 WL 4916722, at *8 (E.D.N.Y. Nov. 24, 2010) (denying Rule 37 motion for discovery sanctions as untimely where it was based on concerns about the completeness of a document production that dated years back); *In re Teligent, Inc.*, 358 B.R. 45, 59-60 (S.D.N.Y. 2006) (same); *see also Brandt v. Vulcan, Inc.*, 30 F.3d 752, 756-57 (7th Cir. 1994) (denying sanctions motion as untimely where movant knew of suspected discovery violations for years).  Accordingly, the indisputable untimeliness of Lazare's Motion provides still further grounds for denial of the relief it seeks.

## CONCLUSION

For the reasons stated, Lazare's motion for sanctions should be denied.

24

ORRICK, HERRINGTON & SUTCLIFFE LLP

By: /s/ Peter A. Bicks

Peter A. Bicks
Stephen G. Foresta
Aaron M. Rubin

51 West 52nd Street
New York, NY  10019-6142
Telephone: (212) 506-5000
pbicks@orrick.com
sforesta@orrick.com
amrubin@orrick.com

*Attorneys for Defendant KBC Bank N.V.*

LANKLER SIFFERT & WOHL LLP

By:  /s/ Helen Gredd

Helen Gredd

500 Fifth Avenue
New York, NY 10110
Telephone:  (212) 921-8399
HGredd@lswlaw.com

*Attorneys for Defendant KBC Bank N.V., as Successor in Interest to Antwerp Diamond Bank N.V.*