USDC SDNY
DOCUMENT ELECTRONICALLY
FILED
DOC#: _____
DATE FILED: 8-24-18

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| |
|---|
| **LAZARE KAPLAN INTERNATIONAL INC.,** |
| **Plaintiff,** |
| **-against-** |
| **KBC BANK N.V. and ANTWERP DIAMOND BANK N.V.,** |
| **Defendants.** |

**11-cv-09490 (ALC)**

**OPINION AND ORDER**

**ANDREW L. CARTER, JR., United States District Judge:**

Plaintiff Lazare Kaplan International, Inc. ("Lazare") sued Antwerp Diamond Bank N.V. ("ADB") and KBC Bank N.V. ("KBC") (collectively "Defendants" or "the Banks"), alleging an international conspiracy between Defendants and various entities to steal diamonds and diamond proceeds belonging to Lazare. Defendants move to dismiss Plaintiff's complaint on grounds that (1) a forum selection clause in Plaintiff's contract with ADB mandates that all claims against the bank be brought in Belgium; (2) under *forum non conveniens* this case should be litigated in Belgium; and (3) Plaintiff fails to state a claim. For the reasons that follow, Defendants' motion to dismiss is GRANTED.

## BACKGROUND

### I.    Factual Background

The following facts are taken from Plaintiff's First Amended Complaint ("FAC") and this Court's Findings of Fact following a hearing pursuant to *New Moon Shipping Co., Ltd. v. MAN B & W Diesel AG*, 121 F.3d 24 (2d Cir. 1997) ("New Moon Hearing") ("Findings").[1]

---

[1] Where the two statements of facts conflict, this Court's Findings control.

Lazare is a diamond company that is headquartered in New York and which conducts business in Belgium through its subsidiary, Lazare Kaplan Belgium, N.V. ("Lazare Belgium"). Findings at 2. Its business involves buying and selling rough and polished diamonds. *Id.* Lazare finances these operations through working (or revolving) lines of credit that it maintains at numerous financial institutions. *Id.*

Defendants KBC and ADB (collectively "Banks") are Belgium bank corporations. During the relevant time period, ADB provided loans, including overdraft facilities, to participants in the diamond industry. *Id.* At the time of the conduct giving rise to this action, ADB was a subsidiary of KBC. *Id.* On July 1, 2015, after this complaint was filed, KBC absorbed ADB's business and operations. *Id.* at 2-3.

### A. Bank Operations and Agreements

KBC operates a branch office in New York ("KBC-NY"). *Id.* at 3. ADB was licensed to maintain a representative office in New York ("ADB-NY"). *Id.* However, ADB's New York operations were limited. The terms of ADB's representative office license prohibited ADB-NY from providing banking services or making decisions about originating loans. *Id.* Such decisions were reserved for ADB's "Head Office" in Antwerp, Belgium. *Id.* Accordingly, employees at ADB-NY were limited to conducting research on the United States market, marketing the bank, introducing New York-based clients to the Head Office, and monitoring those clients' activities. *Id.* While employees at ADB-NY could negotiate credit arrangements with clients or potential clients, the members of ADB's credit committee at the Head Office were ultimately responsible for actually approving credit decisions with respect to the bank's clients. *Id.* at 3-4. In some instances, KBC's credit committee also had to weigh in on the decision. *Id.* at 4.

### i.    Services Agreement Between ADB and KBC-NY

In light of ADB-NY's limited capacities, on October 15, 1999 ADB entered into a
Services Agreement with KBC-NY to provide certain operational services to ADB's New York-
based clients. *Id.* Such services included "allowing diamond clients to open current accounts in
their books and effectuating both local and international payments and other banking services on
behalf of the diamond client." *Id.* The arrangement was designed to allow ADB clients in New
York to receive their funds during the same business day, notwithstanding the six-hour time
difference between New York and Belgium. *Id.* Under the Services Agreement, KBC was "free
to charge the diamond clients for transactions effectuated on their behalf," and ADB was
permitted to charge interest to those customers "[s]ince the credit risk [was] occurred and acted
upon by ADB." *Id.*

Under the Services Agreement, KBC-NY would "communicate all payments effectuated
by the diamond clients to ADB" so that ADB could "make internal entries to adjust the
customer's credit position." *Id.* KBC-NY maintained a "pooling account" in ADB's name to
"fund the payments effectuated by KBC on behalf of the diamond clients." *Id.*

The Court will briefly describe how this Agreement functioned in practice. Essentially,
when an ADB client in New York desired to draw down on its line of credit from ADB, the
payment order went to KBC-NY. *Id.* at 5. KBC-NY then confirmed that the client had sufficient
credit available in its ADB credit line and that there were sufficient funds in ADB's pooling
account. *Id.* If the client had sufficient credit and the pooling account had sufficient funds,
KBC-NY would debit the client's account and carry out the payment as directed. *Id.* If ADB
had insufficient funds in its pooling account, however, KBC-NY could choose to effectuate the
client's payment by overdrafting the pooling account. *Id.* KBC-NY would then alert ADB to the

payment so that ADB could "debit[] the diamond customer['s] account in its books against the KBC pooling account." *Id.* KBC-NY also "accept[ed] and registrate[d] all incoming funds" to ADB's customers, crediting those clients' accounts and sending the information to ADB so that it could "credit[] the diamond clients' accounts in its books against the KBC pooling account." *Id.*

The Services Agreement provides that "[e]ach day, KBC clears the customer's account via ADB's pooling [account]." *Id.* Typically, this final reconciliation between a client's KBC account and the ADB pooling account happened at the end of the day, rather than intra-day. *Id.* This process was referred to as "clearing," "zeroing-out," or "sweeping" the customer's credit or debit activity into ADB's pooling account with KBC. *Id.* at 5-6. For this reason, KBC and ADB representatives referred to clients' accounts at KBC-NY as "zero balance accounts." *Id.* at 6. As a result of this process, during the course of a given day either the client's or KBC-NY's funds were being used to satisfy ADB clients' payment requests. *Id.* However, by the end of the day, KBC-NY would be made whole via funds from ADB's pooling account—unless the bank chose to allow ADB to overdraft the pooling account. *Id.*

**B. Lazare's ADB Credit Facility**

On December 14, 2000, ADB and Lazare entered into an agreement ("Credit Agreement") by which ADB extended Lazare a $10 million credit line. *Id.* At this time, Lazare-Belgium had a line of credit with ADB, but Lazare did not. *Id.* The credit limit was extended several times, ultimately reaching $45 million by the time the parties terminated their relationship ten years later. *Id.* at 6-7.

Section 2 of each Credit Agreement provided that the credit was to only be utilized for overdrafts in current accounts. *Id.* at 7. "Current accounts" referred to accounts that ADB's

clients had with the bank in Belgium, and they were the means by which ADB extended credit to its customers. *Id.* A client could not have an overdraft facility with ADB without also being an account holder at ADB. *Id.* As a general matter, a customer with a line of credit from ADB in the form of an overdraft facility accessed that credit by overdrafting its ADB account, meaning by withdrawing more funds than were deposited. *Id.*

Each Credit Agreement provides that the credit is governed by two sets of conditions: (1) General Conditions for Banking Operations ("Banking Conditions") and (2) General Credit Granting Conditions ("Credit Conditions"). *Id.* The documents were registered in Antwerp on November 2, 2000 and March 11, 1999 respectively. *Id.*

### C. Lazare's Accounts at ADB and KBC-NY

Around the same time that Lazare entered into the 2000 Credit Agreement with ADB, Lazare applied to open accounts at ADB and KBC-NY. *Id.* at 9. Sometime after March 29, 2001, Lazare signed KBC-NY's Account Agreement and General Terms and Conditions. *Id.* at 12. The KBC-NY account became operational on November 16, 2001. *Id.* at 11.

With the exception of certain "straight loans," there is no dispute that, from the time that Lazare's KBC account became operational, Lazare used the KBC account as the exclusive vehicle for all payments and disbursements under its credit facility with ADB. *Id.* at 12. Indeed, on May 31, 2001, William H. Moryto, the Vice President and Chief Financial Officer of Lazare, signed a letter on behalf of Lazare requesting that "all disbursements and payments under our credit facility with [ADB] shall be effected through our account with [KBC-NY] and shall result in a same day debit or credit to our loan balance with ADB." *Id.* The letter also allowed KBC and ADB to exchange all credit, financial, and any other information concerning Lazare and its accounts. *Id.* Nothing in the record states that a KBC-NY zero-balance account was required for

a credit line with ADB; rather, to the extent that a client based in New York wanted convenient access to their credit line during New York business hours, ADB preferred that all debits and credits went exclusively through a single account (the KBC-NY account) rather than through both their KBC-NY and ADB accounts. *Id.* at 12-13.

### D. Forum Selection Clauses

Lazare's agreements with KBC-NY and ADB each contained a forum selection clause ("FSC").

#### i. ADB Forum Selection Clause

Article 37 of ADB's Banking Conditions provides that "Each of the account holder, any correspondent, surety, guarantor, third-party pledgor and other third party hereby further agree that the courts of Antwerp, Belgium shall have exclusive jurisdiction with respect to any action brought against the Bank." *Id.* at 9 (quoting ECF No. 193-38 at 6 ("Antwerp FSC")).

#### ii. KBC-NY Forum Selection Clause

Article 35 of the KBC-NY General Terms provides:

> Any claim or action you bring must be brought before the courts of the County of New York, State of New York, or the Federal Courts situated in the Southern District of New York, which you agree shall have exclusive jurisdiction over these Terms and Conditions or any other agreements you have with KBC Bank relating to any accounts or disputes arising thereunder.

*Id.* at 12 (citing ECF No. 190-31 at 6 ("New York FSC")).

### E. Alleged Unlawful Scheme

Plaintiff contends that KBC and ADB engaged in racketeering and other fraudulent and corrupt practices. *See* Amended Complaint (ECF No. 251) ("FAC"). From around 2007 to 2010, KBC and ADB, their customer Erez Daleyot ("Daleyot"), and various other individuals associated with them, engaged in a systemic money laundering scheme. *Id.* ¶¶ 1-2. In short, the

scheme involved stealing "LKI Diamonds" and LKI Diamond Proceeds; transferring those diamonds through a series of legitimate and illegitimate transactions that made them difficult to trace; laundering the LKI Diamond Proceeds through a network of legitimate and illegitimate businesses and accounts and the New York Pooling Account, and preventing them from reaching Lazare; using the LKI Diamond Proceeds to repay certain financially disastrous loans that the Banks had made to Daleyot and his companies; and covering up and obstructing Lazare's investigation into this scheme, in order to personally enrich senior executives of the Banks and Daleyot. *Id.* ¶ 5.

Formal sector diamonds were delivered to Dubai and Hong Kong, and moved through Switzerland, Israel, and, ultimately, Belgium. *Id.* ¶¶ 130-34. Informal and sight rough diamonds were purchased from Angolan sellers. *Id.* ¶ 149. Transfers of LKI Diamond Proceeds occurred in U.S. dollar denominations and through Lazare's Pooling Account at KBC-NY. *Id.* ¶ 16.

In early 2009, Lazare expressed concerns to senior officers at the Banks that it had not received proceeds from the sales of LKI Diamonds from certain Daleyot Entities. *Id.* ¶ 21. Lazare repeatedly sought the Banks' assistance in investigating these issues, but the Banks refused to assist and obstructed Lazare's attempt to investigate. *Id.* ¶ 22. The Banks then tried to intimidate and extort Lazare by threatening it with claims of defaults over its own lines of credit. *Id.* ¶¶ 23-24. The Banks ultimately terminated Lazare's credit lines, devastating its ability to conduct its business. *Id.* ¶ 24.

**F. Belgium Court Proceedings**

In March 2010, ADB commenced proceedings against Lazare in Antwerp, Belgium, pursuant to the Antwerp FSC, to recover the $45 million lent to Lazare. *See* Direct Testimony of Veerle Snyers ¶ 86 (ECF No. 193-3) ("Snyers Testimony"). Lazare and Lazare-Belgium

asserted counterclaims against ADB based on virtually the same allegations as those brought in this Court. *See* Declaration of Bob Delbaere ¶ 21 (ECF No. 30) ("Delbaere Decl"). Lazare-Belgium also has separate ongoing litigation involving the same facts between Daleyot and certain Daleyot Entities, which has been ongoing for several years. *See id.* ¶¶ 35-38. Additionally, in 2013 Lazare served a criminal summons on ADB and filed a criminal complaint in Antwerp. Declaration of Joost Verlinden ¶ 6 (ECF No. 257) ("Second Verlinden Decl").

## II. Procedural Background

Plaintiff filed the complaint commencing this action on December 23, 2011. ECF No. 1. On September 5, 2012, this Court granted Defendants' motion to transfer this case to Belgium based on *forum non conveniens*. ECF No. 62. Plaintiff appealed and on June 20, 2013 the Second Circuit vacated and remanded this case for further proceedings—namely, to determine the applicability of each forum selection clause to the various aspects of this litigation. ECF No. 68. On February 14 and 15, 2017, this Court held a *New Moon* Hearing to determine facts relevant to the applicability of the Banks' forum selection clauses.

On March 1, 2017, Plaintiff filed a motion for sanctions. ECF Nos. 219-222. The motion was fully briefed and denied on March 28, 2018. ECF No. 269.

This Court issued its Findings of Fact following the *New Moon* Hearing on June 30, 2017. ECF No. 227 ("Findings"). Also at that time, the Court granted Defendants leave to move to dismiss the complaint. *Id.* On July 14, 2017, Plaintiff filed a motion for reconsideration of this Court's Findings. ECF No. 230. The matter was fully briefed and this Court denied the motion for reconsideration on August 16, 2017. ECF No. 241.

On September 26, 2017, Plaintiff filed an amended complaint. ECF No. 251 ("FAC"). On October 27, 2017, Defendants filed a motion to dismiss the amended complaint and

supporting declarations. ECF Nos. 254-58 ("Def Mem"). On November 7, 2017, Defendants filed a notice of supplemental authority. ECF No. 259. Plaintiff filed its opposition to Defendants' motion to dismiss and supporting declaration on November 27, 2017. ECF Nos. 261-62 ("Pl Mem"). Defendants filed their reply brief on December 11, 2017. ECF No. 263 ("Def Reply"). At that point, the Court considered this matter fully submitted.

Following the completion of briefing, on January 25, 2018, Plaintiff filed a supplemental letter advising the Court of "new information" bearing on the pending motion to dismiss. ECF No. 264. Both parties subsequently filed a series of supplemental letters and supporting declarations. ECF Nos. 265-68; 271-84. Defendants urge the Court not to consider such supplemental filings in its consideration of the pending motion. ECF No. 276.

## DISCUSSION

### I.    Consideration of Supplemental Filings

Plaintiff urges the Court to consider new information contained its supplemental filings regarding, *inter alia*, the adequacy and availability of Belgium's courts. Defendants contest the information contained in Plaintiff's letters and also urge the Court not to consider the letters as they were filed without leave of the Court.

The S.D.N.Y. local rules do not contemplate the submission of a sur-reply in further opposition to a motion, and this Court's Individual Rules provide that "[s]ur-reply memoranda will not be accepted without prior permission of the Court." Local Civil Rule 6.1; Individual Rules of Practice § 2(B). Caselaw in this Circuit confirms that a court need not consider new claims raised in supplemental letters filed without leave of the Court. *See Wells Fargo Bank, N.A. v. Wrights Mill Holdings, LLC*, 127 F. Supp. 3d 156, 164 n.5 (S.D.N.Y. 2015) (disregarding supplemental letter because it "improperly raises new arguments after the close of briefing and

argument, without having sought or obtained permission for such a submission"); *Allen v. Avon Products, Inc.*, No. 81-cv-6895, 1988 WL 18841, at *5 n.2 (S.D.N.Y. Feb. 22, 1988) ("It is this Court's policy not to accept supplemental submissions with respect to pending motions, filed without permission."); *see also* Fed. R. Civ. P. 15(d) (permitting supplemental briefing "[o]n motion and reasonable notice").

Here, Plaintiff did not seek leave of the Court before filing multiple supplemental pleadings. The letters essentially contain four categories of allegations: (1) Belgium's courts are no longer available because (a) proceedings in the Court of Cassation, Belgium's main court of last resort, have stayed the litigation and (b) civil proceedings will be stayed due to a pending criminal investigation into similar facts; (2) the U.S. Government has a vested interest in investigating Defendants for conduct related to Hizballah; (3) the Court should consider a document that Plaintiff did not obtain in unredacted form during discovery; and (4) Defendants did not comply with Belgian orders for document production.

The Court will not consider the latter three categories of information as the documents were filed without leave of the Court and, in any event, have no bearing on this motion to dismiss. *See Wells Fargo*, 127 F. Supp. 3d at 164 n.5. The Court has considered letters related to the availability of Belgium's courts to the extent that Plaintiff discusses new developments that could not have been raised in its moving papers.[2]

## II. Applicability of Forum Selection Clauses

### A. Legal Standard

The Supreme Court has made clear that "a valid forum-selection clause [should be] given controlling weight in all but the most exceptional cases." *Atlantic Marine Const. Co., Inc. v.*

---

[2] If the Court considered all of the information contained in the supplemental letters, it would not change its decision.

*U.S. Dist. Court for Western Dist. Of Tex.*, 571 U.S. 49, 62 (2013). Courts in this Circuit afford

substantial deference to parties' selected forum, especially where a forum selection clause was

"made in an arm's-length negotiation by experienced and sophisticated businessmen." *New*

*Moon Shipping Co., Ltd. v. MAN B & W Diesel AG*, 121 F.3d 24, 29 (2d Cir. 1997) (quoting *M/S*

*Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1, 12 (1972)); *see also Mercury West A.G., Inc. v. R.J.*

*Reynolds Tobacco Co.*, No. 03-cv-5262, 2004 WL 421793, at *3 (S.D.N.Y. Mar. 5, 2004)

(citation omitted) ("[T]he Second Circuit has developed a policy of honoring forum selection

clauses.").

Under federal law, "[a] forum-selection clause is 'presumptively enforceable' if the

moving party can demonstrate that: (1) the clause was reasonably communicated to the party

challenging enforcement; (2) the clause is mandatory, rather than permissive, in nature; and (3)

the clause encompasses the plaintiff's claims." *Bank v. Laptop & Desktop Repair, LLC*, 206 F.

Supp. 3d 772, 777 (E.D.N.Y. 2016) (citing *Phillips v. Audio Active Ltd.*, 494 F.3d 378, 383 (2d

Cir. 2007)).[3] "If these conditions are satisfied, the clause must be enforced unless the party

opposing transfer makes a 'sufficiently strong showing that enforcement would be unreasonable

or unjust, or that the clause was invalid for such reasons as fraud or overreaching.'" *Id.* (quoting

*Martinez v. Bloomberg, LP*, 740 F.3d 211, 221 (2d Cir. 2014)). Then, "the only remaining

inquiry is whether there are public interest considerations-such as the desire to avoid court

---

[3] The Second Circuit has clarified that "questions of enforceability are resolved under federal law, while interpretive questions—questions about the meaning and scope of a forum selection clause—are resolved under the substantive law designated in an otherwise valid contractual choice-of-law clause." *Martinez v. Bloomberg LP*, 740 F.3d 211, 224 (2d Cir. 2014). Nevertheless, litigants may choose "not to 'rely on any distinctive features of [the selected law] and [instead to] apply general contract principles and federal precedent to discern the meaning and scope of the forum clause.'" *Id.* at 223 (quoting *Phillips*, 494 F.3d at 386). Accordingly, despite the existence of choice-of-law provisions in the parties' contracts, "because the portions of the parties' briefs that address the forum-selection clause cite exclusively to federal law, the Court will apply federal precedent to determine the enforceability, meaning, and scope of the clause." *Midamines SPRL Ltd. v. KBC Bank NV*, No. 12-cv-8089, 2014 WL 1116875, at *3 n.6 (S.D.N.Y. Mar. 18, 2014).

congestion or the preference for adjudicating local controversies locally-that weigh against [the FSC's] enforcement." *Midamines SPRL Ltd. v. KBC Bank NV*, No. 12-cv-8089, 2014 WL 1116875, at *3 (S.D.N.Y. Mar. 18, 2014) (citing *Atlantic Marine*, 571 U.S. at 62). Importantly, in this context "the plaintiff's choice of forum and the private interests of the parties are accorded no weight." *Id.*

"Where, as here, two sides have put forth different contracts, each containing a forum selection clause designating a different forum . . . the court must decide as a matter of law on the agreed facts which forum selection clause governs." *Asoma Corp. v. SK Shipping Co.*, 467 F.3d 817, 822 (2d Cir. 2006). In this analysis, the Court must consider the possibility that "each clause could apply only to particular claims and/or particular parties." *Lazare Kaplan Intern. Inc. v. KBC Bank N.V.*, 528 Fed. App'x 33, 36 (2d Cir. 2013).

The Supreme Court has clarified that "the appropriate way to enforce a forum-selection clause pointing to a state or foreign forum is through the doctrine of forum non conveniens." *Atlantic Marine*, 571 U.S. at 60.

### B. Analysis

This Court must first determine whether some or all of Plaintiff's claims are governed by a FSC, and – if so – which FSC governs each claim against each Defendant.

Defendants contend that the Antwerp FSC is broad and governs Plaintiff's claims against ADB as well as its claims against KBC under the "closely related" doctrine. Additionally, Defendants argue that the New York FSC is too narrow to cover Plaintiff's claims and, in any event, claims under the New York FSC would be time-barred.

Plaintiff contends that the Antwerp FSC has no application to its claims because they do not relate to any banking activity at ADB. To the extent that any FSC mandates where its claims must be brought, Plaintiff contends that the New York FSC requires litigation here in New York.

### *Plaintiff's Claims Against ADB*

#### i. Application of Antwerp FSC

The Court first addresses whether the Antwerp FSC governs Plaintiff's claims against ADB.

#### 1. Whether the Banking Conditions Require Litigation in Antwerp

As an initial matter, Plaintiff argues that its agreement with ADB does not even require it to litigate in Belgium. Plaintiff signed two contracts with ADB: Banking Conditions and Credit Conditions. Article 37 of the Banking Conditions contains the FSC requiring litigation in Antwerp. *See* Antwerp FSC. Article 24 of the Credit Conditions provides that ADB can sue in New York courts. Credit Conditions Art. 24 (ECF No. 193-39). Article 24 does not dictate where borrowers may or may not sue. *See id.*

Plaintiff contends that the Antwerp FSC only applies to claims against the bank based on a plaintiff's status as an *account holder* (such as Plaintiff's account with ADB), while Article 24 of the Credit Conditions governs claims based on a plaintiff's status as a *borrower* (such as Plaintiff's Credit Facility). According to Plaintiff's reading, since Plaintiff's claims relate to its status as a borrower, they are not governed by the Banking Conditions and Plaintiff is thus free to sue in New York.

Defendants dispute this interpretation. Defendants assert that the FSCs in the Banking and Credit Conditions should be read together: ADB can sue in New York, Belgium, or any other competent jurisdiction, while accountholders—which includes Plaintiff—can only sue in

Belgium. And since, as this Court found, every borrower at ADB was also an accountholder, a lawsuit related to credit agreements *is* a lawsuit related to that individual's bank account.

Defendants have the better of the argument here. Plaintiff's agreement with ADB requires Plaintiff to litigate claims against the Bank in Belgium. The question is whether the Antwerp FSC applies to Plaintiff's claims here.

### 2. Whether the Antwerp FSC was Reasonably Communicated to Lazare

In determining whether a FSC presumptively applies, "[t]he first inquiry is whether the clause was reasonably communicated to the party resisting enforcement." *Phillips*, 494 F.3d at 383 (citation omitted). A FSC "is reasonably communicated if it is phrased in clear and unambiguous language." *Magi XXI, Inc. v. Stato Della Citta Del Vaticano*, 818 F. Supp. 2d 597, 604-05 (E.D.N.Y. 2011) (citing *Effron v. Sun Line Cruises*, 67 F.3d 7, 9 (2d Cir. 1995)).

Here, the FSC was set off in its own paragraph by a bolded heading, "Article 37 – Applicable Law and Jurisdiction-Choice of Law and Forum." Antwerp FSC. Further, the language is clear and unambiguous. This is sufficient to provide requisite notice. *See Mercury West A.G., Inc. v. R.J. Reynolds Tobacco Co.*, No. 03-cv-5262, 2004 WL 421793, at *5 (S.D.N.Y. Mar. 5, 2004) (since clause was "its own paragraph, set-off by a title clearly indicating its purpose" it provided "requisite notice"). Moreover, while vehemently disputing its applicability, Plaintiff does not appear to contest the fact that the clause was reasonably communicated.

### 3. Whether the Antwerp FSC is Mandatory

"A forum selection clause is viewed as mandatory when it confers exclusive jurisdiction on the designated forum or incorporates obligatory venue language." *Phillips*, 494 F.3d at 386. Here, the clause states that "the courts of Antwerp, Belgium *shall* have exclusive jurisdiction . . .

." Antwerp FSC (emphasis added). Moreover, Plaintiff does not appear to contest the mandatory nature of the clause. Accordingly, the clause is considered mandatory. *See Magi XXI*, 818 F. Supp. 2d at 605.

### 4. Whether the Antwerp FSC Encompasses All of Lazare's Claims Against ADB

Next, this Court must determine whether "the claims and parties involved in the suit are subject to the forum selection clause." *Phillips*, 494 F.3d at 383 (citation omitted). Plaintiff brings claims for racketeering, conversion, fraud, aiding and abetting fraud, tortious interference with prospective business advantage, commercial bad faith, negligence, breach of the covenant of good faith and fair dealing, unjust enrichment, money had and received, declaratory judgment, and accounting.

"Where broadly worded, 'a forum selection clause is not limited solely to claims for breach of the contract that contains it.'" *KTV Media Intern., Inc. v. Galaxy Group, LA LLC*, 812 F. Supp. 2d 377, 385 (S.D.N.Y. 2011) (quoting *Cfirstclass Corp. v. Silverjet PLC*, 560 F. Supp. 2d 324, 329 (S.D.N.Y. 2008)); *accord Lurie v. Norwegian Cruise Lines, Ltd.*, 305 F. Supp. 2d 352, 363 (S.D.N.Y. 2004) (It is "well settled that forum selection clauses may encompass claims beyond breach of the contract containing the clause, including tort claims."). Indeed, "[t]he Second Circuit has endorsed an expansive reading of the scope of forum selection clauses, in keeping with the policy favoring their use." *Bluefire Wireless, Inc. v. Cloud9 Mobile Communications, Ltd.*, No. 09-7268, 2009 WL 4907060, at *3 (S.D.N.Y. Dec. 21, 2009) (citations omitted); *accord Roby v. Corp. of Lloyd's*, 996 F.2d 1353, 1361 (2d Cir. 1993).

Accordingly, "the scope of a forum selection clause depends on the language of the clause itself." *Lurie*, 305 F. Supp. 2d at 363 (citations omitted). In this analysis, "it is inappropriate . . . to depend solely on the legal labels used by plaintiff to decide if his case arises

out of the contract." *Phillips*, 494 F.3d at 388.  Instead, "when ascertaining the applicability of a contractual provision to particular claims, we examine the substance of those claims, shorn of their labels." *Id.* (citation omitted).  Courts consider whether the non-contract claims "ultimately depend on the existence of a contractual relationship between the parties, or if resolution of the claims relates to interpretation of the contract, or if the tort claims involv[e] the same operative facts as a parallel claim for breach of contract." *Direct Mail Prod. Servs, Ltd. v. MBNA Corp.*, No. 99-cv-10550, 2000 WL 1277597, at *6 (S.D.N.Y. Sept. 7, 2000) (internal citations omitted).

Plaintiff argues that the Antwerp FSC does not apply to its statutory and tort-based claims because those claims do not arise under or depend on the parties' contract.  Defendants contend that the FSC does encompass such claims because of the clause's breadth.  According to Defendants, since the clause applies to "any action" that is brought (1) by an accountholder (2) against Antwerp Bank, and because this Court found that Lazare is an accountholder (Findings at 11), and each claim is brought against Antwerp Bank[4] (through KBC as its successor-in-interest), the FSC necessarily encompasses Lazare's claims.  Further, Defendants argue that even if the Court credits Plaintiff's interpretation, Plaintiff's claims are related to the contract.[5]

The Antwerp FSC applies to "*any* action brought against the Bank."  Antwerp FSC (emphasis added).  This language is at least as broad as many clauses that courts in this Circuit have held applicable to non-contract claims.  *See, e.g., Roby v. Corp. of Lloyd's*, 996 F. 2d 1353, 1361 (2d Cir. 1993) ("[T]he broad language of the forum selection clause" covers Plaintiff's

---

[4] The fifth cause of action charges KBC with aiding and abetting ADB's alleged fraud.  Accordingly, this claim is not asserted against ADB.  However, as discussed *infra* it is "closely related."

[5] Furthermore, as Defendants note, Plaintiff's arguments against application of the Antwerp FSC to its statutory and tort claims must logically also apply to the New York FSC.  Accordingly, were this Court to credit Plaintiff's claims with respect to the Antwerp FSC, the New York FSC—which as discussed *infra* is narrower—would also not apply to their claims.

RICO and Securities Act claims); *Korean Press Agency, Inc. v. Yonhap News Agency*, 421 F.

Supp. 2d 775, 781 (S.D.NY. 2006) (applying FSC covering "any disputes [that] arise between

'A' and 'B'" to tort claims because, *inter alia*, the clause was "significantly broader than clauses

in similar cases which were found to encompass more than just contractual claims"); *Weingard*

*v. Telepathy, Inc.*, No. 05-cv-2024, 2005 WL 2990645, at *2; 5 (S.D.N.Y. Nov. 7, 2005)

(holding that FSC providing "Registrant consents to the exclusive jurisdiction of the venue of the

United States District Court for the Eastern District of Virginia" covered non-contract claims and

noting the clause was "broader" than the clauses in cases cited by opposing party); *Lurie*, 305 F.

Supp. 2d at 363-64 (applying FSC to false imprisonment claim when language was "quite broad:

by its terms, governing "any and all claims, disputes or controversies whatsoever arising from or

in connection with this Contract and the transportation furnished hereunder. . ." ).

Moreover, here the alleged scheme does relate to the Banking Agreement. While

Plaintiff used its KBC-NY account as the "exclusive vehicle for all payments and

disbursements," that KBC-NY account existed to facilitate access to Plaintiff's ADB account in

Belgium. *See* Findings at 12-13. Thus, were it not for Plaintiff's ADB account, the alleged

scheme could not have occurred. Further, Plaintiff did not have a relationship with Defendants

outside of the contracts. *See Young Women's Christian Ass'n of U.S., Nat. Bd. v. HMC*

*Entertainment, Inc.*, No. 91-cv-7943, 1992 WL 279361, at *4 (S.D.N.Y. Sept. 25, 1992)

(applying FSC to non-contract claims where "Plaintiff's entire business relation with defendant . .

. stemmed from the contract between the two parties").

### 5. Whether Plaintiff Can Rebut the Presumption of Enforceability

Plaintiff has not rebutted the presumption of enforceability. The "exception to

enforceability is interpreted narrowly." *S.K.I. Beer Corp. v. Baltika Brewery*, 612 F.3d 705, 711

(2d Cir. 2010). A plaintiff must show that: (1) the FSC "was the result of fraud or overreaching," (2) enforcement will deprive the complaining party "of his day in court, due to the grave inconvenience or unfairness of the selected forum," (3) "the fundamental unfairness of the chosen law may deprive Plaintiff of a remedy," or (4) the FSC "contravene[s] a strong public policy of the forum state." *Id.* (citing *Roby*, 996 F.2d at 1363).

Here, Plaintiff has not presented any factual allegations that these criteria are met. There is no suggestion that the contract was the product of fraud or overreaching, or that the contract contravenes a strong public policy of the forum state. Moreover, as discussed *infra* Section III(B)(ii), litigation between the parties is ongoing in the Belgium, which, contrary to Plaintiff's contentions, remains an adequate and available forum.

### 6.  Whether Public Interest Factors Counsel Against Enforcement

Having determined that the Antwerp FSC is valid, the Court must consider "whether public interest factors nevertheless counsel against its enforcement." *Thyssenkrupp Materials NA, Inc. v. M/V Kacey*, 236 F. Supp. 3d 835, 839 (S.D.N.Y. 2017) (citing *Atlantic Marine*, 571 U.S. at 64). The Supreme Court instructs that "[b]ecause those factors will rarely defeat a transfer motion, the practical result is that forum-selection clauses should control except in unusual cases." *Atlantic Marine*, 571 U.S. at 64. Further, "New York has a strong public policy of enforcing forum selection clauses so that parties are able to rely on the terms of the contracts they make." *Bank v. Laptop & Desktop Repair LLC*, 206 F. Supp. 3d 772, 781 (E.D.N.Y. 2016) (citation and internal quotation marks omitted).

Here, as discussed *infra* Section III(B)(iii)(2), Plaintiff has not pointed to any public interest factors that would warrant non-enforcement of the FSC in this case.

### ii.  Application of New York FSC

Finally, Plaintiff does not make a convincing argument that ADB is instead bound by the New York FSC under the "closely related" doctrine. "[A] non-signatory to a contract containing a forum selection clause may enforce the forum selection clause against a signatory when the non-signatory is 'closely related' to another signatory." *Magi XXI, Inc. v. Stato della Citta del Vaticano*, 714 F.3d 714, 723 (2d Cir. 2013) (citation omitted). A non-signatory is closely related if "the non-signatory's enforcement of the forum selection clause is 'foreseeable' to the signatory against whom the non-signatory wishes to enforce the forum selection clause." *Id.* "Applying this rule, courts in the Second Circuit have permitted non-parties to enforce forum selection clauses where the signatory's claims against the non-signatory defendant are substantially identical to its claims against a signatory defendant." *Amto, LLC v. Bedford Asset Mgmt., LLC*, 168 F. Supp. 3d 556, 569 (S.D.N.Y. 2016); *accord Horvath v. Banco Comercial Portugues, S.A.*, 461 Fed. App'x 61, 63 (2d Cir. 2012) (collecting cases) (FSC applies to claims against a non-signatory where "(1) those claims are 'nearly identical to' the claims against the signatory, (2) 'arise out of' the same transaction as those claims, and (3) the non-signatory consents to foreign jurisdiction").

Here, the parties agree that KBC and ADB are closely related. It is evident that Plaintiff's claims against the Banks are nearly identical and arise out of the same transaction, and KBC and ADB both consent to jurisdiction in New York and Belgium.

Nevertheless, as discussed *infra* the New York FSC does not even cover Plaintiff's claims against KBC; accordingly, it cannot also bind ADB under the "closely related" doctrine. Further, Plaintiff's argument that since ADB and KBC merged, they are "no longer merely 'closely related' entities, but are the *same* entity" is unavailing. *See* Pl Mem at 23. As its successor-in-interest, KBC remains subject to the "presumption of the enforceability of

mandatory forum selection clause[]" in the ADB-Lazare contract." *Aguas Lenders Recovery Grp., LLC v. Suez, S.A.*, 585 F.3d 696, 701 (2d Cir. 2009).

Accordingly, all of Plaintiff's claims against ADB are subject to the Antwerp FSC and must be litigated in the courts of Antwerp, Belgium.

### *Plaintiff's Claims Against KBC*

#### i. Application of New York FSC

The parties agree that the New York FSC was clearly communicated and mandatory. The issue, then, is whether the clause encompasses Plaintiff's claims. Plaintiff contends that, if any FSC governs this case, the New York FSC covers all of its claims. This is so because the clause covers "[a]ny claim or action" by Lazare against KBC "relating to any accounts or disputes." New York FSC. Plaintiff argues that Lazare's credit activity was conducted "exclusively" with its KBC-NY account, whereas "no activity of consequence" occurred in the ADB account. Pl Mem at 22.

Defendants counter that the New York FSC does not cover Plaintiff's claims because it is narrow. Whereas the Antwerp FSC governs "any action" brought against ADB, the New York FSC contains qualifying language, limiting its application to "these Terms and Conditions or any other agreements [Plaintiff has] with KBC Bank relating to any account or disputes arising thereunder." Defendants contend that since (1) Plaintiff's claims against KBC do not relate to the Terms or Conditions and (2) Plaintiff had no other agreements with KBC, the New York FSC is inapplicable to this case.

As an initial matter, Plaintiff overstates the role of the KBC-NY account to this case. To be sure, Plaintiff interfaced with KBC-NY and its funds passed through the pooling account.

However, this Court found that the KBC-NY account existed to facilitate access to Plaintiff's account at ADB in Belgium. Findings at 12-13.

Next, the New York FSC is meaningfully narrower than the Antwerp FSC. It is more akin to clauses that courts have deemed too limited to govern non-contract claims. For instance, "where a clause applied by its terms to 'any suits or causes of action arising directly or indirectly from this AGREEMENT,' the U.S. Court of Appeals for the Second Circuit concluded that the clause encompassed a [tort] claim," while by contrast "where a clause applied more narrowly to 'litigation between the parties concerning the alleged breach of this Agreement or the meaning, effect, application and/or interpretation of its terms,' the court found that the clause encompassed the plaintiff's breach of contract claim but not a tort claim of fraudulent inducement." *Direct Mail Prod*, 2000 WL 1277597, at *5 (citations omitted). *See also* discussion *supra* Section II(B)(i)(4). Thus, the New York FSC only governs Plaintiff's claims if they relate to the Terms or Conditions or any other agreements relating to accounts or disputes arising thereunder.

First, Plaintiff does not have any "other agreements . . . relating to" its account with KBC. The ADB Banking Conditions do not constitute another agreement with KBC. Plaintiff argues the ADB Banking Conditions became an agreement with KBC when KBC absorbed ADB. However, under New York law absorption does not alter the parties' contractual rights and obligations and "any judgment, order or decree may be rendered for or against it that might have been rendered for or against such other corporation if the merger had not occurred." N.Y. Banking Law § 602(4); *see also Aguas Lenders Recovery Group v. Suez, S.A.*, 585 F.3d 696, 701 (2d Cir. 2009) (successor-in-interest bound by obligations of predecessor's contract).

Additionally, the May 31, 2001 letter does not constitute "another agreement" with KBC. KBC was not a party to the letter. Moreover, as this Court found, Lazare was not required to use

the KBC-NY account; the letter merely evinced ADB's preference to direct its' clients transactions through a single account. *See* Findings at 12-13. In any event, Plaintiff does not allege any violation of the May 31, 2001 letter.

Second, Plaintiff brings only one claim that mentions the Terms and Conditions: its claim for breach of the covenant of good faith and fair dealing. *See* FAC ¶¶ 326-32. Plaintiff alleges that Defendants violated the KBC-NY contract, along with the May 31, 2001 agreement and the Lazare Credit Facility with ADB, by making false claims regarding outstanding amounts due and applying funds belonging to Plaintiff to outstanding obligations of the Daleyot entities. *Id.* Defendants contend that since the KBC-NY account only existed to facilitate access to the ADB account, the substance of Plaintiff's claim arguably relates primarily to ADB, not KBC-NY's Terms and Conditions.

The Court determines that Plaintiff's claim here relates to the Terms and Conditions and thus would be covered by the New York FSC. However, as discussed below any claim under that clause is time-barred, and thus not actionable.

### 1. Time Bar

Defendants argue that, in any event, Plaintiff's claims under the New York agreement are time-barred. The KBC agreement required that individuals "promptly notify [the bank] of any fraudulent or unauthorized transactions, including unauthorized signatures or alterations of forged endorsements." KBC Credit Agreement ¶ 10 (ECF No. 190-31). Such notice must be made "in writing within thirty (30) days after [a] statement containing the first such irregularity was received, or otherwise made available." *Id.* The Agreement further prohibited individuals from "bring[ing] a legal proceeding or action against KBC bank to recover for any claim or error or fraudulent transaction" unless such timely notice was given. *Id.*

Defendants argue that since Plaintiff never gave the bank written notice of perceived irregularities as required under the contract, any claims under the KBC agreement are time-barred. Plaintiff contends that the time bar applies only to banking irregularities, not this type of fraud which could not be detected from reviewing bank statements. Defendants respond that Plaintiff knew of the alleged fraud as early as 2008, years before the Complaint was filed in 2011 and with plenty of time to provide KBC with the required notice.

Here, the time bar would render this clause inapplicable. According to the complaint, throughout 2009 and 2010 Plaintiff provided the Banks with "detailed descriptions of, among other things, false documentation filed by Daleyot and the Daleyot Entities." FAC ¶¶ 195-97. On July 22, 2009, Plaintiff sent ADB a letter that "showed how [a Daleyot Entity] had falsified certain documents." *Id.* ¶¶ 204-05. This appears to be the type of banking irregularity Plaintiff contends it could not have detected. Yet it is undisputed that Plaintiff did not notify KBC as required for suit under the Credit Agreement. Accordingly, any claims under this FSC would be barred.

### ii.    Application of Antwerp FSC

Since the New York FSC does not govern Plaintiff's claims against KBC, the Court must next determine whether such claims are covered by the Antwerp FSC or whether they lie beyond both FSCs.

Defendants assert that the Antwerp FSC governs Plaintiff's claims against KBC under the "closely related" doctrine. Plaintiff does not contest that the entities are closely related. However, Plaintiff contends that the "closely related" doctrine cannot nullify a separate FSC to which the non-signatory is actually a party—here, the New York FSC.

Neither party cites any cases for or against the proposition that the "closely related" doctrine nullifies a FSC to which a non-signatory is actually a party. Nevertheless, since the Court determined that the New York FSC does not apply to this case, that clause cannot nullify the "closely related" doctrine here. The Court holds that the Antwerp FSC governs Plaintiff's claims against KBC under the "closely related" doctrine because, as discussed *supra*, Plaintiff's claims against KBC and ADB are nearly identical; they arise out of the same transaction; and KBC consents to Antwerp's jurisdiction. *See Horvath v. Banco Comercial Portugues, S.A.*, 461 Fed. App'x 61, 63 (2d Cir. 2012) (collecting cases).

Finally, as discussed *supra* Plaintiff has not provided any allegations to rebut the presumption of enforceability of the Antwerp FSC or to show that public interest factors counsel against its enforcement.

Accordingly, the Antwerp FSC requires that Plaintiff's claims against ADB and KBC be litigated in the courts of Antwerp, Belgium.

## III. Forum Non Conveniens

If this Court had held that some or all of Plaintiff's claims fell beyond the scope of the FSCs, the Court would nevertheless determine that this case should be tried in Belgium under a traditional *forum non conveniens* ("FNC") analysis.

### A. Legal Standard

Courts in this Circuit apply a three-step process to determine whether dismissal on FNC grounds is warranted:

> At step one, a court determines the degree of deference properly accorded the plaintiff's choice of forum. At step two, it considers whether the alternative forum proposed by the defendants is adequate to adjudicate the parties' dispute. Finally, at step three, a court balances the private and public interests implicated in the choice of forum.

*Norex Petroleum Ltd. v. Access Industries, Inc.*, 416 F.3d 146, 153 (2d Cir. 2005) (internal citations omitted).[6]

A decision on whether to dismiss by reason of FNC "is confided to the sound discretion of the district court, to which substantial deference is given." *Pollux Holding Ltd. v. Chase Manhattan Bank*, 329 F.3d 64, 70 (2d Cir. 2003) (citing *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 257 (1981)).

### B. Analysis

#### i. Degree of Deference to Plaintiff's Chosen Forum

The Circuit has instructed that "the degree of deference to be given to a plaintiff's choice of forum moves on a sliding scale." *Iragorri v. United Tech. Corp.*, 274 F. 3d 65, 71 (2d Cir. 2001). A "plaintiff's choice of forum is generally entitled to great deference when the plaintiff has sued in the plaintiff's home forum." *Id.* (citations omitted). This is because "it is presumed to be convenient." *Id.* (citing *Piper Aircraft*, 454 U.S. at 255-56). Meanwhile, "the choice of a United States forum by a foreign plaintiff is entitled to less deference" because in such cases "a plausible likelihood exists that the selection was made for forum-shopping reasons, such as the perception that United States courts award higher damages than are common in other countries" or, in any event, there is "little reason to assume that it is convenient" for that plaintiff. *Id.* (citations omitted).

Thus, "the greater the plaintiff's or the lawsuit's bona fide connection to the United States and to the forum of choice and the more it appears that considerations of convenience favor the conduct of the lawsuit in the United States," the more deference a Court affords to the plaintiff's choice of forum. *Id.* at 72. Meanwhile, "the more it appears that the plaintiff's choice of a U.S.

---

[6] Of course, the traditional FNC analysis only applies in the event that a FSC does not govern the claims at issue. *See Atlantic Marine Const. Co., Inc. v. U.S. Dist. Court for Western Dist. Of Tex.*, 571 U.S. 49, 62 (2013).

forum was motivated by forum-shopping reasons . . . the less deference the plaintiff's choice commands." *Id.*

In this analysis, courts consider various factors such as "convenience of the plaintiff's residence in relation to the chosen forum, the availability of witnesses or evidence to the forum district, the defendant's amenability to suit in the forum district, the availability of appropriate legal assistance, and other reasons relating to convenience or expense." *Id.* Additionally, courts consider that "a corporation doing business abroad can expect to litigate in foreign courts." *Guidi v. Inter-Continental Hotels Corp.*, 224 F.3d 142, 147 (2d Cir. 2000) (collecting cases); *accord Sussman v. Bank of Israel*, 801 F. Supp. 1068, 1073 (S.D.N.Y. 1992) ("Where an American plaintiff chooses to invest in a foreign country and then complains of fraudulent acts occurring primarily in that country, the plaintiff's ability to rely upon citizenship as a talisman against forum non conveniens dismissal is diminished."). "The doctrine of international comity may also militate against litigation in this country when an American citizen has voluntarily conducted business in a foreign country, and parallel litigation is proceeding abroad." *Sussman*, 801 F. Supp. at 1073.

Finally, courts consider evidence of forum shopping such as "as attempts to win a tactical advantage resulting from local laws that favor the plaintiff's case, the habitual generosity of juries in the United States or in the forum district, the plaintiff's popularity or the defendant's unpopularity in the region, or the inconvenience and expense to the defendant resulting from litigation in that forum." *Iragorri*, 274 F. 3d at 72. While "the possibility of RICO treble damages alone does not support a finding of forum shopping," *Matter of the Application of Mount Whitney Investments, LLLP*, No. 15-cv-4479, 2016 WL 1737109, at *4 (S.D.N.Y. May 2, 2016), courts in this Circuit recognize that the prospect of such damages "might [make] the

choice of a United States forum attractive to [the plaintiff] regardless of convenience." *Norex Petroleum*, 416 F.3d at 155 (citing *Iragorri*, 274 F.3d at 71).

Here, Plaintiff's choice of forum is accorded a moderate level of deference. First, the convenience of Plaintiff's residence in relation to the chosen forum counts somewhat in favor of deferring to Plaintiff's chosen forum. Plaintiff is a U.S. citizen entity with its principal place of business in New York. This counsels in favor of significant deference.

Nevertheless, the substantive issues and conduct here have a greater relation to Belgium. Although Plaintiff is a U.S. citizen, Defendants are Belgium corporations. None of the non-party entities identified in the complaint are U.S. citizens, and many are Belgian citizens. *See* FAC ¶ 43.

Additionally, while KBC and ADB both had offices in New York, ADB only had a representative office in New York that could not provide banking services or make decisions about originating loans. Findings at 3. Furthermore, Plaintiff first began its relationship with ADB in Belgium, before ADB had the New York representative office. Declaration of Cynthia B. Okrent ¶ 5 (ECF No. 25) ("Okrent Decl"). And while Plaintiff contends that New York law governs the Credit Facility and its KBC-NY account, since the Court determined that Plaintiff's claims are beyond the scope of the KBC-NY contract, "those contractual provisions have a limited impact on the overall calculus." *Lfoundry Rousset SAS v. Amtel Corp.*, No. 14-cv-1476, 2015 WL 4461617, at *5 (S.D.N.Y. July 21, 2015) (citation and internal quotation marks omitted).

Some alleged unlawful conduct is connected to the United States. Namely, money moved through the KBC-NY pooling account and transactions occurred in U.S. dollar denominations. However, the KBC-NY account facilitated access to Plaintiff's account with

ADB in Belgium. Findings at 12-13. Additionally, courts have held that the use of a "New York branch by one of the defendants . . . to route the loan proceeds . . . cannot be regarded, in the overall scheme of things, as other than peripheral." *Sussman v. Bank of Israel*, 801 F. Supp. 1068, 1074 (S.D.N.Y. 1992).

Instead, here the brunt of the alleged conduct took place outside of the United States. Plaintiff consigned diamonds to Lazare-Belgium, which in turn consigned diamonds to the Daleyot Entities. FAC ¶ 52. Formal sector diamonds were delivered to Dubai and Hong Kong, and moved through Switzerland, Israel, and, ultimately, Belgium, while informal and sight rough diamonds were purchased from Angolan sellers. *Id.* ¶¶ 130-34; 149. Thus, this case's connection to New York is peripheral.

Moreover, the parties are already litigating substantially similar issues in Belgium. *See In re Nat'l Bank of Anguilla (Private Banking Trust) Ltd.*, 580 B.R. 64, 86 (S.D.N.Y. 2018) (considering fact that "Plaintiffs were already seeking the same relief for the same wrongs in the foreign forum" when dismissing on FNC grounds). Indeed, since Plaintiff conducts business abroad, it can expect to litigate in another nation's courts. *See Guidi*, 224 F.3d at 147.

Second, the availability of witnesses and evidence in the chosen forum does not weigh in favor of deferring to Plaintiff's chosen forum. Defendants contend that witnesses and evidence relevant to this case are located in Belgium. Plaintiff, meanwhile, argues that they are located in New York. While at this stage it is difficult to discern where the majority of witnesses and evidence will be located, as discussed further *infra* Section III(b)(iii)(1), given that all of the participants in the unlawful enterprise are Belgian or otherwise foreign citizens, and since the majority of conduct occurred abroad, witnesses and evidence will likely be located outside of New York.

Third, Defendants' amenability to suit in this district weighs somewhat in favor of deferring to Plaintiff's choice of forum. Defendants are subject to personal jurisdiction in New York. However, they are also subject to suit in Belgium and, indeed, the parties are litigating in Belgium. Thus, this is not a case where the forum was selected "to obtain jurisdiction over defendant." *Norex Petroleum*, 416 F.3d at 156 (citation omitted).

Fourth, the availability of appropriate legal assistance weighs slightly in favor of deference to Plaintiff's chosen forum. Both parties have access to competent counsel capable of litigating in New York. However, as with Defendants' amenability to suit, both parties also have competent counsel capable of litigating – and, indeed, currently litigating – in Belgium.

Finally, this case presents a plausible inference that Plaintiff's choice of forum was motivated by tactical reasons. Plaintiff had threatened ADB with a "high visibility" RICO suit in the United States. Declaration of Veerle Snyers ¶ 17 (ECF No. 31) ("Snyers Decl"); Letter from Maurice Tempelsman to Jan Vanhevel (May 26, 2010) (ECF No. 31-3). The parties were already litigating essentially the same issues in Belgium before this case was filed. Snyers Decl ¶ 20. And as discussed *supra*, New York is a less convenient forum than Belgium.

Accordingly, this Court accords Plaintiff's chosen forum a moderate level of deference.

### ii. Adequacy of Alternative Forum

The defendant "bears the burden of establishing that a presently available and adequate alternative forum exists." *Adbullahi v. Pfizer, Inc.*, 562 F.3d 163, 189 (2d Cir. 2009) (citations omitted). "An alternative forum is adequate if the defendants are amenable to service of process there, and if it permits litigation of the subject matter of the dispute." *Pollux Holding Ltd. v. Chase Manhattan Bank*, 329 F.3d 64, 75 (2d Cir. 2003) (citations omitted).

A forum that satisfies this criteria "may nevertheless be inadequate if it does not permit the reasonably prompt adjudication of a dispute, if the forum is not presently available, or if the forum provides a remedy so clearly unsatisfactory or inadequate that it is tantamount to no remedy at all." *Abdullahi*, 562 F.3d at 189 (citations omitted). The defendant still "bears the ultimate burden of persuasion as to the adequacy of the forum." *Id.* Yet since "considerations of comity preclude a court from adversely judging the quality of a foreign justice system . . . the plaintiff bears the initial burden of producing evidence of corruption, delay or lack of due process in the foreign forum." *Id.* (citations omitted). "[C]onclusory submissions, bare denunciations, and sweeping generalizations about the alternative forum's legal system do not satisfy the plaintiff's burden on this issue." *RIGroup LLC v. Trefonisco Mgmt., Ltd.*, 949 F. Supp. 2d 546, 554 (S.D.N.Y. 2013) (citing *In re Arbitration between Monegasque De Reassurances S.A.M. v. Nak Naftogaz of Ukraine*, 311 F.3d 488, 499 (2d Cir. 2002)) (internal quotation marks omitted).

In this analysis, "[t]he availability of an adequate alternative forum does not depend on the existence of the identical cause of action in the other forum, nor on identical remedies." *Norex Petroleum*, 416 F.3d at 158 (citation and internal quotation marks omitted). Indeed, "the fact that a plaintiff might recover less in an alternate forum does not render that forum inadequate." *Figueiredo Ferraz E Engenharia de Projecto Ltda. v. Republic of Peru*, 665 F.3d 384, 391 (2d Cir. 2011) (citation omitted). This principle "pertains with particular force to civil RICO actions because few foreign jurisdictions provide such an expansive civil vehicle for parties injured by ongoing criminal schemes; even more rare are foreign provisions for the recovery of treble damages." *Norex Petroleum*, 416 F.3d at 158. Further, "most foreign

jurisdictions provide alternative legal actions to address the wrongdoing encompassed by civil RICO." *Id.* (citation omitted).

Here, Belgium is an adequate forum. First, both ADB and KBC are amenable to service of process in Belgium. *See* Declaration of Beatrix Vanlerberghe ¶ 35 (ECF No. 32) ("Vanlerberghe Decl"). Lazare-Belgium, the Daleyot Entities, and other relevant individuals or entities are also subject to suit in Belgium if they are domiciled in Belgium or if they are connected to the Belgian defendants or claims asserted. *Id.* ¶¶ 36-39.

Second, Belgium's courts have jurisdiction to address the subject matter of this dispute. *See* Declaration of Joost Verlinden ¶¶ 4-24 (ECF No. 33) ("First Verlinden Decl"). Importantly, "the nonexistence of a RICO statute there does not, by itself, preclude the use of" Belgian courts. *PT United Can Co. Ltd. v. Crown Cork & Seal Co., Inc.*, 138 F.3d 65, 74 (2d Cir. 1998) (collecting cases). Further, the parties are already litigating in Belgium and "[t]he U.S. Court of Appeals for the Second Circuit has affirmed dismissal on the grounds of forum non conveniens where, as here, the defendant has already commenced suit in the alternative (foreign) forum." *Abert Trading, Inc. v. Kipling Belgium N.V./S.A.*, No. 00-cv-0478, 2002 WL 272408, at *3 (S.D.N.Y. Feb. 26, 2002) (citing *Alcoa S.S. Co., Inc. v. M/V Nordic Regent*, 654 F.2d 147, 150 (2d Cir. 1980)).

Further, while the Court need not definitively resolve the choice of law issue on a FNC motion, Belgium can adequately adjudicate Lazare's claims even under New York law. Belgian courts apply foreign law according to the actual interpretation given to it in the foreign country. *See* Belgium Code of Private International Law of July 16, 2004 at Art. 15.

Finally, updated information regarding proceedings between the parties in Belgium does not render Belgium's courts unavailable.[7] Plaintiff first contended that Belgium's courts are no longer adequate or available because the Court of Cassation was considering allegations of improper conduct in the lower courts' determination of this matter, thus staying the case. ECF Nos. 264, 272. Defendants responded that a temporary stay would not render Belgium's courts unavailable and that, in any event, as of April 19, 2018 the Court of Cassation has denied all of Plaintiff's claims. ECF Nos. 268, 271, 276. Plaintiff has not contested this assertion in its subsequent letters. *See* ECF Nos. 277, 280.

Instead, Plaintiff now argues that civil litigation in Belgium is nonetheless stayed due to a pending criminal investigation that Plaintiff initiated into similar facts, as Belgium courts will not consider a civil claim until the termination of criminal proceedings. ECF Nos. 277, 280. Defendants contend that Belgian civil proceedings are only stayed if there is a danger of contradiction between the criminal court and civil court decision, which is not necessarily the case in this matter. ECF No. 279. Plaintiff responds that there is such a danger here, and thus the civil case would be stayed. ECF No. 280. Defendants further note that Plaintiff did not include this argument in its opposition brief, despite its awareness of the criminal investigation and, indeed, Plaintiff's role in its initiation. ECF No. 279. While Plaintiff admits it was aware of the criminal investigation, Plaintiff claims it could not raise this argument in its brief because disclosing its existence could have interfered with the investigation. ECF No. 280.

Here, the Court will not consider Plaintiff's allegations that a pending criminal investigation renders Belgium unavailable, as Plaintiff could have raised this issue in its opposition papers. The Court notes that, to the extent that Plaintiff had legitimate concerns about

---

[7] As discussed *supra* Section I, because Plaintiff did not seek leave of the Court before filing supplemental letters after the close of briefing in this case, the Court need not consider these filings.

exposing the pending investigation, Plaintiff could have taken precautionary measures, for instance by filing papers under seal.[8] The Court has considered allegations that proceedings in the Court of Cassation rendered Belgium unavailable. Whether or not Belgium was temporarily unavailable, now that the Court of Cassation has rejected Plaintiff's claims Belgium's courts are certainly available.

Thus, Belgium remains an adequate forum.

### iii. Balance of Private and Public Interest Factors

Regardless of the weight accorded to Plaintiff's forum choice, the balance of public and private interest factors counsels in favor of transferring this action to Belgium.

### 1. Private Interest Factors

Private interest factors include "the relative ease of access to sources of proof; availability of compulsory process for attendance of unwilling, and the cost of obtaining attendance of willing, witnesses; possibility of view of premises, if view would be appropriate to the action; and all other practical problems that make trial of a case easy, expeditious and inexpensive." *Iragorri v. United Tech. Corp.*, 274 F.3d 65, 73-74 (2d Cir. 2001) (quoting *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 508 (1947)). "There may also be questions as to the enforcibility of a judgment if one is obtained." *Gulf Oil*, 330 U.S. at 508. In this analysis, the Court must compare "the hardships defendant would suffer through the retention of jurisdiction" with "the hardships the plaintiff would suffer as the result of dismissal and the obligation to bring suit in another country." *Iragorri*, 274 F.3d at 74. The Court also "must take into consideration the presumption in favor of plaintiff's choice of forum." *Abert Trading, Inc. v. Kipling Belgium*

---

[8] In any event, this factor does not necessarily render Belgium inadequate. *See Broadcasting Rights Intern. Corp. v. Societe du Tour de France, S.A.R.L.*, 708 F. Supp. 83, 86 (S.D.N.Y. 1989) ("The French proceeding remains adequate, even if the criminal charge stays the civil process. A similar result obtains on occasion in this country.").

*N.V./S.A.*, No. 00-cv-0478, 2002 WL 272408, at *4 (S.D.N.Y. 2002) (citing *Gulf Oil*, 330 U.S. at 508-09).

First, the relative ease of access to sources of proof weighs somewhat in favor of dismissal. To be sure, Lazare is located in New York and its documents are located in this district. However, few potential witnesses are located in the United States, while many witnesses are located in Belgium or elsewhere in Europe. Snyers Decl ¶ 26; Declaration of Walter Haeck ¶ 16 (ECF No. 29) ("Haeck Decl"). Further, many of those witnesses, such as current and former employees of KBC and ADB, speak Dutch. Snyers Decl ¶ 29; Haeck Decl ¶ 18. Likewise, much of the relevant documentary evidence is located in Belgium. Snyers Decl ¶¶ 25, 27; Haeck Decl ¶¶ 11, 17. A substantial amount of these documents are in Dutch, including most internal ADB and KBC electronic communications. Snyers Decl ¶ 27; Haeck Decl ¶ 17. These documents must be collected in Belgium and translated into English for use in this litigation, increasing the Defendants' litigation costs. *See* Snyers Decl ¶ 28.

The Court notes that, "[w]hen evaluating a motion for dismissal pursuant to *forum non conveniens* [] the availability of letters rogatory is relevant to a court's analysis." *Strategic Value Master Fund, Ltd. v. Cargill Financial Servs, Corp.*, 421 F. Supp. 2d 741, 769 (S.D.N.Y. 2006). Nevertheless, "[t]he Second Circuit has held that a witness's live in-court testimony is the preferred method of presenting his or her testimony." *Id.* (citing *DiRienzo v. Phillip Servs Corp.*, 294 F.3d 21, 30 (2d Cir. 2002)). Thus, "where the number of nonparty witnesses is large, coupled with the Court's natural preference for live testimony and the time-consuming nature of using letters rogatory, a district court's decision to weigh this factor in favor of dismissal will not be overturned." *Id.* (internal citations omitted).

Second, the cost to transport witnesses to trial weighs slightly in Defendants' favor. Some potential witnesses for Plaintiff reside in New York. Many potential defense witnesses reside in Belgium, however, and will have to fly to New York to testify. Nevertheless, given that Defendants conduct other business in New York, "any inconvenience caused by travel to New York for this litigation will not be oppressive." *In re Optimal U.S. Litigation*, 837 F. Supp. 2d 244, 258 (S.D.N.Y. 2011).

Third, the availability of compulsory process for unwilling witnesses weighs significantly in favor of litigating in Belgium. Most of the individuals and entities identified in the Complaint reside in Belgium or other foreign jurisdictions. *See* FAC ¶ 43. Those potential witnesses fall outside of this Court's subpoena power and thus cannot be compelled to give evidence in this case. However, if any of these entities is sued in a Belgium court, that court would also have jurisdiction over any foreign co-defendant that was connected to the Belgian defendants or claims asserted. Vanlerberghe Decl ¶¶ 38-40. Thus, while Daleyot is no longer considered a Belgian resident, he could still be sued in Belgium and compelled to testify in a case against the Belgian entities or intrinsically linked claims. Supplemental Declaration of Beatrix Vanlerberghe ¶ 13-14 (ECF No. 256) ("Vanlerberghe Supp Decl"). Further, certain of the Daleyot Entities that are located in countries that are not party to the Hague Convention on the Taking of Evidence Abroad in Civil and Commercial Matters, such as the United Arab Emirates, and cannot be subject to any discovery in connection with a U.S. proceeding, are subject to Belgian jurisdiction. Vanlerberghe Decl ¶¶ 37-41. These factors count strongly in favor of dismissal. *See Pollux Holding Ltd. v. Chase Manhattan Bank*, 329 F.3d 65, 75 (2d Cir. 2003) (affirming district court's determination that unavailability of compulsory process weighed heavily in favor of dismissal where defendant "identified several key witnesses whose testimony

can be compelled only in England while plaintiffs have not demonstrated that any material witnesses would be unavailable there"); *accord Strategic Value Master Fund*, 421 F. Supp. 2d at 768 (collecting cases).

Finally, the fact of Belgium's exclusive jurisdiction clause and the pendency of the Belgian proceedings could render any judgment of this Court unenforceable in Belgium. Plaintiff contends that it can enforce its judgment in the U.S. given KBC's billions of assets at KBC-NY. However, "it is undisputed that Plaintiffs would have less difficulty enforcing a [Belgian] judgment in [Belgium], which favors dismissal." *RIGroup LLC v. Trefonisco Mgmt Ltd.*, 949 F. Supp. 2d 546, 557 (S.D.N.Y. 2013) ("private interest factors favor a Russian forum because a judgment from this Court may not be enforceable in Russia" since the case raises issues that "under Russian law[] are subject to the exclusive jurisdiction of the Russian commercial courts"); *accord Abert*, 2002 WL 272408, at *4 (private interest factors favored Belgian forum where litigation was pending in Belgium).

## 2. Public Interest Factors

Public interest factors include "administrative difficulties associated with court congestion; the unfairness of imposing jury duty on a community with no relation to the litigation; the interest in having localized controversies decided at home; and avoiding difficult problems in conflict of laws and the application of foreign law." *Aguinda v. Texaco, Inc.*, 303 F.3d 470, 480 (2d Cir. 2002) (citing *Gilbert*, 330 U.S. at 508-09).

Here, the public interest factors counsel in favor of litigation in Belgium. First, "this Court has an interest in preventing unnecessary congestion of the court's docket." *BMR & Associates, LLP v. SFW Capital Partners, LLC*, 92 F. Supp. 3d 128, 142 (S.D.N.Y. 2015). While not dispositive, "it should be noted that this Court sits in one of the busiest districts in the

country, . . . making this one of the congested centers of litigation referred to in [Gulf Oil ]." *Id.* (citation and internal quotation marks omitted).

Second, a New York jury has some interest in this matter as the injuries were allegedly felt on a New York-based bank. However, this interest is relatively small since, as discussed further below, the alleged misconduct occurred overseas and only peripherally touches New York or the United States. *See Online Payment Solutions, Inc. v. Svenska Handelsbanken AB*, 638 F. Supp. 2d 375, 391 (S.D.N.Y. 2009) (collecting cases).

Third, while both fora have a connection to this action, the substantive allegations are much more closely connected to Belgium than to New York or the United States.[9] Both New York and the United States have a strong interest in determining the truth of whether Belgian citizens committed fraud, theft, misconduct, and conspiracy against a New York entity. New York is also interested in protecting New York residents who conduct business with foreign banks in New York. The United States further has an interest in protecting its citizens from racketeering activity. However, this is not dispositive as "the United States' interest in applying its own . . . RICO laws . . . is merely one consideration to be weighed in the totality of the *Gilbert* analysis." *Alfadda v. Fenn*, 159 F.3d 41, 47 (2d Cir. 1998) (collecting cases).

Further, as discussed throughout this opinion, the brunt of the alleged misconduct took place in Belgium or otherwise outside of the United States. New York does not have a strong interest in the alleged misappropriation of diamond proceeds and banking activities that occurred abroad. The fact that the alleged conduct may be sufficient to trigger the application of RICO

---

[9] Plaintiff claims that the relevant fora are Belgium and the United States, not Belgium and New York. Pl Mem at 40. The Court has considered the interests of both New York and the United States. *See, e.g.*, *Alfadda v. Fenn*, 159 F.3d 41, 47 (2d Cir. 1998) (affirming analysis of public interest factors with reference to United States and France as relevant fora); *Capital Currency Exchange, N.V. v. Nat'l Westminster Bank PLC*, 155 F.3d 603, 611 (2d Cir. 1988) (affirming analysis of public interest factors with reference to New York and England as relevant fora).

laws does not mean that the United States has a strong public interest in pursuing this particular case in this forum. Moreover, "the argument that dollar transfers through banks in the United States creates a strong public interest in favor of the United States has been rejected by courts in this Circuit." *LaSala v. UBS, AG*, 510 F. Supp. 2d 213, 229 (S.D.N.Y. 2007) (collecting cases).

Meanwhile, Belgium shares the strong interest in determining whether its citizens committed the alleged conduct. Likewise, Belgium has a strong interest in regulating its own banks and holding a Belgium bank liable for allegedly harming a New York company. *See id.* ("Switzerland possesses a strong interest in regulating the conduct of banks within its borders" and "[t]here is no question that this dispute centers around events occurring there.").

Fourth, while the Court need not resolve the choice-of-law issue in a FNC analysis, Belgian law may very well apply to these proceedings. The ADB Banking Conditions provide that disputes "shall be governed by Belgian law." Banking Conditions Art. 37; *see also* Delbaere Decl ¶¶ 10-11. Plaintiff contends that Defendants concede that New York law applies. Pl Mem at 42 (citing ECF No. 51 at 11). However, Plaintiff relies on a footnote in Defendants' reply brief in the initial motion to dismiss, which is not a relevant pleading before the Court on the instant motion. Defendants plainly have not conceded the application of New York law. *See* Def Mem at 37. In any event, while it appears that New York law would apply to claims involving "loans or the granting of credit," such provisions would not necessarily encompass the substantive claims at issue here. *See* Banking Conditions Art. 37; Delbaere Decl ¶¶ 11-13.

Finally, judicial economy counsels in favor of litigation in Belgium. Litigation is currently pending in Belgium between the same parties over essentially the same issues. *See Abert Trading*, 2002 WL 272408, at *6 (when similar litigation was pending in Belgium, "[t]he

interests of judicial economy would best be served by resolving issues in this case with the Belgian case").

Accordingly, the public and private interest factors weigh substantially in favor of a Belgian forum. If any or all of Plaintiff's claims were not covered by the Antwerp FSC, the Court would exercise its discretion to dismiss this case in favor of litigation in Belgium under the doctrine of *forum non conveniens*.

The Court therefore need not consider Defendants' motion to dismiss under Fed. R. Civ. P. 12(b)(6).

## CONCLUSION

For the above reasons, the Court holds that the Antwerp FSC is valid and enforceable as to Plaintiff's claims against both Defendants. Defendants' motion to dismiss is GRANTED and this case is dismissed for *forum non conveniens*. The Clerk of Court is kindly directed to terminate the motion at ECF No. 254.

**SO ORDERED.**

Dated: August 29, 2018
New York, New York

**ANDREW L. CARTER, JR.**
**United States District Judge**